KC **F I L E D** *CH*

DEC 2 8 2007
DEC 28 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Robert J. Larson                    )
                                    )
                                    )
                                    )
        vs.                         )
                                    )
                                    )        CIVIL ACTION
                                    )
PEAK6 Investments LP                )
Arthur John Hass III
Nancy McKinney                      **07CV7283**
Daniel Max Rosenthal                **JUDGE ASPEN**
                                    **MAGISTRATE JUDGE ASHMAN**

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
1. This is an action for employment discrimination.
2. The plaintiff is Robert J. Larson of the county of Cook in the state of Illinois.
3. The defendants are:

PEAK6 Investments LP, whose street address is:
141 West Jackson Blvd, Suite 500, Chicago, Cook County, IL  60604
Telephone Number: 312-362-2401

Nancy McKinney, Director of Human Resources, whose street address is::
PEAK6 Investments LLC 141 West Jackson Blvd, Suite 500, Chicago, IL 60604
Telephone Number: 312-362-2401

Daniel Max Rosenthal, President & CEO, who street address is:
OptionsHouse/PEAK6 Investments LLC
303 East Wacker Drive, Suite 700, Chicago, IL 60601
Telephone Number: 312-676-8801

Arthur John Hass III, Co-CEO, who street address is:
OptionsHouse/PEAK6 Investments LLC
303 East Wacker Drive, Suite 700, Chicago, IL 60601
Telephone Number: 312-676-8801

4. The plaintiff employed by the defendant at 141 West Jackson Blvd., Chicago, Cook
County, IL 60604

5. The plaintiff [*check one box*]

(c) **X** was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about,
2:45 PM Central Standard Time, in Friday, January 26, 2007.

.
7.1 *(Choose paragraph 7.1 or 7.2, do not complete both.)*
(a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*]

 *has not* **X** *has*

filed a charge or charges against the defendants asserting the acts of discrimination
indicated in this complaint with any of the following government agencies:

(i) **X** the United States Equal Employment Opportunity Commission, on or about
Tuesday, February 20, 2007.

(ii) **X** the Illinois Department of Human Rights, on or about Thursday, July 12, 2007.

(b) If charges *were* filed with an agency indicated above, a copy of the charge is
attached. **X** YES.  NO.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois
Department of Human Rights to cross-file with the other agency all charges received. The
plaintiff has no reason to believe that this policy was not followed in this case.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(b)**X** the United States Equal Employment Opportunity Commission has issued a
*Notice of Right to Sue*, which was received by the plaintiff on October 18, 2007.a copy of
which *Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's [*check only
those that apply*]:

(a)**X** Age (Age Discrimination Employment Act).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII
claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for
42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117;
for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant [*check only those that apply*]

(b)**X** terminated the plaintiff's employment.

(g) **X** retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

13. The facts supporting the plaintiff's claim of discrimination are as follows: Please see attached document

14. [*AGE DISCRIMINATION ONLY*] Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15. The plaintiff demands that the case be tried by a jury. **X** YES    NO

16. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff
[*check only those that apply*]

(f)**X** Direct the defendant to amend the plaintiff's Form U-5 (Uniform Securities Industry Termination Notice) from "Discharged" to "Voluntary Termination."

(g)**X** If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)**X** Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

Robert J. Larson
5334 N. Kenmore Avenue
Apartment 1N
Chicago, IL 60640
Telephone Number: 773-989-5588

Date: 12 — 28 — 2007

TO:
United States District Court
For the Northern District of Illinois
Eastern Division

FROM:
Robert J. Larson
5334 N. Kenmore Avenue
Apartment 1N
Chicago, IL 60640
Tel: 773-989-5588

RE: Robert J. Larson vs. PEAK6 Investments LP, et al

### 1. Introductory Statement

I am providing this written document to answer paragraph #13 of my claim against the plaintiffs alleging Age Discrimination claim against my former employer, PEAK6 Investments LP (i.e. "PEAK6"), located at 141 West Jackson Blvd. Suite 500, Chicago, IL 60604, telephone 312-362-2401 my immediate co-supervisors, Mr. Daniel Max Rosenthal, and Mr. Arthur John Hass III. Messrs. Rosenthal and Hass are both Co-CEO's of OptionsHouse/PEAK6, Inc. a wholly-owned subsidiary of PEAK6 and is registered as a broker-dealer with the U.S. Securities & Exchange Commission (SEC File # 8-066936) and a registered member broker-dealer of the Financial Industry Regulatory Authority ("FINRA"), formerly known until July, 2007 as the National Association of Securities Dealers ("NASD"), Central Registration Depository Firm #135625. (see Exhibit #) PEAK6 was founded in 1997.

### 2. Personal Background of Robert J. Larson, Plaintiff

As an introduction, I am 50 years old and a United States citizen. I was born on June 9, 1957 in Chicago, Illinois. My mother and father were never married (my father who I have never met was a married man with a wife and family). I was raised by my grandmother who was a widow throughout the time that I lived with her. My mother, Mary Elizabeth Mischler, was never married and spent almost fifty years of her life in and out of mental institutions and half-way houses from the time that I was born until she died at the age seventy four on April 15th of this year at St. Elizabeth's Hospital, located at 1431 N. Western Avenue, in Chicago, IL. I have spent time during my life living in homeless shelters in both Chicago and New York City. I have never been handed anything in my life. I have always had to work for anything that I have.

3. I am currently married, with a daughter who is fifteen years of age. My wife is currently unemployed but is actively searching for work.

4. Since being discharged by OptionsHouse/PEAK6 Investments LP on January 26, 2007, I have applied for work to almost three thousand brokerage firms, banks, savings & loans and other financial entities. I have used up all of my unemployment insurance and financial assets. I was unemployed for nine months until Monday, October 29, 2007, when I obtained a temporary position that pays me on an hourly basis with no other benefits for either myself or my

wife and/or daughter I am earning less than I was making at OptionsHouse/PEAK6.

5. During the time that I was unemployed, I used up all of my savings and was forced to the State of Illinois for welfare assistance for me and my family. We qualified for $408 in monthly food stamps (i.e. via the Link Card) from August through the end of October. We were also dependant upon the local food depositories and panties for other assistance (see Exhibit #58).

6. In February 1980, I was honorably discharged from the United States Navy. I have an undergraduate BS in Business Administration in Finance and Economics with a Minor in Accounting from Rockhurst University located in Kansas City, MO. I also have an MBA in Finance with a Minor in Economics from DePaul University located in Chicago, IL and I have also attended the John Marshall School of Law, which is also located in Chicago, IL, (see Exhibit #1).

7. I have twenty five years of securities industry experience. I originally was an NASD Senior Compliance Examiner from April 1982 until August 1986. I became a registered representative in September 1986 and a registered principal in November 1986. I have been a Director of Compliance for the last thirteen years for various NASD and Exchange member firms. I have also been an NASD Arbitrator since November 1990. Finally, I have been a Vice President and Senior Vice President for various NASD Broker-Dealer member firms.

8. I was the President & CEO of First Analysis Investment Corporation, a State of Illinois Registered Investment Advisor from May 2003 until January 2005.

9. I originally interviewed for the Director of Compliance position which was available at OptionsHouse/PEAK6 (f/k/a ezOptions, Inc.), which is a division of PEAK6 on Tuesday, March 29, 2005. I had been referred to OptionsHouse/PEAK6 by Mr. Marc B. Horin, the President & CEO of National Compliance Consultants, Inc., (see Exhibits #1 and 2).

10. The two individuals who interviewed me were: Mr. Daniel Rosenthal, President & CEO of OptionsHouse/PEAK6 and Mr. Robert Baldwin, who was at the time the Director of Operations for OptionsHouse/PEAK6. (Please note that Mr. Baldwin plays a very important role in this case. I shall refer to him more in detail later in my narrative).

11. At that time, Messrs. Rosenthal and Baldwin told me that the company was not at the stage whereby they would need to hire me as the Director of Compliance but that they would contact me in the future should they need me (see Exhibit #2).

12. On or about October 24 2005, I was contacted by Mr. Rosenthal and Richard Bojanowski, who had replaced Bob Baldwin in April 2005 as the Director of Business Development and who told me that the NASD was prepared to approve OptionsHouse/PEAK6 (then known as "ezOptions") as an NASD Membership firm but that the NASD District No. 8 staff felt that a more seasoned person was needed as Director of Compliance. My name was mentioned to the NASD staff members and they stated that if OptionsHouse/PEAK6 was to hire me that they would accept my registrations and experience and approve the firm for

membership. I accepted a position with the firm on Tuesday, October 25, 2005 and met with the NASD District 8 staff for the Pre-Membership Interview (PMI) that afternoon, (see Exhibit #3).

13. My first full workday at OptionsHouse/PEAK6 was Friday, October 28, 2005. I was told that my direct supervisor was Daniel Rosenthal, the President, but that I would also report to Richard Bojanowski, whenever Mr. Rosenthal was not available. I was told that my Firm Employee Number is 260, (see Exhibits # 4, #5, #6, #9, #10, and #13).

14. At that time, Mr. Rosenthal and I agreed that I would be a probationary full-time employee for the first four months, and that at the end of that period, it would be determined by Mr. Rosenthal if I would become a permanent employee. I offered to sign an employment contract with OptionsHouse/PEAK6 by Mr. Rosenthal said that he felt that it would not be needed. Subsequently, after my four month probationary employment period, I was notified by the firm that I was a permanent full-time employee, annual salary was $120,000 per year, with a bonus determined by PEAK6 management. During the entire fifteen months I worked for PEAK6 I never received a raise from my $120,000 base salary, (see Exhibits #4, 5, and 6).

15. The firm, with me registered as Director of Compliance and Executive Representative with the NASD, was registered as a NASD Broker-Dealer firm on November 3, 2005, (see OptionsHouse Form BD).

16. During the entire time that I was employed by PEAK6, I was a Designated Control Person with the SEC, NASD and all states. One can verify this by reviewing the OptionsHouse/PEAK6 Form BD filed with the Central Registration Depository during this time, (see OptionsHouse Form BD).

17. At the time that I was hired as the Director of Compliance, I had more securities registrations and experience than any other employee of both the parent company PEAK6 and OptionsHouse/PEAK6. At the time of my termination, I still have more registrations than all of the other 180 PEAK6 employees either individually or combined, (see Exhibits #1, #17, and #45). These registrations are:

Series 3 - Registered Commodities Representative
Series 4 – Registered Options Principal
Series 7 – General Securities Registered Representative
Series 8 – NYSE Branch Manager/Sales Supervisor Examination
Series 14 – NYSE Compliance Officer Examination
Series 24 – General Securities Registered Principal Examination
Series 27 – Financial & Operations Principal Examination
Series 53 – Municipal Securities Principal Examination
Series 55 – Equity Trader Examination
Series 63 – Uniform Securities Agent State Law Examination
Series 65 – Registered Investment Advisor Examination

18. These registrations require that one sit and pass a federal securities examination sponsored by the NASD/NYSE. Along with registering the firm with the SEC and

NASD, I also registered the firm in all fifty states and the District of Columbia and Puerto Rico. In almost all of these states, I was required to be the Designated Principal, because I had retail industry experience, whereas the other OptionsHouse/PEAK6 employees did not, (see Exhibit #1).

19. In many of the states, because the firm had only me as the person with any true retail securities industry experience, OptionsHouse/PEAK6 was only approved as a broker-dealer in those states with the specific requirement that I be the Designated Principal (i.e. Supervisor) of securities transactions within that given state. Once I was removed, then technically, the registration for OptionsHouse/PEAK6 was to have been revoked also. You can verify this by contacting each of the fifty states that OptionsHouse/PEAK6 is registered in, (see Exhibit #16).

20. I am also a State-of-Illinois Registered Insurance Producer. I have had all of the major Illinois insurance producer licenses since 1998. No other of the 180 PEAK6 employees has any insurance licenses, (see Exhibit #1). My insurance Licenses are:

Illinois Accident & Health Insurance Producer
Illinois Casualty Insurance Producer
Illinois Fire Insurance Producer
Illinois Variable Contracts Producer
Illinois Long-Term Care Producer

21. When I first started my employment with OptionsHouse/PEAK6, I was included in all of the staff meetings. I was encouraged to participate. Then after about three months, I was dropped from the attendance list. The reason for this I believe is that Daniel Max Rosenthal, President & CEO did not want to hear my input. There were many times when I would try to tell Mr. Rosenthal that a certain process was not legal or would not be acceptable to the various securities regulators, and he would become angry, like a small child being told that he could not do something. In one meeting, Mr. Rosenthal told me to "shut up" when I was trying to explain something in front of the entire staff. At no time during or after the meeting did he even apologize for his rude remark. It was only after the meeting, that Bob Baldwin apologized to me for Mr. Rosenthal's poor treatment of me, (see Exhibit #25).

22. Shortly after that meeting, Mr. Edward "Whiz" Buckley, PEAK6 Director of Business Development, commenced meeting with all of the departments of PEAK6 in order to develop a better business plan for each department. OptionsHouse/PEAK6 was also included in this I was invited to the first few initial sessions, at which time I provided my input, - of which I was encouraged to provide. Unfortunately, Mr. Rosenthal stopped including me in any staff meetings, because, I assume, he did not like my input. There must have been at least twenty of these meetings, of which matters which pertained to matters of Compliance were discussed. And I was not invited. I asked Mr. Rosenthal why I was not invited to these meetings and he told me that they had nothing to do with Compliance, But in discussing the content of the meetings with other OptionsHouse/PEAK6 employees many aspects of Compliance were discussed. I feel that Mr. Rosenthal deliberately discriminated against me because of my

age and experience by excluding me from these meetings. Mr. Rosenthal, from my vantage point, was telling me to leave, that he did not want me with the firm any longer, (see Exhibit #25).

23. There was a section dealing with the Single Point Accountability (called an "SPA") for the Compliance Department which I was responsible for, but Mr. Rosenthal entirely eliminated that section. I was never given an opportunity to discuss my role or that Compliance Department within the OptionsHouse/PEAK6 framework.

24. During August 2006, Steve Claussen, one of the PEAK6 traders wanted to open UTMA accounts for his children and trade "naked-options." I refused to approve the accounts and Claussen complained to Rosenthal. Rosenthal then told me to let him trade "whatever he wants to," (see Exhibit #24). Claussen was also approved to trade "naked options" in his 82 year-old mother's trust account, (see the Dorcas Claussen Trust account).

25. In the early fall of 2006, I was asked by Jenny Just to participate in a questionnaire for the 2007, "50 Best Small & Medium Companies to Work for in America" list. I answered the question. I was very honest and gave the firm poor marks in the majority of its employment categories. At the end I wrote this answer to the following question:

> **If you could change one thing about this company
> to make it a better place to work, would it be?**
>
> **My answer was," Bring in Professional Managers."**

(see Exhibit #26).

26. Mr. Arthur John  Hass III, was hired as the Co-CEO with Mr. Rosenthal of OptionsHouse/PEAK6 in late September 2006, I was told that he would be handling the administrative functions, whereas Mr. Rosenthal would handle the technology of the firm. From that point onward, I dealt with both Messrs. Hass and Rosenthal on Compliance matters, (see Exhibit # 27).

27. Even though I am listed as a control person and the Executive Representative for Options House with the NASD, Messrs. Hass and Rosenthal treated me as a clerk. They ignored my suggestions and comments and did not include me in discussions about firm Compliance. They had Mr. Richard Bojanowski, the Director of Business Development, (who also oversaw Securities Operations), consult with our outside legal counsel and regulators without including me. As a standard operating procedure within the securities industry, the Director of Compliance is always designated as the person who acts as the gatekeeper with outside legal counsel. How could I do my job when I was not allowed to do it, (see Form BD).

28. As the Director of Compliance, I should be the liaison between OptionsHouse/PEAK6 and James D. Van De Graaff, who is our outside counsel and is a Partner at Katten Muchin Rosenman LLP, located at 525 West Monroe Street, Chicago, IL 60661, telephone 312-902-5200, e-mail at

james.vandegraaff@kattenlaw.com, during the time that I was employed by PEAK6. But I was left out of numerous meetings with Mr. Van De Graaff and the staff dealing with legal and compliance matters. Messrs. Hass and Rosenthal would have Mr. Bojanowski discuss all legal matters with Mr. Van De Graaff. It was only after a compliance matter has been discussed and decided between Messrs. Bojanowski and Van De Graaff that I would then be notified of what had happened and I feel that my input was neither wanted nor asked for, even though these decisions affected me and the Compliance Department.

29. This was even more frustrating for me because Mr. Van De Graaff and I had worked with each other during my employment with previous employers and Mr. Van De Graaff and I knew one another well prior to my employment with PEAK6.

30. I was treated with constant disrespect by Messrs. Hass and Rosenthal on a daily basis. Numerous meetings were held daily which pertain to my work wherein I am not included in. I am not in the loop on almost all major decisions, even though, according to the documents filed with the SEC, FINRA and all states I am an active manager involved in the compliance aspect of the firm. This means that decisions are made that I am regulatorily responsible for but that I am not involved in or are aware of, (See Form BD and FINRA Quarterly Supervisor List).

31. Mr. Rich Bojanowski (Firm Employee #30) and Joel Blumenau (Firm Employee #100), who had both worked with Mr. Rosenthal at PEAK6 for many years were treated like equals by Mr. Rosenthal (Firm Employee #12), even though neither had retail securities industry experience prior to the exposure while OptionsHouse/PEAK6, their input was always valued, whereas my input, honed by twenty five years of real securities industry experience was never taken seriously or with the value that it should have been accorded. This in my mind is discriminatory.    I was the oldest employee at OptionsHouse/PEAK6 until December 8, 2006, when a Mr. James Halm, at age 51, was hired as the OptionsHouse/PEAK6 Operations Manager. Including Mr. Halm, I was second oldest employees at PEAK6 at the time of my termination.

32. I had my initial PEAK6 Employee Review with Mr. Rosenthal in January of 2006. I received a positive review, (see Exhibit #14). I received my 2006 PEAK6 Bonus on or about January 31, 2006, (see Exhibit #15). At that time I was told that I was a permanent employee. I was also told in writing that I would have another review on May 16, 2006. About a week before I was to have my review, Mr. Rosenthal's father passed away. A trying time for anyone, and I fully understood when I was told that Mr. Rosenthal had postponed my review until later in May, 2006. Unfortunately for me, Mr. Rosenthal never gave me the review that I was owed. I am aware that certain other employees did receive their review, Joel Blumenau and Stefani Sandow, two other OptionsHouse/PEAK6 employees that I know of personally. I asked about my review and was told by Mr. Rich Bojanowski that Mr. Rosenthal had decided not to proceed with my review. No reason why was ever provided to me, (see Exhibits #18, #19, and #20)

33. Finally, according to the PEAK6 Policy on Performance Trackers, I was to have also had an Employee Review on or about September 10, 2006. This means that prior to my termination on January 26, 2007, I was to have had two reviews, one in May 2006 and September 2006, these meetings never occurred. No reason for

this was ever provided to me, (see Exhibit #12)

34. I had spoken about my problem situation with Mr. Rosenthal with Bob Baldwin, Rich Bojanowski and Kelly Lively (all managers at PEAK6) and I had been warned about not angering Mr. Rosenthal because he has a history of getting rid of people he does not like or want to have around. I assume that his poor treatment of me during my time of employment at PEAK6 was an indication of his dislike of having me around also.

35. Another example of my poor treatment by Mr. Rosenthal is that I was the Financial & Operations Principal (i.e. FINOP) for OptionsHouse/PEAK6. As such I was responsible for reviewing and approving all Financial & Operational Combined Uniform Single (i.e. FOCUS) Reports submitted the NASD. As such I should have sole discretion of approval, but Mr. Rosenthal insists that Mr. Bojanowski review and approve these reports also, even though Mr. Bojanowski is not a FINOP. Mr. Bojanowski is twenty years younger than I am. There are many meetings which pertained to financial and operations matters which I should have participated in but was excluded from, (see Form BD).

36. During the afternoon of August 2, 2006, there was a "Brain-Storming Session" which included all members of OptionsHouse/PEAK6 and Edward "Whiz" Buckley, PEAK6 Director of Business Development, wherein Mr. Rosenthal requested ideas for improving the number of new account openings from all of the staff. I contributed at least five suggestions to Mr. Rosenthal (you may verify this with Mr. Edward Buckley). Mr. Rosenthal complimented me on my suggestions and asked me in front of all meeting members to provide additional work-ups on each idea in writing. After the meeting I did just that. Of course he ignored all of my ideas. As a matter of fact, he had another employee follow-up on my original ideas, even though Mr. Rosenthal told me that we should each follow-up on our ideas.

37. I sent Mr. Rosenthal various e-mails asking for time to meet with him concerning my ideas and he never responded to any of these e-mails, (see Exhibit #23).

38. On July 21, 2006, I received a second bonus for calendar year 2006, (see Exhibit #21).

39. In April, 2006, Ms. Donna MacDonald was hired as the Director of Compliance for PEAK6, our parent company. Prior to Ms. MacDonald's hiring I had spoken with Mr. JP Just, one of the PEAK6 senior managers and the brother of Jenny Just, one of the owners of PEAK6 about this position. Mr. Just asked me if I knew of anyone who might want to take the position and I told him that I could not think of anyone. I did ask him if he felt that I should apply for the position and he said no, that the OptionsHouse/PEAK6 Director of Compliance position was considered equal in stature to the PEAK6 position. I might note that JP Just always treated me with the utmost of respect. I have nothing but good things to say about JP Just, (see Exhibits #45 and #48)

40. I had not known Ms. MacDonald before she came to PEAK6, but in working with her, I found her to be fair and hard-working. I have nothing but good things to say about her. My understanding of her background was that she had worked as a

Compliance Officer at various broker-dealers before coming to work at PEAK6.

41. I do want to note though, and this will become important later in my discussions, that Ms. MacDonald is:

Younger than I am.
Has less experience in years and types of firms worked.
Did not have an MBA or had attended Law School.
Was not an NASD Arbitrator.
Has fewer securities registrations, I have eleven, and I was registered in all fifty states and the District of Columbia and Puerto Rico.
I have 4 ½ on experience as an NASD Senior Compliance Examiner, the regulatory body which oversees the activities of OptionsHouse/PEAK6, she has never worked for the NASD.
Had no Insurance Producer Licenses.
Is not a State of Illinois Notary Public as I am.

42. (NOTE: At this time I would also like to point out that at the time of my being hired by PEAK6 in October, 2005 through and including January 2007, I had more securities industry experience and licenses than any of the other OptionsHouse/PEAK6, Inc. managers, including Daniel Rosenthal, Arthur John Hass, Peter Lawler, Richard Bojanowski, Joel Blumenau (see Exhibits # 45, #46, #47 and #48) and the two owners of OptionsHouse/PEAK6, Matt Hulsizer and Jenny Just).

43. After Ms. MacDonald was hired, an announcement to all of the PEAK6 staff was made and Ms. MacDonald was introduced during a PEAK6 staff meeting. Even though I had been working for the firm for at least six months longer, at no time did management ever introduce me as the Director of Compliance for Options House, even though Messrs. Bojanowski and Blumenau had been also introduced to the staff also. As a matter of fact, there have been many instances wherein Messrs. Hass and Rosenthal had gone out of their way to keep the fact that I was the Director of Compliance for OptionsHouse/PEAK6 from all other PEAK6 employees. I feel this is because they did not want people to know who I was so that they could replace me without difficulty when the time came. During the entire fifteen month employment period at PEAK6, it caused me great concern and stress to feel that I was not wanted by an employer and that at any moment Messrs. Hass or Rosenthal would replace me without any warning. Which, as you can see from my complaint eventually happened to me?

44. Finally, Ms. MacDonald had daily compliance input concerning PEAK6 with Mr. Matt Hulsizer and Jenny Just, the husband and wife owners of PEAK6 and OptionsHouse/PEAK6. Not once in the fifteen months that I worked for them did either Mr. Hulsizer or Ms. Just asked for any input or ideas from me concerning compliance matters at OptionsHouse/PEAK6 or PEAK6, even though I was listed as the OptionsHouse/PEAK6 Executive Representative with the NASD (now FINRA) and was considered a control person.

45. Another example that I feel was discriminatory is that on July 31, 2006, Ms. Tory L. Game was hired as the first OptionsHouse/PEAK6 Client Service Representative. During the interview process, both Messrs. Bojanowski and

Blumenau interviewed Ms. Game and eventually hired her. Even though I worked with Ms. Game every day and I was considered a control person in the eyes of the SEC, NASD (now FINRA) and state regulators, I was never included in this hiring process, which I consider wrong. Other Client Service Representatives were hired after Ms. Game and I was omitted from the interview and hiring process for those new hires also. Even though by securities law, I was responsible for the due diligence for each of these employees, (which meant that I was responsible for checking their background with former employers), in many instances, I only found out about an employee being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

46. When Mr. Arthur John Hass III, was hired sometime in mid to late September 2006 by Mr. Rosenthal to be the Co-CEO of OptionsHouse/PEAK6, Inc., at no time was I ever included in the interview or hiring process. This again is discriminatory and ignores the fact that I was a control person and I worked with Mr. Hass on a daily basis.

47. There are other instances, such as when Peter Lawler, Jamie Just and James Halm were hired as new employees of OptionsHouse/PEAK6 and yet I was omitted from the interview and hiring process, even though again, by securities law, I was responsible for the due diligence for each of the these employees. I only found out about these employees being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

48. As a side matter, I might point out that I was more qualified to be chosen as sole or Co-CEO than Mr. Hass because I have more financial services experience, registrations and hands-on retail brokerage experience. I have approved over 35,000 customer new account forms, Messrs, Rosenthal and Hass have approved none. I have twenty five years on securities industry experience, Hass had eighteen in investment banking, not retail brokerage and Rosenthal had none at all, (see Exhibits #27 and #47).

**49. Employment Discrimination**
On Friday, September 29, 2006, at approximately 2:00 PM CST, I filed with Ms. Nancy McKinney, PEAK6 Director of Human Resources a Letter of Complaint (see Exhibit #25) because I felt that I had had my federal, state and local employee rights violated under at least the Age Discrimination in Employment Act of 1967 and also internal PEAK6 Policy #HR-012(see Exhibit #11), "PEAK6 prohibits discrimination in employment based on any characteristic protected by law, including race, color, national origin, sex, age, religion, disability, or sexual orientation (each of which shall be referred to throughout the rest of this Policy as a "protected characteristic"). Employment discrimination occurs when an employee is adversely affected because of a protected characteristic with respect to any term or condition of employment (including hiring, compensation, advancement, discipline or termination). PEAK6 will take appropriate measures to prevent and/or stop any such discrimination."

50. Ms. McKinney told me that she would investigate my allegations but never

responded to me. It was not until January 26, 2007, when she was present at my termination meeting that she told me that she had found no violations of my PEAK6 employee rights by Mr. Rosenthal. Not once did I receive any written document from anyone at PEAK6 answering my allegations. As a matter of fact, Ms. Harris of the EEOC told me via the telephone that Ms. McKinney states that she never received my letter, which is not true. At this time also, I told her of an updated letter that I was writing to her called, "history,:" which included other updated complaints which I had, (see Exhibit #27)

## 51. PEAK6 Internal Complaint Procedure (see Exhibit #11)

According to PEAK6 Policy #HR-012, "Any employee who believes that he or she has been discriminated against or harassed by a co-worker, manager, executive manager, outside contractor, customer, or other person should promptly report such harassment to the Human Resources Manager (currently Ms. Nancy McKinney)... The Human Resources Manager will promptly and thoroughly investigate all complaints of harassment and, based on the investigation, will take appropriate corrective and preventive action. Every effort will be made to conduct an investigation in as discreetly a manner as possible... If harassment is established, PEAK6 will discipline the offender... The Human Resources Manager will inform the complaining employee of 1) how the investigation was conducted and 2) of any corrective action that was taken."

## 52. Letter of Information provided to Carla Romano of the Chicago District Office of the NASD (n/k/a FINRA)

On February 6, 2007, I provided an informational memo to Carla Romano, Senior Vice President and District Director for the Chicago District Office of the NASD (n/k/a FINRA) regarding my concern about the firm's books and records( See Exhibit #37).

## 53. Formal Complaints Filed with the U.S. EEOC and the State of Illinois Dept of Human Rights

On February 20, 2007, I filed an "in-person" compliant with the United States Equal Employment Opportunity Commission ("EEOC") against PEAK6. The charge number is 440-2007-03177. The person who is handling the investigation of my compliant with the EEOC is Ms. Sarronda C. Harris, Federal Investigator with the Chicago District Office of the EEOC located at 500 West Madison Street, Suite 2800, Chicago, IL 60661; telephone 312-886-9320, (see Exhibits #40 and #42).

54. Also, on July 20, 2007, I filed with the Illinois Department of Human Rights ("IDHR") a concurrent complaint against PEAK6. The charge number is 2007CN3582. The person who is handling the investigation with the IDHR is Ms. Jacquelyn Turner Hamb, Human Rights Investigator II with the IDHR Office located at 100 West Randolph Street, James R. Thompson Center, Suite 10-100, Chicago, IL 60661, telephone 312-814-6225, (see Exhibits #41, #53, and #54).

## 55. Letter of Information provided to Merri Jo Gillette of the Chicago Regional office of the US Securities and Exchange Commission

On July 12, 2007, I provided an informational memo to Merri Jo Gilette, Regional

Director of the Chicago Regional Office of the US Securities and Exchange Commission, (see Exhibit #52).

54. One of the requirements of all NASD (n/k/a/ FINRA) member broker-dealers who do a public business is to abide to both Federal SEC and NASD Conduct Rules. OptionsHouse/PEAK6 was approved for NASD membership in November 2005, it was not until August 2006 that the firm had any public customers, (and these were basically PEAK6 family related accounts).

55. The NASD had conducted its New Membership Examination in April and May 2006. Due to the fact that we had done no business at the time of the initial examination, the NASD Examination staff  - and me for that matter -  could only assume and estimate how the firm's regulatory reporting would work,

56. After our initial NASD Membership Examination, there were two areas that were of a concern for me:

    a.  Daily OATS Reporting

57. The daily reporting of Order Audit Trail System (i.e. "OATS") eligible securities, by OptionsHouse/PEAK6 to the NASD (as required by NASD Rule 6950 and 6951-6958, see the NASD Manual). During the early part of 2006 I registered the firm with the NASD OATS Reporting System. The MPID for our firm was: EZOP and I was designated as the OATS Administrator for OptionsHouse/PEAK6. (see Ex# _____ for an example of an OATS Report).

58. When the NASD had conducted its initial New Member Examination, we had thought that Merrill Lynch Execution (MLCX), one of our order execution firms, would report our OATS-eligible trades for us. I registered OptionsHouse/PEAK6 with OATS and I was the designated OATS Administrator. Our firm's Market Participant Identification (i.e. "MPID") was "EZOP". I designated "MLCX" as our OATS Reporting Firm, for which they initially acknowledged that they would do. Since we had done no business, and would not do any business until August 2006, this was all well and good.

59. Apparently though, there were disagreements between the senior management of OptionsHouse/PEAK6 and the senior management of Merrill Lynch Execution concerning execution charges and OATS reporting responsibilities. As such, the execution agreement between OptionsHouse/PEAK6 and Merrill Lynch Execution was cancelled. The senior management of OptionsHouse/PEAK6 then signed an execution agreement sometime in late August 2006 with a firm called Interactive Brokerage, (i.e. "IB"). IB agreed to execute out trades, but that they would not do our OATS reporting for us.

60. It should be noted at this time that I was never included in any of these agreement meetings with either Merrill Lynch or Interactive Brokerage. I was only provided with a copy of the contracts for filing in the Regulatory Storage Files after all of the agreements had been signed and finalized.

61. During a meeting concerning our order execution held in late August 2006. A discussion arose questioning that since IB was not going to be our OATS

Reporting Firm, it was decided by Daniel Rosenthal, OptionsHouse/PEAK6 President & CEO, that OptionsHouse/PEAK6 would report its own OATS Eligible trades directly to OATS. In other words, we would become a Direct OATS Reporting Member. It was at this time that I stressed to all members of the firm, not just management that we would be in OATS violation if we did any OATS eligible trades and did not report them. Mr. Rosenthal told me that we would just have to move forward with reporting the OATS trades and the person who we hire to construct ours OATS Reporting System would have to move quickly. I voiced my concern to Mr. Rosenthal at this time that there was no exemption from OATS Reporting. He told me that we should move forward and not worry about such things. The people present at this meeting were: myself as Director of Compliance; Daniel Rosenthal, President & CEO; Richard Bojanowski, Director of Business Development (CRD# 4040154 and who had replaced Robert Baldwin earlier in the year); Joel Blumenau, Director of Customer Service (CRD#2592445); Gong Szeto, Director of Marketing; and Dave Budworth, Director of Management Information Services. I was also told by Mr. Rosenthal that Ms. Donna Joy MacDonald (CRD#1178698) the Director of Compliance for PEAK6 Investments, LLC and the owners of the firm, Matt Hulsizer and Jenny Just had also been notified of my concerns.

62. In September 2006, after numerous inquiries about OATS reporting on my part, Mr. Rosenthal hired Mr. Robert Lund as the person who would write the computer programs for connecting OptionsHouse/PEAK6 to the OATS System. Mr. Lund had worked with Mr. Budworth in California for a number of years prior to Mr. Budworth's move to Chicago. Mr. Budworth spoke very highly of Mr. Lund, both as a personal friend and fellow worker. Mr. Lund moved from California to Chicago in early September 2006 to start his new job at OptionsHouse/PEAK6. When I met Mr. Lund, I found him to a laid-back, personable and very knowledgeable computer program designer and writer. Mr. Lund had worked with Mr. Budworth at a firm I believe was called "e-Loan," it specialized in finding mortgage loans for prospective home buyers on the Internet. I had great confidence that Rob Lund would get the job done with all respect to OATS reporting.

63. Rob Lund had never worked with the OATS System, so I printed out a copy of the NASD OATS Technical Specifications Manual and a copy of the OATS Administrative Manual. He kept the OATS Technical Manual and I kept the OATS Administrative Manual.

64. Rob started working on designing an OATS Reporting System immediately upon his arrival. I know that Rob Lund had numerous meetings over the next five month period with Mr. Rosenthal concerning the status of development of the OATS system. During this time we transacted trades in OATS-eligible securities and no Daily OATS Report was ever filed. I stressed to Mr. Rosenthal that it was a severe violation of NASD OATS Rules and SEC Rules 17a-3 and 17a-4 not to report either: 1) the eligible trades themselves and 2) the fact that we were deficient in our OATS Reporting capabilities. Mr. Rosenthal told me to be silent and in no way was I to notify any regulator about our OATS situation. I told Mr. Rosenthal that if the SEC or NASD discovered this situation, they would fine and/or possibly close the firm. He told me that that was for him to worry about, not me. Mr. Richard Bojanowski, the Director of Business Development, who was

also responsible for the firm's operations also voiced the same concerns to Mr. Rosenthal and he too, was told to remain silent.

65. On or about Wednesday, September 13, 2006, I held a Continuing Education Program Meeting attended by ALL employees of OptionsHouse/PEAK6 wherein the only subject covered was the OATS Reporting System. Every OptionsHouse/PEAK6 employee, both registered and non-registered, attended the meeting. A signed attendance sheet should be in the CEP File for review and verification. During this CEP Meeting, I covered all aspects of OATS. I provided each employee with a copy of all of the OATS Rules taken directly from the NASD Manual. I also included copies of all of the NASD Notices-to-Members pertaining to OATS. I provided a pass-around-copy and I then reviewed the OATS Administrative Manual for everyone to read and ask questions of me about OATS. I then introduced Rob Lund, let everyone know that he would be writing our new OATS Reporting Program and I then provided a pass-around-copy of the OATS Technical Specifications Manual. I also again, during this meeting, reiterated that we not reporting our current OATS trades and that we needed to have the OATS Reporting System up and running as soon as possible.

66. Mr. Lund worked on our internal OATS Reporting System from September 2006 through and including the first week of January 2007. During that time, not one single OATS Report was filed by OptionsHouse/PEAK6. I continued to tell Mr. Rosenthal that even though Mr. Lund was creating a new OATS Reporting System, our firm was in violation of both the NASD OATS Reporting Rules and the NASD and SEC Books and Records Rules. Mr. Rosenthal told me to remain silent about the matter and that no regulator should be notified of these violations. Mr. Rosenthal threatened to terminate me for reporting these violations to any regulatory entity.

67. The next week, on Monday, October 2, 2006, Mr. Arthur John Hass III joined the firm as Co-CEO. On Wednesday, October 4, 2006, at approximately 3:15 PM, I met with Messrs. Rosenthal and Hass to provide them with a copy of the NASD Disciplinary Guidelines pertaining to violations of the NASD OATS System (see Exhibit #22).

68. Again, both Messrs. Rosenthal and Hass warned me to keep my mouth shut and not report the matter to any regulator or risk termination. I was also told not to put any of my concerns in written form and never e-mail either of them concerning the matter so that any regulatory agencies investigating the matter could not find a paper trail. At that time, I told them that the firm had violated OATS Reporting Rules for over sixty straight calendar days.

69. On or about Wednesday, October 11, 2006, at around 2:00 PM, I contacted Ms. Nichole C. Clark-Ake, who is the Director of Compliance and Chief Compliance Officer of Penson Financial Services, Inc., 1700 Pacific Avenue, Suite 1400, Dallas, Texas, 75201, telephone 214-765-1000. (Note: Penson is the firm who OptionsHouse/PEAK6 clears all of the firms securities transactions through on a "fully-disclosed" basis). I notified her of the violations of the OATS Reporting Rules by OptionsHouse/PEAK6. I also asked her to contact Messrs. Rosenthal and Hass and reiterate to them the severity of the violations of not reporting the

transactions on a timely basis. I contacted her later and she told me that she did discuss the matter with Messrs. Rosenthal and Hass and That they were aware of the potential regulatory problems. In February 2007, Ms. Cark-Ake and I discussed the possibility of me accepting a job with Penson. Please review the section entitled "Penson Job."

70. During this time also, the firm also hired Mr. Peter Traugutt Lawler, (CRD#1131068) as the Director of Institutional Business. I recall a employee meeting in early November 2006 wherein Mr. Lawler attended where again I reiterated to all who were present that were violating NASD OATS Reporting Rules by not having an OASTS reporting System. So he also was well aware of the firm's OATS violations.

71. It was also at this November 2006 meeting that I discussed SEC Release 34-54585 (I.e. SR-NASD-2005-101) which expanded the OATS reporting requirements to OTC Equity Securities effective in early 2007.

72. At that November 2006 meeting, Messrs. Rosenthal and Hass assured all who were present that Mr. Lund was diligently working on the completion of the OATS Reporting System for OptionsHouse/PEAK6. .At that time, the firm was close to failure to file OATS Reports for calendar ninety days.

73. On Tuesday, January 2, 2007, without any prior notice, at around 10:30 AM, Mr. Lund came to me to say good-bye. He said to me, "it just did not work out between OptionsHouse/PEAK6 and him and that he was returning to California." I wished him well. He worked for OptionsHouse/PEAK6 approximately four months and never finished our OATS Reporting System.

74. I immediately went to Messrs. Rosenthal and Hass to let them know that we should report via telegraph the lack of an OATS Reporting System to the SEC and NASD immediately, as required by SEC Rule 17a-11, paragraphs (d) and (e) and the amended NASD Rule 3170. I told them that we should send immediate telegraphic notice to the SEC and NASD and notify all of the states that we were registered in also. Both Messrs. Rosenthal and Hass instructed me to remain silent about the matter and not tell anything about our OATS reporting problem to any regulator.

75. At this time, OptionsHouse/PEAK6 had failed to report OATS eligible trades to the NASD from late August 2006 through and including January 2007, some five months.

76. On the day of my termination from OptionsHouse/PEAK6, January 26, 2007, I estimate that the firm had failed to file some 110 business days of required OATS Reports.

77. My other concern dealt with:

78. 2) Daily Review of E-Mails and Instant Messages
The daily review of e-mails and Instant Messages with and to clients, (required by SEC Rules 17a-3 and 17a-4, see pages 1234-1235, NASD Manual and NASD Conduct Rule 3010, Supervision, paragraphs (d)(2) and (d)(3), Review and

Retention of Correspondence, see the NASD Manual

79. One of the SEC and NASD required functions is that a Registered Principal review a representative daily sample of the firm's sales-related e-mails and Instant Messages (IMs). I was responsible for this function. When the NASD Examiners had visited the firm in April and May of 2006, we had no customers, so the only e-mails that we had were operational e-mails, which I reviewed on a daily basis. There were no problems. After the NASD and left and in August 2006, when we started to do a business, I determined that I was not getting all of the e-mails for proper review. I was also not receiving any Instant Messages for review. I have never had an IM account through OptionsHouse/PEAK6, but in other firms which I have worked for, have had IM systems and I was responsible for the review of those sales-related communications also.

80. Sometime in September 2006, I approached Mr. Rosenthal and asked him when OptionsHouse/PEAK6 would provide me with a proper review system foe Instant Messages. Mr. Rosenthal told me that once Rob Lund had finished the OATS Reporting System that he would then assist me with creating proper review system. When it became apparent that Rob Lund would not be able to assist me, Mr. Rosenthal told me that Mr. Dave Budworth, the Director of MIS would either help me himself or find someone else to assist me. I never heard from anyone else. Whenever I would ask about the IM review system, I would be told that it was on their "list of things to do" but was not considered a high priority item. Currently, OptionsHouse/PEAK6 has no IM Review System.

81. Mr. Lund also worked on our E-Mail and Instant Message Review System from September 2006 through and including the first week of January 2007. During that time, I was unable to properly review all incoming or outgoing e-mail and instant message correspondence. I continued to tell Mr. Rosenthal that even though Mr. Lund was creating a new E-Mail and Instant Message Review System, our firm was in violation of both the NASD Conduct Rule 3010 and the NASD and SEC Books and Records Rules. Mr. Rosenthal told me to remain silent about the matter and that no regulator should be notified of these violations. Mr. Rosenthal threatened to fire me for reporting these violations to anyone.

82. Numerous times I warned both Messrs. Rosenthal and Hass about possible violations of NASD and SEC Books and Records Rules. I told them that according to SEC Rule 17a-11 paragraphs (d) and (e), we were required to notify both the NASD and SEC of these violations. They chose not to listen to me.

83. I had wanted to contact the NASD to report these potential violations but was instructed by Messrs. Rosenthal and Hass not to contact either to the NASD or SEC about these books and records problems.

84. A Mr. Robert Lund was hired in early September, 2006 to work on these books and records problems but he left the Firm on January 2, 2007.

85. Finally, on January 26, 2006, some three weeks after Robert Lund left the firm, I was laid-off. I was told by Messrs. Hass and Rosenthal that OptionsHouse/PEAK6 no longer had any need for my services.

### 86. Holiday Party for 2005

In early January 2006, the Holiday Party for 2005 was held for all PEAK6 employees. I attended the party without my wife or daughter. During the party, both Matt Hulsizer and Jenny Just, the owners of OptionsHouse/PEAK6 said hello to me. Rather than thanking me for my hard work in registering the firm with the SEC, NASD and all fifty states, they commented to me that they had never been forced to hire an employee before. They said it to me in such a condescending and insulting manner that I was taken aback. If they were angry with the NASD for being forced to hire me, then they should have taken their frustrations out on the NASD not me.

### 87. My Medical Condition Discussed

In April 2003 I had heart surgery performed at Louis A Weiss Memorial Hospital, located at 4640 North Lake Shore Drive, Chicago, Illinois. I had been born with an enlarged heart and leakage to two of my heart valves. It was thought by my cardiologist that it would be appropriate to correct the leakage problems and check out the overage condition of the heart.

88. The surgery went well and I was proscribed various medication to take for the rest of my life. These chronic condition medications are:

89. Diovan HCT Tablets 160/12.5 mg – Valsartan and Hydrochlororothiazide - and is an angiotensin II antagonist and thiazide diuretic combination used to treat high blood pressure and congestive heart failure. I am to take two of these tabs each day.

90. Lipitor Tablets 20mg – Atorvastatin – and is an HMG-CoA inhibitor used to lower cholesterol. I take one of these tabs each day.

91. Celebrex Capsules 200 mg – Celecoxib – and is a non stereroidal medicine (NSAID) for anti-inflammation. I take one of these capsules each day.

92. When I went to work at PEAK6 I promptly notified Michael Lazenby and Gael Day of the Human Resources department of my need to continue these medications. Both Michael and Gael told me that there would be no trouble for the PEAK6 insurance carrier, *Destiny Health.* On December 29, 2005, I completed the Destiny Health/PEAK6 Chronic Medication Benefit registration to insure these medications for me. From that point onward, each quarter, I would be charged $204.00 for these chronic medications and Destiny would be billed $648.41 for the balance. These charges occurred on 2/23/06; 5/03/06; 7/11/06; and 11/13/06. (se Exhibits #7 and #8).

93. Finally, on April 12, 2006, I was notified by my orthopedic specialist, Dr. Henry A. Finn, MD, FACS, Director of the University of Chicago Bone & Joint Replacement Center located at Weiss Memorial Hospital, office telephone 773-564-5888, that both of my natural knees were damaged beyond repair as a result of a lifetime of running. Dr. Finn estimated that to replace both knees with prosthetic joints would cost close to $40,000.

94. When I told Gael Day of this she wished me well. She asked when I might have this surgery done and I told her that I wanted to wait until 2007 because I was only 48 years old at the time and this year I turned 50 years-old.

95. Michael and Gael were both replaced by Nancy McKinney when she became the PEAK6 Director of Human Resources in the spring of 2006. I feel that part of the reason for PEAK6 terminating me was to save on drug costs and the fact that I had planned on having my orthopedic surgery this year, even though they did not overtly state that. By terminating me in January, they were assured of saving almost $45,000 in medical expenses

## 96. *My Daughter Meets Matt Hulsizer*

One of the things that Matt Hulsizer and Jenny Just, owners of OptionsHouse/PEAK6 always stressed to the PEAK6 staff was how they wanted every employee to feel that each was part of an extended family. They made formal announcements that they wanted employees to bring their children to work so that they (Matt and Jenny) could meet them.

97. One day during the summer of 2006, I brought my daughter Lisa (who was thirteen years old at the time) to work with me. I had received approval for this so Lisa and I were looking forward to being together for the day. Overall, we had a pleasant visit until about two o'clock in the afternoon. Hulsizer/Just enjoy modern art so they have decorated the office located at 141 West Jackson with various works of modern art.

98. One of the new artworks that they had just installed prior to my daughter Lisa's visit was a very large portrait located on the east wall of the trade room showing a "Man Covering His Face" (which is what I will call it). Lisa asked about it and I told her that it was new and I knew nothing about it. We went over to check to see if there was a description for it but it was so new that it had none at that time.

99. I noticed Hulsizer was on the trade floor. I thought that it would be a wonderful time to introduce my daughter Lisa to him and he could describe his new artwork to her. So Lisa and I started to approach Hulsizer as he headed for the stairway leading up to the fifth floor offices.

100.    I started to open my mouth to introduce Lisa to him when he yelled at me in a very unfriendly voice, "What do you want? I am in a hurry to make a phone call." At that moment I realized that he had no interest in meeting my daughter. I told him that it was not important. I looked at my poor daughter Lisa and I could tell that she was crushed. We returned to my desk and she spent the last few minutes of the day in silence. From that moment onward, Lisa never asked about my workplace again nor did she ever ask to come to work with me again. This showed me the type of jerk Matt Hulsizer truly was. There are other examples of this that occurred almost on a daily basis.

## 101.    *Christmas Party for 2006*

In early to mid December 2006, OptionsHouse/PEAK6/PEAK6 had its Christmas Party at a restaurant called *Nine*, located at Randolph and Canal Streets in

Downtown Chicago. At that time there had been discussion about the situation with the ongoing capabilities of OptionsHouse/PEAK6 and the fact that it was still in the 'Start-Up" mode.

102.        At this time, both Messrs. Hass and Rosenthal both assured the entire staff that "PEAK6, and Matt and Jenny (the owners) were committed to the OptionsHouse/PEAK6 concept and that none of us had to worry about loosing our jobs." I took them at their word, as did all of the other employees. I fully understand that what they said does not constitute a binding promise or agreement, but they had no reason to make such statements if they were not true. It should be noted that the Parent Company, PEAK6 Investments, LLC earned in excess of $150,000,000 dollars in calendar year 2006, according to Mr. Bob Baldwin, and even though the OptionsHouse/PEAK6 division lost money, overall the Parent Company and subsidiaries made more than enough in profits.

**103.        Annual Bonus Week (see Exhibits #28, and**
The week of January 22-26, 2007 as the PEAK6 Annual Bonus Week. It is at this time that all PEAK6 employees received an Annual Bonus. Nancy McKinney, the Director of Human Resources for PEAK6 sent a firm-wide e-mail notifying all PEAK6 employees (including myself, see Exhibit #28 that the Annual Bonus was to be paid on January 31, 2007, and that on either Tuesday, January 23rd or Wednesday, January 24th, we would be notified of our bonus amount. Since I had been paid an Annual Bonus in January 2006, (see Exhibit #15) I expected to also receive an Annual Bonus for 2007 also. I received from the PEAK6 Human Resources Department an Election Form for tax withholding which I had also received and completed in January 2006 indicating the amount of federal taxes I wanted withheld from my Annual Bonus Amount.

104.        Tuesday and Wednesday came and went and I still had not received my bonus amount notification. Finally, during the morning of Friday, January 26, 2007,I asked Daniel Rosenthal when I might be meeting with him about my Annual Bonus and he told me that there were still some others who had not received their bonus amounts and to not worry, that he would meet with me that afternoon. At no time did he or Arthur John Hass  III tell me that I would not be receiving my Annual Bonus.

105.        On Friday, January 26th, the tax withholding election form was to have been filed with the PEAK6 Human Resources Department by no later than 3:00 PM. At approximately 1:30 PM, I contacted Teresa Grissom of the PEAK6 Human Resources Department via e-mail notifying her of the fact that I had still not received my Annual Bonus amount and could not provide her with my Tax Election Form. Ms. Grissom replied via e-mail and told me not to worry, that when I received my Annual Bonus Amount, to then file the Tax Election Form with the PEAK6 Human Resources Department, (see Exhibit #29).

106.        Of 183 current employees of PEAK6 who were employed on Friday, January 26, 2007, the majority of the employees received a bonus, also the letters from McKinney and Grissom lead me to believe that I would receive one. Again, I had received a Annual Bonus the year before, (see Exhibit #15).

**107.        Termination Meeting (see Exhibits #30, #31, #32 and #33)**

On Friday, January 26th, at 2:45 PM, I received a telephone call from Nancy H. McKinney, the PEAK6 Director of Human Resources requesting that I come to see her in her office. When I arrived in here office at 2:50 PM, Messrs. Hass and Rosenthal where there in her office. I was told by Messrs. Hass and Rosenthal that they were, "no in longer in need of my services" and that I was being let go. They told me that I could claim unemployment and that they would not contest it. Ms. McKinney then asked me for my Access Key Card which allowed me access to the PEAK6 Office, I immediately gave it to her.

During this termination meeting:

108.    At no time did they thank me for my hard and dedicated work that I performed during my fifteen months of employment.

109.    At no time did they offer to provide to me a "Reference Letter" for prospective employers.

110.    At no time did they offer me a financial "severance package," in order to help me and my family live during the time that I would be searching for a new job.

111.    At no time did they provide me with the annual bonus that I was led to believe would be paid to me on that day.

112.    At no time did they wish me well or offer words of encouragement that I would find another job.

113.    McKinney, Rosenthal and Hass treated me as if I was a piece of human garbage. Someone to be used and then replaced, like a computer of copy machine. They tried to hurry through the exit meeting that I began to feel as if I was taking up their precious time because I was asking questions and not leaving quickly enough.

114.    Finally, it was at this time also that they provided me with a legal waiver document wherein for a payment of $5,000 less payroll taxes, I would waive all of my federal, state and local employee legal rights and not discuss my employment experience with any other person or entity. I told them that I had no intention of signing such a document and that $5,000 was an insult. Ms. McKinney told me that I had twenty one calendar days (i.e. until Friday, February 16, 2007) to change my mind and sign the document (see Exhibit #30).

115.    I told them that I had no intention of signing the document. Mr. Hass then told me that already interviewed and hired my replacement. Also, he told me that Donna MacDonald would take over as the OptionsHouse/PEAK6 Director of Compliance and that the person that they had just hired would report directly to Donna. I later discovered that the person they had replaced me with was a Mr. Carl M. Kunz, (see Exhibit #49). Mr. Kunz and I had both worked at the NASD at different times. I had known him socially through a series of focus groups that he and I had participated in 2004 sponsored by the Commerce Clearing House (CCH) which is located here in Chicago on Petersen Avenue. At the time that he was hired to replace me, he was working for David A. Noyes & Company, a

NYSE member firm.

116.     In comparing my termination from PEAK6, at other firms, when I have been laid off, I have received financial severance; payment for outsourcing services; paid extended insurance for me, my wife and 14 year old daughter; and $500 for resume creation and copying and miscellaneous fees relating to a job search. At PEAK6 I received nothing. I was hustled out of the building like a criminal and I was not allowed to say good-bye to any of my fellow staff members.

117.     In other words, I was thrown away like garbage. I am a human being, not trash. I did my job and I was treated like some used piece of equipment being discarded for some new piece of equipment.

118.     I also have the following questions regarding these actions regarding Donna Macdonald:

    a.  Why was Donna MacDonald selected over me when am older and I have more experience than she does. I have twenty five years of securities industry experience, she has ten.

    b.  I had worked that at PEAK6 firm six months longer than Donna has.

    c.  I had been an NASD Senior Compliance Examiner, she has no NASD experience.

    d.  I have more securities registrations than she has.

    e.  I have been a President & CEO of a Registered Investment Advisor, she has not.

    f.  I have six different insurance licenses, she has none.

    g.  I have been an NASD Arbitrator for over sixteen years, she has never been an NASD Arbitrator.

    h.  I have an MBA from DePaul University, she has no MBA.

    i.  I have attended the John Marshall Law School, she has no law school experience.

    j.  Finally, even if she was chosen over me, why did they lay me off when I could have done my job and reported to Ms. MacDonald? At no time was I provided with a choice as to whether I wanted to stay. I do not know the credentials of the person who has been hired to replace me, but I should have been provided with an opportunity to retain my current at the time that I was laid-off.

119.     I now also have the following questions regarding these actions regarding Carl Kunz:

    a.  Why was Carl Kunz hired to replace me? At no time was I notified by any member of PEAK6 management that I was not performing my job properly.

    b.  .I am older and I have more experience than he does. I have twenty five years of securities industry experience, he has twelve.

    c.  I have more securities registrations than he has. When I was discharged, I had over twenty years experience as a Registered Options Principal ("ROP"). He did not become a ROP until the day after I was terminated (1/27/2007). That means that I had twenty years of ROP experience when

I was the firm's Director of Compliance. He had ONE DAY.

   d.   I have been a President & CEO of a Registered Investment Advisor, he has not.

   e.   I have six different insurance licenses, he has none.

   f.   I have been an NASD Arbitrator for over sixteen years, he has never been an NASD Arbitrator.

   g.   I have an MBA from DePaul University, he has no MBA.

   h.   I have attended the John Marshall Law School, he has no law school experience.

   i.   Mr. Kunz had a full time job at David A. Noyes & Company, Inc. before he was hired by OpitonsHouse/PEAK6. Why did the management hire him when I could have continued working at PEAK6.

120.      During the exit interview, Mr. Rosenthal then asked me if I wanted to resign rather than being laid off and for Form U-5 (i.e. the federal securities form which notifies the SEC, NASD and all of the states of the reason for your termination from a securities firm, See Exhibit #32) purposes and I said that I definitely wanted my Form U-5 to state that I was "Laid-Off", I had no intention of resigning from OptionsHouse/PEAK6/PEAK6. I had done nothing wrong to resign.

121.      Messrs. Hass and Rosenthal then left Ms. McKinney's Office and I told he that I felt that they had violated my federal employee rights. I also to her where to find my updated letter to her dated September 29, 2006, (see Exhibit #25). Ms. McKinney told me that it was too late to allege a violation of my employee rights and but that she would read my September 29, 2006 letter to her. I told her to look on my computer for a file named, "History" which was dated January 12, 2007 and included updated comments by me about Both Hass and MacDonald, (see Exhibit # 27).

### 122.    Clean Out Desk

On Friday, January 26th at 3:10 PM I was escorted by Ms. McKinney to my desk and I boxed my personnel affects and at 3:15 PM was escorted by Ms. McKinney from the firm's office. I will note at this time that Nancy McKinney at no time was rude or disrespectful toward me either on this last day or during the seven months that she had been the PEAK6 Director of Human Resources. But again, I was hustled out of the PEAK6 offices without a chance to say good-bye to any of my fellow employees.

### 123.    Comments Made to Me by Mr. Robert Baldwin, a PEAK6 Manager

After I was laid-off, I had a telephone conversation with a Mr. Robert "Bob" Baldwin. Bob Baldwin had been the other person with Daniel Rosenthal who interviewed me in January 2005. He then worked with me in the OptionsHouse/ PEAK6 Division from October 2005 until he was transferred to the Technology Division of PEAL6 during the summer of 2006.

124.      As a PEAK6 manager who I had worked for while at OptionsHouse/PEAK6 and other divisions of PEAK6, Bob told me that I had done a very fine job and that there had been no reason for Messrs. Rosenthal and Hass to terminate me. His final statement to me was that I should find an attorney and sue PEAK6 for violating me company and employee rights. He told

**Robert J. Larson**
**Vs. OptionsHouse/PEAK6**

me that he would be willing to testify on my behalf.

125.     He continued by saying that it was well known throughout PEAK6 that Mr. Rosenthal did not like me and that was the reason for me being laid-off.

126.     Mr. Baldwin retired from PEAK6 in April 2007, but you can still contact him at home by calling 1-312-588-1592.

127.     A week later, I met with Mr. Richard Bojanowski, he told me that on the Monday following my termination, (i.e. January 29, 2007), Mr. Rosenthal announced during a morning staff meeting with the rest of the staff that I had received a financial package to quite. That was a lie, I did not quite and I never received any financial package to leave the firm.

**128.     Book and Records Violations Disclosed to the NASD**
On Tuesday, February 6, 2007, at 10:30 AM CST I hand delivered a written report to Ms. Carla Romano, Senior Vice President and District 8 Director of the violations that were occurring at OptionsHouse/PEAK6/PEAK6, (see Exhibit #37). I would like to note that Ms. Romano and I worked as examiners together in the District 8 NASD (n/k/a FINRA) Offices in the early to mid 1980s.

**129.     Compliance Positions Advertised by Penson Financial**
As I had mentioned previously, Nichole Clark-Ake was the Director of Compliance for Penson, the firm which provided OptionsHouse/PEAK6 with back-office support. This is quite common in the securities brokerage industry. It is commonly called being "fully-disclosed" through Penson Financial..

130.     After my discharge from PEAK6, sometime in early February 2007, I came across an advertisement in the *National Society of Compliance Professionals ("NSCP") Jobline* (see www.nscp.com/jobline) which stated that they were looking for a Senior Compliance Officer, the firm looking for this person was Penson Financial, the firm who PEAK6 cleared through. I submitted my resume via the internet and on or about February 15, 2007. (See Exhibits #38 and #39). I received a call from Ms. Pam Silveus, who was the Director of Human Resources. Penson as you may recall is headquartered in Dallas, Texas. Ms. Silveus asked me if I would be interested in working for Penson in Dallas. I told her that I might be, that I had worked in Dalles for the NASD as a Senior Compliance Examiner during 1985. Ms. Silveus asked me if I knew Nichole Clark-Ake, the Director of Compliance and Legal Counsel and I said yes, that I had worked with her during my time at OptionsHouse/PEAK6. Ms. Silveus told me that Ms. Clark-Ake would call me and discuss the position. A few days later Ms. Clark-Ake called me. We spoke for about an hour. She seemed quite interested in hiring me. She then told me that she would contact Daniel Max Rosenthal, my immediate supervisor at OptionsHouse/PEAK6 and get back to me. After speaking to Mr. Rosenthal, Ms. Clark-Ake and Ms. Silveus showed  no interest in all with either hiring or interviewing me.

130.     I feel that Penson was quite interested in me but that Rosenthal and PEAK6 bad-mouthed me and lost all interest in me. I applied for a second job as Trade Surveillance Officer with Pension but again they showed no interest (see Exhibits \#43 and #44).

**131. Compliance Position Advertised by PEAK6**

On or about March 16, 2007, while reviewing the *National Society of Compliance Professionals ("NSCP") Jobline* (see www.nscp.com/jobline) I came across a PEAK6 advertisement looking for a Director of Compliance for OptionsHouse/ PEAK6 and PEAK6 Advisors, a related company of PEAK6 which also happens to be a Registered Investor Advisor pursuant to the Investment Advisers Act of 1940, (see Exhibit #50).. This is a position in which I am perfectly suitable for, since I had been the Director of Compliance and CCO for OptionsHouse/PEAK6 and a former President of First Analysis Investment Corporation, a State of Illinois RIA. I applied for the position via the internet (see Exhibit #51) with my current resume which I sent to Nancy H. McKinney. Ms. McKinney has never had the courtesy to respond to my application. My question is, why was I discharged when I was the most suitable person for this job even before I was discharged?

**132. Books and Records Violations Disclosed to the SEC**

On June 12, 2007, I mailed via Certified US Mail a letter to Ms. Merri Jo Gillete, Regional Director of the Midwest Regional Office of the United States Securities and Exchange Commission notifying her of the books and records violations that I felt had or were still occurring at OptionsHouse/PEAK6, (see Ex #52 ).

**133. False Allegations Made by PEAK6**

On Monday June 25, 2007, Ms. Sarronda Harris of the US EEOC called me to let me know that she had received a response from PEAK6 concerning my allegations.

134. Ms. Harris stated that I had refused to work with Ms. Donna Macdonald the other Compliance Officer at PEAK6. This is a lie. My response to Ms Harris is provided below

135. *Good Afternoon Ms. Harris:*

136. *I wanted to write to you concerning something that you said that the management of PEAK6 stated to you in their response letter.*

137. *According to them, Donna Macdonald, the PEAK6 Director and I were equals. That is what I was told when Ms. Macdonald started, some six months after I started working at PEAK6. But this was not the case, (as my letter to Nancy McKinney of September 29, 2006 also addressed).*

   a. *Ms. Macdonald met on at least a weekly or bi-weekly basis with Matt Hulsizer/Jemmy Just, the owners of OptionsHouse/PEAK6/PEAK6. In the fifteen months that I worked at PEAK6, I never once was invited to meet with Hulsizer. Just to discuss compliance matters.*

   b. *Ms. Macdonald was invited to the weekly senior management meetings, I was not.*

*and*

138.*3) Ms. MacDonald was invited to the Fall 2006 Senior Manager Workshop held off site away from the firm's corporate offices. I was not invited, even though they say that Ms. Macdonald and I were equals. If you look at my experience vs. Ms. MacDonald's, you will see that I had more experience than she does and I should also have been included in these meetings.*

139.*Finally, concerning my interaction with my fellow employees. One reason for me being so emphatic is that I was attempting to convince senior management that the firm was violating federal "Books and Records Rules" from early September 2006 until the day that I was terminated from PEAK6 (i.e. January 26, 2007) and that the firm should have filed SEC Rule 17a-11 Telegraphic Notice to both the SEC and NASD for violating these books and records rules, But senior management refused to file these required notices and continually ignored my warnings.*

*Thank you.*

*Robert J. Larson*

### 140.Alleged Incorrect Use of the Choice Point AML System
Ms. Harris also stated to me that PEAK6 alleged that I had incorrectly used the Choice Point Anti-Money Laundering System, which is an outside vendor-provided product to verify whether a potential client was on one of numerous Anti-Money Laundering lists. Apparently, management of PEAK6 - after I had been terminated – has come up with statement that I incorrectly used the Choice Point System. I would like to point out that during the time that I used the Choice Point System, Mr. Rich Bojanowski, the Director of Business used the same system during the same period and no comments were made that the results were incorrect. If I was not following the system correctly, the Mr. Bojanowski was not either.

### 141.Brokerage Supervisor Position Advertised by PEAK6 after Termination

142.On August 25, 2007, PEAK6 advertised that they were looking to hire a Brokerage Supervisor (see Exhibit #56). Again, I was more than qualified for the position. I again submitted my resume to Ms. Nancy H. McKinney, *(see Exhibit #57) and as with the Compliance Officer position, I have yet to receive a response from either Ms. McKinney and/or PEAK6 concerning this position.

143.Why I was not retained and reassigned to one of these positions rather than summarily terminated.

### 148.    OptionsHouse Moves from PEAK^ Offices to their Own Offices
Sometime in October 2007, the OptionsHouse subsidiary moved its physical location from the Trading Floor of PEAK6 at 141 West Jackson Blvd. to 303 East Wacker Drive, Chicago, Illinois, 60601, telephone: 312-676-8801. Rosenthal, Hass and the other members of OptionsHouse moved to this address. They also rehired Bob Baldwin, who had retired from PEAK6 earlier in the year. Nancy H. McKinney remained at the PEAK6 office located on Jackson

Blvd.

### 149.    Illinois Department of Human Rights  Fact Finding Conference held on November 20, 2007 (see Exhibits #55, #63 and #64)

On November 20, 2007, Ms. Melonie Morgan-Tyler (tel 312-814-6212) conducted a Fact Finding Conference starting at 9:00 AM CST. Present were Robert Larson, Pro Se, Daniel Max Rosenthal, Nancy McKinney and Ms. Sally Scott, Esq. of Franczek Sullivan PC, Attorneys at Law. Mr. Arthur John Hass III failed to attend the meeting even though he was required to provide attend. No reason was given for him not attending. Shortly before the conference and after the conference, Ms. Morgan-Tyler tried to help settle the case between Larson and PEAK6 but the members of PEAK6 refused to settle.

### 150.    Closing Comments

I feel that the actions taken by certain managers of OptionsHouse/PEAK6 evidence violation of my employee rights under the Age Discrimination in Employment Act of 1967. I received my Right to Sue Letter dated October 18, 2007 from the US Equal Employment Opportunity Commission, (see Exhibit #61).

As it is now, I am unemployed, have no insurance for either myself or my wife (see Exhibits #34, #35 and #36). During the time that I was unemployed, my daughter Lisa, was been approved for the State of Illinois Department of Human Services "AllKIds" Program, (Public Aid Insurance).

151.    In April of this year my family and I were forced to move from a nice two bedroom apartment located in Evanston, IL  to a small one bedroom apartment in a much less nice neighborhood located in Chicago, IL as a result of my being discharged by PEAK6.

152.    If I was still working for PEAK6, I would have earned from February 1 until October 29, 2007 a gross salary of $90,000, (i.e. nine months at $10,000 per month) which would have been more than sufficient to pay all of my bills and provide for my family. I have had three credit cards terminated because I could not make the minimum monthly payments, there cards are: American Express, Discover Card, and the Optima Card, I have over $70,000 in credit card bills, (see Exhibits 59, #60 and #62).

153.    During the late summer until October 29, 2007, the State of Illinois Department of Human Services provided my family with $408 in monthly Food Stamps (via the Link Card).

154.    None of these terrible events would have happened to me or my family.if I had not been illegally terminated by PEAK6 as I was.

155.    By the way, last year PEAK6 earned over $150,000,000 in income with just 180-190 employees, I was not terminated for economic reasons.

Thank you.

Respectfully submitted,

Robert J. Larson

TO: United States Court for the Northern District of Illinois

RE: Robert J. Larson vs. PEAK6  Investments LP  List of Exhibits

| Exhibit # | Exhibit Description |
|---|---|
| 1 | Resume provided to Rosenthal/PEAK6 during interview in March 2005 |
| 2 | Thank you e-mail from Larson to Rosenthal/PEAK6 concerning March 2005 interview |
| 3 | Acceptance Letter – dated 10/24/2005 |
| 4 | E-mail version of Acceptance Letter from Michael Lazenby, PEAK6 Human Resources |
| 5 | Compensation List – dated 10/28/2005 |
| 6 | Primary Job/Supervisor List – dated 10/28/2005 |
| 7 | Destiny Health/PEAK6 Chronic Medication Benefit Registration  Form for Robert J. Larson dated December 29, 2005 notifying PEAK6 of Chronic Illness Medication required for: Celebrex, Lipitor and Diovan HCT |
| 8 | Destiny Health/PEAK6 acceptance letter to the Chronic Medication Benefit Program |
| 9 | PEAK6 Benefits Summary for Full-Time Employees 2005 |
| 10 | PEAK6 Disciplinary Policy (Policy #BA-010 Effective June 1, 2005) |
| 11 | PEAK6 Policy against Discrimination and Harassment (Policy #HR-012 Effective June 1, 2005) |
| 12 | PEAK6 Important Information about Performance Trackers (i.e. employee reviews) – not dated. |
| 13 | Exhibit H: Employee Agreement Regarding Confidentiality, Nonsolicitation and Noncompensation  - signed and dated October 28, 2005 |
| 14 | PEAK6 2005 Performance Tracker for Robert J. Larson - signed and dated January 19, 2006. |
| 15 | Bonus Letter for 2006 PEAK6 Bonus for Robert J. Larson |
| 16 | NASD Central Registration Depository (CRD) for OptionsHouse (f/k/a ezOptions)  evidencing registration with the NASD, SEC and all fifty states along with the DC and Puerto Rico |
| 17 | NASD Central Registration Depository (CRD) for Robert J. Larson evidencing registration with the NASD, SEC and all fifty states along with the DC and Puerto Rico |
| 18 | E-Mail May 2006 Performance Tracker Notice from Karen day, PEAK6 Director of Human Resources dated May 9, 2006 |
| 19 | Performance Tracker Appointment for Robert J. Larson – from Pat Barry, assistant to Daniel M. Rosenthal – dated Tuesday, May 16, 2006, 9:41 AM |
| 20 | E-mail Acceptance of May 2006 Performance Tracker Appointment for Robert J. Larson – dated Tuesday, May 16, 2006, 11:33 AM. |
| 21 | Second PEAK6 2006 Bonus Letter dated July 21, 2006 for Robert J. Larson |
| 22 | NASD List of Regulatory Penalties for violating the Order Audit Trail System (OATS) Rules |
| 23 | Marketing Ideas Follow-up e-mail from Robert J. Larson to Daniel Max Rosenthal dated Friday, August 25, 2006 |
| 24 | Larson e-mail to Rosenthal concerning Steve Claussen UTMA accounts dated August 29, 2006 |

| | |
|---|---|
| 25 | Letter dated September 29, 2006 from Robert J. Larson to Nancy H. McKinney, PEAK6 Director of Human Resources. |
| 26 | Great Place to Work Institute PEAK6 Employee Survey Number 34481 completed by Robert J. Larson in the Fall of 2006 |
| 27 | Letter dated January 12, 2007 from Robert J. Larson to Nancy H. McKinney, PEAK6 Director of Human Resources. |
| 28 | 2006 Bonus Payroll Memo – dated Friday, January 19, 2007 from Nancy McKinney, PEAK6 Director of Human Resources. |
| 29 | 2006 Bonus Award Follow-Up Memo  - dated Thursday, January 25, 2007 from Teresa Grissom – assistant to Nancy McKinney. |
| 30 | PEAK6 Confidential Separation Agreement – to be signed and dated between Robert J. Larson and Nancy McKinney |
| 31 | PEAK6 Termination Letter from Nancy H. McKinney to Robert J. Larson – signed and dated January 30, 2007. |
| 32 | Uniform Termination Notice for Securities Industry Registration – for Robert J. Larson - dated and signed on February 1, 2007 – but not filed until  Wednesday, February 7, 2007 with the NASD Central Registration Depository. |
| 33 | Various e-mails from Robert Larson to McKinney and MacDonald dated February 13-15, 2007 |
| 34 | Certificate Number 2007045-06438 of Blue Cross/Blue Shield Insurance Coverage for Robert Larson – dated February 14, 2007. |
| 35 | Certificate Number 2007045-06439 of Blue Cross/Blue Shield Insurance Coverage for Sonia Larson – dated February 14, 2007. |
| 36 | Certificate Number 2007045-06440 of Blue Cross/Blue Shield Insurance Coverage for Lisa Larson  – dated February 14, 2007. |
| 37 | Larson Letter Dated February 6, 2007 addressed to Carla Romano, VP and District Director of FINRA District Number 8. |
| 38 | Larson Response Letter to Penson Senior Compliance Officer Advertisement dated February 15, 2007 |
| 39 | Penson e-mail to Larson concerning  Penson Senior Compliance Officer Advertisement dated March 29, 2007 |
| 40 | Larson Letter Dated February 20, 2007 addressed to John P. Rowe, District Director of the Chicago District Office of the U.S. EEOC |
| 41 | U.S. EEOC/Illinois Department of Human Rights Charge of Discrimination Number 440-2007-03177 dated February 20, 2007. |
| 42 | Letter Dated February 22, 2007 from Sarronda Harris, Investigator    for the US EEOC addressed to Robert J. Larson |
| 43 | Penson Advertisment for Trade Surveillance Officer position dated May 15, 2007. |
| 44 | Larson follow-up e-mail to Pam Silveus of Penson concerning Trade Surveillance officer dated August 13, 2007 |
| 45 | CRD #1565322 BrokerCheck Report for Robert Jerome Larson dated April 18, 2007 |
| 46 | CRD #4971856 BrokerCheck Report for Daniel Max Rosenthal dated November 18,,2007 |
| 47 | CRD #2172376 BrokerCheck Report for Arthur John Hass III dated November 18, 2007 |
| 48 | CRD #1178698 BrokerCheck Report for Donna Joy MacDonald  dated November 18, 2007 |

| | |
|---|---|
| 49 | CRD #4207522 BrokerCheck Report for Carl R. Kunz dated November 18, 2007 |
| 50 | PEAK6 Compliance Officer Position Advertisement dated April 17, 2007 |
| 51 | Larson Response to PEAK6 Compliance Officer Advertisment dated April 19, 2007 |
| 52 | Larson Letter Dated June 12, 2007 addressed to Merri Jo Gilette, Regional Director of the U.S. Securities Exchange Commission Midwest Regional Office |
| 53 | Follow-up Letter to Larson from the Illinois Department of Human Rights dated June 29, 2007. |
| 54 | Certification of Illinois Department of Human Rights Charge of Discrimination Number 2007CN3582 dated July 13, 2007.of Robert J. Larson Vs. PEAK6 Investments, LP |
| 55 | Acknowledgement Letter to Larson and PEAK6 from Illinois Department of Human Rights dated July 20, 2007 |
| 56 | Advertisement dated August 25, 2007 of PEAK6 searching for a Brokerage Supervisor. |
| 57 | Larson response to PEAK6 Brokerage Supervisor Advertisement with resume dated August 25, 2007. |
| 58 | St. Thomas of Canterbury Food Pantry Pass (this is affiliated with the Greater Chicago Food Depository) |
| 59 | Demand for Payment Letter from Jaffe & Asher, Attorneys at Law, New York City, New York  representing American Express dated August 29, 2007 |
| 60 | Demand for Payment Letter from Discover Card dated October 7, 2007 |
| 61 | US EEOC Notice of Right to Sue Letter dated October 18, 2007 issued to Robert J. Larson |
| 62 | Additional Demand for Payment Letter from Blitt and Gaines PC representing American Express Centurion Bank for defaulted debt owed by Robert J. Larson dated October 22, 2007 |
| 63 | Notice of Fact Finding Conference dated October 22, 2007 from the Illinois Department of Human Rights to Robert J. Larson |
| 64 | Order of Closure dated December 4, 2007 from the Illinois Departmnet of Human Rights to Robert J. Larson |

**ROBERT J. LARSON**
**5300 N. Sheridan Road**
**Apartment 203**
**Chicago, IL 60640**
**Home (773) 271-4710**
**E-mail rbtjlarson@yahoo.com**



Professional Objective
To pursue a management career in the financial services industry.

### Registrations & Licensing Securities Industry Registrations

| | |
|---|---|
| Series 3 | Registered Commodities Representative *(since July 1988)* |
| Series 4 | Registered Options Principal *(since December 1986)* |
| Series 7 | General Securities Registered Representative *(since September 1986)* |
| Series 8 | General Securities Sales Supervisor *(since August 1988)* |
| Series 14 | Compliance Officer *(since June 1991)* |
| Series 24 | General Securities Registered Principal *(since November 1986)* |
| Series 27 | Financial & Operations Principal *(since June 1987)* |
| Series 53 | Municipal Securities Registered Principal *(since February 1987)* |
| Series 55 | Equity Trader *(since December 1999)* |
| Series 63 | Uniform State Securities Law Examination *(since March 1987)* |
| Series 65 | Uniform Investment Advisor Law Examination *(since December 1993)* |

### Insurance Industry Licensing (from July 1998 to present)

Illinois Accident & Health Insurance Producer
Illinois Casualty Insurance Producer
Illinois Fire Insurance Producer
Illinois Life Insurance Producer
Illinois Variable Contracts Producer
Illinois Long-Term Health Care Producer

### Employment History

May 2003 to January 2005     **First Analysis Investment Corporation**
                                       President and Chief Executive Officer

October 2001 to January 2005    **First Analysis Securities Corporation**
                                         Director of Compliance and
                                         Compliance Registered Options Principal (CROP)
                                         Chicago, IL

- Chief Compliance Officer and Executive Representative for an NASD member firm that provides securities research analysis for 110 publicly traded companies.
- Responsible for the compliance activities of fifty registered employees
- Responsible for the conversion of clearing firm from BNY to Jefferies & Co. in 2003
- U.S. PATRIOT ACT Anti-Money Laundering Administrator
- General, CROP, FINOP and Municipal Principal
- Continuing Education Program (CEP) Administrator
- Administrator for the Order Audit Trail System (OATS) and Canadian NRD Systems
- Administrator for the NASD Web CRD and IARD Registration Systems
- Shared in writing various supervisory, compliance, operations and training manuals
- Responsible for the passing of the 2002 and 2004 NASD Routine Compliance Exams
- Responsible for the passing of the 2003 and 2004 Anti-Money Laundering Exams
- Responsible for the passing of the 2003 SEC Routine Compliance Examination
- Responsible for the compliance review of the firm's Archipelago ECN Trade System
- President & CEO and NASD Executive Representative of a State of Illinois Registered Investment Advisor





**June 1999 to May 2001**    **The Third Market Corporation**
Chicago, IL

<u>Vice President and Director of Compliance</u>
- Chief Compliance Officer and Registered Equity Trader for an NASD member firm that makes markets in over 200 CQS and Nasdaq securities over-the-counter
- Responsible for the compliance activities of eighteen registered equity traders
- Compliance Registered Options Principal
- General, FINOP and Municipal Principal
- Continuing Education Program (CEP) Administrator
- Order Audit Trail System (OATS) Administrator
- Shared in writing various supervisory, compliance, operations and training manuals
- Calculates quarterly One Percent Listed Stock trading requirement
- Responsible for the outcome of the 2000 and 2001 NASDR TMMS Examinations
- Responsible for the outcome of the 2000 SEC Limit Order Display Rule Examination
- Responsible for the compliance review of the firm's Brass System activities

**October 1997 to March 1999**    **Oak Brook Investor Advisory Services, Inc. and Bauer-Wolf Investment Advisors, LLC**
Oak Brook, IL

<u>Vice President of Compliance</u>
- Chief Compliance Officer for an NASD member full service broker-dealer
- Vice President and Chief Compliance Officer for a Registered Investment Advisor
- Responsible for the compliance activities of eleven registered representatives
- Compliance Registered Options Principal
- General, FINOP and Municipal Principal
- Registered the firm with the NASD and participated in the Pre-Membership Interview
- Registered the firm as a member of the Municipal Securities Rulemaking Board, Inc.
- Registered the firm and its employees with fifteen states
- Chief Compliance Officer during initial NASD Routine Examination
- Shared in writing various supervisory, compliance, operations and training manuals

**January 1997 to September 1997**    **Chicago Investment Group, Inc.**
Chicago, IL

<u>Senior Vice President & Director of Compliance</u>
- Chief Compliance Officer for an NASD member full service broker-dealer
- Responsible for the compliance activities of ten registered representatives
- Compliance and Senior Registered Options Principal
- General, FINOP and Municipal Principal
- Chief Compliance Officer during the NASD Continuing Membership Process
- Registered the firm as a member of the Municipal Securities Rulemaking Board, Inc.
- Registered the firm and its employees with eight states

May 1996 to July 1996        ***Joseph Charles & Associates, Inc.***
                                       Boca Raton, FL

Vice President & Director of Compliance
- Chief Compliance Officer for an NASD member full service broker-dealer
- Managed three employees
- Responsible for the compliance activities of two hundred seventy registered representatives
- General, FINOP, Municipal and Options Principal
- Chief Compliance Officer during MSRB Municipal Compliance Examination
- Registered employees of the firm with the NASD and various states

April 1994 to May 1996        ***BirkelBach Investment Securities, Inc. et al***
                                         Chicago, IL

Vice President & Director of Compliance
- Chief Compliance Officer for an NASD member full service broker-dealer
- Responsible for the compliance activities of up to sixteen registered representatives
- General, FINOP, Municipal and Options Principal
- Chief Compliance Officer during NASD Routine and MSRB Municipal Compliance Examinations
- Registered employees of the firm with the NASD and various states
- Registered the firm as a member of the Municipal Securities Rulemaking Board, Inc.
- Wrote various Supervisory, Compliance and Operations Manuals

November 1993 to January 1994        ***Capital Securities Investment Corp.***
                                                     Oak Brook, IL

Director of Compliance
- Chief Compliance Officer for an NASD member full service broker-dealer
- Responsible for the compliance activities of five registered representatives
- Compliance and Senior Registered Options Principal
- General, FINOP and Municipal Principal
- Registered the firm and its employees with various states

- August to October 1993        ***Olde Discount Corporation***
                                             Detroit, MI

Compliance Officer
- Compliance Officer and ROP for a NYSE member broker-dealer
- General, FINOP and Municipal Principal
- Investigated customer complaints

March 1991 to August 1993        ***Kemper Securities, Inc***.
                                         Chicago, IL

Assistant Vice President - Compliance Department
- Compliance Officer and ROP for a NYSE member full service broker-dealer
- General, FINOP and Municipal Principal
- Conducted branch office compliance examinations
- Responsible for daily compliance report review
- Investigated customer complaints and terminations for cause

July 1989 to October 1990        ***Shearson Lehman Brothers, Inc.***
                                         New York, NY

Assistant Vice President – Litigation & Regulatory Analysis Group
- Compliance Officer and ROP for a NYSE member full service broker-dealer
- General, FINOP and Municipal Principal
- Investigated customer complaints, arbitration claims and customer lawsuits
- Responded to regulatory inquiries concerning terminations for cause
- Testified as an expert and fact witness in various SRO, federal and state forums
- Performed churning and turnover analysis relating to customer complaints

September 1987 to July 1989       **_William Blair & Company_**
Chicago, IL

Compliance Registered Options Principal
- Compliance Officer and ROP for a NYSE  member full service broker-dealer
- General, FINOP and Municipal Principal
- Conducted internal and branch office compliance examinations
- Wrote audit procedures for compliance examinations
- Responsible for daily compliance report review
- Investigated customer complaints and terminations for cause


Sept 1986 to Sept 1987       **_INVEST Financial Services, Inc._**
Chicago, IL

Senior Regional Compliance Examiner
- Compliance Officer and ROP for an NASD  member full service broker-dealer
- General, FINOP and Municipal Principal
- Conducted branch office compliance examinations
- Responsible for daily compliance report review
- Investigated customer complaints and terminations for cause

April 1982 to August 1986       **_National Association of Securities Dealers, Inc._**
Chicago, IL

Senior Compliance Examiner
- Senior examiner for the self regulatory organization for the over-the-counter securities industry
- Attended Phases I and II of the NASD Examiner Training School in Washington, D.C.

**Education**

*Awarded in February 1980*
***MASTERS OF BUSINESS ADMINISTRATION***
Major in Finance and a Minor in Economics
**De Paul University – Chicago, IL**

*Awarded in August 1978*
***BACHELOR OF SCIENCE IN BUSINESS ADMINISTRATION***
Major in Finance & Economics
**Rockhurst University – Kansas City, MO**

*Awarded in May 1982*
***CERTIFICATE IN ACCOUNTING***
Major in Accounting
**Rockhurst University – Kansas City, MO**

*Spring Semester 1994*
***FIRST YEAR LAW SCHOOL STUDENT***
John Marshall Law School – Chicago, IL

**Arbitrator**

*Arbitrator*
**American Arbitration Association, Inc. since 1992.**

*Arbitrator*
**National Association of Securities Dealers, Inc. since 1991.**

*Member*
**National Society of Compliance Professionals since 1997.**

 **MAIL** Classic

Print - Close Window

**Subject:** RE: Thank you message from Bob Larson

**Date:** Thu, 31 Mar 2005 18:20:24 -0600

**From:** "Danny Rosenthal" <drosenthal@peak6.com>

**To:** "Robert Larson" <rbtjlarson@yahoo.com>

```
We also enjoyed the meeting and learned a lot.  We liked you a lot and
think of you as a serious candidate for this position.  If we had to
make an offer today, we would do dilligence and make you an offer.  But
we have one other candidate that we need to meet before we make any
decision.  I had hoped that this would happen this week, but it may get
pushed back to next week.  In any case, I look forward to speaking with
you again soon.
Regards,
Danny

-----Original Message-----
From: Robert Larson [mailto:rbtjlarson@yahoo.com]
Sent: Thursday, March 31, 2005 10:30 AM
To: Danny Rosenthal
Subject: Thank you message from Bob Larson
```



```
Dear Dan:

I just wanted to e-mail you and thank both you and Bob
Baldwin for meeting with me on Tuesday.

I am still very much interested in the position and I
think that I can certainly do the job for you and
Peak6.

I am Downtown today, should you like to meet with me
again, please e-mail me or call me on my cell phone at 312-498-8095.

Thanks again.

Bob Larson
```

_____

```
Do you Yahoo!?
Yahoo! Small Business - Try our new resources site!
http://smallbusiness.yahoo.com/resources/
```

*PEAK6*

141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
P: 312.362.2401
F: 312.362.2315
www.peak6.com

October 24, 2005

Robert Larson
5300 N. Sheridan Road
Apt. 203
Chicago, IL 60640

Dear Robert:

We are very happy you have decided to join PEAK6 Investments, LP, as the Compliance Officer for the Blackbird project!

The purpose of this letter is to confirm the conditions of your employment. Your employment is contingent upon a successful reference and background check, including fingerprints, which will be completed shortly after your start date. It is the express policy of PEAK6 that the employment relationship between you and PEAK6 is at-will. This means that the employment relationship may be terminated, with or without cause, at any time by you or by the company.

Please consider this letter to be confidential in nature, between PEAK6 and yourself, and not to be discussed with any other potential candidates for employment or employees at PEAK6. Should you have any questions, please do not hesitate to contact Michael Lazenby directly at (312) 362-2441.

- **Your Start Date**
  Your first day will be Friday, October 28, 2005. Please report to Michael Lazenby at 141 W. Jackson, Suite 500, at 8:30AM.

- **Employment Status**
  This will be a full-time position. We will evaluate your position on February 28, 2006, and determine if we are able to continue to offer you full-time employment.

- **Your Compensation**
  Your compensation will be $120,000 per year, and will be paid on the 15th and 30th of each month. This is an exempt position.

- **Benefits**
  You will be eligible to participate in our extensive benefits package. Details on all the benefits programs can be found on the enclosed document entitled *PEAK6 Investments, LP Benefits Summary for Full-Time Employees - 2005*. Your benefits will be reviewed with you in more detail on your first day.

- **Intent to Transfer**
  We are initially hiring you as an employee of PEAK6 Investments, LP. However, we have the intention of transferring your employment to a new start-up company. We anticipate this transfer to occur at some point during 2005 or early 2006.

  - **Impact of Transfer on Benefits**
    It is our intention that the new start-up company that you will be transferring into will have an employee benefits package. However, the benefits at the new company will likely differ in substantial ways from the PEAK6 benefits package.

  - **Performance Based Rewards**
    It is our intention that the new start-up company that you will be transferring to will offer discretionary performance-based rewards that will be distributed based on both the profitability of the company and your contributions to the company's success. If this is the case, you will be eligible for those rewards.

- **Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition**
  As a condition of your employment with PEAK6 Investments, LP, you will be required to sign an Employee Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition (Exhibit H attached).

Robert, we are convinced that you represent the future for our company. We believe that you bring a strong background to our team, and that you will positively impact our efforts. We look forward to your start and to a satisfying association!

Sincerely,

Karen Day
Human Resources Manager

Danny Rosenthal
Chief Technology Officer

EX 3

 **YAHOO!** MAIL                                                    Print - Close Window

**Subject:** Welcome!

**Date:** Tue, 25 Oct 2005 06:38:26 -0500

**From:** "Michael Lazenby" <mlazenby@peak6.com>

**To:** rbtjlarson@yahoo.com

**CC:** "Karen Day" <kday@peak6.com>, "Danny Rosenthal" <drosenthal@peak6.com>

October 24, 2005



Robert Larson
5300 N. Sheridan Road
Apt. 203
Chicago, IL 60640

Dear Robert:

We are very happy you have decided to join PEAK6 Investments, LP, as the Compliance Officer for the Blackbird project!

The purpose of this letter is to confirm the conditions of your employment. Your employment is contingent upon a successful reference and background check, including fingerprints, which will be completed shortly after your start date. It is the express policy of PEAK6 that the employment relationship between you and PEAK6 is at-will. This means that the employment relationship may be terminated, with or without cause, at any time by you or by the company.

Please consider this letter to be confidential in nature, between PEAK6 and yourself, and not to be discussed with any other potential candidates for employment or employees at PEAK6. Should you have any questions, please do not hesitate to contact Michael Lazenby directly at (312) 362-2441.

- **Your Start Date**
Your first day will be Friday, October 28, 2005. Please report to Michael Lazenby at 141 W. Jackson, Suite 500, at 8:30AM.

- **Employment Status**
This will be a full-time position. We will evaluate your position on February 28, 2006, and determine if we are able to continue to offer you full-time employment.

- **Your Compensation**
Your compensation will be $120,000 per year, and will be paid on the 15th and 30th of each month. This is an exempt position.

- **Benefits**
You will be eligible to participate in our extensive benefits package. Details on all the benefits programs can be found on the enclosed document entitled *PEAK6 Investments, LP Benefits Summary for Full-Time Employees - 2005*. Your benefits will be reviewed with you in more detail on your first day.

- **Intent to Transfer**
We are initially hiring you as an employee of PEAK6 Investments, LP. However, we have the intention of transferring your employment to a new start-up company. We anticipate this transfer to occur at some point during 2005 or early 2006.

    - **Impact of Transfer on Benefits**
It is our intention that the new start-up company that you will be transferring into will have an employee benefits package. However, the benefits at the new company will likely differ in substantial ways from the PEAK6 benefits package.

    - **Performance Based Rewards**
It is our intention that the new start-up company that you will be transferring to will offer discretionary performance-based rewards that will be distributed based on both the profitability of the company and your contributions to the company's success. If this is the case, you will be eligible for those rewards.

- **Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition**
As a condition of your employment with PEAK6 Investments, LP, you will be required to sign an Employee Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition (Exhibit H attached).

Robert, we are convinced that you represent the future for our company. We believe that you bring a strong background to our team, and that you will positively impact our efforts. We look forward to your start and to a satisfying association!

Sincerely,


Karen Day
Human Resources Manager

Danny Rosenthal
Chief Technology Officer

Michael C. Lazenby, Sr.
PEAK6 Investments
mlazenby@peak6.com
(312) 362-2441
(312) 362-2335 (Fax)


## Attachments

Files:

Benefits_Summary_Sheet___Full_Time_Employees.rtf (164k) [Preview]

Exhibit_H___Employee_Agreement_Regarding_Confidentiality_and_Non_Solicitation___V4.doc (99k) [Preview]

| | | | |
|---|---|---|---|
| **Annual** | $120,000.00 | **Job** | Compliance Officer |
| **Period** | $5,000.00 | **Salary grade** | None |
| **Weekly** | $2,307.69 | **Pay frequency** | Semi-Monthly |
| **Hourly** | $57.6901 | **Scheduled hours** | 86.6700 |

| | | | |
|---|---|---|---|
| **Original hire date** | 10/28/2005 | **Last change date** | |
| **Last hire date** | 10/28/2005 | **Last change percent** | |
| **Date in job** | 10/28/2005 | | |

None





| | | | |
|---|---|---|---|
| **Job** | COMOFF - Compliance Officer | **Employee number** | 000000260 |
| **Alternate title** | | **Time clock** | |
| **Date in job** | 10/28/2005 | **Location** | IL1 - Main |
| **Time in job** | Years:0 Months:11 | **BUSINESS UNI** | OH - OptionsHouse |
| **Salary grade** | None | **DIVISIONS** | BROKER - Broker |
| **Supervisor** | Daniel M Rosenthal | **DEPARTMENTS** | 030100 - Blackbird |
| **Tip type** | Non-Applicable | **ENTITY** | OH - OptionsHouse |
| | | **Shift** | None |

None







Destiny Health Insurance Company
Chronic Medication Benefit Registration Form

The Destiny Health insurance plan includes a Chronic Medication Benefit, which covers medication for certain Chronic Illnesses. **Only medications/treatments for those illnesses that appear on the Chronic Illness List (see Section E on the back of this page) are eligible for this benefit.** The presence of a specific condition and/or completion of this Chronic Medication Benefit Registration Form is not a guarantee of coverage under the Chronic Medication Benefit and is subject to the patient's eligibility at the time services are rendered and all plan provisions, exclusions and limitations.

In order to activate this benefit, you will need to:
1. Complete Sections A, B and C.    (Incomplete information may delay implementation of this benefit)
2. Sign and Date Section D.
3. Send or fax completed form to:

Destiny Health Insurance Company
Attn: Health Services Department
200 West Monroe St., Suite 2100
Chicago, IL 60606

Confidential Fax# 312-224-7506



If you have any questions, please call Destiny HealthConnect™ at (888) 999-4958. You may also be eligible for participation in the FutureHealth® Care Management Program. A FutureHealth Nurse may be contacting you.

## ALL FIELDS ARE MANDATORY – ONE FORM PER PATIENT

### SECTION A: MEMBER INFORMATION

| Employee Name (policyholder) | Employee ID # | Employee Effective Date | Group Name and Group # |
|---|---|---|---|
| ROBERT J. LARSON | DY0116/36 | 11/27/2005 | PEAK6 INV 10D139-1 |
| Member Name (patient) | Member ID # | Member Effective Date | Member Date of Birth |
| ROBERT J. LARSON | DY0116136 | 12/27/2005 | 06-09-1957 |

### SECTION B: PHYSICIAN INFORMATION

| Physician's Name and Specialty | Physician's Address | Physician's Phone # |
|---|---|---|
| 1. JEROME FRANKEL | 4640 N. MARINE DRIVE | 773-564-5355 |
| 2. AMJAD SHEIKH | 4640 N. MARINE DRIVE | 773-564-5900 |

If you have more physicians, please provide the above information on a separate piece of paper.

### SECTION C: CHRONIC ILLNESS INFORMATION

| Condition(s): Indicate Diagnosis from the Chronic Illness List (See Section E) | Date or Year Diagnosed | Treating Physician (# from above) | Prescribed Medication: | Current Medications | | |
|---|---|---|---|---|---|---|
| | | | | Dosage | Frequency | Route |
| 1. OSTEOARTHRITIS | 2002 | FRANKEL | CELEBREX | 200MG | ONE | DAILY |
| 2. ATHEROSCLEROSIS | 2002 | FRANKEL | LIPITOR | 20MG | ONE | DAILY |
| 3. HYPERTENSION | 2002 | FRANKEL | DIOVAN/HCT | 160/12.5 | TWO | DAILY |
| 4. | | | | | | |

### SECTION D: CONSENT TO RELEASE MEDICAL INFORMATION

I consent to the release of my medical information to Destiny Health Insurance Company or its representatives. A photocopy of this consent shall be considered as effective and valid as the original. This consent shall be considered valid for one year from the date signed.

| Member Signature | Date |
|---|---|
| ROBERT J. LARSON | 12-29-05 |
| Parent/Legal Guardian Signature (if the member does not have the legal capacity to sign) | Date |
| | 12-29-05 |

CMBRF 4.0 1/04

⑦

## SECTION E: CHRONIC ILLNESS LIST

### Cardiovascular

Angina
Atherosclerosis
Cardiomyopathy
Conductive Disorders
Dysrhythmias
Heart Failure
Hyperchlolestermia
Hypertension
Ischemic Heart Disease
Peripheral Vascular Disease
Valvular Heart Disease

### Gastrointestinal

Achalasia
Barrett's Esophagus
Chronic Pancreatitis
Cirrhosis
Crohn's Disease
Cystic Fibrosis
Inflammatory Bowel Disease
Portal Hypertension
Short Bowel Syndrome
Ulcerative Colitis
Zollinger-Ellison Syndrome

### Neurologic

Alzheimer's Disease
Amyotrophic Lateral
   Sclerosis (ALS; Lou
   Gehrig's Disease)
Cerebral Atherosclerosis
Cerebral Palsy
Cerebrovascular Disease
Epilepsy
Multiple Sclerosis
Myasthenia Gravis
Narcolepsy
Neuropathy
Parkinson's Disease
Pseudotumor Cerebi
Tourette's Syndrome
Transient Cerebral
   Ischemia

### Pulmonary

Asthma
Bronchiectasis
Chronic Obstructive
   Pulmonary Disease
   (COPD)
Cystic Fibrosis
Emphysema
Interstitial Lung Disease
Pulmonary Embolism
Pulmonary Hypertension
Sarcoidosis



### Dermatologic

Bullous Dermatoses
Chronic Skin Ulcers
Cutaneous Lupus
   Erythematoses
Psoriasis

### Hematologic

Chemotherapy-induced
   Anemias
Hemophilia
Hypercoagulation Syndrome
Pernicious Anemia
Thrombocytosis

### Opthalmic

Glaucoma
Keratoconjunctivitis Sicca
Uveitis

### Other
Anaphylaxsis

### Renal/Genitourinary

Benign Prostatic
   Hyperplasis (BPH)
Chronic Prostatitis
Chronic Interstitial
   Cystitis
Chronic Renal Failure
Diabetic Nephropathy
Glomerulonephritis
Lupus Nephropathy
Nephrotic Syndrome
Neurogenic Bladder
Renal Artery Stenosis
Renal Tubular Acidosis
Urinary Incontinence

### Endocrine

Acromegaly
Addison's Disease
Cushing's Disease
Diabetes Insipidus
Diabetes Mellitus
Hyperthyroidism
Hypogonadism
Hypoparathyroidism
Hypopituitarism
Hypothyroidism

### Infectious Disease

Chronic Hepatitis
HIV
Sarcoidosis
Tuberculosis

### Neoplasms

Chemotherapy – induced
   Anemias
Chemotherapy – induced
   Nausea & Vomiting
Neoplasms with Oral Drug
   Therapy

### Psychiatric*

Attention Deficit Disorder *
   (ADD)
Bipolar Mood Disorder*
Childhood Psychoses*
Chronic Panic Disorder*
Dementia*
Eating Disorders*
Major Depressive
   Disorder*
Obsessive-Compulsive
   Disorder*  (OCD)
Psychoses*
Schizophrenia*

### Rheumatologic

Ankylosing Spondilitis
Fibromyalga
Gout
Osteoarthritis
Osteoporosis
Polymyalgia Rheumatica
Pseudo-gout-
   Chondrocalcinosis
Psoriatic Arthritis
Rheumatoid Arthritis
Scleroderma
Sjogren's Disease
Systemic Lupus
   Erythematosus (SLE)
Vasculitis

*Psychiatric Conditions are not covered under the Destiny Health Insurance Individual Policy.

CMBRF 4.0 1/04

# CAREMARK

*It all starts with care®*

2700 MILAN COURT
BIRMINGHAM, AL 35211
1-800-552-8159



COPY

| Account: | 1201164586 |
| | ROBERT J LARSON |
| | 5300 N SHERIDAN RD |
| | # 203 |
| | CHICAGO, IL 60640-0000 |
| Invoice | 120605445353 |
| Date of Fill: | 02/23/2006 |

| | | |
|---|---|---|
| LIPITOR TAB 20MG<br>000710156 | PFIZER U.S | 54.00 |
| CELEBREX CAP 200MG<br>000251525 | PFIZER U.S | 54.00 |
| DIOVAN HCT TAB 160/12.5<br>000780315 | NOVARTIS | 96.00 |

| | |
|---|---|
| Shipping and Handling: | 0.00 |
| Sales Tax: | 0.00 |
| Resulting in Your Cost of: | 204.00 |
| PREVIOUS BALANCE: | 0.00 |
| RECEIVED AMOUNT: | |
| Amount Charged: | 204.00 |

Payment By: AMERICAN EXPRESS
Card #XXXXXXXXXXX2008  Exp. Date: 06/30/2006

| | |
|---|---|
| TOTAL BALANCE DUE: | 0.00 |

Note: Please ensure that your doctor writes the month, day and year on all prescriptions that you submit to Caremark. Prescriptions without this information may be delayed. Also, remind your doctor to write your mail service prescriptions for the maximum quantity and days supply allowed by your prescription plan. If there is a discrepancy with your order, please contact Caremark Customer Care within 30 days.



1201164586

# Destiny ❸ Health™

PO Box 4628, Oak Brook, IL 60523-4628

Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

**COPY**

Statement Number: 20
Page: 3

## Claim Detail

| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense |
|---|---|---|---|---|---|---|
| 26442S1/1 | 04/12/2006 | Finn, H | 99203 Evaluation and Management | 134.00 | 0.00 | 134.00 |
| 26442S1/2 | 04/12/2006 | Finn, H | 20610 Surgery Services | 241.00 | 0.00 | 241.00 |
| | | | **TOTAL** | 375.00 | 0.00 | 375.00 |

## Deductible Accumulation

| Applied To Remaining Annual Deductible | HS In-Network/ HS Out-Network |
|---|---|
| 0.00 | 0.00/0.00 |
| 0.00 | 0.00/0.00 |
| 0.00 | 0.00 |

## Benefit Paid From

| PMF | Insured Benefit (Non-PMF) |
|---|---|
| 0.00 | 120.60 |
| 0.00 | 216.90 |
| 0.00 | 337.50 |

## Payment Information

| Paid to You | Paid to Provider | You Owe to the Provider | Code |
|---|---|---|---|
| 0.00 | 120.60 | 13.40 | 4, 105, 222 |
| 0.00 | 216.90 | 24.10 | 4, 105, 222 |
| 0.00 | 337.50 | 37.50 | |

## Notes

| Code | |
|---|---|
| 4 | NON-PARTICIPATING PROVIDER. BENEFITS WERE PAID BASED ON OUR MAXIMUM ALLOWABLE EXPENSE. |
| 105 | PLEASE NOTE THAT PREFERRED BENEFITS WERE APPLIED. |
| 222 | IF ALL OR A PORTION OF YOUR CLAIM HAS BEEN DENIED, YOU HAVE THE RIGHT TO APPEAL. YOU MUST SUBMIT YOUR APPEAL IN WRITING, WITHIN 180 DAYS, TO THE ADDRESS LISTED ON THE FIRST PAGE OF THIS NOTICE. |

Please do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

NOTICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in Chicago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.



# Destiny ◈ Health™

PO Box 4628, Oak Brook, IL 60522-4628

**COPY**

Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

Statement Number: 37
Page: 3

## Claim Detail

| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense |
|---|---|---|---|---|---|---|
| 3076048/1 | 09/10/2006 | CAREMARK | 00078031534 Prescription | 325.46 | 325.46 | 0.00 |
| 3076049/1 | 09/10/2006 | CAREMARK | 00025152551 Prescription | 241.32 | 241.32 | 0.00 |
| 3076050/1 | 09/10/2006 | CAREMARK | 00071015623 Prescription | 285.63 | 285.63 | 0.00 |
| **TOTAL** | | | | 852.41 | 852.41 | 0.00 |

## Deductible Accumulation

| Applied To Remaining Annual Deductible | HS In-Network/ HS Out-Network |
|---|---|
| 0.00 | 0.00/0.00 |
| 0.00 | 0.00/0.00 |
| 0.00 | 0.00/0.00 |
| 0.00 | 0.00 |

## Benefit Paid From

| Savings Account* | Insured Benefit |
|---|---|
| 0.00 | 229.46 |
| 0.00 | 187.32 |
| 0.00 | 231.63 |
| 0.00 | 648.41 |

## Payment Information

| Paid to You | Paid to Provider | You Owe to the Provider | Code |
|---|---|---|---|
| 0.00 | 229.46 | 96.00 | 1, 68 |
| 0.00 | 187.32 | 54.00 | 1, 68 |
| 0.00 | 231.63 | 54.00 | 1, 68 |
| 0.00 | 648.41 | 204.00 | |

Savings Account refers to the type of funding you have and could be an HRA/HSA or Savings Account

| Code | Notes |
|---|---|
| 1 | THANK YOU FOR CHOOSING A PARTICIPATING PROVIDER. BENEFITS WERE BASED ON THE PROVIDER'S CONTRACTED DISCOUNT. |
| 68 | PLEASE NOTE THE AMOUNT INDICATED AS OWED TO THE PROVIDER REPRESENTS THE COPAY YOU PAID AT THE TIME OF SERVICE. |

ease do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

OTICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in
icago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.

# Destiny ⬢ Health™

PO Box 4628, Oak Brook, IL 60523-4628

Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

Statement Number: 12
Page: 1

COPY

| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense | Deductible Accumulation | | Benefit Paid From | | Payment Information | | | |
| --- | --- | --- | --- | --- | --- | --- | Annual | HS In-Network/ HS Out-Network | PMF | Insured Benefit (Non-PMF) | Paid to You | Paid to Provider | You Owe to the Provider | Code |
| 24061091 | 02/23/2006 | CAREMARK | 00076031534 | 325.46 | 325.46 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 229.46 | 0.00 | 229.46 | 96.00 | 1, 68 |
| 24061101 | 02/23/2006 | CAREMARK | 00025152551 | 241.32 | 241.32 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 187.32 | 0.00 | 187.32 | 54.00 | 1, 68 |
| 24061111 | 02/23/2006 | CAREMARK | 00071015623 | 285.63 | 285.63 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 231.63 | 0.00 | 231.63 | 54.00 | 1, 68 |
| TOTAL | | | | 852.41 | 852.41 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 648.41 | 0.00 | 648.41 | 204.00 | |

**Notes**

| Code | |
| --- | --- |
| 1 | THANK YOU FOR CHOOSING A PARTICIPATING PROVIDER. BENEFITS WERE BASED ON THE PROVIDER'S CONTRACTED DISCOUNT. |
| 68 | PLEASE NOTE THE AMOUNT INDICATED AS OWED TO THE PROVIDER REPRESENTS THE COPAY YOU PAID AT THE TIME OF SERVICE. |

Please do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

NOTICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in Chicago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.

011HLC0004.DD.DESTINY.22228.308/000649/000994/

# Destiny ⊗ Health™

PO Box 4628, Oak Brook, IL 60523-4628

**COPY**

Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

Statement Number: 2
Page: 3

| Claim Detail | | | | | | | | Deductible Accumulation | | | Benefit Paid From | | | Payment Information | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense | | Applied to Remaining Annual Deductible | HS In-Network/ HS Out-Network | | Savings Account* | Insured Benefit | | Paid to You | Paid to Provider | You Owe to the Provider | Code |
| 28792151 | 07/11/2006 | CAREMARK | 00078031534 Prescription | 325.46 | 325.46 | 0.00 | | 0.00 | 0.00/0.00 | | 0.00 | 229.46 | | 0.00 | 229.46 | 96.00 | 1, 68 |
| 28792161 | 07/11/2006 | CAREMARK | 00025152551 Prescription | 241.32 | 241.32 | 0.00 | | 0.00 | 0.00/0.00 | | 0.00 | 187.32 | | 0.00 | 187.32 | 54.00 | 1, 68 |
| 28792171 | 07/11/2006 | CAREMARK | 00071015623 Prescription | 285.63 | 285.63 | 0.00 | | 0.00 | 0.00/0.00 | | 0.00 | 231.63 | | 0.00 | 231.63 | 54.00 | 1, 68 |
| **TOTAL** | | | | 852.41 | 852.41 | 0.00 | | 0.00 | 0.00 | | 0.00 | 648.41 | | 0.00 | 648.41 | 204.00 | |

| Code | Notes |
|---|---|
| 1 | THANK YOU FOR CHOOSING A PARTICIPATING PROVIDER. BENEFITS WERE BASED ON THE PROVIDER'S CONTRACTED DISCOUNT. |
| 68 | PLEASE NOTE THE AMOUNT INDICATED AS OWED TO THE PROVIDER REPRESENTS THE COPAY YOU PAID AT THE TIME OF SERVICE. |

Savings Account refers to the type of funding you have and could be an HRA/HSA or Savings Account

...ase do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

...TICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in ...cago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.

# Destiny ⬥ Health™

PO Box 4628, Oak Brook, IL 60523-4628

**COPY**



Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

Statement Number:
Page: 3

| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense | Deductible Accumulation — Applied To Remaining Annual Deductible | Deductible Accumulation — HSI In-Network/ HSO Out-of-Network | Benefit Paid From — Savings Account* | Benefit Paid From — Insured Benefit | Payment Information — Paid to You | Payment Information — Paid to Provider | Payment Information — You Owe to the Provider | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3295469/1 | 11/13/2006 | CAREMARK | 00078031534 Prescription | 325.46 | 325.46 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 229.46 | 0.00 | 229.46 | 96.00 | 1, 68 |
| 3295470/1 | 11/13/2006 | CAREMARK | 00025152551 Prescription | 241.32 | 241.32 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 187.32 | 0.00 | 187.32 | 54.00 | 1, 68 |
| 3295471/1 | 11/13/2006 | CAREMARK | 00071015623 Prescription | 285.63 | 285.63 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 231.63 | 0.00 | 231.63 | 54.00 | 1, 68 |
| **TOTAL** | | | | 852.41 | 852.41 | 0.00 | 0.00 | 0.00 | 0.00 | 648.41 | 0.00 | 648.41 | 204.00 | |

Savings Account refers to the type of funding you have and could be an HRA/HSA or Savings Account

| Code | Notes |
|---|---|
| 1 | THANK YOU FOR CHOOSING A PARTICIPATING PROVIDER. BENEFITS WERE BASED ON THE PROVIDER'S CONTRACTED DISCOUNT. |
| 68 | PLEASE NOTE THE AMOUNT INDICATED AS OWED TO THE PROVIDER REPRESENTS THE COPAY YOU PAID AT THE TIME OF SERVICE. |

lease do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

OTICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in hicago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.

**Destiny Health™**

PO Box 4628, Oak Brook, IL 60523-4628

COPY

Statement Number: 19
Page: 3

Subscriber Name: ROBERT LARSON
Subscriber ID: DY0116136
Member Name: ROBERT LARSON

### Claim Detail

| Claim/Line No. | Date | Provider | Service | Billed Amount | Discounted Amount | Maximum Allowable Expense | Deductible Accumulation — Applied To Remaining Annual Deductible | HS In-Network/ HS Out-Network | Benefit Paid From — PMF | Insured Benefit (Non-PMF) | Paid to You | Paid to Provider | You Owe to the Provider | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2646919/1 | 05/03/2006 | CAREMARK | 00078031534 Prescription | 325.46 | 325.46 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 229.46 | 0.00 | 229.46 | 96.00 | 1, 68 |
| 2646920/1 | 05/03/2006 | CAREMARK | 00025152551 Prescription | 241.32 | 241.32 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 187.32 | 0.00 | 187.32 | 54.00 | 1, 68 |
| 2646921/1 | 05/03/2006 | CAREMARK | 00071015623 Prescription | 285.63 | 285.63 | 0.00 | 0.00 | 0.00/0.00 | 0.00 | 231.63 | 0.00 | 231.63 | 54.00 | 1, 68 |
| TOTAL | | | | 852.41 | 852.41 | 0.00 | 0.00 | 0.00 | 0.00 | 648.41 | 0.00 | 648.41 | 204.00 | |

### Notes

| Code | |
|---|---|
| 1 | THANK YOU FOR CHOOSING A PARTICIPATING PROVIDER. BENEFITS WERE BASED ON THE PROVIDER'S CONTRACTED DISCOUNT. |
| 68 | PLEASE NOTE THE AMOUNT INDICATED AS OWED TO THE PROVIDER REPRESENTS THE COPAY YOU PAID AT THE TIME OF SERVICE. |

Please do not hesitate to contact our Customer Care Center if you should have any inquiries regarding this remittance. They can be reached by calling 888-999-4957 or send an e-mail to customercare@destinyhealth.com

NOTICE OF AVAILABILITY: We are required by law to provide the following state insurance department information if your claim has been denied in whole or in part: The Illinois Department of Insurance maintains a Consumer Division in Chicago at 100 W Randolph St., Suite 15-100, Chicago, IL 60601; and in Springfield at 320 W Washington Street, Springfield, IL 62767.

# Destiny  Health™

### The Future of Health Insurance. Now.™

Robert Larson
5300 N Sheridan Rd Apt 203
Chicago, IL 60640

| | |
|---|---|
| Subscriber Name: | Robert Larson |
| Member Name: | Robert Larson |
| Subscriber ID: | DY0116136 |
| Physician Name: | Dr Frankel/Sheikh |

January 3, 2006



Dear Robert Larson:

Thank you for taking the time to register for our Chronic Medication Benefit Program. Your registration has been approved for the Chronic Medication Benefit coverage effective 11/29/2005. This enhanced benefit means that the prescription(s) listed below will be insured by Destiny Health, minus any co-payments, rather than being funded out of your Personal Medical Fund (PMF).

**The approval is for:**
   **Condition(s):**

| | | |
|---|---|---|
| Atherosclerosis | Hypertension | Osteoarthritis |

   **Medications:**

| | | |
|---|---|---|
| Lipitor | Diovan/HCT | Celebrex |

Treatment for this as well as other conditions is covered as stated in your Certificate and group membership materials. These materials explain the full terms, limitations, and exclusions of your coverage.

If your treating physician changes the treatment for the specified condition(s) or you develop a new chronic condition, you will not need to complete any additional forms, but you will need to notify our Health Services Department at (888) 999-4958. You do not need to call Health Services when a treatment plan ends, a dosage is changed or a drug is discontinued.

Our decision on the availability of benefits is based on your eligibility for health care coverage. Please continue to use your Destiny Health Member ID card at your pharmacy for all prescription purchases, including those covered under the Chronic Medication Benefit.

Again, thank you for completing the registration process and please call (888) 999-4958 if you have any remaining questions.

Sincerely,

Health Services
Destiny Health

M18-0501

⑧

## Benefits Summary for Full-Time Employees - 2005

PEAK6 considers its employees to be the Company's greatest asset. Therefore, it may not be surprising that PEAK6 believes benefits to be an important part of your total compensation package.

### As of your 1st day, you can enjoy the following benefits:

➢ **Vacation** - PEAK6 provides 3 weeks or 15 days based on a standard calendar year. For the first year vacation days are prorated based on the month and week in which you are hired rounded to the nearest half day based on the following formula; 15 days times remaining weeks in the year divided by 52 weeks.

➢ **Personal Time-Off (PTO) Bank** – PEAK6 provides 7 personal time-off days per calendar year that can be used for a variety of reasons, such as because of sickness, to observe religious holidays, to practice preventative health and dental care, etc. First year eligibility is prorated based on the month and week of hire using the same formula as vacation days.

➢ **Paid Holidays** - The company's holiday schedule is consistent with the Exchange's holiday schedule, which for the year 2005 includes:
- ☺ Jan. 17th – Martin Luther King Day
- ☺ Feb. 21st - Washington's Birthday (Observed)
- ☺ Mar. 25th – Good Friday
- ☺ May 30th – Memorial Day
- ☺ July 4th – Independence Day
- ☺ Sept. 5th – Labor Day
- ☺ Nov. 24th – Thanksgiving
- ☺ December 26th – Christmas (Observed)

➢ **A Casual Work Environment** - PEAK6 employees enjoy a casual dress code, not just on Fridays, but all week long!

➢ **Matching Gifts Program** - PEAK6 will match charitable contributions up to $250 for approved organizations for up to 3 organizations per employee per year.

➢ **CTA/RTA Transit Benefit Program** – Allows you to purchase through pre-tax payroll deductions CTA Chicago Card Plus cards and RTA transit checks that are delivered to your work location.

➢ **Direct Deposit** – For your convenience PEAK6 can arrange to have your paycheck directly deposited into the checking and/or savings accounts of your choice.

➢ **Credit Union** – PEAK6 offers employees membership in Progress Credit Union. Services include high interest savings accounts, free checking, low interest loans, and ATM/VISA check cards.

➢ **Employee Assistance Program** – Another program available to you and your immediate family members. This program provides access to counselors who can help with issues such as: family or relationship problems, marital conflicts, work-related problems, substance use or abuse, depression, eating disorders, anxiety and stress, grief and loss, emotional or physical abuse, etc.

➢ **529 College Savings Program** – Another program available to you and your immediate family members. This allows for employees to have after-tax money deducted from their paycheck to save for their children's or their own college education.

➢ **Pre-Tax Parking Program** – you have the option of contributing up to $200 in pre-tax dollars to be set aside in an account for reimbursement of qualified parking expenses.

➢ **Dell - Employee Purchasing Program** – purchase items for your own personal use from our primary technology vendor, Dell, at a discounted rate.

### After 30 days of employment at PEAK6, you will enjoy:

➢ **Medical and Dental Insurance** - You can choose coverage through Destiny Health. Your plan includes comprehensive protection for hospitalization, outpatient surgery, and chronic medication, as well as a Personal Medical Fund (PMF) for you and your family's day-to-day healthcare needs. The dental insurance portion of the plan provides coverage for preventative, basic, and major procedures, as well as orthodontic care. The PMF is a unique feature of this plan, as it rewards you for being a wise consumer of health care services. Money that is contributed by PEAK6 and is remaining in your PMF at the end of your policy year remains yours, rolls over and is payable to you should you leave the plan.

➢ **Vision Coverage** - This program is available to you and your dependents, if you elect medical and dental coverage, and covers any supplies and services for the treatment of visual imparities, such as regular eye exams; prescription eyewear; contact lenses; refractive laser eye surgery and optometric vision therapy. The maximum benefit for an individual is $250 or $500 per family.

➢ **Life and AD&D Insurance** - PEAK6 offers through Assurant Employee Benefits, life insurance and accidental death and dismemberment coverages up to $50,000 to help protect your family's financial future if you die or become dismembered.

➢ **Dependent Life Insurance** - PEAK6 also provides through Assurant Life Insurance up to $5,000 in life insurance for your dependents.

➢ **Wellness Program** - Destiny Health offers additional incentives to members for making healthy choices.

### Optional benefits (employee paid) available after 30 days of employment:

➢ **Dependent Day Care Program (via AFLAC)** – A program that allows an individual employee to contribute up to $5,000 (pre-tax) per year into an account to provide for qualified dependent day care expenses.

➢ **Personal Accident Protection Plan (via AFLAC)** – A program that provides for supplemental expenses related to a personal accident or injury.

➢ **Personal Cancer Protection Plan (via AFLAC)** – A program that provides for supplemental expenses related to diagnosis of cancer for covered individuals.

### On the first day of the calendar month coinciding with or next following 60 consecutive days of employment, you will also have:

➢ **Short-Term Disability Insurance** - PEAK6 covers a total disability at 90% of your earnings beginning on the 6th day of disability up to the 90th day of disability.

➢ **Long-Term Disability Insurance** - PEAK6 through Northwestern Mutual Life Insurance Company covers partial or total disability at 60% or your earnings beginning the 91st day after you become disabled.

### After 3 months of employment at PEAK6, you will enjoy:

➢ **Tuition Reimbursement** - PEAK6 will reimburse 100% of the cost of tuition expense and books for undergraduate course work and certification successfully completed during non-working hours up to $3,000 per year and 100% of the cost of tuition expense and books for graduate course work and certification successfully completed during non-working hours up to $8,000 per year.

### After the first quarter following six months of employment at PEAK6, employees 18 years of age and older, can take advantage of the company's:

➢ **401k Profit Sharing Plan** - PEAK6 is committed to helping you achieve a financially secure retirement. You can prepare for retirement by saving and investing tax-deferred income in the company's 401K program. PEAK6 makes discretionary annual contributions into your 401k account based on the company's profitability.

*Should there be a conflict between the information provided in this summary and the governing PEAK6 Plan Documents, the Plan Documents apply.*



## Disciplinary Policy

Policy #: BA- 010    Effective Date: June 1, 2005

The purpose of this policy is to provide PEAK6's policy on taking disciplinary action against an employee.

The intended users of this policy are all employees.

PEAK6 recognizes that a variety of situations may call for disciplinary actions. As a general practice, PEAK6 will employ a progressive approach in taking disciplinary action that could include any combination of the following:

- Individual coaching
- Verbal warning
- Written warning
- Suspension
- Immediate termination of employment

The PEAK6 *Disciplinary Policy* will be administered to promote fairness, with common sense, and in light of the individual circumstances of each situation. PEAK6's general practice to take a progressive approach towards disciplinary action is not a binding or rigid framework that must be mechanically applied in every case, nor should it be construed as forming a contract of any kind.

The severity, intent and frequency of unwanted employee behavior will be taken into consideration before any disciplinary action is taken. Corrective action, except for cases of misconduct calling for immediate termination, generally will be taken to help an employee get back on the right track.

A verbal warning will be given by the employee's manager for any minor behavior or violation that requires corrective action. Verbal warnings may be issued to an employee who is not meeting job expectations, or has violated a company rule or a policy, but whose intentions are not to undermine the integrity of the PEAK6 operations. Managers issuing verbal warnings will describe the infraction to the employee. Notes on the verbal warning may be noted in the employee's file. Depending on the severity of the situation, an employee may be immediately issued a written warning instead of a verbal warning.

A written warning will be given by the employee's manager for either failure to alter behavior after a verbal warning, or for violation of a company rule or policy. Written warnings will be kept in the employee's personnel file. Depending on the severity of the situation, an employee may be immediately suspended with or without pay, instead of being issued a written warning.

An employee may be suspended by his or her manager for either failure to alter behavior after a written warning, or for the violation of a company rule or policy. The suspension may consist of suspending the employee from:

- his or her regular job duties and temporarily reassigning him or her with pay to other duties,
- from work with pay, or
- from work without pay.

The offenses that may subject employees to immediate termination are:

1. Breach of confidentiality and/or conflicts of interest, including unauthorized removal from Company premises of Company property, records or other materials.

2. Insubordination: abusive language or conduct directed at a manager, refusal to comply with instructions of your manager, or refusal to comply with Company directives and policies.



3. Abusive or insolent behavior and/or language toward other employees or customers.

4. Fighting, horseplay, disorderly conduct, violation of safety rules, or any other act or omission that might endanger the safety of others.

5. Physical or verbal threat of violence towards other employees or members of the public.

6. Negligently or intentionally damaging Company equipment, products, or records.

7. Falsifying or altering work hour records, including the application for employment or any documents accompanying the application for employment.

8. Dishonesty and/or theft.

9. Harassment, including sexual harassment, of any employee, outside contractor, temporary employee, or customer of the Company.

10. Excessive absenteeism, lateness or early departures. Unreported or unexcused absences of three or more days will be considered a voluntary termination of employment.

11. Unauthorized access (or enabling unauthorized access) to physical files, storage rooms, secured areas, including unauthorized access to computer files or disks.

12. Willful waste of Company material.

13. Unsatisfactory performance or productivity.

14. Possession, use or sale of controlled substances or alcohol on Company property or while conducting Company business; or reporting to work under the influence of alcohol or controlled substances.

15. Smoking inside the building and/or in designated "no smoking" areas.

16. Commission of an immoral or criminal act whether on or off the job.

17. Possession of firearms or other dangerous weapons on Company premises or while conducting Company business.

18. Failure to return promptly from approved leaves of absence.

19. Misuse of Company funds or property.

20. Performing personal work on Company time or equipment without permission.

21. Breach of Company security policies.

22. Three violations of risk limits.

23. Violation of PEAK6's Business Ethics and Compliance Policy.

24. Violation of any other policy or procedure detailed in issued memorandums or publications.

The above list is not intended to be all-inclusive, and the rules are subject to change. All employees are encouraged to contact their manager and/or the Human Resources Manager for any clarification of these rules. Some areas may also have specific rules that are not included in this policy. Any questions relative to the above items or specific rules should be addressed to your manager or Human Resources department.

PEAK6 does not have any policy or practice for payment of severance pay or for providing outplacement services at termination. On occasion, and at the company's sole discretion, it may decide to offer such pay and/or outplacement to particular employees.

 

## Policy against Discrimination and Harassment

Policy #: HR- 012    Effective Date: June 1, 2005

The purpose of this policy is to provide PEAK6's policy on discrimination and harassment in the work place.

The intended users of this policy are all employees.

PEAK6 is proud of its professional and congenial work environment, and strives to maintain a work environment that remains pleasant for all who work here. PEAK6 is committed to maintaining a workplace free of:

- employment discrimination or harassment on the basis of any characteristic protected by law,

- retaliation for engaging in protected activity, and

- failure to provide reasonable accommodation for disability or religion.

PEAK6 provides an Internal Complaint Procedure (described below) that current and former employees should use if they feel that the company has not fulfilled this commitment. PEAK6 prohibits retaliation against any employee because he or she made a good faith report under its Internal Complaint Procedure.

PEAK6 prohibits discrimination in employment based on any characteristic protected by law, including race, color, national origin, sex, age, religion, disability, or sexual orientation (each of which shall be referred to throughout this Policy as a "protected characteristic"). Employment discrimination occurs when an employee is adversely affected because of a protected characteristic with respect to any term or condition of employment (including hiring, compensation, advancement, discipline, or termination). PEAK6 will take appropriate measures to prevent and/or stop any such discrimination. Any employee who is aware of conduct that may violate this policy should promptly report the conduct using the Internal Complaint Procedure described below.

PEAK6 prohibits harassment in employment based on any protected characteristic, and will take appropriate measures to prevent and/or stop any such harassment. Any employee who is aware of conduct that may violate this policy should promptly report the conduct using the Internal Complaint Procedure described below. Harassment that violates this policy is broadly defined as any conduct, whether verbal or physical, that denigrates, insults, or offends a person or group because of a protected characteristic where:

1. submission to such conduct is made an explicit or implicit term or condition of employment;

2. submission to or rejection of such conduct is used as a basis for any employment decision; or

3. such conduct has the purpose or effect of interfering with an employee's work performance or creating an intimidating, offensive or hostile working environment.

PEAK6 will not tolerate any form of harassment (including but not limited to sexual harassment) of an employee by another employee or manager. This policy also strictly prohibits any form of harassment of third parties (such as customers, outside contractors, or other individuals who engage in business with PEAK6) by PEAK6 employees or managers and prohibits harassment of employees and managers by any third party. All employees must treat each other with courtesy, consideration, and professionalism. In addition, harassment based on factors such as race, sex, national origin, disability, sexual orientation, age, religion, medical condition, marital status, family care or medical leave status, or veteran status is prohibited by state and federal laws, which may subject PEAK6 and/or individual harassers to liability for any such unlawful conduct. With this policy, PEAK6 not only prohibits unlawful harassment, but other unprofessional and discourteous actions. Accordingly, derogatory racial, ethnic, religious, age, sexual orientation, sexual or other inappropriate remarks, slurs, or jokes will not be tolerated. Harassment because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions. Sexual harassment includes unwanted sexual advances, requests for sexual favors, and other visual, verbal or physical conduct of a sexual nature. Sexually harassing conduct can be by a person of either the same or opposite sex.



Each employee must exercise his or her good judgment to avoid engaging in conduct that may be perceived as discrimination or harassment. Behaviors that may violate this policy may include but is not limited to:

- **Verbal Conduct**
  Requests for sexual favors; lewd or derogatory comments or jokes; questionable compliments; terms of endearment; comments regarding sexual behavior or the body of another employee; propositions; making or threatening reprisals after a negative response to sexual advances; sexual innuendo; derogatory or vulgar comments or jokes regarding race, sex, religion, ethnic heritage, age, disability, veteran status, physical appearance or sexual orientation; and other vocal activity such as catcalls or whistles.

- **Visual/Non-Verbal Conduct**
  Letters, e-mails, objects, notes, invitations, photographs, cartoons, articles, or other written or pictorial materials of a sexual, racial, ethnic, religious nature or related to a person's disability, age, veteran status; physical appearance or sexual orientation; leering; and obscene sexual gestures.

- **Physical Conduct**
  Any unwanted physical contact of any kind, including assault, or impeding or blocking of movements.

PEAK6 is committed to providing reasonable accommodation to enable qualified employees with disabilities to perform the essential functions of their jobs. Depending on the circumstances, reasonable accommodation may include modifying the work environment, making facilities accessible, restructuring a job, adjusting work schedules, granting leave, or other measures.

PEAK6 is also committed to providing reasonable accommodation of an employee's sincere religious observances and beliefs that conflict with normal job requirements.

Any employee who believes he or she needs accommodation based on disability or religion is responsible for bringing the matter to the attention of the Human Resources Manager. In the case of disability, the employee may be required to provide medical documentation establishing the existence of a disability, any job-related restrictions, and the estimated length of time for which accommodation is needed. PEAK6 will keep all medical information confidential to the greatest extent practicable.

Any employee who believes he or she has been denied reasonable accommodation in violation of this policy should promptly notify the Human Resource Manager and/or a member of management per the Internal Complaint Procedure described below.

Any employee who believes he or she has been discriminated against or harassed by a co-worker, manager, executive manager, outside contractor, customer, or other person should promptly report such harassment to the Human Resource Manager and/or a member of the management team. An employee should not allow an inappropriate situation to continue by not reporting it, regardless of who is creating that situation. If for some reason an employee feels uncomfortable reporting the conduct to the Human Resources Manager, the complaint should be brought to the any member of management. It is each and every employee's responsibility to report harassment to the proper authority so that appropriate action can be taken. Managers who receive complaints or who observe harassing conduct should notify the Human Resource Manager immediately. The Human Resources Manager will promptly and thoroughly investigate all complaints of harassment and, based on the investigation, will take appropriate corrective and preventive action. Every effort will be made to conduct an investigation in as discreetly a manner as is possible. All facts concerning any investigation (including the identity of the complaining party, the person alleged to have violated this policy, and other witnesses) will be kept confidential from anyone who does not have a legitimate reason to know about them, subject to management's need to investigate and take appropriate remedial measures. If harassment is established, PEAK6 will discipline the offender. Disciplinary action for violation of PEAK6's *Policy Against Discrimination and Harassment*, and/or not cooperating during an investigation may result in verbal or written warnings, suspension without pay, and/or termination of employment. The Human Resource Manager will inform the complaining employee of 1) how the investigation was concluded and 2) of any corrective action that was taken.

Any employee may also file a charge of discrimination or harassment with the Illinois Department of Human Rights within 180 days of the date the discrimination or harassment took place. The Illinois Department of Human Rights accepts charges at its two offices:

- James R. Thompson Center
  100 West Randolph, Suite 10-100
  Chicago, IL 60601
  (312) 814-6200

- 222 South College, Room 101A
  Springfield, IL 62704
  (217) 785-5100

PEAK6 prohibits any retaliation against any employee who in good faith brings a complaint to the attention of the company and/or participates in any investigation regarding a complaint. PEAK6 will not tolerate reprisals or retaliation against employees for reporting harassment or for assisting in any action related to this policy. Additionally, it is unlawful for PEAK6 to retaliate against an employee who has filed a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing conducted by the Illinois Department of Human Rights.

# PEAK6

## Important Information about Performance Trackers

All employees' *Performance Trackers* will be stored on this drive:

P:\Performance Trackers\2004 - Jan goals



Team Goals for all departments within the firm will be stored on this drive:

P:\Performance Trackers\2004 - Jan goals\Team Goals for Firm

You no longer need to e-mail updates you make on your *Performance Tracker* to your manager or to HR!  By updating and saving your *Performance Tracker* on the drive above, you will automatically be making it available for viewing by your manager, HR, and the partners.

Only you, your manager, HR and the partners are aware of the password assigned to your *Performance Tracker*.  Your password is your employee ID number, which is also listed on your <u>pay check stub</u>.  (See upper right hand corner of any pay stub.  It's the number right next to your name.)  You may also contact the <u>Human Resources Director</u> for your password.  To ensure those who need access to your *Performance Tracker* have it, DO NOT CHANGE YOUR PASSWORD.

You will be required to update your Performance Tracker 3 times a year:



- **May 7th**

- **September 10th**

- **January 7th**

Reminders of the required due dates will be sent to you by the <u>Human Resources Director</u>.  However, it is highly recommended that you update your *Performance Tracker* every month.

*Performance Trackers* will be used to assist with the bonus allocations process.  Additionally, bonus allocations will done in conjunction with the required *Performance Tracker* due dates, May 7th, September 10th, and January 7th.  ~~... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... For example, you fail to update your Performance Tracker~~ by May 7th, you might forfeit any bonus allocation that was made on your behalf for January 1st – April 30th of that year.)  So, use your *Performance Tracker* to tell your manager and the partners about your contributions!



*PEAK6*
# *Employee Handbook*



· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## Performance Updates

PEAK6 employs a rigorous 4-phase performance management process to help employees add value and achieve their highest level of performance in a way that supports the company's mission and strategy. The second and third phases of this process are performance updates. The following lists the activities that each employee is responsible for during these phases:

- **Performance Updates**
  **Due date:** Each quarter
  In May and September of each year, all employees are required to revisit the team goals, individual SMART goals, employee development goals, and routine job responsibilities documented on their *Performance Tracker*. (All employees should update their *Performance Tracker* stored on the P:\Performance Tracker drive.)

  Specifically, employees provide details on the progress made toward the accomplishment of goals and performance of routine job responsibilities in the "performance comments" section of the *Performance Tracker*. This is also the time to document any additional goals or routine job responsibilities that have been taken on since the last time the *Performance Tracker* was updated. Any goals or routine job responsibilities that are no longer applicable should be noted as such in the "performance comments" section. Although not required, it is highly recommended that once an employee has updated his or her *Performance Tracker*, he or she schedule a brief meeting with his or her manager to discuss overall job performance. These meetings are great opportunities for employees to get feedback, and coaching on how to maximize their job performance. Finally, every employee is encouraged to use mentor meetings as opportunities to get additional coaching and guidance on how to achieve goals listed on his or her *Performance Tracker*.

  **Click below for an Excel version of the Performance Tracker. (All references above are in Word format.)**
  Performance Tracker – Excel Version

- **Important Information About Performance Trackers**







# Exhibit H: Employee Agreement Regarding Confidentiality, Nonsolicitation and Noncompetition

This Employee Confidentiality, Nonsolicitation and Noncompetition Agreement ("**Agreement**") is made and entered into as of , _OCT 28_ , __, 2005 by and between **PEAK6 Investments, L.P.**, a Delaware limited partnership (the "Company"), and ___ROBERT  J.  LARSON___ ("Employee"). For purposes of this Agreement: (1) the term "Company" shall be deemed to include any successor organization and any current or future subsidiary, parent or affiliate of the Company, and (2) the term "Employee" shall apply to any person who is employed on a full-time or part-time, temporary or permanent, basis by the Company.

WHEREAS, the Company has and will expend considerable time, effort and resources in the development of certain proprietary information, which must be maintained as confidential in order to ensure the success of the Company's business; and

WHEREAS, Employee will have access to such information.

NOW THEREFORE, in consideration of (i) the covenants and promises contained herein, (ii) Employee's employment by the Company, (iii) the compensation and benefits received by Employee from the Company, including, without limitation, a discretionary bonus payable on or prior to January 31, 2005, and (iv) the access given Employee to the aforesaid information, the parties hereto agree as follows:

**▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**

A.  **Definitions.** As used herein, the term "**Proprietary Information**" means any and all information of or relating to the Company existing as of this date or hereafter developed or acquired, oral or written, that is confidential or proprietary in nature, including, without limitation:

1.  Inventions, designs, methods, systems, strategies, discoveries, works of authorship, trade secrets, creations, improvements or ideas developed or otherwise produced, acquired or used by the Company;

2.  The Company's proprietary programs, processes or software, consisting of, but not limited to, computer programs in source or object code and all related documentation, technical information and training materials, including all upgrades, updates, improvements, derivative works and modifications thereof, all algorithms, databases, models, programs and analyses of data, and including all such items in incomplete stages of design or which are part of the Company's research and development;

3.  The Company's educational processes and all materials related thereto;

4.  The Company's methods of doing business, including proprietary methods of trading and servicing methods for options;

5.  Trademarks, patents, copyrights, service marks, trade names and trade dress, along with all applications for the foregoing;

6.  The Company's business records, including market research, development or marketing plans, business strategies which have been implemented or are being considered and the Company's pricing information, pricing methods and financial information;

7.  The Company's lists of past, existing or potential clients or customers; and

8.  Any other information or documents which the Company reasonably regards as being proprietary or confidential, or which the Company is required by any of its directors, officers or Employees, or by any third party, to keep confidential.

B.  **Ownership of Proprietary Information.**

(13)

1. Employee hereby acknowledges that the Company is the owner of the Proprietary Information and Employee's assistance in the development of any Proprietary Information is or will be as an Employee of the Company and, as such, Employee hereby renounces any claim to the Proprietary Information.

2. Employee hereby agrees not to dispute, contest or deny any such ownership rights of the Company (or any third party, except to the extent authorized to do so by the Company), either during or after Employee's employment with the Company.

3. Subject to Paragraph B(4), Employee hereby assigns and agrees to assign to the Company at any time during and after Employee's employment with the Company, promptly at the Company's request and without additional compensation, all of Employee's right, title and interest in and to any Proprietary Information which Employee heretofore or hereafter may develop, or contribute to, or in which he or she acquired or may acquire rights, in whole or in part, as a result of his/her employment by the Company, and to sign such documents, provide such information and take such actions (or refrain from such action as may be requested by the Company) as may be reasonably necessary to accomplish such assignment.

4. Pursuant to the Illinois Employees' Patent Act, Public Act 83-493 (the "**Patent Act**"), the parties agree that Paragraph B(3) shall not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless the invention (i) relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development; or (ii) results from any work performed by Employee for the Company.

5. Subject to the requirements of the Patent Act, Employee acknowledges that any computer software or programs, documentation, works of authorship or other copyrightable works created in whole or in part by Employee during his employment with the Company shall be considered "works made for hire" under U.S. Copyright Act, 17 U.S.C. 101 and shall become part of the Proprietary Information.

6. During the period of six months after the termination of his/her employment relationship with the Company, upon written request by the Company, Employee shall notify the Company of all patents and copyrights claimed or applied for by Employee and provide the Company with a description of such patents and copyrights sufficient to enable the Company to consider whether the works over which they are claimed constitute, relate to, or are derived from, the Proprietary Information.

C. **Nondisclosure of Proprietary Information.**  Employee agrees to hold the Proprietary Information in the strictest confidence, both during and after Employee's employment relationship with the Company. To this end, Employee shall:

1. Not make, or permit or cause to be made, copies of the Proprietary Information, or use the Proprietary Information, except as necessary to carry out Employee's duties as prescribed by the Company;

2. Except as is necessary to carry out Employee's duties as prescribed by the Company, not disclose or reveal the Proprietary Information, or any portion thereof, to any person except other Company Employees or others to whom disclosure has been authorized;

3. Take all reasonable precautions to prevent the inadvertent disclosure by Employee of the Proprietary Information to any unauthorized person;

4. Not transport or cause to be transported the Proprietary Information outside the premises of the Company, except as necessary to carry out Employee's duties as prescribed by the Company; and

5. Not, without the Company's express written authorization, participate directly or indirectly in the development, marketing, sale, licensing or other exploitation of software or other products or services which embody or are derived from the Proprietary Information.

D. **Return of Proprietary Information.**  Upon the earlier occurrence of a request by the Company or

upon termination of employment, Employee shall deliver to the Company all written or printed documents, all tapes, disks and other electronic media (including without limitation any electronic mail and any attachment thereto) and all other tangible property in Employee's possession which contain any Proprietary Information.

**A.** **Nonsolicitation of Employees.** During Employee's employment with the Company and for the period of twelve (12) months after the effective date of Employee's termination, Employee will not, directly or indirectly, employ, retain or solicit for employment or retention (or assist any other party to take any such action regarding) or work directly with any individual who was, at any time during the twelve (12)-month period immediately prior to the termination of Employee's employment, an employee of the Company.

**B.** **Nonsolicitation of Customers.** During Employee's employment with the Company and for the period of twelve (12) months after the effective date of Employee's termination, Employee will not, for the purpose of engaging in the purchase, sale or exchange of stock options or other derivatives on behalf of any person or entity (excluding the Company or Employee's personal account), directly or indirectly, solicit, contact or engage in business with any person or entity which was, at any time during the twelve (12)-month period immediately prior to the termination of Employee's employment, a customer or client of the Company with which Employee conducted business during Employee's employment with the Company. For the sake of clarity, Employee understands and agrees that the term "customer or client of the Company" includes, but is not limited to, any trading desk with which the Company conducts transactions for the purchase, sale or exchange of stock options or other derivatives.

**C.** **Noncompetition.** During Employee's employment with the Company and for the period of six (6) months after the effective date of Employee's termination, Employee will not, within a 50 mile radius of the Company's headquarters, engage in proprietary trading or technology development for the proprietary trading of equity derivatives for another person or entity (other than the Company) that manages a broad-based portfolio, generally consisting of 150 or more securities, on a volatility arbitrage or market-making basis including, but not limited to, Citadel, G-Bar, Wolverine, Chicago Trading Company (CTC), and Ronin Capital LLC.

**D.** **Previous Noncompetition Agreements.** Employee hereby represents that, except as Employee has disclosed in writing to the Company, Employee is not a party to, or bound by the terms of, any agreement restricting Employee from competing, directly or indirectly, with the business of any party or otherwise engaging in any particular type of business. Employee further represents that Employee is under no obligation or restriction that would in any way prohibit, restrict, limit or otherwise be in conflict with Employee's employment with the Company. Employee represents that Employee has not removed, copied, reproduced, any confidential or proprietary information for any prior employer regardless of whether or not Employee is or was under any obligations of any other agreement with any previous employer. Employee and the Company hereby acknowledge and agree that the parties hereto respect all confidential or proprietary materials and information of all other persons and entities.

**A.** **Injunctive Relief.** Employee acknowledges and agrees that any breach or threatened breach by Employee of any of the provisions of this Agreement will cause irreparable harm and continuing damages to the Company and that the remedy at law for any such breach or threatened breach will be inadequate. Accordingly, in addition to any other remedies that may be available to the Company at law or in equity in such event, the Company shall be entitled to seek and obtain, from any court of competent jurisdiction, a decree of specific performance and a temporary and permanent injunction, without bond or other security and without proving special damages or irreparable injury, enjoining and restricting the breach or threatened breach.

**B.** **Complete Agreement.** This Agreement represents the complete agreement and understanding between the parties, and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. No modification of any of the terms or provisions of this Agreement shall

be effective unless executed in writing by Employee and by a duly authorized officer of the Company.

**C.    Assignability.** This Agreement is not assignable by Employee, but in any event shall be binding upon any of Employee's heirs, executors, administrators, assigns and legal representatives. The Company may assign this Agreement to any successor to all or a part of its business which employs Employee, and this Agreement shall inure to the benefit of the Company as well as its successors and assigns.

**D.    Severability and Blue Penciling.** If any clause, term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such clause, term or provision to persons or circumstances other than those to which it is invalid and unenforceable, shall not be affected thereby, and each clause, term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. If any court of competent jurisdiction shall deem any provision of the Agreement too restrictive, the other provisions shall stand, and the court shall modify the provision at issue to the point of greatest restriction permissible by law.

**E.    No Waiver.** Any waiver of breach of any of the terms, provisions, or conditions of this Agreement must be in writing to be effective, and shall not be construed or held to be a waiver of any other breach, or a waiver of, acquiescence in, or consent to any further or succeeding breach thereof.

**F.    Governing Law.** The terms and provisions of this Agreement shall be governed by and construed according to the laws of the State of Illinois, without regard to its principles regarding conflict of laws.

EMPLOYEE UNDERSTANDS THAT EXECUTING AND AGREEING TO BE BOUND BY THIS AGREEMENT IS A CONDITION TO AND PREREQUISITE OF HIS/HER EMPLOYMENT WITH THE COMPANY. EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS HAD THE OPPORTUNITY TO CONFER WITH LEGAL COUNSEL CONCERNING THIS AGREEMENT. EMPLOYEE HAS HAD AMPLE TIME TO CONSIDER THIS AGREEMENT AND BY SIGNING BELOW, ACKNOWLEDGES THAT EMPLOYEE IS ENTERING THIS AGREEMENT KNOWINGLY AND VOLUNTARILY AND INTENDS TO BE BOUND BY IT. AGREED TO AND ACCEPTED BY:

_____
**Employee Signature**

ROBERT   J.   LARSON
_____
**Printed Name**

OCT 28, 2005
_____
**Date**

# PEAK6

## 2005 Performance Tracker

PEAK6 rewards employees for their performance. Performing successfully on the job can be hectic as you try to figure out where to focus your efforts and how to prioritize. Knowing this, PEAK6 wants to do everything in its power to set you up for success. You should use this tracker to prepare for any meetings with your manager(s) to plan and review your job performance.

**Name:** Robert Larson
**Hire Date:** 10/28/2005

**Position/Title:** Director of Compliance
**Manager:** Danny/Rich



| Team Goals | | | | Employee or Manager Comments | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
| Launch ezOptions | Traders trading on ezOptions account | 1 Tester Trading at a time per symbol | Can complete a simple (no-spreads) trade of stocks or options. Can log bugs. Testing Jan 15-Jan31. | 1. Stock & Option Quotes 2. Positions 3. Order Ticket (No Spread) 4. Activity Reporting 5. Bug Reporting (JIRA) | | | |
| Launch ezOptions | Peak6 "Customers" trading (on individual, multiple accounts) | 10-20 Peak6 traders | Traders can execute simple and spread trades according to suitability rules. Can see balances. Can enter bugs; get some online support (FAQs) Testing Feb 5-Feb 25. | 1. Cash/Margin Balances 2. Commissions 3. Spread Orders 4. Suitability 5. Account Sign up UI 6. Trading Error Messages 7. Trading Help/FAQ 8. Order Restrictions | | | |
| Launch ezOptions | Friends and Family trading | 100 Friends and Family accounts. | Traders can do above plus; Get support, automated account setup, View 3rd party content, do ACH transfers. Testing Feb 26-Mar 18. | 1. ezTools (3) 2. Transfers (Cash) 3. Help 4. 3rd Party Content 5. Fully Automated Account Setup 6. Automate Accounting | | | |



Ex 14

| | | Open to Public (50 states). "Real" Customers by | Traders can do the above plus set watchlists, set up auto-trading, securities in and out of account. Testing Mar 19-Apr 9. | 1. Message Center 2. Watchlists 3. Preferences 4. More ezTools 5. Auto-Trade 6. Securities in/Out |
|---|---|---|---|---|
| Launch ezOptions | Marketing Launch | Publicity campaign/marketing start. | Traders can do the above, plus have live chat. Start April 9 | 1. Live Chat |
| **My Goals** | | | | |
| Launch ezOptions | Register ezOptions in all fifty states and the DC and PR. | Continue registering individual states, DC and PR until all fifty are completely registered. | Follow-up with all remaining unregistered states, DC and PR to complete registration process. | Follow-up with all remaining unregistered states, DC and PR to complete registration process. |
| Launch ezOptions | Accomplish my daily goals. | Daily compliance review of all active customer accounts. | I will try to register all fifty by Feb 5 but a drop-dead of March 19th. I will commence my daily review activities by no later than Jan 15th. | 1. Stock & Option Quotes 2. Positions 3. Order Ticket (No Spread) 4. Activity Reporting 5. Bug Reporting (JIRA) |
| Launch ezOptions | Accomplish my weekly goals. | Weekly compliance with compliance activities which require weekly review. | I will commence my weekly review activities by no later than Jan 15th. | 1. Cash/ Margin Balances 2. Commissions 3. Spread Orders 4. Suitability 5. Account Sign up UI 6. Trading Error Messages 7. Trading Help/FAQ 8. Order Restrictions |
| Launch ezOptions | Accomplish my monthly and quarterly goals. | Monthly and quarterly compliance with compliance activities which require monthly and quarterly review. | I will commence my monthly and quarterly review activities by no later than Jan 15th. | 1. ezTools 2. Transfers (Cash) 3. Help 4. 3rd Party Content 5. Fully Automated Account Setup 6. Automate Accounting |
| Launch ezOptions | Accomplish my annual and as-needed goals. | Annual and as-needed compliance with compliance activities which require annual and as-needed review. | I will commence my annual and as-needed review activities by no later than Jan 15th. | 1. Message Center 2. Watchlists 3. Preferences 4. More ezTools 5. Auto-Trade 6. Securities in/Out |
| Launch ezOptions | System Testing | Prepare systems for customer launch. | February 4, 2006 Alpha Date. | ezTools 1. Transfers (Cash) 3. Help 4. 3rd Party Content 5. Fully Automated Account Setup 6. Automate Accounting |
| Launch ezOptions | Learn to Use Technology | Prepare a list | March 18, 2006. | Peak 6 Technology. |

| ...tions | Customer Service FAQs | Prepare a list of customer questions and answers for the Firm's Customer Service FAQs. | February 4, 2006 Alpha Date. | 1. Stock & Option Quotes 2. Positions 3. Order Ticket (No Spread) 4. Activity Reporting 5. Cash/ Margin Balances 6. Commissions 7. Spread Orders 8. Suitability 9. Account Sign up UI | | |
|---|---|---|---|---|---|---|
| Launch ezOptions | Customer daily questions and answers | Prepare scripts for customer service personnel to respond to customer problems when clients sell in | February 4, 2006 Alpha Date. | 1. Stock & Option Quotes 2. Positions 3. Order Ticket (No Spread) 4. Activity Reporting 5. Cash/ Margin Balances 6. Commissions 7. Spread Orders 8. Suitability 9. Account Sign up UI | | |

*Want more rows? Click so your cursor is in a cell in the last row of the table.  Click on "Table", click on "Insert", click on "Row Below."*



| Director of Compliance. | Every minute of the day 365 days a year. | Help the firm in start-up and contiun | | |
|---|---|---|---|---|

*Want more rows? Click so your cursor is in a cell in the last row of the table.  Click on "Table", click on "Insert", click on "Row Below."*

## Employee Acknowledgement
(Print and sign in December of each year only! Otherwise e-mail completed version to the Human Resources Manager.)

I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily mean that I agree with the evaluation.

*Employee Signature* _____ Robert J. Larson    *Date:* January 12, 2006

*Manager Signature* _____    *Date:* 1/19/06

**COPY**

## Notes and/or General Performance Comments:
(OPTIONAL: Either the manager or the employee can document below any notes he/she would like have on file about the employee's performance throughout the year.  Notes could include general performance strengths, areas for improvement, future goals, upcoming projects, etc.)

PEAK6

141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
P: 312.362.2401
F: 312.362.2315
www.peak6.com

# Congratulations!
## Robert J Larson

*PEAK6 Investments, L.P. is pleased to present you with a:*

## Cash Bonus of $1,000



*This represents our acknowledgement of your
commitment to the company, your contribution to
the team and your individual efforts. We look
forward with great*

*Sincerely,*

_____          _____
*Matt Hulsizer*                                    *Jenny Just*



(15)

# Organization Registration Status



| Organization CRD#: 135625 | Organization Name: EZOPTIONS |
|---|---|
| Organization SEC#: 8-66936 | Applicant Name: EZOPTIONS |
| No IA Record | |

| SEC / SRO / Jurisdiction | Registration Status | Status Effective Date |
|---|---|---|
| SEC | Approved - | 11/03/2005 |
| NASD | Approved - | 11/03/2005 |
| AL | Approved - | 02/01/2006 |
| AK | Approved - | 01/30/2006 |
| AZ | Approved - | 02/16/2006 |
| AR | Approved - | 02/09/2006 |
| CA | Approved - | 01/06/2006 |
| CO | Approved - | 01/09/2006 |
| CT | Approved - | 02/15/2006 |
| DE | Approved - | 02/09/2006 |
| DC | Approved -, | 02/02/2006 |
| FL | Approved - | 02/03/2006 |
| GA | Approved - | 02/03/2006 |
| HI | Approved - | 02/14/2006 |
| ID | Approved - | 01/04/2006 |
| IL | Approved - | 12/07/2005 |
| IN | Approved - | 01/24/2006 |
| IA | Approved - | 01/26/2006 |
| KS | Approved - | 02/07/2006 |
| KY | Approved - | 01/09/2006 |
| LA | Approved - | 02/02/2006 |
| ME | Approved - | 02/15/2006 |
| MD | Approved - | 01/24/2006 |
| MA | Approved - | 01/09/2006 |
| MI | Approved - | 02/08/2006 |
| MN | Approved - | 01/03/2006 |
| MS | Approved - | 01/03/2006 |
| MO | Approved - | 02/07/2006 |

| MT | Approved - | 01/04/2006 |
|---|---|---|
| NE | Approved - | 02/02/2006 |
| NV | Approved - | 01/19/2006 |
| NH | Approved - | 02/21/2006 |
| NJ | Approved - | 02/03/2006 |
| NM | Approved  -DP: ROBERT J. LARSON 1565322 | 01/31/2006 |
| NY | Approved - | 01/13/2006 |
| NC | Approved - | 01/10/2006 |
| ND | Approved - | 01/24/2006 |
| OH | Approved - | 01/24/2006 |
| OK | Approved - | 01/06/2006 |
| OR | Approved - | 01/26/2006 |
| PA | Approved - | 01/23/2006 |
| PR | Approved - | 01/27/2006 |
| RI | Approved - | 01/10/2006 |
| SC | Approved - | 01/10/2006 |
| SD | Approved - | 01/05/2006 |
| TN | Approved - | 03/31/2006 |
| TX | Approved - | 03/29/2006 |
| UT | Approved - | 01/06/2006 |
| VT | Approved - | 02/07/2006 |
| VA | Approved - | 01/11/2006 |
| WA | Approved - | 01/03/2006 |
| WV | Approved - | 01/04/2006 |
| WI | Approved - | 01/18/2006 |
| WY | Approved - | 01/23/2006 |

4/5/2006

# There is 1 individual broker that meets your search criteria.

Click on the name of the individual broker to review the File.

| Individual Broker's Personal Information | Currently Approved Registrations with: | Current Employment with NASD Member Firm(s) |
|---|---|---|
| ROBERT JEROME LARSON<br>**CRD #**1565322<br><br>*Other Names*<br>ROBERT J LARSON | AK, AL, AR, AZ, CA, CO, CT, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NASD, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY | **OPTIONSHOUSE, INC.**<br>CHICAGO , Illinois<br><br>**Previous Employment**<br>DIRECT CAPITOL SECURITIES<br><br>COPY |



File for:                                                    Data Current as of: 01/29/2007

CRD# 1565322
ROBERT JEROME LARSON

# ALL CURRENT EMPLOYMENTS

This section provides all current employments (investment-related and
non-investment related) as reported on the individual broker's Form U-4.
It displays the name of the employing brokerage firm that employs this
individual broker, the brokerage firm's CRD number (if applicable), the
location of the office where the individual broker is employed, and the
individual broker's start date.

To view information on NASD registered firms, you can click on the
brokerage firm name hyperlink.

If the individual broker is currently employed with an investment adviser,
the investment adviser's name and CRD number will display. However,
additional information is not available on investment advisers through
NASD BrokerCheck as they are not NASD registered brokerage firms.

If the individual broker is currently employed with a brokerage firm
registered with any self-regulatory organization other than NASD (e.g.,
the NYSE), either the brokerage firm's name or "Other Business" will
display as the Employing Firm. To obtain the brokerage firm's name
when "Other Business" displays as the Employing Firm, please call the
NASD BrokerCheck Hotline number, 1-800-289-9999.

A Brokerage Firm CRD Number will display for NASD registered
brokerage firms the individual broker is currently associated with. A
Brokerage Firm CRD Number will not display for NASD registered firms
the individual broker was formerly associated with.

In addition, a Brokerage Firm CRD Number will not display for employing
brokerage firms that are not NASD registered firms. Information on
these employing brokerage firms is not available through NASD
BrokerCheck.

| | |
|---|---|
| **Employing Brokerage Firm:** | OPTIONSHOUSE, INC. |
| **Brokerage Firm CRD Number:** | 135625 |
| **Office of Employment Address:** | 141 WEST JACKSON BLVD SUITE 500 CHICAGO, IL 60604 |
| **Start Date:** | 10/24/2005 |
| **End Date:** | to present |

## Other Business

File for:

CRD# 1565322

ROBERT JEROME LARSON

Data Current as of: 01/29/2007

# Registrations

This section provides the jurisdictions with which the individual broker is currently registered or licensed to do business, the category of each registration, and the date on which the registration approval was granted.

**Employer: OPTIONSHOUSE, INC.**

| Jurisdiction/SRO | Category | Status | Status As Of Date |
|---|---|---|---|
| AK | Agent | Approved | 01/31/2006 |
| AL | Agent | Approved | 02/22/2006 |
| AR | Agent | Approved | 02/09/2006 |
| AZ | Agent | Approved | 02/23/2006 |
| CA | Agent | Approved | 01/06/2006 |
| CO | Agent | Approved | 01/10/2006 |
| CT | Agent | Approved | 02/15/2006 |
| DC | Agent | Approved | 02/10/2006 |
| DE | Agent | Approved | 02/10/2006 |
| FL | Agent | Approved | 02/06/2006 |
| GA | Agent | Approved | 02/07/2006 |
| HI | Agent | Approved | 02/22/2006 |
| IA | Agent | Approved | 01/26/2006 |
| ID | Agent | Approved | 01/05/2006 |
| IL | Agent | Approved | 12/07/2005 |
| IN | Agent | Approved | 01/26/2006 |
| KS | Agent | Approved | 02/07/2006 |
| KY | Agent | Approved | 01/17/2006 |
| LA | Agent | Approved | 02/02/2006 |
| MA | Agent | Approved | 01/09/2006 |
| MD | Agent | Approved | 01/24/2006 |
| ME | Agent | Approved | 02/16/2006 |
| MI | Agent | Approved | 02/09/2006 |
| MN | Agent | Approved | 01/11/2006 |
| MO | Agent | Approved | 02/08/2006 |
| MS | Agent | Approved | 01/09/2006 |
| MT | Agent | Approved | 01/06/2006 |
| NASD | Equity Trader | Approved | 11/03/2005 |
| | Financial and Operations | Approved | 11/03/2005 |

| | | | |
|---|---|---|---|
| | Principal General Securities Principal | Approved | 11/03/2005 |
| | General Securities Representative | Approved | 11/03/2005 |
| | General Securities Sales Supervisor | Approved | 11/03/2005 |
| | Municipal Securities Principal | Approved | 11/03/2005 |
| | Registered Options Principal | Approved | 11/03/2005 |
| NC | Agent | Approved | 01/12/2006 |
| ND | Agent | Approved | 01/24/2006 |
| NE | Agent | Approved | 02/08/2006 |
| NH | Agent | Approved | 02/22/2006 |
| NJ | Agent | Approved | 02/10/2006 |
| NM | Agent | Approved | 01/31/2006 |
| NV | Agent | Approved | 01/20/2006 |
| NY | Agent | Approved | 01/20/2006 |
| OH | Agent | Approved | 01/24/2006 |
| OK | Agent | Approved | 01/09/2006 |
| OR | Agent | Approved | 01/26/2006 |
| PA | Agent | Approved | 01/23/2006 |
| PR | Agent | Approved | 02/03/2006 |
| RI | Agent | Approved | 01/10/2006 |
| SC | Agent | Approved | 01/11/2006 |
| SD | Agent | Approved | 01/05/2006 |
| TN | Agent | Approved | 04/04/2006 |
| TX | Agent | Approved | 04/28/2006 |
| UT | Agent | Approved | 01/10/2006 |
| VA | Agent | Approved | 01/19/2006 |
| VT | Agent | Approved | 02/09/2006 |
| WA | Agent | Approved | 01/05/2006 |
| WI | Agent | Approved | 01/18/2006 |
| WV | Agent | Approved | 01/05/2006 |
| WY | Agent | Approved | 01/23/2006 |

**Robert Larson**

| | |
|---|---|
| **From:** | Karen Day [kday@peak6.com] |
| **Sent:** | Tuesday, May 09, 2006 5:12 PM |
| **To:** | PEAK6; Blackbird; JOE; Hedge Fund |
| **Subject:** | Performance Trackers Due - May 17th |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| **Attachments:** | 2006 Performance Tracker - BSC Format - Blank Template.doc |

# Our Deadline:

All employees are required to turn in updated Performance Trackers by **Wednesday, May 17th!**

# Directions:

Now's the time to report the progress you've made toward the accomplishment of any goals established between **January and April** of this year by commenting in the "Results" section of your Performance Tracker. This is also the time to document on your Performance Tracker the goals you'll be working on in the upcoming months. Although not required, it is highly recommended that once you have updated your Performance Tracker, you schedule a brief meeting with your manager to discuss your overall job performance. This informal meeting is a great opportunity to get feedback and coaching on how to be maximize your job performance.

# Getting Started:

If your manager distributed a Performance Tracker to you, please update it and save it down on P:\Performance Trackers\2006. Use the following format for the file name: "Last Name, First Name." Be sure to password protect your Performance Tracker with your employee ID number. (Found in the upper right hand corner when you log into the payroll system.) If your manager didn't distribute a Performance Tracker to you, feel free to use the template attached. This new template incorporates the new strategic planning terminology.

# The Incentive: Why Do This?

Your updated Performance Tracker will be used to assist with the bonus allocations process. Bonus allocations are done in conjunction with the required Performance Tracker due dates (usually in May, September, and January of each year.) If you fail to update your Performance Tracker on time, you might "forfeit" your bonus allocation for the preceding time period. (For example, you fail to update your Performance Tracker by May 17th, you might forfeit any bonus allocation that was made on your behalf for January 1st – April 30th of this year.) So, use your Performance Tracker to tell your manager and the partners about your contributions!

(18)

# Robert Larson

| | |
|---|---|
| **From:** | Pat Barry [pbarry@peak6.com] |
| **Sent:** | Tuesday, May 16, 2006 9:41 AM |
| **To:** | David Budworth; Gong Szeto; Joel Blumenau; Rich Bojanowski; Bob Baldwin; Robert Larson |
| **Cc:** | Pat Barry |
| **Subject:** | RE: Performance Trackers |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

COPY

If it's ok with you guys -
I'm just going to go ahead & schedule these mtgs; you don't have to "schedule with me" unless you want to .

**From:** Danny Rosenthal
**Sent:** Tuesday, May 16, 2006 9:01 AM
**To:** Blackbird
**Cc:** Pat Barry
**Subject:** RE: Performance Trackers

Please remember to do your performance trackers and schedule a meeting with the person who will review it.  If I am that person, please schedule with Pat.

**From:** Danny Rosenthal
**Sent:** Thursday, May 11, 2006 2:36 PM
**To:** Blackbird
**Subject:** Performance Trackers

In case you were wondering…  We are doing performance trackers.  These are important for a number of reasons:
- They provide us the opportunity to think about what we should be doing and how we can best help ourselves and ezOptions.
- They provide us with the opportunity to make sure that our goals line up with the people who manage us.
- We do so much short term thinking, this is one thing that is guided at setting larger longer term goals.
- They help us course correct if an individual or a group is not well aligned with our corporate goals.

Here is how it will work with us:
1. Each person should take a stab at filling out their own performance tracker.  Think about what you can do to improve yourself and also provide longer term help and growth to ezOptions.
   a. Do not set too many or too few goals – no less than 2 and no more than 5.
   b. Goals should be larger.  Do not say that I want to become more proficient with JIRA.  Do say, I think that I can be more valuable if I take responsibility for all of the ezTools and want to be the expert involved in creation of each tool.
2. Arrange a meeting with your manager(s)
   a. We do not have an extremely clear hierarchy in ezOptions and do not need one today.  So we use the term "manager" loosely.  Think of it more as an objective third party who is helping by making informed observations to help you set goals.
      i. Rob -> David
      ii. David -> Danny
      iii. Daniel -> Gong/David
      iv. Stef -> Gong
      v. Gong -> Danny
      vi. Danny -> Matt/Jenny
      vii. Scott -> Gong/David
      viii. Joel -> Danny
      ix. Rich -> Danny
      x. Bob L -> Danny/Rich
      xi. Bob B -> Danny



7/5/2006

3. Bring your new performance tracker and your last one if you had it. You should review whether or not you met previous goals and find agreement about what the future goals should be.

4. Each person is responsible for setting up the meeting with their "manager(s)." Do not expect the manager to do it for you.

Let me know if you have questions.

**Robert Larson**

**From:**          Robert Larson
**Sent:**          Tuesday, May 16, 2006 11:33 AM
**To:**            'Pat Barry'
**Subject:**       Accepted: Bob Larson - Performance Tracker



1

20

PEAK6

141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
P: 312.362.2401
F: 312.362.2315
www.peak6.com

July 21, 2006

Dear Robert Larson,

7/23/06 will mark the 9th anniversary of PEAK6's first trading day. We like to take a moment each year on this date to celebrate what has most certainly become a profitable and growing enterprise and to reflect on the spirit of the people that made the journey successful, memorable and enjoyable.

As a sign of our appreciation and in recognition of this important date, you will be receiving a check in the amount of $723.00. We hope that you always value being part of the PEAK6 team as much as we value having you on the team, that you continue to dedicate yourself to the business and that we continue to enjoy many good times together.

Sincerely,

Matthew Hulsizer

Jennifer Just

21

# Order Audit Trail System (OATS)—Late Reporting; Failing to Report; False, Inaccurate or Misleading Reporting; and Clock Synchronization Failure

NASD Systems and Programs Rules 6950 through 6957

| Principal Considerations in Determining Sanctions¹ | Monetary Sanction¹ | Suspension, Bar or Other Sanctions |
|---|---|---|
| **See Principal Considerations in Introductory Section**<br><br>1. Nature of OATS reporting violation.<br><br>2. Extent to which violative conduct affected the regulatory audit trail.<br><br>3. Whether violation occurred over an extended period of days.<br><br>4. Whether reporting violation was readily apparent from a review of NASD's OATS Web site.⁴<br><br>5. While respondents are responsible for the systems that they use and the third-party vendors that they employ, the appropriate level of sanctions will depend on whether the respondent diligently chose, installed, and tested a system that nevertheless malfunctioned; the frequency and thoroughness with which the respondent ensured that the system was operating in compliance with applicable rules; and the care that the respondent exercised in undertaking all necessary steps to correct systems-related malfunctions. The same considerations apply to a respondent that has relied on a third-party vendor's products or services. | ***Late Reporting, Failing to Report, False, Inaccurate or Misleading Reporting***<br><br>**First Action¹**<br>Fine of $5,000 to $10,000.<br><br>**Second Action**<br>Fine of $10,000 to $50,000.<br><br>**Subsequent Actions**<br>Fine of $10,000 to $100,000.³<br><br>In all egregious cases, whether a first, second, or subsequent action, consider a fine greater than or equal to the high end of the range for a first, second, or subsequent action.<br><br>***Failure to Synchronize Clocks***<br><br>**First Action**<br>Fine of $5,000 to $10,000.<br><br>**Subsequent Actions**<br>Fine of $10,000 to $50,000.⁵ | ***For All Types of Violations***<br><br>*Firm*<br><br>**Subsequent Actions**<br>Consider suspending the firm with respect to any or all activities or functions for up to 30 business days.<br><br>In egregious cases, consider a lengthier suspension (of up to two years) or expulsion of the firm.<br><br>*Individual*<br><br>**Subsequent Actions**<br>Consider suspending the responsible individual in any or all capacities for up to 30 business days.<br><br>In egregious cases, consider a lengthier suspension (of up to two years) or a bar.<br><br> |

61

1 In cases in which the violators: (1) involve a pattern or patterns of misconduct, (2) can be quantified by number or percentage, or (3) can be compared to the standard maintained by industry peers, Adjudicators may consider deviating from the fine structure recommended in this guideline for first, second, or subsequent actions. Imposition of monetary sanctions greater than those recommended in this guideline may be particularly appropriate in cases involving violations that occurred during two or more examination or review periods or violations that occurred over an extended period of time. Similarly, in cases in which the respondent acted intentionally or recklessly, and in cases in which the respondent's compliance rate is significantly lower than that of its peers, Adjudicators may impose a monetary sanction in excess of the recommended range.

2 A respondent's delegation of its reporting responsibilities to a third party who caused or contributed to respondent's violation is not an independent basis for mitigation.

3 Adjudicators should consider actions concerning violative events that occurred within the three years prior to the misconduct at issue. Events that are more recent in time, however, should be given more weight than less recent events.

4 In cases in which the respondent fails for more than one week to detect a failure to report that would have been apparent from a review of data on the OATS Website, Adjudicators should consider the respondent's violations to be egregious.

5 If respondent's second or subsequent action involves a violation that is less serious than a prior violation, includes conduct that demonstrates that respondent is improving its compliance rate, or involves mitigation that did not exist in a prior action, Adjudicators may consider imposing a fine that is less than the fine imposed in the prior action.

**Robert Larson**

| | |
|---|---|
| **From:** | Robert Larson |
| **Sent:** | Friday, August 11, 2006 8:59 AM |
| **To:** | Danny Rosenthal |
| **Subject:** | Marketing Ideas |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |



Good Morning Danny:

Last week you and I talked about some marketing ideas for OptionsHouse, you told me that you wanted to get together at some later date to discuss my ideas. Are you still interested in any of them If not, I shall not comment to you on the matter any further.

Thank you.

Bob Larson

Robert J. Larson
Director of Compliance

OptionsHouse, Inc.
141 West Jackson Blvd, Suite #500
Chicago, Illinois 60604
Direct 312.362.2398 Fax 312.362-0071
rlarson@ezOptions.com



**Robert Larson**

| | |
|---|---|
| **From:** | Danny Rosenthal |
| **Sent:** | Tuesday, August 29, 2006 6:32 PM |
| **To:** | Robert Larson |
| **Cc:** | Rich Bojanowski |
| **Subject:** | RE: Claussen UTMA Accounts and Naked Options Trading |



we have to figure out what is appropriate.  if we cannot let him do it, then we will not.  rich will try to get more info on what he wants to do and see what we can figure for him.  i do not want to break any rules.

---

**From:** Robert Larson
**Sent:** Tue 8/29/2006 1:06 PM
**To:** Danny Rosenthal
**Subject:** Claussen UTMA Accounts and Naked Options Trading


Good Afternoon Danny:

Mr. Steve Claussen has requested that we open four UTMA/IL Accounts. These accounts are:

127-55518 Steve Claussen Custodian FBO Michael Claussen UTMA/IL
127-55526 Steve Claussen Custodian FBO Abigail Claussen UTMA/IL
127-55534 Steve Claussen Custodian FBO John Claussen UTMA/IL
127-55542 Steve Claussen Custodian FBO Grace Claussen UTMA/IL

Mr. Claussen wants to trade uncovered (i.e. naked) options in each of these accounts.

I told Mr. Claussen that I would require your approval in order to allow naked options writing in these accounts.

I strongly recommend that we NOT allow naked options writing in these accounts. As UTMA account, our fiduciary laibility increases exponentially with these types of accounts. UTMA Accounts cannot by law margin securities and thus a Margin Account cannot be opened. I have never seen an UTMA Account trade naked options. Also, the regulators look negatively on allowing such trading in such an account. Please let me know if you still want to allow such trading to be done in these accounts.

Thank you.

Bob Larson

Robert J. Larson
Director of Compliance

OptionsHouse, Inc.
141 West Jackson Blvd, Suite #500
Chicago, Illinois 60604
Direct 312.362.2398 Fax 312.362-0071
rlarson@OptionsHouse.com

30-08-06 06:57 RCVD

(24)

8/30/2006

TO: Nancy McKinney, Director of Human Resources, PEAK6

FROM: Robert J. Larson, Director of Compliance, OptionsHouse, and Division of PEAK6

DATE: September 29, 2006

RE: Employment Discrimination



I am writing to your in order to file a complaint against my supervisor, Mr. Danny Rosenthal, pursuant to PEAK6 Policy against Discrimination and Harassment, Firm Policy # HR-012, concerning Employment Discrimination.

### Employment Discrimination
According to Policy #HR-012, "PEAK6 prohibits discrimination in employment based on any characteristic protected by law, including race, color, national origin, sex, age, religion, disability, or sexual orientation (each of which shall be referred to throughout the rest of this Policy as a "protected characteristic" ). Employment discrimination occurs when an employee is adversely affected because of a protected characteristic with respect to any term or condition of employment (including hiring, compensation, advancement, discipline or termination). PEAK6 will take appropriate measures to prevent and/or stop any such discrimination. Any employee who is aware of conduct that may violate this policy should promptly report the conduct using the Internal Complaint Procedure described below."

### Internal Complaint Procedure
"Any employee who believes that he or she has been discriminated against or harassed by a co-worker, manager, executive manager, outside contractor, customer, or other person should promptly report such harassment to the Human Resources Manager... The Human Resources Manager will promptly and thoroughly investigate all complaints of harassment and, based on the investigation, will take appropriate corrective and preventive action. Every effort will be made to conduct an investigation in as discreetly a manner as possible... If harassment is established, PEAK6 will discipline the offender... The Human Resources Manager will inform the complaining employee of 1) how the investigation was conducted and 2) of any corrective action that was taken."

### Complaint Statement
As an introduction. I am 49 years old. I have an MBA in Finance with a Minor in Economics from DePaul University of Chicago, and I have also attended the John Marshall School of Law, also located in Chicago. I have twenty five years of securities industry experience. I originally was an NASD Senior Compliance Examiner from April 1982 until August 1986. I became a registered representative in September 1986 and a registered principal in November 1986. I have been a Director of Compliance for the last thirteen years for various NASD and Exchange member firms. I have also been an NASD Arbitrator since November 1990. I have also been a Vice President and Senior Vice President for various NASD Broker-Dealer member firms. I have worked in many cities, including, Chicago, New York, Tampa, Boca Raton, Dallas, Kansas City and San Francisco.

Finally, I was the President & CEO of First Analysis Investment Corporation, a State of Illinois Registered Investment Advisor from May 2003 until January 2005.

(25)

I originally interviewed for the Director of Compliance position at OptionsHouse (t/k/a ezOptions) in February 2005. I had been referred to OptionsHouse by Mr. Marc B. Horin, the President & CEO of National Compliance Consultants, Inc.

The two individuals who interviewed me were: Mr. Daniel Rosenthal, President & CEO of OptionsHouse and Mr. Robert Baldwin, who was at the time the Director of Operations for OptionsHouse.

At that time, Messrs. Rosenthal and Baldwin told me that the company was not at the stage whereby they would need to hire me as the Director of Compliance but that they would contact me in the future should they need me.

In October 2005, I was contacted by Mr. Rosenthal who told me that the NASD was prepared to approve the firm for NASD Membership but that the NASD District No. 8 staff felt that a more seasoned person was needed as Director of Compliance. My name was mentioned to the NASD staff members and they stated that if OptionsHouse was to hire me that they would accept my registrations and experience and approve the firm for membership. I accepted a position with the firm on Tuesday, October 25, 2005 and met with the NASD District 8 staff for the Pre-Membership Interview (PMI) that afternoon.

My first full workday at OptionsHouse was Friday, October 28, 2005. I was told that my direct supervisor was Daniel Rosenthal, the President, but that I would also report to Richard Bojanowski, the Permanent Director of Operations who had taken over for Robert Baldwin in April 2005. I was told that my Firm Employee Number is 260.

The firm, with me registered as Director of Compliance and Executive Representative with the NASD, was registered as a NASD Broker-Dealer firm on November 3, 2005.

At the time that I was hired as the Director of Compliance, I had more securities registrations than any other employee of both the parent company PEAK6 and OptionsHouse. I currently still have more registrations than any other employee, these registrations are:

- Series 3 - Registered Commodities Representative – since July 1988
- Series 4 – Registered Options Principal – since December 1986
- Series 7 – General Securities Registered Representative – since Sept 1986
- Series 8 – NYSE Branch Manager/Sales Supervisor Exam – since July 1992
- Series 14 – NYSE Compliance Officer Examination – since June 1991
- Series 24 – General Securities Registered Principal Exam – since Nov 1986
- Series 27 – Financial & Operations Principal Examination – since June 1987
- Series 53 – Municipal Securities Principal Examination – since Feb 1987
- Series 55 – Equity Trader Examination – since December 1999
- Series 63 – Uniform Securities Agent State Law Examination – since Mar 1987
- Series 65 – Registered Investment Advisor Examination – since Dec 1993

Along with registering the firm with the SEC and NASD, I also registered the firm in all fifty states and the District of Columbia and Puerto Rico. In almost all of these states, I was required to be the Designated Principal, because I had retail industry experience, whereas the other OptionsHouse employees did not.

When I first started my employment with OptionsHouse, I was included in all of the staff meetings. I was encouraged to participate. Then after about three months, I was dropped from the attendance list. The reason for this I believe is that Danny Rosenthal, President & CEO does not want to hear my input. There were many times when I would try to tell Mr. Rosenthal that a certain process was not legal or would not be acceptable to the various securities regulators, and he would become angry, like a small child being told that he could not do something. In one meeting, Mr. Rosenthal told me to "shut up" when I was trying to explain something in front of the entire staff. At no time during or after the meeting did he even apologize for his rude remark. It was only after the meeting, that Bob Baldwin apologized to me for Mr. Rosenthal's poor treatment of me.

Shortly after that meeting, Mr. Edward "Whiz" Buckley, Director of Business Development, commenced meeting with all of the departments of PEAK6 in order to develop a better business plan for each department. OptionsHouse was also included in this I was invited to the first few initial sessions, at which time I provided my input, - of which I was encouraged to provide. Unfortunately, Mr. Rosenthal stopped including me in any staff meetings, because, I assume, he did not like my input. There must have been at least twenty of these meetings, of which matters which pertained to matters of Compliance were discussed. And I was not invited. I asked Mr. Rosenthal why I was not invited to these meetings and he told me that they had nothing to do with Compliance, But in discussing the content of the meetings with other OptionsHouse employees many aspects of Compliance were discussed. I feel that Mr. Rosenthal deliberately discriminated against me because of my age and experience by excluding me from these meetings. Mr. Rosenthal, from my vantage point, was telling me to leave, that he did not want me with the firm any longer.

There was a section dealing with the Single Point Accountability (called an "SPA") for the Compliance Department which I am responsible for, but Mr. Rosenthal entirely eliminated that section. I was never given an opportunity to discuss my role or that Compliance Department within the OptionsHouse framework.

Even though I am listed as a control person and the Executive Representative for Options House with the NASD, Mr. Rosenthal treats me as a clerk. He ignores my suggestions and comments and does not include me in discussions about firm Compliance. He has Mr. Richard Bojanowski, the Director of Operations, consult with our outside legal consul and regulators without including me. How can I do my job when I am not allowed to do it?

I am the Registered Principal who reviews and approves all customer new accounts for OptionsHouse. At present, I have reviewed and approved well over one hundred customer new accounts for the firm, yet rather than being complimented and appreciated for doing this, Mr. Rosenthal restricts my access to clients and promotes the members of the Clients Services Department as reviewer of these accounts when it is me who opens these accounts. I feel the reason for this is that Mr. Rosenthal does not want to give me the credit due me for doing this and also, should he want to replace me, it is easier if clients do not know who reviews and approves their new accounts.

I am treated with constant disrespect from Mr. Rosenthal on a daily basis. Numerous meetings are held daily which pertain to my work wherein I am not included in. I am not in the loop on almost all major decisions, even though, according to the documents filed with the SEC, NASD and all states I am an active manager involved in the compliance

aspect of the firm. This means that decisions are made that I am regulatorily responsible for but that I am not involved in or are aware of.

Mr. Rich Bojanowski (Firm Employee #30) and Joel Blumenau (Firm Employee #100), who both have worked with Mr. Rosenthal at PEAK6 for many years are treated like equals by Mr. Rosenthal (Firm Employee #12), even though neither had retail securities industry experience prior to the exposure while OptionsHouse, their input is always valued, whereas my input, honed by twenty five years of real securities industry experience is never taken seriously or with the value that it should be accorded. This in my mind is discriminatory. Of course, I am the oldest employee at OptionsHouse and one of the oldest at PEAK6.

I had my initial review with Mr. Rosenthal in February of 2006. I received a positive review. At this time I was told that I was a permanent employee. I was also to have had another review in May 2006, but due to a personal matter, Mr. Rosenthal never gave me the review. I am aware that certain other employees did receive their review. I asked about my review and was told by Mr. Rich Bojanowski that Mr. Rosenthal had decided not to proceed with my review.

According to the PEAK6 Policy on Performance Trackers, I was to have also had a review on or about September 10, 2006. A review that I might add, I have yet to have with Mr. Rosenthal.

I have spoken about my situation with Bob Baldwin, Rich Bojanowski and Kelly Lively and been warned about not angering Mr. Rosenthal because he has a history of getting rid of people he does not like or want to have around. I assume that his poor treatment of me is an indication of him not wanting me around either.

Another example of my poor treatment by Mr. Rosenthal is that I am the Financial & Operations Principal (i.e. FINOP) for OptionsHouse. As such I am responsible for reviewing and approving all Financial & Operational Combined Uniform Single (i.e. FOCUS) Reports submitted the NASD.  As such I should have sole discretion of approval, but Mr. Rosenthal insists that Mr. Bojanowski review and approve these reports also, even though Mr. Bojanowski is not a FINOP. Mr. Bojanowski is twenty years younger than I am.

During the afternoon of August 2, 2006, there was a "Brain-Storming Session" which included all members of OptionsHouse and Edward "Whiz" Buckley, Director of Business Development, wherein Mr. Rosenthal requested ideas for improving the number of new account openings from all of the staff. I contributed at least five suggestions to Mr. Rosenthal (you may verify this with Mr. Buckley). Mr. Rosenthal complimented me on my suggestions and asked me in front of all meeting members to provide additional work-ups on each idea in writing. After the meeting I did just that. Of course he ignored all of my ideas. As a matter of fact, he had another employee follow-up on my original idea, even though Mr. Rosenthal told me that we should each follow-up on our ideas.

I sent Mr. Rosenthal various e-mails asking for time to meet with him concerning my ideas and he never responded to any of these e-mails.

In April, 2006, Ms. Donna MacDonald was hired as the Director of Compliance for PEAK6, our parent company. An announcement to the staff was made and Ms.

MacDonald was introduced during a staff meeting. Even though I had been working for the firm for at least six months longer, at no time did management ever introduce me as the Director of Compliance for Options House, even though Messrs. Bojanowski and Blumenau have been also introduced to the staff. As a matter of fact, there have been many instances wherein Mr. Rosenthal has gone out of his way to keep the fact that I am the Director of Compliance for OptionsHouse from all other PEAK6 employees. I feel this is because he does not want people to know who I am so that he can replace me without difficulty when the time comes that he wants to. It causes me great concern and stress to feel that you are not wanted by an employer and that at any moment Mr. Rosenthal will replace me without any warning.

Also, Ms. MacDonald has daily compliance input with Mr. Matt Hulziser and Jenny Just, the husband and wife owners of PEAK6 and OptionsHouse. Not once in the eleven months that I have worked for them have either Mr. Hulziser or Ms. Just asked for any input or ideas from me concerning compliance matters at OptionsHouse.

As the Director of Compliance, I should be the liaison between OptionsHouse and James D. Van De Graaff, who is our outside counsel affiliated with Katten Muchin Rosenman LLP, telephone (312) 902-5227 or e-mail at james.vandegraaff@kattenlaw.com. But I am left out of numerous meetings with Mr. Van De Graaff and the staff dealing with legal and compliance matters. Mr. Rosenthal has Mr. Bojanowski discuss all legal matters with Mr. Van De Graaff. It is only after a compliance matter has been discussed and decided between Messrs. Bojanowski and Van De Graaff I am notified of what has happened and I feel that my input is neither wanted nor asked for, even though these decisions affect me and the Compliance Department.

Another matter I feel was discriminatory is that on July 31, 2006, Ms. Tory L. Game was hired as a Client Service Representative. During the interview process, both Messrs. Bojanowski and Blumenau interviewed Ms. Game and eventually hired her. Even though I work with Ms. Game every day and I am considered a control person in the eyes of the SEC, NASD and state regulators, I was never included in this hiring process, which I consider wrong.

There is another person who has been hired Mr. John Hass, who has been hired by Mr. Rosenthal to be some sort of Co-CEO with Mr. Rosenthal. At no time was I ever included in the interview or hiring process. This again is discriminatory and ignores the fact that I am a control person. Also, I feel that I should have been given the opportunity to apply for this position because I have the same credentials as Mr. Hass has.

All of these actions toward me by Mr. Rosenthal evidence to me that he only hired me to be a "figure-head" so that the federal and state regulators would approve OptionsHouse for membership in the NASD and the states. Even though I have twenty five years of securities industry experience and knowledge and want to share that experience and knowledge with the other members of the firm, Mr. Rosenthal does not want me to do anything. He treats me like clerk, which I am not. My only assumption is that by ignoring me long enough, Mr. Rosenthal hopes that I will "go away." I have no plans on going away and I expect to be treated fairly by the Human Resources Department of PEAK6.

Robert J. Larson
Employee #260



141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
P: 312.362.2401
F: 312.362.2315
www.peak6.com

October 26, 2006

Dear PEAK6 Investments, LP Employee:

I encourage you to fill out the enclosed employee survey. As explained on the enclosed survey itself, PEAK6 is being considered for inclusion on the 2007 "50 Best Small & Medium Companies to Work for in America" list.

The Great Place to Work® Institute requires a minimum number of surveys back from our employees in order for our company to be considered for this award. Therefore, it is very important that you respond to the survey.

Please be honest and candid. No one from the company will see your responses. When you have finished filling out the survey, please place and seal it in the enclosed postage-paid envelope and drop it in the mail.

To be included in the results, please complete and put the survey in the mail on or before **Tuesday, November 7, 2006**.

Thank you very much for your participation.

Jenny Just

CEO



26


GREAT
PLACE
TO
WORK
INSTITUTE INC.



---

**About This Survey**



Fall 2006

Fold here

You have been selected to participate in an employee survey to determine the "Best Small & Medium Companies to Work for in America". Your company is a candidate for inclusion on this list, which will be announced in the summer of 2007.

This list is a joint endeavor of the Society for Human Resource Management (SHRM) and Great Place to Work® Institute.

Your participation is very important to the success of this project. Please respond to the questions openly and honestly. **There are no right or wrong answers.** Your responses will be used to help describe what it is like to work for your company.

Your answers will be treated anonymously and with complete confidentiality. All responses go directly to the Great Place to Work® Institute, an independent research firm. **No one at your company will see your individual responses.**

Please take 15 minutes now to complete the survey. To be included in the results, please mail your survey no later than the date indicated on the accompanying letter. When you have completed the survey, place and seal it in the enclosed postage paid envelope and drop it in the mail.

Fold here

Thank you for your participation.

*Robert Levering*

Robert Levering
Co-Founder, Great Place to Work® Institute

PLEASE DO NOT WRITE IN THIS AREA

34481

Copyright © 2006 Great Place to Work® Institute, Inc. All Rights Reserved.

SME2007

## MARKING INSTRUCTIONS

| | |
|---|---|
| INCORRECT MARKS:  ⊘ ⊗ ⊖ ◔ ⊙ | • Use a black or blue pen or a Number 2 pencil.<br>• Make solid marks that fill the response completely.<br>• Do not use pens with ink that soaks through the paper.<br>• Make no stray marks on this form.<br>• Erase cleanly any marks you wish to change. |
| CORRECT MARKS:  ● | |

**For each statement, fill in one answer that most accurately reflects your opinion of your organization as a whole. If you feel you cannot answer a question for any reason, please leave it blank.**

| Statement | Almost always untrue | Often untrue | Sometimes untrue / sometimes true | Often true | Almost always true |
|---|---|---|---|---|---|
| 1. This is a friendly place to work. | ① | ② | ● | ④ | ⑤ |
| 2. I am given the resources and equipment to do my job. | ① | ② | ③ | ● | ⑤ |
| 3. This is a physically safe place to work. | ① | ② | ③ | ④ | ● |
| 4. Everyone has an opportunity to get special recognition. | ● | ② | ③ | ④ | ⑤ |
| 5. People here are willing to give extra to get the job done. | ① | ② | ③ | ④ | ● |
| 6. You can count on people to cooperate. | ① | ② | ● | ④ | ⑤ |
| 7. Management makes its expectations clear. | ① | ② | ● | ④ | ⑤ |
| 8. I can ask management any reasonable question and get a straight answer. | ① | ② | ● | ④ | ⑤ |
| 9. I am offered training or development to further myself professionally. | ● | ② | ③ | ④ | ⑤ |
| 10. Management shows appreciation for good work and extra effort. | ① | ② | ● | ④ | ⑤ |
| 11. People here are paid fairly for the work they do. | ① | ② | ③ | ● | ⑤ |
| 12. My work has special meaning: this is not "just a job." | ● | ② | ③ | ④ | ⑤ |
| 13. When people change jobs or work units, they are made to feel right at home. | ① | ② | ● | ④ | ⑤ |
| 14. Management is approachable, easy to talk with. | ① | ● | ③ | ④ | ⑤ |
| 15. Management recognizes honest mistakes as part of doing business. | ① | ② | ③ | ● | ⑤ |
| 16. Management genuinely seeks and responds to suggestions and ideas. | ● | ② | ③ | ④ | ⑤ |
| 17. When I look at what we accomplish, I feel a sense of pride. | ① | ● | ③ | ④ | ⑤ |
| 18. I feel I receive a fair share of the profits made by this organization. | ① | ● | ③ | ④ | ⑤ |
| 19. Management keeps me informed about important issues and changes. | ① | ② | ● | ④ | ⑤ |
| 20. Management has a clear view of where the organization is going and how to get there. | ● | ② | ③ | ④ | ⑤ |
| 21. Management trusts people to do a good job without watching over their shoulders. | ① | ② | ● | ④ | ⑤ |
| 22. Management involves people in decisions that affect their jobs or work environment. | ① | ● | ③ | ④ | ⑤ |
| 23. Managers avoid playing favorites. | ① | ● | ③ | ④ | ⑤ |
| 24. I feel good about the ways we contribute to the community. | ① | ● | ③ | ④ | ⑤ |
| 25. Management does a good job of assigning and coordinating people. | ① | ● | ③ | ④ | ⑤ |

Copyright © 2006 Great Place to Work® Institute, Inc. All Rights Reserved.

| | Almost always untrue | Often untrue | Sometimes untrue / sometimes true | Often true | Almost always true |
|---|---|---|---|---|---|
| 26. People here are given a lot of responsibility. | ① | ② | ● | ④ | ⑤ |
| 27. This is a psychologically and emotionally healthy place to work. | ① | ② | ● | ④ | ⑤ |
| 28. People here are treated fairly regardless of their age. | ① | ② | ● | ④ | ⑤ |
| 29. Promotions go to those who best deserve them. | ① | ● | ③ | ④ | ⑤ |
| 30. People look forward to coming to work here. | ① | ② | ● | ④ | ⑤ |
| 31. I can be myself around here. | ① | ② | ● | ④ | ⑤ |
| 32. Management delivers on its promises. | ① | ● | ③ | ④ | ⑤ |
| 33. People here are treated fairly regardless of their race. | ① | ② | ③ | ● | ⑤ |
| 34. People care about each other here. | ① | ● | ③ | ④ | ⑤ |
| 35. Management's actions match its words. | ① | ● | ③ | ④ | ⑤ |
| 36. Our facilities contribute to a good working environment. | ① | ② | ③ | ● | ⑤ |
| 37. People here are treated fairly regardless of their sex. | ① | ② | ③ | ● | ⑤ |
| 38. I'm proud to tell others I work here. | ① | ② | ● | ④ | ⑤ |
| 39. There is a "family" or "team" feeling here. | ① | ② | ● | ④ | ⑤ |
| 40. People celebrate special events around here. | ① | ② | ● | ④ | ⑤ |
| 41. I believe management would lay people off only as a last resort. | ① | ② | ● | ④ | ⑤ |
| 42. People avoid politicking and backstabbing as ways to get things done. | ① | ● | ③ | ④ | ⑤ |
| 43. People are encouraged to balance their work life and their personal life. | ① | ● | ③ | ④ | ⑤ |
| 44. People here are treated fairly regardless of their sexual orientation. | ① | ② | ● | ④ | ⑤ |
| 45. Management is competent at running the business. | ① | ② | ● | ④ | ⑤ |
| 46. If I am unfairly treated, I believe I'll be given a fair shake if I appeal. | ① | ● | ③ | ④ | ⑤ |
| 47. We have special and unique benefits here. | ① | ● | ③ | ④ | ⑤ |
| 48. We're all in this together. | ① | ● | ③ | ④ | ⑤ |
| 49. Management is honest and ethical in its business practices. | ① | ② | ● | ④ | ⑤ |
| 50. Management shows a sincere interest in me as a person, not just an employee. | ① | ● | ③ | ④ | ⑤ |
| 51. I want to work here for a long time. | ① | ② | ③ | ● | ⑤ |
| 52. I am treated as a full member here regardless of my position. | ① | ● | ③ | ④ | ⑥ |
| 53. I am able to take time off from work when I think it's necessary. | ① | ② | ③ | ● | ⑤ |
| 54. I feel I make a difference here. | ① | ● | ③ | ④ | ⑤ |
| 55. When you join the company, you are made to feel welcome. | ① | ● | ③ | ④ | ⑤ |
| 56. This is a fun place to work. | ① | ● | ③ | ④ | ⑤ |
| 57. Taking everything into account, I would say this is a great place to work. | ① | ● | ③ | ④ | ⑤ |

**IMPORTANT: There are more items on the next page. . .**

Copyright © 2006 Great Place to Work® Institute, Inc. All Rights Reserved.

SME2007

**To better understand your work** ...e, we need some additional informatic ...classify participants into **general categories. Individual responses will be kept strictly confidential and will not be shared with anyone within your organization. Please fill in one answer for each question.**

INCORRECT MARKS: ⊘ ⊗ ◐ ◖ ⊛          CORRECT MARKS: ●

**1.   Type of job:**
- ① Hourly--Clerical/Administrative
- ② Hourly--Production/Services
- ③ Hourly--Professional/Technical
- ④ Commission--Sales
- ⑤ Salaried--Professional/Technical
- ● Salaried--Manager/Supervisor
- ⑦ Salaried--Executive/Senior Manager

**2.   Sex:**
- ① Female
- ● Male

**3.   Age category:**
- ① 25 years or younger
- ② 26 years to 34 years
- ③ 35 years to 44 years
- ● 45 years to 54 years
- ⑤ 55 years or older

**4.   Years of service with this organization:**
- ● Less than 2 years
- ② 2 years to 5 years
- ③ 6 years to 10 years
- ④ 11 years to 15 years
- ⑤ 16 years to 20 years
- ⑥ Over 20 years

**5.   Racial/Ethnic identity:**
- ① African American
- ② Asian/Pacific Islander
- ● Caucasian
- ④ Hispanic/Latino
- ⑤ Native American/Alaskan Native
- ⑥ Other: _____

**6.   Work status:**
- ● Full-time
- ② Part-time

**1.  Is there anything unique or unusual about this company that makes it a great place to work? Please give specific examples.**

*NONE*

**2.  If you could change one thing about this company to make it a better place to work, what would it be?**

*BRING IN PROFESSIONAL MANAGERS.*

**Optional:** If you wish to make further comments, please contact us -via e-mail at smecomments@greatplacetowork.com or by phone, by calling toll-free, at 1-800-940-4789. If you are willing to be contacted to discuss your workplace further, please provide your email address or your telephone number below : _____

**Please fold and seal your completed survey in the postage-paid envelope addressed to Great Place to Work® Institute, Inc., c/o Sentenium, L.L.C., 391 Taylor Blvd., Suite 110, Pleasant Hill, California 94523-9826, and drop it in the mail.**

PLEASE DO NOT WRITE IN THIS AREA

■○○○■○■○●■○■■○○○○○○○○○          **34481**

Copyright © 2006  Great Place to Work® Institute, Inc.  All Rights Reserved.          SME2007-1

27          Letter dated January 12, 2007 from Robert J. Larson to Nancy H.
            McKinney (was called' "History" on Larson's computer hard drive.

            In the possession of Nancy H. McKinney, Director of Human Resources,
            PEAK6.

27

## Robert Larson

| | |
|---|---|
| **From:** | Nancy McKinney [nmckinney@peak6.com] |
| **Sent:** | Friday, January 19, 2007 10:48 AM |
| **To:** | PEAK6 |
| **Subject:** | 2006 Bonus Awards |
| **Attachments:** | 2006 Bonus Payroll Memo.doc |



Dear PEAK6 Team,

We are pleased to let you know that we are in the final stages of determining the 2006 bonus awards. Your bonus award will be communicated to you by your manager next week on Wednesday January 24 or Thursday January 25 and your bonus will be paid on January 31, 2007 via direct deposit.

Your manager will also provide you with a payroll memo so that you can let HR know the tax withholding level you want for your bonus and whether you want additional 401k deductions withheld from your bonus pay. A copy of that memo is attached to this email for your convenience. As the nature of our businesses has evolved significantly in the past year we will also be asking everyone to enter into a new non-compete agreement at this time.

The payroll memo and non-compete agreements must be returned to the Human Resource Department no later than Friday, January 26, 2007 in order for your bonus award to be paid on January 31, 2007.

Will you please let me know if you have any questions or concerns regarding the bonus process?

Thank you very much

Nancy McKinney
PEAK6 Investments, LP
141 W. Jackson Suite 500
Chicago IL 60604

312 362 2458 (office)
312 543 0783 (cell)



**Robert Larson**

| | |
|---|---|
| **From:** | Teresa Grissom [tgrissom@peak6.com] |
| **Sent:** | Thursday, January 25, 2007 5:42 PM |
| **To:** | PEAK6 |
| **Subject:** | Bonus Payroll Forms Due by 3pm Friday 1/26 |
| **Importance:** | High |
| **Follow Up Flag:** | Review |
| **Due By:** | Friday, January 26, 2007 3:00 PM |
| **Flag Status:** | Flagged |
| **Attachments:** | 2006 Bonus Awards; Employee Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition |

COPY

Dear PEAK6 Team,

As a reminder, in order to process your Bonus Award payroll, the following forms are **due no later than 3:00pm tomorrow (Friday, January 26)**:

- – **REQUIRED:** Employee Agreement Regarding Confidentiality, Non-Solicitation and Non-Competition
- – **OPTIONAL:** Elections for additional federal tax withholding and/or 401(k) contribution

**Forms returned after 3:00pm tomorrow will be process in the following payroll period.** Attached are the original e-mails you received regarding the information above. Please return forms to my attention in the Human Resource Department. I have copies of blank forms at my desk for anyone who needs them.

Thank you!

*Teresa A. Grissom*
PEAK6 Investments, LP
141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
312.362.2521 Ph
312.362.2470 Fax
tgrissom@peak6.com

---

The information in this email or in any file attached hereto is intended only for the personal and confidential use of the individual or entity to which it is addressed and may contain information that is proprietary and confidential. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Email transmission cannot be guaranteed to be secure or error-free.



EX 29

1/26/2007

## CONFIDENTIAL SEPARATION AGREEMENT,
## GENERAL & COMPREHENSIVE RELEASE OF ALL CLAIMS

**THIS CONFIDENTIAL SEPARATION AGREEMENT, GENERAL & COMPREHENSIVE RELEASE OF ALL CLAIMS** ("Agreement") is entered into this 26th day of January, 2007 by and between Robert Larson ("Employee") and PEAK6 Investments, L.P. ("Employer") (collectively referred to as the "Parties") to resolve on strictly confidential terms all issues related to or arising out of Employee's former employment with Employer and Employee's January 26, 2007 separation. In consideration of the mutual covenants contained in this Agreement, the sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.      Separation Date.  Employee's last day of employment with Employer was January 26, 2007 ("Separation Date").

2.      Payments at Separation.  Employee acknowledges that as of January 26, 2007 Employer paid Employee all of Employee's: (a) regular current salary through the Separation Date less all applicable withholdings in accordance with Employee's last form W-4 on file with Employer; and (b) all accrued but unused paid time off as of the Separation Date.

3.      Severance Pay.  In consideration for the agreements and releases by Employee set forth below, Employer agrees that within five (5) business days after the expiration of the revocation period described in Paragraph 21 below with no such revocation of this Agreement having been exercised by Employee, Employer will provide Employee with a payment of $5,000.00 (Five Thousand Dollars) less all applicable withholdings in accordance with Employee's last form W-4 on file with Employer. Employee acknowledges and agrees that throughout his employment with Employer, Employee has been an employee at will and that as such his employment with Employer has at all times been subject to termination without cause or notice by both his and Employer.  Employee further acknowledges and agrees that throughout his employment with Employer, Employee has had no contract of employment with Employer and no entitlement to continued employment on any particular terms or conditions or for any particular duration, and no entitlement to severance pay or salary continuation.  Employee further acknowledges that, but for the terms and provisions of this Agreement respecting the Severance Payments to be made to Employee hereunder, Employee would have no entitlement to severance or to salary continuation of any kind whatsoever from Employer.

4.      Termination of Benefits.  Employee acknowledges that Employer has explained Employee's rights under COBRA and understands that Employee has sixty (60) days to notify Employer that Employee formally elects COBRA insurance.  Employee acknowledges that Employee's participation in and entitlement to any and all other compensation, fringe benefits and employee benefit plans, of Employer ceased as of Employee's Separation Date, except to the extent, if any, specifically otherwise provided for in this Agreement.

30

5.   <u>No Attempt at Employment</u>.   Employee agrees that Employee will not apply for employment or otherwise seek to be hired, rehired, re-employed, or re-instated by Employer or by any business entity affiliated with Employer including specifically, without limiting the generality of the foregoing, Just Options LLC, Goldman Sachs Execution and Clearing, L.P., Optionshouse, Incorporated and all Released Parties as defined in Section 7 of this Agreement.

6.   <u>No Wrongdoing by Employer</u>.   Employee acknowledges and agrees that Employer has not discriminated against, breached any contract with, committed any tort against, or otherwise acted in any unlawful manner towards Employee.

7.   <u>Released Parties</u>.   As used in this Agreement, "Released Parties" means Employer and any of its affiliated businesses, subsidiaries, partners, and joint ventures, including specifically, without limiting the generality of the foregoing, Just Options LLC, Goldman Sachs Execution and Clearing, L.P., Optionshouse, Incorporated and all of its/their respective past, present, and future predecessors, successors, heirs, and assigns, directors, shareholders, officers, members, agents, attorneys, employees, representatives, trustees, administrators, fiduciaries, and insurers, jointly and severally, in their individual, fiduciary, and corporate capacities.

8.   <u>Release</u>.

a. In consideration of the benefits to be provided under this Agreement, Employee, on behalf of Employee's agents, representatives, attorneys, assigns, heirs, executors, and administrators, waives, releases, and forever discharges Employer and all of the Released Parties from and for any and all causes of action, claims, liabilities, suits, charges, demands, debts, liens, damages, costs, grievances, agreements, promises, back and front pay, attorneys' fees, and remedies of any type, known or unknown, liquidated or unliquidated, absolute or contingent, in law or in equity, which could have been filed with any federal, state, local, or private court or agency, arbitrator, or any other entity, including those based directly or indirectly upon Employee's employment with Employer, the cessation of this employment, and any alleged act or omission to act by the Released Parties, related to this employment, as of the date of this Agreement, excepting only that notwithstanding the provisions of this Paragraph 8 of this Agreement, Employee may seek the recovery of unemployment compensation insurance benefits through the Illinois Department of Employment Security.

b. Without limiting the foregoing terms' generality, this Agreement specifically includes and extinguishes all claims for age discrimination, sex discrimination, gender discrimination, sexual orientation discrimination, sexual harassment, race, color and national origin discrimination, and/or discrimination on any other basis, retaliation, "whistle-blowing," any and all wage claims, breach of contract, wrongful discharge, detrimental reliance, retaliatory discharge, infliction of emotional distress claims, any other tort claims, and any and all claims arising from any alleged violation by or on behalf of the Released Parties, of any federal, state, or local constitution, statute, regulation, ordinance, order, public policy, or common law, including, but not limited to, *Title VII of the Civil Rights Act of 1964*, as amended, the *Civil Rights Act of 1991*, the *Age Discrimination in*

*Employment Act of 1967,* as amended, *The Older Workers Protection Act,* 29 U.S.C. § 21 *et. seq.,* the *Americans With Disabilities Act,* 42 U.S.C. § 1981, the *Fair Labor Standards Act,* the *Portal-to-Portal Act,* the *Family and Medical Leave Act,* the *Sarbanes-Oxley Act of 2002,* the *Employee Retirement Income Security Act,* the *Illinois Human Rights Act* and any other similar Illinois law prohibiting employment discrimination, the *Cook County Human Rights Ordinance,* the *Chicago Human Rights Ordinance,* or the common law or other laws, statutes, ordinances, or regulations of the United States, the State of Illinois, or of any state, county, city, town, village, or municipality.

9.   <u>Covenant Not to Sue</u>. Employee agrees, on behalf of Employee and Employee's agents, representatives, attorneys, assigns, heirs, executors, and administrators, never to bring, assist in bringing, or cause to be brought, any claim against Employer or any of the Released Parties regarding any act or failure to act that occurred up to and including the date on which Employee signs this Agreement, including but not limited to any claim relating to Employee's employment or separation of employment from Employer. If any such claim has been brought before Employee signs this Agreement, Employee must and will take all steps necessary to cause that claim to be withdrawn and dismissed with prejudice and finality. If any such action is brought after Employee signs this Agreement, Employee will immediately become ineligible for any further consideration from Employer under this Agreement and shall be obligated, upon written demand by Employer, to return to Employer all consideration that Employee has already received from Employer under this Agreement.

10.   <u>Confidentiality of Agreement</u>. Employee will not disclose, publish, indicate, or communicate the existence of this Agreement or any term or provision hereof to any person or entity other than Employee's attorney or (solely to the extent necessary to allow preparation of Employee's tax returns) Employee's accountant. Without limiting the generality of the foregoing, the non-disclosure requirements and confidentiality obligations imposed upon Employee by this Agreement shall apply to, and do unqualifiedly prohibit Employee from making any disclosure described and prohibited herein, to any family member of Employee and/or any past, present or future employee of Employer or of any Released Party. Prior to making any disclosure expressly permitted hereunder to his attorney and/or accountant, Employee will inform each person to whom disclosure is to be made that the existence and terms of this Agreement are and must remain confidential and secure the agreement of each such person to strictly maintain the confidentiality of all terms of this Agreement and not to disclose its existence to others. If at any future time Employee considers herself specifically required by law to disclose the existence or any of the terms or provisions of this Agreement, Employee will, as soon as is practicable and before making any such disclosure, provide prompt advance, written notice to Nancy McKinney, Director of Human Resources, PEAK6 Investments, L.P., 141 West Jackson Blvd., 5th Floor, Chicago, IL 60604, and in such written notice shall describe in writing the reason for, and the scope, nature, and timing of, any such legally-required anticipated disclosure. By signing this Agreement and accepting payments hereunder, Employee confirms that Employee has honored the confidentiality terms hereof through the date on which Employee signs this Agreement.

Employee agrees to inform third parties seeking to verify his employment with Employer to contact Nancy McKinney, Director of Human Resources, PEAK6 Investments, L.P., 141 West Jackson Blvd., 5th Floor, Chicago, IL 60604. Employer agrees that such verification will be limited to Employee's last salary, starting and ending employment dates, and last job title.

11.    No Encouragement of Claims.    Employee will not encourage any person to file a lawsuit, claim, charge or complaint against Employer and/or any of the Released Parties. Employee will not assist any person who has filed a lawsuit, claim, charge or complaint against Employer or any of the Released Parties excepting only to the extent that Employee is compelled by lawful process, court order or valid subpoena to render formal deposition, hearing, or trial testimony before a court or other tribunal having jurisdiction. If at any future time Employee considers herself to be specifically required by such lawful process, court order or valid subpoena to render formal deposition, hearing or trial testimony, Employee will, as soon as is practicable and before rendering any such testimony, provide prompt, advance written notice to Nancy McKinney, Director of Human Resources, PEAK6 Investments, L.P., 141 West Jackson Blvd., 5th Floor, Chicago, IL 60604, and in such written notice shall describe in writing the reason for, and the scope, nature, and timing of, any such anticipated formal testimony and provide Employer with a copy of any process, subpoena or court order by which Employee considers herself to be legally compelled to provide such testimony.

12.    Return of Employer's Property.    Employee agrees that Employee will return or has returned to Employer all of its property that is in Employee's possession or control, including, without limitation, all keys, materials, papers, books, files, documents, records, policies, customer information and lists, sales and marketing information, database information and lists, mailing lists, notes, computer software and programs, data, and any other property or information that Employee may have relating to Employer, its customers, employees, policies, or practices (whether those materials are in paper or computer-stored form).

13.    Confidential Information.    Employee acknowledges that, during the term of Employee's employment with Employer, Employee was obligated to retain the confidentiality of all information disclosed to Employee and the security of Employer's property entrusted to Employee. Therefore, at all times during and subsequent to Employee's employment by Employer, Employee will regard and preserve all confidential information and will not disclose such information to others and will refrain from harming any Employer property.

14.    Non-Disparagement.    Employee agrees that Employee will not disparage, denigrate, or defame Employer or any Released Parties and/or related persons or any of its/their business products or services.

15.    Non-Admission.    This Agreement does not constitute an admission by Employer or by any of the Released Parties. Employer specifically denies that any action that it or any of the Released Parties has taken or has failed to take with respect to

Employee was or is wrongful, unlawful, in violation of any local, state, or federal act, statute, or constitution or susceptible of inflicting any damages or injury upon Employee.

16.    Applicable Law.  This Agreement shall be governed by, construed, and enforced in accordance with, and all questions concerning the construction, validity, interpretation, and performance of this Agreement shall be governed by, the laws of the State of Illinois without giving effect to that State's principles regarding conflict of laws. The Parties agree that the venue for any action arising from this Agreement or the breach thereof will lie solely with the federal or state courts located in Cook County, Illinois and therefore submit to the jurisdiction of federal or state courts located in Cook County, Illinois and Employee hereby waives all objections thereto based on any claim of lack of personal jurisdiction, improper venue or on the basis of the doctrine of *forum non conveniens*.

17.    Severability.  In the event that any provision of this Agreement is found by any court or tribunal of competent jurisdiction to be invalid or unenforceable, the remaining provisions shall remain valid and enforceable.

18.    Entry to Employer's Property.  Employee agrees that Employee will not enter the premises of Employer without Employer's prior written consent, which consent only may be given by Nancy McKinney, Director of Human Resources, PEAK6 Investments, L.P., 141 West Jackson Blvd., 5th Floor, Chicago, IL 60604.

19.    Remedies.  If any of the provisions of this Agreement are violated, Employer, in addition to other legal remedies, shall have the right to revoke this Agreement, immediately stop all payments and benefits already provided to Employee pursuant to this Agreement, and recover any payments previously made and other losses incurred as a result of Employee's violation.  In any action to enforce the terms of this Agreement or for breach of this Agreement, Employer shall be entitled to be reimbursed by Employee for all of Employer's reasonable litigation expenses, including without limitation reasonable attorneys' fees and costs.

20.    Entire Agreement.  This Agreement contains the entire agreement and understanding between Employee and Employer concerning the matters described herein and supersedes all prior agreements, discussions, negotiations, understandings, and proposals of the Parties.  The terms of this Agreement cannot be changed except in a subsequent document signed by Employee and by Employer through its chief executive officer.  This Agreement binds and is for the benefit of Employee and Employer as well as his/his/its respective heirs, personal representatives, successors, and assigns.

21.    Revocation Period.  Employee has the right to revoke this Agreement during a period of seven (7) days after Employee signs it.  To revoke this Agreement, Employee must sign and send a written notice of Employee's decision to revoke the Agreement, addressed to Nancy McKinney, Director of Human Resources, PEAK6 Investments, L.P., 141 West Jackson Blvd., 5th Floor, Chicago, IL 60604, and that written notice must be received at that address no later than seven (7) days after the Employee signed this Agreement.  If Employee exercises Employee's right to revoke this

763345-2

Agreement, Employee will not be entitled to any of the money, benefits, and other consideration from Employer described in Paragraph 3, and Employer will have no obligation to pay any consideration to Employee under that paragraph unless and until the revocation period described in this Paragraph 21 has expired without Employee having elected revocation as stated herein.

22.    Knowing and Voluntary Waiver.   Employee acknowledges that before signing this Agreement Employee: (a) has completely read this Agreement and fully understands it; (b) has had the opportunity of twenty-one (21) days to review this agreement; (c) has had the full opportunity to investigate all matters pertaining to Employee's claims and fully understands its terms and contents, including the rights and obligations hereunder; (d) has been informed in writing of the right to consult an attorney before signing this document, and has, in fact, reviewed and consulted regarding it with counsel of Employee's choice; (e) is entering into this Agreement knowingly and voluntarily; and (f) the only consideration Employee is receiving for signing this Agreement is described herein, and no other promises or representations of any kind have been made by any person or entity to cause Employee to sign this Agreement.

**READ CAREFULLY.**
**THIS DOCUMENT CONTAINS A GENERAL RELEASE OF ALL**
**KNOWN AND UNKNOWN CLAIMS**

**Employee**                                                    **Employer**

_____      By:_____
NAME                                                            Nancy McKinney
                                                                Director of Human Resources
                                                                PEAK6 Investments, L.P.

_____      _____
Date                                                            Date

Witnessed:                                                  Witnessed:

_____      _____
Name                          Date                Name                          Date

_____      _____
Name                          Date                Name                          Date

_____      _____
Name                          Date                Name                          Date

763345-2



141 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
P: 312.362.2401
F: 312.362.2315
www.peak6.com

January 30, 2007

Robert Larson
915 Hinman Avenue #3E
Evanston, IL 60202

Dear Robert:

The purpose of this letter is to answer some of the questions you may have about the termination of your employment at PEAK6. Your last day of work was January 26, 2007.

- **Final Paycheck**
  Currently, you have been paid through January 31, 2007. Therefore, no final check is due.

- **Vacation Pay**
  You were entitled to 3 weeks, or 15 business days, per calendar year of vacation time. At the time of your termination, you had accrued 1.5 days of vacation time in 2007 and had a carry-over balance of 4.5 vacation days. On January 30, 2007 your vacation payout will be mailed to you.

- **Health Coverage**
  All of your employee benefits terminate on January 31, 2007. You do have the option to elect to continue your health benefits under COBRA. A COBRA notification letter and enrollment form will be sent to you under separate cover.

- **Exhibit H: Employee Agreement**
  At your hire, you signed an employee agreement regarding confidentiality, non-solicitation and/or non-competition. Please be advised that there are provisions in this agreement that apply to you, even after termination of your employment with PEAK6. A copy of the agreement has been attached for your reference.

Should you have any questions about the contents of this letter, please do not hesitate to contact me directly at 312.362.2458.

Sincerely,

Nancy H. McKinney
Director, Human Resource Department

Enclosure







February 6, 2007

Mr. Robert J. Larson
915 Hinman Ave. #3E
Evanston, IL 60202



Re:  Form U-5

Dear Mr. Larson:

Enclosed is a copy of your Form U-5, which has been submitted to the appropriate regulatory agency(s) on your behalf.  Please retain a copy of this form for your records.

In addition, please be advised that you are required to maintain a current address with the NASD.  In the event that an NASD/NYSE firm no longer employs you and your address changes, you will need to send notification of such changes to:

> NASD/CRD
> Attn:  Correspondent Department
> P.O. Box 9495
> Gaithersburg, MD  20898-9495

If you have any questions, please contact the person listed in the *Firm Acknowledgement* section of the attached form.

Sincerely,

Carl R. Kunz
Director of Compliance

Enclosure:  Form U-5

optionshouse △

U.S. Bancorp Center
141 W. Jackson Blvd., Suite 500  Chicago, IL 60604
main (312) 362-2510  fax (866) 563-3343  web www.optionshouse.com

32

# FORM U5
# UNIFORM TERMINATION NOTICE FOR SECURITIES INDUSTRY REGISTRATION

| **U5 - FULL** |
|---|
| **02/06/2007** |

Rev. Form U5 (10/2005)

### NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

*Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for two years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495, Gaithersburg, MD 20898-9495.*

## 1. GENERAL INFORMATION

| First Name:<br>ROBERT | Middle Name:<br>JEROME | Last Name:<br>LARSON | Suffix: |
|---|---|---|---|
| *Firm* CRD #:<br>135625 | *Firm* Name:<br>OPTIONSHOUSE, INC. | *Firm* NFA #: | |
| *Individual* CRD #:<br>1565322 | **Individual** SSN:<br>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 | **Individual** NFA #: | Firm Billing Code: |

**Office of Employment Address**

| CRD<br>Branch # | NYSE<br>Branch<br>Code # | Firm<br>Billing<br>Code | Address | Private<br>Residence | Type of<br>Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| BD Main | | | 141 WEST<br>JACKSON<br>BLVD<br>SUITE 500<br>CHICAGO , IL<br>60604 | N | Located<br>At | 10/24/2005 | 01/26/2007 |
| 282125 | | 001 | 141 WEST<br>JASKSON<br>BLVD<br>SUITE 500<br>CHICAGO , IL<br>60604<br>UNITED<br>STATES | N | Located<br>At | 06/22/2006 | 01/26/2007 |

Rev. Form U5 (10/2005)

## 2. CURRENT RESIDENTIAL ADDRESS

### NOTICE TO THE FIRM

*This is the last reported residential address. If this is not current, please enter the current residential address.*

| From | To | Street | City | State | Country | Postal Code |
|---|---|---|---|---|---|---|
| 04/2006 | PRESENT | 915 HINMAN AVENUE #3E | EVANSTON | IL | UNITED STATES | 60202 |

Rev. Form U5 (10/2005)

## 3. FULL TERMINATION

**Is this a _FULL TERMINATION_?** ⊙ Yes ○ No
Note: A "Yes" response will terminate ALL registrations with all _SROs_ and all _jurisdictions_.

**Reason for Termination:** * Discharge  * Provide an explanation below

REORGANIZATION OF COMPLIANCE DEPARTMENT

---

Rev. Form U5 (10/2005)

## 4. DATE OF TERMINATION

**Date Terminated (MM/DD/YYYY):** 01/26/2007
A complete date of termination is required for full or partial termination. This date represents the actual date that the termination of registration is effective.

---

Rev. Form U5 (10/2005)

## 6. AFFILIATED FIRM TERMINATION

No Information Filed

Rev. Form U5 (10/2005)

## 7. DISCLOSURE QUESTIONS

**IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S). IF THE INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5, DO NOT RESUBMIT DRPS FOR THESE ITEMS. REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALICIZED WORDS.**

### Investigation Disclosure

YES NO

**7A.** Currently is, or at termination was, the individual the subject of an _investigation_ or ○ ⊙ _proceeding_ by a domestic or foreign governmental body or _self-regulatory organization_ with jurisdiction over _investment-related_ businesses? (Note: Provide details of an _investigation_ on an Investigation Disclosure Reporting Page and details regarding a _proceeding_ on a Regulatory Action Disclosure Reporting Page.)

### Internal Review Disclosure

YES NO

**7B.** Currently is, or at termination was, the individual under internal review for fraud or ○ ⊙ wrongful taking of property, or violating _investment-related_ statutes, regulations, rules or industry standards of conduct?

### Criminal Disclosure

YES NO

**7C.** While employed by or associated with your _firm_, or in connection with events that occurred while the individual was employed by or associated with your _firm_, was the individual:

| | | | YES | NO |
|---|---|---|---|---|
| **1.** | convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to any *felony*? | | ○ | ⊙ |
| **2.** | *charged* with any *felony*? | | ○ | ⊙ |
| **3.** | convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving*: investments or an *investment-related* business, or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | | ○ | ⊙ |
| **4.** | *charged* with a *misdemeanor* specified in 7(C)(3)? | | ○ | ⊙ |

### Regulatory Action Disclosure

| | | YES | NO |
|---|---|---|---|
| **7D.** | While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual *involved* in any *disciplinary action* by a domestic or foreign governmental body or *self-regulatory organization* (other than those designated as a "*minor rule violation*" under a plan approved by the U.S. Securities and Exchange Commission) with jurisdiction over the *investment-related* businesses? | ○ | ⊙ |

### Customer Complaint/Arbitration/Civil Litigation Disclosure

| | | | YES | NO |
|---|---|---|---|---|
| **7E.** | **1.** | In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations* and which: | | |
| | | **(a)** is still pending, or; | ○ | ⊙ |
| | | **(b)** resulted in an arbitration award or civil judgment against the individual, regardless of amount, or; | ○ | ⊙ |
| | | **(c)** was settled for an amount of $10,000 or more. | ○ | ⊙ |
| | **2.** | In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated complaint, not otherwise reported under question 7 (E)(1) above, which alleged that the individual was *involved* in one or more *sales practice violations*, and which complaint was settled for an amount of $10,000 or more? | ○ | ⊙ |
| | **3.** | In connection with events that occurred while the individual was employed or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under questions 7(E)(1) or 7(E)(2) above, which: | | |
| | | **(a)** would be reportable under question 14I(3)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or | ○ | ⊙ |
| | | **(b)** would be reportable under question 14I(3)(b) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*. | ○ | ⊙ |

### Termination Disclosure

| | | YES | NO |
|---|---|---|---|
| **7F.** | Did the individual voluntarily *resign* from your firm, or was the individual discharged or permitted to *resign* from your firm, after allegations were made that accused the | | |

individual of:

| | | | |
|---|---|---|---|
| **1.** | violating *investment-related* statutes, regulations, rules or industry standards of conduct? | ○ | ⊙ |
| **2.** | fraud or the wrongful taking of property? | ○ | ⊙ |
| **3.** | failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct? | ○ | ⊙ |

Rev. Form U5 (10/2005)

## 8. SIGNATURE

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

**8A.** FIRM ACKNOWLEDGMENT
This section must be completed on all U5 form filings submitted by the *firm*.

**8B.** INDIVIDUAL ACKNOWLEDGMENT AND CONSENT
This section must be completed on amendment U5 form filings where the individual is submitting changes to Part II of the INTERNAL REVIEW DRP or changes to Section 2 (CURRENT RESIDENTIAL ADDRESS).

### 8A. FIRM ACKNOWLEDGMENT

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

**Person to contact for further information**
NANCY MCKINNEY

**Telephone # of person to contact**
312-362-2458

**Signature of *Appropriate Signatory***
CARL R. KUNZ

Type or Print Name of Appropriate Signatory

**Date (MM/DD/YYYY)**
02/01/2007

Rev. Form U5 (10/2005)

## INVESTIGATION DRP

No Information Filed

Rev. Form U5 (10/2005)

## INTERNAL REVIEW DRP

No Information Filed

Rev. Form U5 (10/2005)

## CRIMINAL DRP

No Information Filed

Case 1:07-cv-07283    Document 1    Filed 12/28/2007    Page 111 of 111

Rev. Form U5 (10/2005)

**TERMINATION DRP**

No Information Filed

Rev. Form U5 (10/2005)

**REGULATORY ACTION DRP**

No Information Filed

Rev. Form U5 (10/2005)

**CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP**

No Information Filed