CASE NO.   07 cv 7283

ATTACHMENT NO.

EXHIBIT   33

TAB (DESCRIPTION)   Continued



**Robert Larson <rbtjlarson@gmail.com>**

---

# Form U-5
6 messages

---

**Robert Larson <rbtjlarson@gmail.com>**                              Tue, Feb 13, 2007 at 9:34 AM
To: nmckinney@peak6.com
Cc: dmacdonald@peak6.com
Bcc: Thomas.Shea@nasd.com

COPY

Nancy H. McKinney
Director of Human Resources
PEAK6 Investments LP
141 West Jackson Blvd, Suite 500
Chicago, IL 60604

RE: Form U-5

Good Morning Nancy:

I am sending you this e-mail to follow-up on a couple of matters
concerning my termination from OptionsHouse.

1) I still have not received the January 15th and January 31st check
stubs from my direct deposit checks. As you know, I have no way of
accessing the employee checking files and I would like to have these
two check stubs for my records.

and

2) I am still awaiting delivery of my OptionsHouse Form U-5, Uniform
Termination Notice. As you know, I was laid-off as a result of no
further need of my services by Danny and John on Friday, January 26,
2007, at 3:00 PM CST.

On Wednesday, February 7, 2007, OptionsHouse filed my Form U-5 with
the NASD Central Registration Depository. As required by NASD
Membership and Registration Rules, I am to be provided with a copy of
my Form U-5 when it is filed.

As you also know, I need this Form U-5 in order to apply for any job
in the financial services industry. No employer has been willing to
interview me until I can provide them, with a copy of my Form U-5.

Thanking you in advance for assisting me in these matters.

Robert J. Larson
CRD #1565322

---

**Donna MacDonald <dmacdonald@peak6.com>**                           Tue, Feb 13, 2007 at 10:03 AM
To: Robert Larson <rbtjlarson@gmail.com>
Cc: Nancy McKinney <nmckinney@peak6.com>

Would you like HR to provide you with a PDF version?
[Quoted text hidden]

(33)

The information in this email or in any file attached hereto is
intended only for the personal and confidential use of the individual
or entity to which it is addressed and may contain information that is
proprietary and confidential. If you are not the intended recipient of
this message you are hereby notified that any review, dissemination,
distribution or copying of this message is strictly prohibited. This communication is for information purposes
only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product.
Email transmission cannot be guaranteed to be secure or error-free.

---

**Robert Larson <rbtjlarson@gmail.com>**                          **Tue, Feb 13, 2007 at 6:07 PM**
To; Donna MacDonald <dmacdonald@peak6.com>

That would be fine with me. I just need a copy as soon as possible.

Thank you.you with a PDF version?
>
> -----Original Message-----
> From: Robert Larson [mailto:rbtjlarson@gmail.com]
> Sent: Tuesday, February 13, 2007 9:35 AM
> To: Nancy McKinney
> Cc: Donna MacDonald
> Subject: Form U-5
>
> Nancy H. McKinney

On 2/13/07, Donna MacDonald <dmacdonald@peak6.com> wrote:
> Would you like HR to provide
[Quoted text hidden]

---

**Donna MacDonald <dmacdonald@peak6.com>**                       **Wed, Feb 14, 2007 at 7:19 AM**
To: Robert Larson <rbtjlarson@gmail.com>

Attached is an additional copy.
-----Original Message-----
From: Robert Larson [mailto:rbtjlarson@gmail.com]
[Quoted text hidden]

---

📄 **DOC070213.pdf**
1263K

---

**Robert Larson <rbtjlarson@gmail.com>**                          **Wed, Feb 14, 2007 at 6:05 PM**
To: Donna MacDonald <dmacdonald@peak6.com>
Cc: nmckinney@peak6.com

Dear Donna:

I have received my Form U-5 and it states that I was discharged due to
a the Reorganization of the Compliance Department.

Using the term Discharge implies that I violated some firm or
regulatory policy. My understanding on January 26, 2007 was that I was

being laid off.

If that is the case, then the Form U-5 should have stated" Other -
Laid-off due to Reorganization of Compliance Department."

I want this e-mail to be included in my personal and registration files.

Thank you.

Robert J. Larson
CRD #1565322

[Quoted text hidden]

---

**Nancy McKinney <nmckinney@peak6.com>**                          **Thu, Feb 15, 2007 at 11:37 AM**
To: Robert Larson <rbtjlarson@gmail.com>, Donna MacDonald <dmacdonald@peak6.com>

Dear Robert,

PEAK6 did not use the term or select the category "discharge" when we
filed your Form U-5.

We indicated that your separation from the firm was involuntary due to
the reorganization of our compliance function.

This is consistent with our discussion at the time of your separation.


Nancy McKinney

PEAK6 Investments, LP

141 W. Jackson Suite 500

Chicago IL 60604


312 362 2458 (office)

312 543 0783 (cell)


-----Original Message-----
From: Robert Larson [mailto:rbtjlarson@gmail.com]
[Quoted text hidden]

hereto is intended only for the personal and confiden-
tial use of the individual or entity to which it is
addressed and may contain information that is propri-
etary and confidential. If you are not the intended
recipient of this message you are hereby notified that
any review, dissemination, distribution or copying of
this message is strictly prohibited. This communica-
tion is for information purposes only and should not
be regarded as an offer to sell or as a solicitation
of an offer to buy any financial product. Email trans-
mission cannot be guaranteed to be secure or error-
free. P6070214

ROBERT LARSON
915 HINMAN AVE APT 3E
EVANSTON IL 60202-1822

**Certificate Number**
********************
\*   **2007045-06438**   \*
********************

## CERTIFICATE OF GROUP CREDITABLE COVERAGE
## BLUE CROSS AND BLUE SHIELD OF ILLINOIS

1. Date of this Certificate: **02/14/2007**

2. Name of health plan: **PEAK 6 INVESTMENTS, LP**

3. Name of any participant to whom this Certificate applies: __**ROBERT   LARSON**_____

4. Name of participant/policyholder: **ROBERT   LARSON**

5. Group-Section-Identification # of participant/policyholder: **P20456--3000--000846536465**

6. Name, address and phone number of plan administrator or issuer responsible for providing this Certificate:

    Blue Cross and Blue Shield of Illinois
    300 E. Randolph
    Chicago, IL 60601-5099
    800-541-2763

7. For further information contact your prior customer service area at: **800-541-2763**

8. If the individual identified in line 3 has at least 18 months (546 days) of creditable coverage (disregarding periods of coverage before a 63-day break), an X will appear here___ , and item 9 below will not apply.

9. Date waiting period or affiliation period (if any) began: __**10/28/2005**__

10. Date coverage began: __**01/01/2007**__

11. Date coverage ended: __**01/31/2007**__ . If coverage is continuing as of the date of this Certificate, an X will appear here ___.

THIS CERTIFICATE REFLECTS THE INFORMATION PROVIDED TO BLUE CROSS AND BLUE SHIELD OF ILLINOIS AS OF THE DATE OF THIS CERTIFICATE.

### Statement of HIPAA Portability Rights

**IMPORTANT---KEEP THIS CERTIFICATE.** This certificate is evidence of your coverage under this plan. Under a federal law known as HIPAA, you may need evidence of your coverage to reduce a preexisting condition exclusion period under another plan, to help you get special enrollment in another plan, or to get certain types of individual health coverage even if you have health problems.

**Preexisting condition exclusions.** Some group health plans restrict coverage for medical conditions present before an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting condition can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 months before your "enrollment date". Your enrollment date is your first day of coverage under the plan, or, if there is a waiting period, the first day of your waiting period (typically, your first day of work). In addition, a preexisting condition exclusion cannot last more than 12 months after your enrollment date (18 months if you are a late enrollee). Finally, a preexisting condition exclusion cannot apply to pregnancy and cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for adoption.

*EX 34*

02/14/2007  06438

IL5146 08/05

**Blue Cross Blue Shield
of Illinois**

SONIA LARSON
C/O ROBERT LARSON
915 HINMAN AVE APT 3E
EVANSTON IL 60202-1822

**Certificate Number**
********************
* 2007045-06439 *
********************

## CERTIFICATE OF GROUP CREDITABLE COVERAGE
## BLUE CROSS AND BLUE SHIELD OF ILLINOIS

1. Date of this Certificate: **02/14/2007**

2. Name of health plan: **PEAK 6 INVESTMENTS, LP**

3. Name of any participant to whom this Certificate applies: __SONIA    LARSON__

4. Name of participant/policyholder: **ROBERT    LARSON**

5. Group-Section-Identification # of participant/policyholder: **P20456--3000--000846536465**

6. Name, address and phone number of plan administrator or issuer responsible for providing this Certificate:

   Blue Cross and Blue Shield of Illinois
   300 E. Randolph
   Chicago, IL 60601-5099
   800-541-2763

7. For further information contact your prior customer service area at: **800-541-2763**

8. If the individual identified in line 3 has at least 18 months (546 days) of creditable coverage
   (disregarding periods of coverage before a 63-day break), an X will appear here___ , and item 9
   below will not apply.

9. Date waiting period or affiliation period (if any) began: __10/28/2005__

10. Date coverage began: __01/01/2007__

11. Date coverage ended: __01/31/2007__   . If coverage is continuing as of the
    date of this Certificate, an X will appear here ___ .

THIS CERTIFICATE REFLECTS THE INFORMATION PROVIDED TO BLUE CROSS AND
BLUE SHIELD OF ILLINOIS AS OF THE DATE OF THIS CERTIFICATE.

### Statement of HIPAA Portability Rights

**IMPORTANT---KEEP THIS CERTIFICATE.** This certificate is evidence of your coverage under this plan.
Under a federal law known as HIPAA, you may need evidence of your coverage to reduce a preexisting condition
exclusion period under another plan, to help you get special enrollment in another plan, or to get certain types of
individual health coverage even if you have health problems.

**Preexisting condition exclusions.** Some group health plans restrict coverage for medical conditions present before
an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting
condition can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended
or received within the 6 months before your "enrollment date". Your enrollment date is your first day of coverage
under the plan, or, if there is a waiting period, the first day of your waiting period (typically, your first day of
work). In addition, a preexisting condition exclusion cannot last more than 12 months after your enrollment date
(18 months if you are a late enrollee). Finally, a preexisting condition exclusion cannot apply to pregnancy and
cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for
adoption.

21.5144  88/85

$\widehat{EX\ 35}$   02/14/2007  06439



LISA LARSON
C/O ROBERT LARSON
915 HINMAN AVE APT 3E
EVANSTON IL 60202-1822

**Certificate Number**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*   **2007045-06440**   \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF GROUP CREDITABLE COVERAGE
## BLUE CROSS AND BLUE SHIELD OF ILLINOIS

1. Date of this Certificate: **02/14/2007**

2. Name of health plan: **PEAK 6 INVESTMENTS, LP**

3. Name of any participant to whom this Certificate applies:   **LISA    LARSON**

4. Name of participant/policyholder: **ROBERT   LARSON**

5. Group-Section-Identification # of participant/policyholder: **P20456--3000--000846536465**

6. Name, address and phone number of plan administrator or issuer responsible for providing this Certificate:

   Blue Cross and Blue Shield of Illinois
   300 E. Randolph
   Chicago, IL 60601-5099
   800-541-2763

7. For further information contact your prior customer service area at: **800-541-2763**

8. If the individual identified in line 3 has at least 18 months (546 days) of creditable coverage (disregarding periods of coverage before a 63-day break), an X will appear here___ , and item 9 below will not apply.

9. Date waiting period or affiliation period (if any) began: **10/28/2005**

10. Date coverage began: **01/01/2007**

11. Date coverage ended: **01/31/2007**   . If coverage is continuing as of the date of this Certificate, an X will appear here ___ .

THIS CERTIFICATE REFLECTS THE INFORMATION PROVIDED TO BLUE CROSS AND BLUE SHIELD OF ILLINOIS AS OF THE DATE OF THIS CERTIFICATE.

### Statement of HIPAA Portability Rights

**IMPORTANT---KEEP THIS CERTIFICATE.** This certificate is evidence of your coverage under this plan. Under a federal law known as HIPAA, you may need evidence of your coverage to reduce a preexisting condition exclusion period under another plan, to help you get special enrollment in another plan, or to get certain types of individual health coverage even if you have health problems.

**Preexisting condition exclusions.** Some group health plans restrict coverage for medical conditions present before an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting condition can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 months before your "enrollment date". Your enrollment date is your first day of coverage under the plan, or, if there is a waiting period, the first day of your waiting period (typically, your first day of work). In addition, a preexisting condition exclusion cannot last more than 12 months after your enrollment date (18 months if you are a late enrollee). Finally, a preexisting condition exclusion cannot apply to pregnancy and cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for adoption.

IL514A 08/05

*EX 36*

02/14/2007  06440



TO: Carla Romano
    Senior Vice President & District Director
    District Number 8
    55 West Monroe Street
    Chicago, IL 60604



FROM: Robert J. Larson
      915 Hinman Avenue, Apt 3E
      Evanston, IL
      Tel: 847-864-0964

DATE: February 6, 2007

RE: OptionsHouse, Inc. – CRD #135265

I am writing to your in order to provide you with pertinent information concerning my former employer. OptionsHouse, Inc., located at 141 West Jackson Blvd. Suite 500, Chicago, IL 60604. a member broker-dealer of the National Association of Securities Dealers, (CRD #135625). OptionsHouse, Inc. is a wholly owned subsidiary of PEAK6 Investments LLC. PEAK6 Investments is 100% owned by Matt Hulsizer and Jenny Just, who are husband and wife.

### Background
I am filing this document in order to protect myself concerning my knowledge of certain activities during my registration with OptionsHouse as the Director of Compliance and Executive Representative, where I worked from October 28, 2005 through and including January 26, 2007.

### Personal Background of Robert J. Larson
As an introduction, I am 49 years old and a United States citizen. I have twenty five years of securities industry experience. I originally was an NASD Senior Compliance Examiner from April 1982 until August 1986. I became a registered representative in September 1986 and a registered principal in November 1986. I have been a Director of Compliance for the last thirteen years for various NASD member firms.

I originally interviewed for the Director of Compliance position for OptionsHouse (f/k/a ezOptions) in February 2005. I interviewed with Mr. Daniel Max Rosenthal, who is the President & CEO of the firm. After the initial interview, Mr. Rosenthal contacted me and told me that they were interested in hiring me, but that it would not be until some time in the future. I did not here from the firm again until I was than contacted on October 24, 2005, by Mr. Rosenthal, wherein Mr. Rosenthal told me that the NASD was prepared to approve the firm for NASD Membership but that the NASD District No. 8 staff felt that a more seasoned person was needed as Director of Compliance. My name was mentioned to the NASD staff members and they stated that if OptionsHouse was to hire me that they would accept my registrations and experience and approve the firm for membership. I accepted a position with the firm on Tuesday, October 25, 2005 and met with the NASD District 8 staff for the Pre-Membership Interview (PMI) that afternoon.

My first full workday at OptionsHouse was Friday, October 28, 2005.

(37)

**Violation of NASD and SEC Books and Records Rules**
One of the requirements of all NASD member broker-dealers who do a public business is to abide to both Federal SEC and NASD Conduct Rules. OptionsHouse was approved for NASD membership in November 2005, it was not until August 2006 that the firm had any public customers, (and these were basically PEAK6 family related accounts).

The NASD had conducted its New Membership Examination in April and May 2006. Due to the fact that we had done no business at the time of the initial examination, the NASD Examination staff  - and me for that matter -  could only assume and estimate how the firm's regulatory reporting would work,

After the Initial NASD Examination, there were still two areas that were of a concern for me, these were:

1) Daily OATS Reporting
The daily reporting of Order Audit Trail System (i.e. "OATS") eligible securities, by OptionsHouse to NASD (as required by NASD Market Place Rules 6950-6957, and NASD Conduct Rule 3110, paragraph (h), see the NASD Manual)

When the NASD had conducted its initial New Member Examination, we had thought that Merrill Lynch Execution (MLCX), one of our order execution firms, would report our OATS-eligible trades for us. I registered OptionsHouse with OATS and I was the designated OATS Administrator. Our firm's Market Participant Identification (i.e. "MPID") was "EZOP". I designated "MLCX" as our OATS Reporting Firm, for which they initially acknowledged that they would do. Since we had done no business, and would not do any business until August 2006, this was all well and good.

Apparently though, after the initial execution agreement was signed between the two firms, there were disagreements between the senior management of OptionsHouse and the senior management of Merrill Lynch Execution concerning execution charges and OATS reporting responsibilities. As such, the execution agreement between OptionsHouse and Merrill Lynch Execution was cancelled. The senior management of OptionsHouse then signed an execution agreement sometime in late August 2006 with a firm called Interactive Brokerage, (i.e. "IB"). IB agreed to execute out trades, but that they would not do our OATS reporting for us.

It should be noted at this time that I was never included in any of these agreement meetings with either Merrill Lynch or Interactive Brokerage. I was only provided with a copy of the contracts for filing in the Regulatory Storage Files after all of the agreements had been signed and finalized.

During a meeting concerning our order execution held in late August 2006. A discussion arose questioning that since IB was not going to be our OATS Reporting Firm, it was decided by Daniel Rosenthal, OptionsHouse President & CEO, that OptionsHouse would report its own OATS Eligible trades directly to OATS. In other words, we would become a Direct OATS Reporting Member. It was at this time that I stressed to all members of the firm, not just management, that we would be in OATS violation if we did any OATS eligible trades and did not report them. Mr. Rosenthal told me that we would just have to move forward with reporting the OATS trades and the person who we hire to construct ours OATS Reporting System would have to move quickly. I voiced my concern to Mr. Rosenthal at this time that there was no exemption from OATS Reporting. Mr. Rosenthal

told me that we should move forward and not worry about such things. The people present at this meeting were: myself as Director of Compliance; Daniel Rosenthal, President & CEO; Richard Bojanowski, Director of Business Development; Joel Blumenau, Director of Customer Service; Gong Szeto, Director of Marketing; and Dave Budworth, Director of Management Information Services. I was told by Mr. Rosenthal that the owners of the firm, Matt Hulsizer and Jenny Just had also been notified of my concerns.

In September 2006, Mr. Rosenthal hired Mr. Robert Lund as the person who would write the computer programs for connecting OptionsHouse to the OATS System. Mr. Lund had worked with Mr. Budworth in California for a number of years prior to Mr. Budworth's move to Chicago. Mr. Budworth spoke very highly of Mr. Lund, both as a personal friend and fellow worker. Mr. Lund moved from California to Chicago in early September 2006 and started his new job at OptionsHouse. When I met Mr. Lund, I found him to be an experienced, personable and very knowledgeable computer program designer and writer. Mr. Lund had worked with Mr. Budworth at a firm I believe was called "e-Loan," it specialized in finding mortgage loans for prospective home buyers on the Internet. I had great confidence that Rob Lund would get the job done with all respect to OATS reporting.

Rob Lund had never worked with the OATS System, so I printed out a copy of the NASD OATS Technical Specifications Manual and a copy of the OATS Administrative Manual. He kept the OATS Technical Manual and I kept the OATS Administrative Manual.

Rob started working on designing an OATS Reporting System immediately upon his arrival. I know that Rob Lund had numerous meetings over the next five month period with Mr. Rosenthal concerning the status of development of the OATS system. During this time we transacted trades in OATS-eligible securities and no Daily OATS Report was ever filed. I again stressed to Mr. Rosenthal that it was a severe violation of NASD OATS Rules and SEC Rules 17a-3 and 17a-4 not to report either: 1) the eligible trades themselves and 2) the fact that we were deficient in our OATS Reporting capabilities. At this time I provided him with a copy of pages 61-62 of the NASD Sanction Guidelines, (see Exhibit 'A') and stressed that the firm could potentially be fined and/or barred for violating these rules. Mr. Rosenthal told me to be silent and in no way was I to notify any regulator about our OATS situation. He told me that that was for him to worry about, not me. Mr. Richard Bojanowski, the Director of Business Development, who was also responsible for the firm's back office operations, also voiced the same concerns to Mr. Rosenthal and he too, was told to remain silent.

On or about Wednesday, September 13, 2006, I held a Continuing Education Program Meeting wherein the only subject covered was the OATS Reporting System. Every OptionsHouse employee, both registered and non-registered, attended the meeting. A signed attendance sheet should be in the CEP File for review and verification. During this CEP Meeting, I covered all aspects of OATS. I provided each employee with a copy of all of the OATS Rules taken directly from the NASD Manual. I also included copies of all of the NASD Notices-to-Members pertaining to OATS. I provided a pass-around-copy and I then reviewed the OATS Administrative Manual for everyone to read and ask questions of me about OATS. I then introduced Rob Lund, let everyone know that he would be writing our new OATS Reporting Program and I then provided a pass-around-copy of the OATS Technical Specifications Manual. I also again, during this meeting,

reiterated that we not reporting our current OATS trades and that we needed to have the OATS Reporting System up and running as soon as possible.

Mr. Lund worked on our internal OATS Reporting System from September 2006 through and including the first week of January 2007. On Tuesday, January 2, 2007, around 10:30 AM, Mr. Lund came to me to say good-bye. He said to me, "it just did not work out between OptionsHouse and him and that he was returning to California." I wished him well. He worked for OptionsHouse approximately four months and never finished our OATS Reporting System.

I immediately went to Messrs. Rosenthal and Hass to let them know that we should report the lack of our OATS Reporting System to the SEC and NASD immediately, as required by SEC Rule 17a-11, paragraphs (d) and (e), see NASD Manual. I told them that we should send immediate telegraphic notice to the SEC and NASD and notify all of the states that we were registered in also. Both Messrs. Rosenthal and Hass instructed me to remain silent about the matter and not tell anything about our OATS reporting problem to anyone, including regulators.

At this time, OptionsHouse had failed to report OATS eligible trades to the NASD from late August 2006 through and including January 2007, some five months.

## 2) Daily Review of E-Mails and Instant Messages
The daily review of e-mails and Instant Messages with and to clients, (required by SEC Rules 17a-3 and 17a-4; NASD Conduct Rule 3010, paragraph (d)(2); and NASD Conduct Rule 3110, paragraph (a), see the NASD Manual).

One of the SEC and NASD required functions is that a Registered Principal review a representative daily sample of the firm's sales-related e-mails and Instant Messages (IMs). I was responsible for this function. When the NASD Examiners had visited the firm in April and May of 2006, we had no customers, so the only e-mails that we had were operational e-mails, which I reviewed on a daily basis. There were no problems at that time. After the NASD completed their Initial Examination, we did not start doing a business until August 2006. It was at this time I determined that I was not getting all of the e-mails for proper review. I was also not receiving any Instant Messages for review. I have never had an IM account through OptionsHouse, but in other firms which I have worked for, I have had IM systems and I was responsible for the review of those sales-related communications also.

Sometime in September 2006, I approached Mr. Rosenthal and asked him when OptionsHouse would provide me with a proper review system for Instant Messages, (NOTE: at the other firms that I have worked for in the past, they would use an outside service for IMs). Mr. Rosenthal told me that once Rob Lund had finished the OATS Reporting System that he would them assist me with creating proper review system. When it became apparent that Rob Lund would not be able to assist me, Mr. Rosenthal told me that Mr. Dave Budworth, the Director of MIS would either help me himself or find someone else to assist me. I never heard from anyone else. Whenever I would ask about the IM review system, I would be told that it was on their "list of things to do" but was not considered a high priority item. As far as I know today, OptionsHouse has no IM Review System.

Finally, on January 26, 2006, some three weeks after Rob Lund left the firm, I was laid-off. See below for further information.

### Termination Meeting

On Friday, January 26th, at 2:45 PM, I received a telephone call from Nancy McKinney, the PEAK6 Director of Human Resources requesting that I come to see her in her office. When I arrived in here office at 2:50 PM, Messrs. Hass and Rosenthal where there in her office. I was told by Messrs. Hass and Rosenthal that they were, "no in longer need of my services" and that I was being let go. They told me that I could claim unemployment and that they would not contest it. Ms. McKinney then asked me for my Access Key Card which allowed me access to the PEAK6 Office, I immediately gave it to her.

Mr. Rosenthal then asked me if I wanted to resign rather than being laid off for Form U-5 purposes and I said that I definitely wanted my Form U-5 to state that I was "Laid-Off", I had no intention of resigning from OptionsHouse/PEAK6. I had done nothing wrong to resign.

It was at this time that they provided me with a legal waiver document wherein for a payment of $5,000 less payroll taxes, I would waive all of my federal, state and local employee legal rights and not discuss my employment experience with any other person or entity. I told them that I had no intention of signing such a document. Ms. McKinney told me that I had twenty one calendar days to change my mind and sign the document (see Exhibit 'B').

Mr. Hass then told me at that time that they had already interviewed and hired my replacement.

### Holding My Securities Registration Hostage

According to NASD Rule (See NASD Membership Rules in the NASD Manual), any registered person of a registered broker-dealer, in this case, OptionsHouse, Inc., must provide **all** terminated registered employee with a Form U-5, more properly called a "Uniform Termination Notice" whereby the reason for a person's termination from a broker-dealer may be reported to the SEC, NASD and states via the Central Registration Depository (i.e. "CRD") System. On that form, there are various categories for terminating from a broker-dealer, such a voluntary termination, discharged, permitted resign, death and other. In other, you would list "Laid-off." Once a Form U-5 is filed with the CRD, a copy must be provided to the employee for their permanent record. That is the law.

Since I refused to sign this waiver, they are holding up the filing of my Form U-5. I had contacted Mr. Thomas O'Shea, the Senior Compliance Examiner, of the NASD District 8 Office, who is the designated contact at the NASD for OptionsHouse to notify him of this fact and he has responded to me that OptionsHouse has thirty calendar days in which to file the form.

The problem for me in this regard is that all prospective employers are required to see the copy of my Form U-5, and since OptionsHouse has not provided me with my copy, I cannot even interview for a job.

Not only this, but my CRD record shows as of this very moment (see my CRD record, www.nasd.com, Broker-Dealer Check, CRD Number 1565322) that I am still employed by OptionsHouse, even though I was laid-off on Friday, January 26, 2007, some eleven calendar days ago.

I believe that the primary reason for this is that they do not want me revealing the truth to various regulators so they are holding my Form U-5 hostage, and if I report this matter to regulators, they will besmirch my Form U-5. Also, I was the only FINOP registered for the firm and I believe that they are still searching for a replacement for me.

As a result of these facts, I ask that you not take any action until either:

    1)  the submit my completed Form U-5 to the NASD CRD; or
    2)  The thirty calendar day window expires.

Thank you.


Respectfully submitted,



Robert J. Larson
SSN 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

COPY

# Order Audit Trail System (OATS)—Late Reporting; Failing to Report; False, Inaccurate or Misleading Reporting; and Clock Synchronization Failure

NASD Systems and Programs Rules 6950 through 6957

| Principal Considerations in Determining Sanctions[1] | Monetary Sanction[1] | Suspension, Bar or Other Sanctions |
|---|---|---|
| **See Principal Considerations in Introductory Section** | *Late Reporting, Failing to Report, False, Inaccurate or Misleading Reporting* | *For All Types of Violations* |
| 1. Nature of OATS reporting violation. | **First Action[2]** | *Firm* |
| 2. Extent to which violative conduct affected the regulatory audit trail. | Fine of $5,000 to $10,000. | **Subsequent Actions** Consider suspending the firm with respect to any or all activities or functions for up to 30 business days. |
| 3. Whether violation occurred over an extended period of days. | **Second Action** Fine of $10,000 to $50,000. | In egregious cases, consider a lengthier suspension (of up to two years) or expulsion of the firm. |
| 4. Whether reporting violation was readily apparent from a review of NASD's OATS Web site.[4] | **Subsequent Actions** Fine of $10,000 to $100,000.[3] | *Individual* |
| 5. While respondents are responsible for the systems that they use and the third-party vendors that they employ, the appropriate level of sanctions will depend on whether the respondent diligently chose, installed, and tested a system that nevertheless malfunctioned; the frequency and thoroughness with which the respondent ensured that the system was operating in compliance with applicable rules; and the care that the respondent exercised in undertaking all necessary steps to correct systems-related malfunctions. The same considerations apply to a respondent that has relied on a third-party vendor's products or services. | In all egregious cases, whether a first, second, or subsequent action, consider a fine greater than or equal to the high end of the range for a first, second, or subsequent action. | **Subsequent Actions** Consider suspending the responsible individual in any or all capacities for up to 30 business days. |
|  | *Failure to Synchronize Clocks* | In egregious cases, consider a lengthier suspension (of up to two years) or a bar. |
|  | **First Action** Fine of $5,000 to $10,000. |  |
|  | **Subsequent Actions** Fine of $10,000 to $50,000.[3] |  |

1. In cases in which the violations: (1) involve a pattern or patterns of misconduct; (2) can be quantified by number or percentage; or (3) can be compared to the standard maintained by industry peers, Adjudicators may consider deviating from the fine structure recommended in this guideline for first, second, or subsequent actions. Imposition of monetary sanctions greater than those recommended in this guideline may be particularly appropriate in cases involving violations that occurred during two or more examination or review periods or violations that occurred over an extended period of time. Similarly, in cases in which the respondent acted intentionally or recklessly, and in cases in which the respondent's compliance rate is significantly lower than that of its peers, Adjudicators may impose a monetary sanction in excess of the recommended range.

2. A respondent's delegation of its reporting responsibilities to a third party who caused or contributed to respondent's violation is not an independent basis for mitigation.

3. Adjudicators should consider actions concerning violative events that occurred within the three years prior to the misconduct at issue. Events that are more recent in time, however, should be given more weight than less recent events.

4. In cases in which the respondent fails for more than one week to detect a failure to report that would have been apparent from a review of data on the OATS Website, Adjudicators should consider the respondent's violations to be egregious.

5. If respondent's second or subsequent action involves a violation that is less serious than a prior violation, includes conduct that demonstrates that respondent is improving its compliance rate, or involves mitigation that did not exist in a prior action, Adjudicators may consider imposing a fine that is less than the fine imposed in the prior action.

**YAHOO!** MAIL
Classic

Print - Close Window

| | |
|---|---|
| **Date:** | Thu, 15 Feb 2007 07:42:28 -0800 (PST) |
| **From:** | "Robert Larson" <rbtjlarson@yahoo.com> |
| **Subject:** | Senior Compliance Officer |
| **To:** | mmolina@penson.com |

Hello!

I was until most recently the Director of Compliance
for OptionsHouse, Inc.

OptionsHouse clears through Penson.

I was told that I was being laid-off because they had
no further need for my services.

**COPY**

I reported to Danny Rosenthal.

My resume is attached. I once worked for Peter Walker
at the NASD District 6 in Dallas.

Thank you.

Robert Larson
CRD#1565322

8:00? 8:25? 8:40? Find a flick in no time
with the Yahoo! Search movie showtime shortcut.
http://tools.search.yahoo.com/shortcuts/#news

**Attachments**

Files:

📎 **Larson_Resume_2007.doc** (48k) [Preview]

(38)

 **MAIL**

Print - Close Window

**From:** "Pam Silveus" <noreply@smartsearchonline.com>
**To:** rbtjlarson@yahoo.com
**Date:** Thu, 29 Mar 2007 05:31:33 -0700

COPY

Dear Mr. Larson:

We would like to take this opportunity to thank you for taking the time recently to speak with us in regards to the Sr. Compliance Officer position.  We certainly enjoyed speaking with you and appreciated your patience throughout our search process.

While we were very impressed with your qualifications, we were faced with
a difficult decision, and ultimately we currently do not have a position
open in Chicago.  However, we will be glad to keep your resume on file should we become aware of any other appropriate positions in the near future.

Thank you again for your interest and good luck in all your future endeavors!

Best regards,
Human Resources Team of Penson Financial Services


Thanks!

TO:
John P. Rowe, District Director
U.S. Equal Employment Opportunity Commission
Chicago District Office
500 West Madison Street
Suite 2800
Chicago, IL 60661
Tel: 312-353-2713

**COPY**

FROM:
Robert J. Larson
915 Hinman Avenue, Apt 3E
Evanston, IL
Tel: 847-864-0964

DATE: February 20, 2007

RE: Employment Discrimination Claim vs. PEAK6 Investments LP

I am writing to your in order to file a complaint against my former employer, PEAK6 Investments LP (i.e. "PEAK6"), located at 141 West Jackson Blvd. Suite 500, Chicago, IL 60604, telephone 312-362-2401 my immediate co-supervisors, Mr. Daniel Max Rosenthal, and Mr. Arthur John Hass. who are both Co-CEO's of OptionsHouse, Inc. a wholly-owned subsidiary of PEAK6 and is registered as a broker-dealer with the U.S. Securities & Exchange Commission (SEC File # 8-066936) and a registered member broker-dealer of the National Association of Securities Dealers, (CRD #135625).

### Employment Discrimination
I am filing this complaint because I feel that I have had my federal, state and local employee rights violated under at least the Age Discrimination in Employment Act of 1967 and also internal PEAK6 Policy #HR-012, "PEAK6 prohibits discrimination in employment based on any characteristic protected by law, including race, color, national origin, sex, age, religion, disability, or sexual orientation (each of which shall be referred to throughout the rest of this Policy as a "protected characteristic" ). Employment discrimination occurs when an employee is adversely affected because of a protected characteristic with respect to any term or condition of employment (including hiring, compensation, advancement, discipline or termination). PEAK6 will take appropriate measures to prevent and/or stop any such discrimination."

### PEAK6 Internal Complaint Procedure (see Exhibit #2)
According to PEAK6 Policy #HR-012, "Any employee who believes that he or she has been discriminated against or harassed by a co-worker, manager, executive manager, outside contractor, customer, or other person should promptly report such harassment to the Human Resources Manager (currently Ms. Nancy McKinney) ... The Human Resources Manager will promptly and thoroughly investigate all complaints of harassment and, based on the investigation, will take appropriate corrective and preventive action. Every effort will be made to conduct an investigation in as discreetly a manner as possible... If harassment is established, PEAK6 will discipline the offender... The Human Resources Manager will inform the complaining employee of 1) how the investigation was conducted and 2) of any corrective action that was taken."

40

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 2 of 12*

### Personal Background of Robert J. Larson, Complainant

As an introduction, I am 49 years old and a United States citizen. I was born on June 9, 1957 in Chicago, Illinois. I have an MBA in Finance with a Minor in Economics from DePaul University in Chicago, IL and I also attended the John Marshall School of Law, also located in Chicago, IL. I have twenty five years of securities industry experience. I originally was an NASD Senior Compliance Examiner from April 1982 until August 1986. I became a registered representative in September 1986 and a registered principal in November 1986. I have been a Director of Compliance for the last thirteen years for various NASD and Exchange member firms. I have also been an NASD Arbitrator since November 1990. I have also been a Vice President and Senior Vice President for various NASD Broker-Dealer member firms.

Finally, I was the President & CEO of First Analysis Investment Corporation, a State of Illinois Registered Investment Advisor from May 2003 until January 2005.

I originally interviewed for a position at PEAK6 when I interviewed for the Director of Compliance position which was available at OptionsHouse (f/k/a ezOptions), which is a division of PEAK6 in February 2005. I had been referred to OptionsHouse by Mr. Marc B. Horin, the President & CEO of National Compliance Consultants, Inc.

The two individuals who interviewed me were: Mr. Daniel Rosenthal, President & CEO of OptionsHouse and Mr. Robert Baldwin, who was at the time the Director of Operations for OptionsHouse.

At that time, Messrs. Rosenthal and Baldwin told me that the company was not at the stage whereby they would need to hire me as the Director of Compliance but that they would contact me in the future should they need me.

In October 2005, I was contacted by Mr. Rosenthal who told me that the NASD was prepared to approve the firm for NASD Membership but that the NASD District No. 8 staff felt that a more seasoned person was needed as Director of Compliance. My name was mentioned to the NASD staff members and they stated that if OptionsHouse was to hire me that they would accept my registrations and experience and approve the firm for membership. I accepted a position with the firm on Tuesday, October 25, 2005 and met with the NASD District 8 staff for the Pre-Membership Interview (PMI) that afternoon.

My first full workday at OptionsHouse was Friday, October 28, 2005. I was told that my direct supervisor was Daniel Rosenthal, the President, but that I would also report to Richard Bojanowski, whose title at that time was Director of Business Development, who had taken over from Robert Baldwin in April 2005. I was told that my Firm Employee Number is 260, (see Exhibits # 1, 1A, 1B, and 1C).

At that time, Mr. Rosenthal and I agreed that I would be a probationary full-time employee for the first four months, and that at the end of that period, it would be determined by Mr. Rosenthal if I would become a permanent employee. I offered to sign an employment contract with OptionsHouse by Mr. Rosenthal said that he felt that it would not be needed. Subsequently, after my four month probationary employment period, I was notified by the firm that I was a permanent full-time employee, annual salary was $120,000 per year, with a bonus determined by PEAK6 management. During the entire fifteen months I worked for PEAK6 I never received a raise from my $120,000 base salary.

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 3 of 12*

The firm, with me registered as Director of Compliance and Executive Representative with the NASD, was registered as a NASD Broker-Dealer firm on November 3, 2005.

At the time that I was hired as the Director of Compliance, I had more securities registrations than any other employee of both the parent company PEAK6 and OptionsHouse. At the time of my termination, I still have more registrations than all of the other 180 PEAK6 employees either individually or combined. These registrations are:

- Series 3 - Registered Commodities Representative
- Series 4 – Registered Options Principal
- Series 7 – General Securities Registered Representative
- Series 8 – NYSE Branch Manager/Sales Supervisor Examination
- Series 14 – NYSE Compliance Officer Examination
- Series 24 – General Securities Registered Principal Examination
- Series 27 – Financial & Operations Principal Examination
- Series 53 – Municipal Securities Principal Examination
- Series 55 – Equity Trader Examination
- Series 63 – Uniform Securities Agent State Law Examination
- Series 65 – Registered Investment Advisor Examination

These registrations require that one sit and pass a federal securities examination sponsored by the NASD/NYSE. Along with registering the firm with the SEC and NASD, I also registered the firm in all fifty states and the District of Columbia and Puerto Rico. In almost all of these states, I was required to be the Designated Principal, because I had retail industry experience, whereas the other OptionsHouse employees did not.

In many of the states, because the firm had only me as the person with any true retail securities industry experience, OptionsHouse was only approved as a broker-dealer in those states with the specific requirement that I be the Designated Principal (i.e. Supervisor) of securities transactions within that given state. Once I was removed, then technically, the registration for OptionsHouse was to have been revoked also. You can verify this by contacting each of the fifty states that OptionsHouse is registered in.

I am also a State-of-Illinois Registered Insurance Producer. I have had all of the major Illinois insurance producer licenses since 1998. No other of the 180 PEAK6 employees has any insurance licenses. My insurance Licenses are:

- Illinois Accident & Health Insurance Producer
- Illinois Casualty Insurance Producer
- Illinois Fire Insurance Producer
- Illinois Variable Contracts Producer
- Illinois Long-Term Care Producer

When I first started my employment with OptionsHouse, I was included in all of the staff meetings. I was encouraged to participate. Then after about three months, I was dropped from the attendance list. The reason for this I believe is that Daniel Max Rosenthal, President & CEO does not want to hear my input. There were many times when I would try to tell Mr. Rosenthal that a certain process was not legal or would not be acceptable to the various securities regulators, and he would become angry, like a

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 4 of 12*

small child being told that he could not do something. In one meeting, Mr. Rosenthal told me to "shut up" when I was trying to explain something in front of the entire staff. At no time during or after the meeting did he even apologize for his rude remark. It was only after the meeting, that Bob Baldwin apologized to me for Mr. Rosenthal's poor treatment of me, (see Exhibit #5).

Shortly after that meeting, Mr. Edward "Whiz" Buckley, Director of Business Development, commenced meeting with all of the departments of PEAK6 in order to develop a better business plan for each department. OptionsHouse was also included in this I was invited to the first few initial sessions, at which time I provided my input, - of which I was encouraged to provide. Unfortunately, Mr. Rosenthal stopped including me in any staff meetings, because, I assume, he did not like my input. There must have been at least twenty of these meetings, of which matters which pertained to matters of Compliance were discussed. And I was not invited. I asked Mr. Rosenthal why I was not invited to these meetings and he told me that they had nothing to do with Compliance, But in discussing the content of the meetings with other OptionsHouse employees many aspects of Compliance were discussed. I feel that Mr. Rosenthal deliberately discriminated against me because of my age and experience by excluding me from these meetings. Mr. Rosenthal, from my vantage point, was telling me to leave, that he did not want me with the firm any longer, (see Exhibit #3).

There was a section dealing with the Single Point Accountability (called an "SPA") for the Compliance Department which I was responsible for, but Mr. Rosenthal entirely eliminated that section. I was never given an opportunity to discuss my role or that Compliance Department within the OptionsHouse framework.

Mr. Arthur John Hass, was hired as the Co-CEO with Mr. Rosenthal of OptionsHouse in late September 2006, I was told that he would be handling the administrative functions, whereas Mr. Rosenthal would handle. From that point onward, I dealt with both Messrs. Hass and Rosenthal on Compliance matters.

Even though I am listed as a control person and the Executive Representative for Options House with the NASD, Messrs. Hass and Rosenthal treated me as a clerk. They ignored my suggestions and comments and did not include me in discussions about firm Compliance. They had Mr. Richard Bojanowski, the Director of Business Development, (who also oversaw Securities Operations), consult with our outside legal counsel and regulators without including me. As a standard operating procedure within the securities industry, the Director of Compliance is always designated as the person who acts as the gatekeeper with outside legal counsel. How could I do my job when I was not allowed to do it.

As the Director of Compliance, I should be the liaison between OptionsHouse and JVDG, who is our outside counsel affiliated with Katten Muchin Rosenman LLP. But I was left out of numerous meetings with Mr. VDG and the staff dealing with legal and compliance matters. Messr. Hass and Rosenthal would have Mr. Bojanowski discuss all legal matters with Mr. VDG. It is only after a compliance matter has been discussed and decided between Messrs. Bojanowski and VDG I would then be notified of what has happened and I feel that my input was neither wanted nor asked for, even though these decisions affected me and the Compliance Department.

**Robert J. Larson**
**Complaint vs. OptionsHouse/PEAK6**
**Filed with the EEOC**

*Page 5 of 12*

I was treated with constant disrespect by Messrs. Hass and Mr. Rosenthal on a daily basis. Numerous meetings were held daily which pertain to my work wherein I am not included in. I am not in the loop on almost all major decisions, even though, according to the documents filed with the SEC, NASD and all states I am an active manager involved in the compliance aspect of the firm. This means that decisions are made that I am regulatorily responsible for but that I am not involved in or are aware of.

Mr. Rich Bojanowski (Firm Employee #30) and Joel Blumenau (Firm Employee #100), who both have worked with Mr. Rosenthal at PEAK6 for many years are treated like equals by Mr. Rosenthal (Firm Employee #12), even though neither had retail securities industry experience prior to the exposure while OptionsHouse, their input was always valued, whereas my input, honed by twenty five years of real securities industry experience was never taken seriously or with the value that it should have been accorded. This in my mind is discriminatory. I was the oldest employee until December 8, 2006, when a Mr. James Halm, at age 51, was hired as the OptionsHouse Operations Manager. Including Mr. Halm, I was still one of the oldest employees at PEAK6.

I had my initial PEAK6 Employee Review with Mr. Rosenthal in February of 2006. I received a positive review. At that time I was told that I was a permanent employee. I was also told in writing that I would have another review on May 16, 2006. About a week before I was to have my review, Mr. Rosenthal's father passed away. A trying time for anyone, and I fully understood when I was told that Mr. Rosenthal had postponed my review until later in May, 2006. Unfortunately for me, Mr. Rosenthal never gave me the review that I was owed. I am aware that certain other employees did receive their review, Joel Blumenau and Stefani Sandow, two other OptionsHouse employees that I know of personally. I asked about my review and was told by Mr. Rich Bojanowski that Mr. Rosenthal had decided not to proceed with my review. No reason why was ever provided to me.

Finally, according to the PEAK6 Policy on Performance Trackers, I was to have also had an Employee Review on or about September 10, 2006. One which I also did not have.

I have spoken about my situation with Bob Baldwin, Rich Bojanowski and Kelly Lively (managers at PEAK6) and been warned about not angering Mr. Rosenthal because he has a history of getting rid of people he does not like or want to have around. I assume that his poor treatment of me is an indication of him not wanting me around either.

Another example of my poor treatment by Mr. Rosenthal is that I am the Financial & Operations Principal (i.e. FINOP) for OptionsHouse. As such I am responsible for reviewing and approving all Financial & Operational Combined Uniform Single (i.e. FOCUS) Reports submitted the NASD. As such I should have sole discretion of approval, but Mr. Rosenthal insists that Mr. Bojanowski review and approve these reports also, even though Mr. Bojanowski is not a FINOP. Mr. Bojanowski is twenty years younger than I am. There are many meetings which pertained to financial and operations matters which I should have participated in but was excluded from.

During the afternoon of August 2, 2006, there was a "Brain-Storming Session" which included all members of OptionsHouse and Edward "Whiz" Buckley, PEAK6 Director of Business Development, wherein Mr. Rosenthal requested ideas for improving the number of new account openings from all of the staff. I contributed at least five

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 6 of 12*

suggestions to Mr. Rosenthal (you may verify this with Mr. Buckley). Mr. Rosenthal complimented me on my suggestions and asked me in front of all meeting members to provide additional work-ups on each idea in writing. After the meeting I did just that. Of course he ignored all of my ideas. As a matter of fact, he had another employee follow-up on my original ideas, even though Mr. Rosenthal told me that we should each follow-up on our ideas.

I sent Mr. Rosenthal various e-mails asking for time to meet with him concerning my ideas and he never responded to any of these e-mails, (see Exhibit #3).

In April, 2006, Ms. Donna MacDonald was hired as the Director of Compliance for PEAK6, our parent company. Prior to Ms. MacDonald's hiring I had spoken with Mr. JP Just, one of the PEAK6 senior managers and the brother of Jenny Just, one of the owners of PEAK6 about this position. Mr. Just asked me if I knew of anyone who might want to take the position and I told him that I could not think of anyone. I did ask him if he felt that I should apply for the position and he said no, that the OptionsHouse Director of Compliance position was considered equal in stature to the PEAK6 position. I might note that JP Just always treated me with the utmost of respect. I have nothing but good things to say about JP Just.

I had not known Ms. MacDonald before she came to PEAK6, but in working with her, I found her to be fair and hard-working. I have nothing but good things to say about her. My understanding of her background was that she had worked as a Compliance Officer at various broker-dealers before coming to work at PEAK6.

I do want to note though, and this will become important later in my discussions, that Ms. MacDonald is:

- Younger than I am.
- Has less experience in years and types of firms worked.
- Did not have an MBA or had attended Law School.
- Was not an NASD Arbitrator.
- Has fewer securities registrations, I have eleven, and I was registered in all fifty states and the District of Columbia and Puerto Rico.
- I have 4 ½ on experience as an NASD Senior Compliance Examiner, the regulatory body which oversees the activities of OptionsHouse, she has never worked for the NASD.
- Had no Insurance Producer Licenses.
- Is not a State of Illinois Notary Public as I am.

(NOTE: At this time I would also like to point out that I have more securities industry experience than any of the other OptionsHouse, Inc. managers, including Daniel Rosenthal, Arthur John Hass, Peter Lawler, Richard Bojanowski, Joel Blumenau and the two owners of OptionsHouse, Matt Hulsizer and Jenny Just).

After Ms. MacDonald was hired, an announcement to all of the PEAK6 staff was made and Ms. MacDonald was introduced during a PEAK6 staff meeting. Even though I had been working for the firm for at least six months longer, at no time did management ever introduce me as the Director of Compliance for Options House, even though Messrs. Bojanowski and Blumenau have been also introduced to the staff also. As a matter of

Robert J. Larson
Complaint vs. OptionsHouse/PEAK6
Filed with the EEOC

Page 7 of 12

fact, there have been many instances wherein Messrs. Hass and Rosenthal had gone out of their way to keep the fact that I am the Director of Compliance for OptionsHouse from all other PEAK6 employees. I feel this is because they did not want people to know who I am so that they could replace me without difficulty when the time came. During the entire fifteen month employment period at PEAK6, it caused me great concern and stress to feel that I was not wanted by an employer and that at any moment Messrs. Hass or Rosenthal would replace me without any warning. Which, as you can see from my complaint eventually happened to me.

Finally, Ms. MacDonald had daily compliance input concerning PEAK6 with Mr. Matt Hulziser and Jenny Just, the husband and wife owners of PEAK6 and OptionsHouse. Not once in the fifteen months that I worked for them did either Mr. Hulziser or Ms. Just asked for any input or ideas from me concerning compliance matters at OptionsHouse or PEAK6, even though I was listed as the firm's Executive Representative with the NASD and was considered a control person.

Another example that I feel was discriminatory is that on July 31, 2006, Ms. Tory L. Game was hired as the first OptionsHouse Client Service Representative. During the interview process, both Messrs. Bojanowski and Blumenau interviewed Ms. Game and eventually hired her. Even though I work with Ms. Game every day and I am considered a control person in the eyes of the SEC, NASD and state regulators, I was never included in this hiring process, which I consider wrong. Other Client Service Representatives were hired after Ms. Game and I was omitted from the interview and hiring process for those new hires also. Even though by securities law, I was responsible for the due diligence for each of these employees, in many instances, I only found out about an employee being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

When Mr. Arthur John Haas, was hired sometime in mid to late September 2006 by Mr. Rosenthal to be the Co-CEO of OptionsHouse, Inc., at no time was I ever included in the interview or hiring process. This again is discriminatory and ignores the fact that I am a control person and I worked with Mr. Hass on a daily basis.

There are other instances, such as when Peter Lawler, Jamie Just and James Halm were hired as new employees of OptionsHouse and yet I was omitted from the interview and hiring process, even though again, by securities law, I was responsible for the due diligence for each of the these employees. I only found out about these employees being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

I might point out that I was more qualified to be chosen as sole or Co-CEO than Mr. Hass because I have more financial services experience, registrations and hands-on retail brokerage experience. I have approved over 30,000 customer new account forms, Messrs, Rosenthal and Hass have approved none.

### Concern about NASD and SEC Books and Records Rules
One of the requirements of all NASD member broker-dealers who do a public business is to abide to both Federal SEC and NASD Conduct Rules. OptionsHouse was approved for NASD membership in November 2005, it was not until August 2006 that the firm had any public customers, (and these were basically PEAK6 family related accounts).

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 8 of 12*

The NASD had conducted its New Membership Examination in April and May 2006. Due to the fact that we had done no business at the time of the initial examination, the NASD Examination staff  - and me for that matter -  could only assume and estimate how the firm's regulatory reporting would work,

Numerous times I warned both Messrs. Rosenthal and Hass about possible violations of NASD and SEC Books and Records Rules. They chose not to listen to me.

I had wanted to contact the NASD to report these potential violations but was instructed by Messrs. Rosenthal and Hass not to contact either to the NASD or SEC about these books and records problems.

A Mr. Robert Lund was hired in early September, 2006 to work on these books and records problems but he left the Firm on January 2, 2007.

Finally, on January 26, 2006, some three weeks after Robert Lund left the firm, I was laid-off. I was told by Messrs. Hass and Rosenthal that OptionsHouse no longer had any need for my services. On Wednesday, February 14, 2007, I finally received a copy of my Form U-5, which is the Uniform Termination Notice for registered persons in the financial services industry and is filed with the NASD Central registration Depository. It states that I was, "Discharged as a result of a Reorganization of the Compliance Department". Discharged on a Form U-5 indicates that a person has done something wrong, which I did not. The Form U-5 should have said "Other – Laid off due to no further need of my services". That is what I was told and that is what should have been reported to the NASD Central Registration Depository.

### Christmas Party
In early to mid December 2006, OptionsHouse had its Christmas Party at a restaurant called *Nine*, located at Randolph and Canal Streets in Downtown Chicago. At that time there had been discussion about the situation with the ongoing capabilities of OptionsHouse and the fact that it was still in the 'Start-Up" mode.

At this time, both Messrs. Hass and Rosenthal both assured the entire staff that "PEAK6, and Matt and Jenny (the owners) were committed to the OptionsHouse concept and that none of us had to worry about loosing our jobs." I took them at their word, as did all of the other employees. I fully understand that what they said does not constitute a binding promise or agreement, but they had no reason to make such statements if they were not true. It should be noted that the Parent Company, PEAK6 Investments, LLC earned in the hundreds of million dollars in calendar year 2006, according to Mr. Bob Baldwin, and even though the OptionsHouse division lost money, overall the Parent Company and subsidiaries made more than enough in profits.

### Annual Bonus Week (see Exhibits #4A and 4B)
The week of January 22-26, 2006 was the PEAK6 Annual Bonus Week. It is at this time that all PEAK6 employees received an Annual Bonus. Nancy McKinney, the Director of Human Resources for PEAK6 sent a firm-wide e-mail notifying all PEAK6 employees (including myself, see Exhibit "XX') that the Annual Bonus was to be paid on January 31, 2007, and that on either Tuesday, January 23rd or Wednesday, January 24th, we would be notified of our bonus amount. Since I had been paid an Annual Bonus in January 2006, I expected to receive an Annual Bonus for 2007 also. I received from the PEAK6 Human Resources Department an Election Form for tax withholding which I had also

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 9 of 12*

received and completed in January 2006 indicating the amount of federal taxes I wanted withheld from my Annual Bonus Amount.

Tuesday and Wednesday came and went and I still had not received my bonus amount notification. I asked Daniel Rosenthal when I might be meeting with him about my Annual Bonus and he told me that there were still some others who had not received their bonus amounts and to not worry, that he would meet with me. At no time did he or John Hass tell me that I would not be receiving my Annual Bonus.

On Friday, January 26th, the tax withholding election form was to have been filed with the PEAK6 Human Resources Department by no later than 3:00 PM. At approximately 1:30 PM, I contacted Teresa Grissom of the PEAK6 Human Resources Department via e-mail notifying her of the fact that I had still not received my Annual Bonus amount and could not provide her with my Tax Election Form. Ms. Grissom replied via e-mail and told me not to worry, that when I received my Annual Bonus Amount, to then file the Tax Election Form with the PEAK6 Human Resources Department.

Of 183 current employees of PEAK6 who were employed on Friday, January 26, 2007, I was the ONLY employee who did NOT receive a Annual Bonus. Even though I had received a Annual Bonus the year before.

### Termination Meeting (see Exhibits # 4 and 5 and 5A)
On Friday, January 26th, at 2:45 PM, I received a telephone call from Nancy McKinney, the PEAK6 Director of Human Resources requesting that I come to see her in her office. When I arrived in here office at 2:50 PM, Messrs. Hass and Rosenthal where there in her office. I was told by Messrs. Hass and Rosenthal that they were, "no in longer need of my services" and that I was being let go. They told me that I could claim unemployment and that they would not contest it. Ms. McKinney then asked me for my Access Key Card which allowed me access to the PEAK6 Office, I immediately gave it to her.

It was at this time that they provided me with a legal waiver document wherein for a payment of $5,000 less payroll taxes, I would waive all of my federal, state and local employee legal rights and not discuss my employment experience with any other person or entity. I told them that I had no intention of signing such a document and that $5,000 was an insult. Ms. McKinney told me that I had twenty one calendar days (i.e. until Friday, February 16, 2007) to change my mind and sign the document (see Exhibit #4C').

Mr. Hass then told me at that time that they had already interviewed and hired my replacement. Also, he told me that Donna MacDonald would take over as the OptionsHouse Director of Compliance and that the person that they had just hired would report directly to Donna.

At no time did they thank me for my hard and dedicated fifteen months work to the firm., (which I might add, is the age of OptionsHouse. I was with the firm from the start of business in November, 2005). At no time did they wish me well. At no time did they offer me any type severance package, such as a lump sum payment to help defray my living expenses during my job search. At other firms, when I have been laid off, I have received financial severance; payment for outsourcing services; paid extended insurance for me, my wife and 14 year old daughter; and $500 for resume creation and

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

*Page 10 of 12*

copying and miscellaneous fees relating to a job search. At PEAK6 I received nothing. I was hustled out of the building like a criminal and I was not allowed to say good-bye to any of my fellow staff members.

In other words, I was thrown away like garbage. I am a human being, not trash. I did my job and I was treated like some used piece of equipment being discarded for some new piece of equipment.

I have the following questions regarding these actions:

1) Why was Donna MacDonald selected over me when am older and I have more experience than she does. I have twenty five years of securities industry experience, she has ten.
2) I had worked that at PEAK6  firm six months longer than Donna has.
3) I had been an NASD Senior Compliance Examiner, she has no NASD experience.
4) I have more securities registrations than she has.
5) I have been a President & CEO of a Registered Investment Advisor, she has not.
6) I have six different insurance licenses, she has none.
7) I have been an NASD Arbitrator for over sixteen years, she has never been an NASD Arbitrator.
8) I have an MBA from DePaul University, she has no MBA.
9) I have attended the John Marshall Law School, she has no law school experience.
10) Finally, even if she was chosen over me, why did they lay me off when I could have done my job and reported to Ms. MacDonald. At no time was I provided with a choice as to whether I wanted to stay. I do not know the credentials of the person who has been hired to replace me, but I should have been provided with an opportunity to retain my current at the time that I was laid-off.

Why should I be laid-off and be replaced by a new employee? I did nothing to warrant being laid off. And there was no statement made to me that I was not doing my job properly up until the very end. I was to have had an employee review on May 17, 2006 and again on September 10, 2006, according to PEAK6 employee procedures, yet I was never provided with these reviews, even though almost all of the other employees of PEAK6 had their scheduled reviews.

Mr. Rosenthal then asked me if I wanted to resign rather than being laid off and for Form U-5 (i.e. the federal securities form which notifies the SEC, NASD and all of the states of the reason for your termination from a securities firm, See Exhibit #5A) purposes and I said that I definitely wanted my Form U-5 to state that I was "Laid-Off", I had no intention of resigning from OptionsHouse/PEAK6. I had done nothing wrong to resign.

Messrs. Hass and Rosenthal then left Ms. McKinney's Office and I told he that I felt that they had violated my federal employee rights. I also to her where to find my letter to her dated September 29, 2006, see Exhibit #4. Ms. McKinney told me that it was too late to allege a violation of my employee rights and but that she would read my September 29, 2006 letter to her.

### Clean Out Desk
On Friday, January 26th at 3:10 PM I was escorted by Ms. McKinney to my desk and I boxed my personnel affects and at 3:15 PM was escorted by Ms. McKinney from the firm's office. I will note at this time that Nancy McKinney at no time was rude or disrespectful toward me either on this last day or during the seven months that she had been the PEAK6 Director of Human Resources. But again, I was hustled out of the PEAK6 offices without a chance to say good-bye to any of my fellow employees.

### Comments Made to Me by PEAK6 Manager
After I was laid-off, I had a telephone conversation with a PEAK6 manager who I had worked for while at OptionsHouse. He told me that I had done a very fine job and that there had been no reason for Messrs. Rosenthal and Hass to terminate me.

He continued by saying that it was well known throughout PEAK6 that Mr. Rosenthal did not like me and that was why I was laid-off. Should you wish to contact him, I shall provide you with his telephone number.

### Closing Comments
I feel that the actions taken by certain managers of OptionsHouse/PEAK6 evidence violation of my employee rights under the Age Discrimination in Employment Act of 1967. I ask that the staff of the Equal Employment Opportunity Commission investigate this complaint on my behalf and let me know of your findings.

On February 14, 2007, I discovered that the person who replaced me as Director of Compliance for OptionsHouse/PEAK6 was Mr. Carl R. Kunz. I have known Mr. Kunz through industry gatherings for the past five years. He and I have interviewed for some the of the same job offerings throughout the years also. I have nothing but respect for Mr. Kunz and his background and skills, but I wonder why he was hired to replace me when I still have more experience and an equal or better background then him. I am also older than he is. Why do you replace a person who is doing his job with another like person with no notice or reason? That is what PEAK6 did to me.

Also, when I did receive my Form U-5, see Exhibit #5A, it stated that I had been discharged as a result of the reorganization of the Compliance Department. At no time during my termination meeting did they tell me that the Compliance Department was being reorganized.. All that I was told was that I was being laid off due to there being no further need of my services. Even if there had been a reorganization of the Compliance Department, why was there a need to terminate me. I was willing to work for PEAK6 even after a departmental organization. No one even gave me the chance offer to stay with the firm.

There are many other aspects of this complaint that I am more than willing to discuss, it is just difficult for me to pout it all down in words like this.

As it is now, I am unemployed, have no insurance for either myself or my wife and daughter (see Exhibits #5B, 5C and 5D).

I have cashed-out my PEAK6 401K Plan for additional funds, but my apartment lease expires on April 30, 2007, and I do not believe that I have enough money to support my family past that date. I am truly worried that my family and I may end up in a Homeless Shelter, which is very unfair, since I did nothing wrong.

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*
*Filed with the EEOC*

Thank you.

Respectfully submitted,


Robert J. Larson
SSN 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

*Robert J. Larson*
*Complaint vs. OptionsHouse/PEAK6*                                    *Page 1 of 1*
*Filed with the EEOC*

TO:

John P. Rowe, District Director
U.S. Equal Employment Opportunity Commission
Chicago District Office
500 West Madison Street
Suite 2800
Chicago, IL 60661
Tel: 312-353-2713


DATE: February 20, 2007


RE: Larson Vs. PEAK6  Investments LP
     List of Exhibits


**Exhibit #  1 – Acceptance Letter – dated 10/24/2005**
Exhibit #1A – Compensation List – dated 10/28/2005
Exhibit #1B – Primary Job/Supervisor List – dated 10/28/2005
Exhibit #1C – PEAK6 Employee Agreement Regarding Confidentiality, Nonsolicitation
and Noncompensation  - signed and dated 10/28/2005
**Exhibit #  2  –  PEAK6  Policy  against  Discrimination  and  Harassment  –  dated
6/1/2005**
Exhibit #2A – Important Information about Performance Trackers (i.e. employee reviews)
– not dated.
Exhibit #2B – January 2006 Performance Tracker for Robert J.  Larson – signed and
dated by Daniel M. Rosenthal on January 19, 2005
Exhibit #2C – E-Mail May 2006 Performance Tracker Appointment for Robert J. Larson –
from Pat Barry, assistant to Daniel M. Rosenthal – dated Tuesday, May 16, 2006, 9:41
AM
Exhibit #2D – E-mail Acceptance of May 2006 Performance Tracker Appointment for
Robert J. Larson – dated Tuesday, May 16, 2006, 11:33 AM.
**Exhibit # 3 – Marketing Ideas Follow-Up E-mail**
**Exhibit #  4 – Letter dated September 29, 2006 from Robert J. Larson to Nancy
McKinney, PEAK6 Director of Human Resources**
Exhibit # 4A – 2006 Bonus Payroll Memo – dated Friday, January 19, 2007 from Nancy
McKinney, PEAK6 Director of Human Resources
Exhibit # 4B- 2006 Bonus Award Follow-Up Memo  - dated Thursday, January 25, 2007
from Teresa Grissom – assistant to Nancy McKinney.
Exhibit # 4C – Confidential Separation Agreement – to be signed and dated between
Robert J. Larson and Nancy McKinney
**Exhibit #  5 – Termination Letter from Nancy McKinney to Robert J. Larson –
signed and dated January 30, 2007.**
Exhibit # 5A – Form U-5, Uniform Termination Notice for Securities Industry Registration
– for Robert J. Larson - dated and signed on February 1, 2007 – but not filed until
Wednesday, February 7, 2007 with the NASD Central Registration Depository.
Exhibit #  5B – Certificate of Blue Cross/Blue Shield Insurance Coverage for Robert
Larson – dated February 14, 2007.
Exhibit #5C - Certificate of Blue Cross/Blue Shield Insurance Coverage for Sonia Larson
– dated February 14, 2007.
Exhibit #5D - Certificate of Blue Cross/Blue Shield Insurance Coverage for Lisa Larson –
dated February 14, 2007.

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | **440-2007-03177** |

**Illinois Department Of Human Rights** and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* <br> **Mr. Robert J. Larson** | Home Phone *(Incl. Area Code)* <br> **(847) 864-0964** | Date of Birth <br> **06-09-1957** |
|---|---|---|
| Street Address <br> **915 Hinman Avenue** | City, State and ZIP Code <br> **Evanston, IL 60202** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name <br> **PEAK6 INVESTMENTS LP** | No. Employees, Members <br> **101 - 200** | Phone No. *(Include Area Code)* <br> **(312) 362-2401** |
|---|---|---|
| Street Address <br> **141 W. Jackson Blvd., #500** | City, State and ZIP Code <br> **Chicago, IL 60604** | |
| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN <br> ☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)* | Earliest **4-26-2006**   Latest **1-26-2007** <br> ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment with Respondent on October 28, 2005. My most recent position was Director of Compliance. During my employment I was subjected to different terms and conditions of employment in that I was excluded from management meetings and I was not given my performance evaluations on May 16, 2006 or September 2006. On September 29, 2006, I complained of this to Human Resources, to no avail. In January 2007, I was denied my annual bonus. On January 26, 2007, I was discharged.

I believe I have been discriminated against because of my age, 49 (DOB 6-9-1957), and retaliated against, in violation of the Age Discrimination in Employment Act of 1967, as amended.

COPY

RECEIVED EEOC
FEB 20 2007
CHICAGO DISTRICT OFC

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| **Feb 20, 2007** <br> *Date*          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE <br> *(month, day, year)* |



Ex 41



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison St., Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TDD: (312) 353-2421
ENFORCEMENT FAX: (312) 886-1168
LEGAL FAX: (312) 353-8555

February 22, 2007

Robert J. Larson
915 Hinman Avenue
Evanston, IL 60202

Re:     Robert J. Larson v. Peak6 Investments, LP
        EEOC Number: 440-2007-03177

Dear Mr. Larson:

This is to inform you that I have been assigned as the Investigator for your charge. Presently, I am waiting to receive evidence from the Respondent that you charged with discrimination. When all of this information has been received and analyzed, I will be able to determine what additional steps are appropriate. At any point in this process, I will welcome whatever additional input you may have regarding your charge.

The large inventory of cases currently under investigation in our office may affect the length of time needed to process your charge. You should expect that it will generally require at least six months. We understand that you may be very concerned about your charge when you have not been in contact with us for several weeks or months. Please be assured that the Commission is committed to investigating your charge as expeditiously as possible. We regret that our staff size does not permit us to provide you with more frequent interim contacts without slowing the progress of our investigations. We ask for your understanding and cooperation in this regard.

If it is necessary for you to contact me regarding the investigation of your charge, you may write to me at the above address. Also, if you wish to submit additional information, or report additional complaints of discrimination to us, including reprisal by Respondent against you for filing your present charge, you may do so by writing, or faxing (see fax number above), or by phoning me; I can be reached at (312) 886-9320, between the hours of 8:30 a.m. and 4:00 p.m., Monday through Thursday.

Please be advised that for security reasons, **all visitors to our office <u>must</u> have an appointment, and a photo ID**.

If you need to meet with me for any reason, please contact me for an appointment at (312) 886-9320

Sincerely,

*Sarronda Harris*

Sarronda Harris
Investigator



COPY

# NSCP JOBLINE REGISTER FAQ

NATIONAL SOCIETY OF COMPLIANCE PROFESSIONALS INC.

Phone: 1.86

**Resume Bank**

Email: ☐

Password: ☐

Login

Register    Forgot password?

**QUICK SEARCH**

Employers, please login to search Resumes.

Keyword: ☐

Location:
All Locations ▾

Search

**Job Post**

Email: ☐

Password: ☐

Register    Forgo

---

Job Post Preview

**Position Details:**

**Job Title: Trade Surveillance Officer**

**COPY**

**Company Information:**
Penson Financial Services, Inc.
Dallas, Texas

**Description:**
**Position Responsibilities:**

As the OATS Principal for Penson, the position will be responsible for:
• Daily OATS manual entry, repairs and logs;
• Daily OATS activities of reporting OSOs;
• OATS related inquiries from Penson Correspondents;
• Guidance on upcoming OATS rule changes, and how they should be addressed;
• Penson's OATS Written Supervisory Procedures;
• Guidance and prioritization of OATS development activities of OATS technology providers and Penson's Proje
Management Group.
In addition to the OATS responsibilities, the candidate will cross-train and function as back-up for Trade Surveil
activities including:

• Daily, monthly and quarterly best execution reviews and Rule 606 reporting;
• Market manipulation surveillance, including odd-lots, wash trades, and short sales;
• Reviews of system incidents related to OATS, best execution, and trade surveillance;
• Research and data production in response to regulatory inquiries in co-operation with Compliance;
• Real time trading advice and support to the firm's trading desk.

**Candidate Requirements:**
**Candidate Requirements:**
• BA or BS degree, or relevant experience;
• Series 7, 24 and 55 licenses;
• OATS supervision experience;
• Ability to work independently;
• Experience with trade reporting and direct access systems;
• Knowledge of current trading rules and regulations;
• Knowledge of back office functions;
Experience with other aspects of Broker/Dealer compliance is helpful.

**Salary / Benefits:**
Penson Financial Services, Inc. offers an excellent benefits package including medical and dental insurance, lif
disability insurance, paid time off, ESPP, 401(k) with a generous company contribution and performance bonus
are interested in this opportunity and would like to learn more about our company, please log on to
http://www.penson.com/ and click on the 'Careers' tab to view our available positions and submit your resume

**Employer Contact Information: (company that has posted this position)**



Company Address: **Penson Financial Services**
**1700 Pacific Avenue**
**Suite 1400**
**Dallas, Texas   75201**

Website: **http://www.penson.com**
Toll Free: **N/A**
Phone: **N/A**
Fax:
E-Mail: **psilveus@penson.com**

Additional Information:

**Please email a text copy of your resume**
**Other: www.penson.com**
**Please do no fax information**
**Please do not call**

# YAHOO! MAIL

Print - Close Window

**Subject:**  RE: Trade Surveillance Officer: Larson Follow-Up

**Date:**  Thu, 10 May 2007 07:35:18 -0500

**From:**  "Pam Silveus" <PSilveus@PENSON.COM>

**To:**  "Robert Larson" <rbtjlarson@yahoo.com>

COPY

Good morning Robert,

We are still in the interview process.  I will contact you once I know
how the hiring manager wants to proceed.

Have a great day!

Pam Silveus

-----Original Message-----
From: Robert Larson [mailto:rbtjlarson@yahoo.com]
Sent: Wednesday, May 09, 2007 10:33 PM
To: Pam Silveus
Subject: Fwd: Trade Surveillance Officer: Larson Follow-Up

Dear Pam:

I have not heard from you. Please note that I am
willing to relocate to Dallas in order to accept this
position.

Thanks again.

Bob Larson

PS: As we discussed before, I would be willing to take
$90,000 plus a bonus.

*PAm SILVIus*
*PENSON AR*
*L21#*
*765-1587*

Note: forwarded message attached.

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

STATEMENT OF CONFIDENTIALITY: This message and any attachments are
 intended solely for the person or entity to which it is addressed and may
 contain confidential or privileged information. If the recipient of this
 message is not the addressee or a person responsible for delivering
 the message to the addressee, such recipient is prohibited from reading
 or using this message in any way. If you have received this message in
 error, please call the sender of this message immediately and delete the
 message from any computer.

(44)





COPY

**BrokerCheck Report**

**ROBERT JEROME LARSON**

CRD# 1565322

Report #13539-68172 generated on Wednesday, April 18, 2007.

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 - 5 |
| Disclosure of Customer Disputes, Disciplinary, and Regulatory Events | 6 - 14 |
| About this BrokerCheck Report | 15 |

(45)



## Dear Investor:

NASD has generated the following BrokerCheck report for **ROBERT J. LARSON.** The information contained within this report has been provided by an NASD brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

NASD regulates the securities markets for the ultimate benefit and protection of the investor. NASD believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with an NASD member. To that end, NASD has adopted a public disclosure policy to make certain types of information available to you. Examples of information NASD provides include: regulatory actions, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. NASD recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

NASD BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and NASD rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

**Thank you for using NASD BrokerCheck.**



Using this site/information means that you accept the NASD BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.nasd.com

For additional information about the contents of this report, please refer to the User Guidance or www.nasd.com/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about NASD, visit www.nasd.com.



User Guidance

NASD

www.nasdbrokercheck.com



This broker is not currently registered with an NASD firm.

# Report Summary for this Broker

The report summary provides an overview of the broker's professional background and conduct. The individual broker, an NASD-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by either the broker, a previous employing brokerage firm, or a securities regulator on 04/17/2007.

## Broker Qualifications

**This broker is not currently registered with an NASD firm.**



**This broker has passed:**

- 5 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration and Employment History

This broker was previously registered with the following NASD firms:

**ENERGY SECURITIES, INC.**
CRD# 101220
BRENTWOOD, TN
03/2007 - 04/2007

**OPTIONSHOUSE, INC.**
CRD# 135625
CHICAGO, IL
11/2005 - 02/2007

**DIRECT CAPITAL SECURITIES, INC.**
CRD# 29639
SANTA MONICA, CA
05/2005 - 10/2005

For complete registration and employment history details as reported by the broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this broker? Yes

**The following types of disclosures were reported:**

Regulatory Event



©2007 NASD. All rights reserved.    Report# 13539-68172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

1

www.nasdbrokercheck.com

User Guidance

**NASD**

## Broker Qualifications

## Registrations

This section provides the SROs (i.e., self-regulatory organizations such as NASD and the NYSE), states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective.

This broker is not currently registered with an NASD firm.

©2007 NASD. All rights reserved.    Report# 13539-68172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

www.nasdbrokercheck.com

User Guidance

**NASD**

## Broker Qualifications

### Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

**This individual has passed 5 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.**

#### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| | Series 14 | |
| | | |
| | Series 27 | 06/07/1997 |
| | Series 63 | |

#### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| Limited Representative-Security Trade Exam | Series 55 | 12/01/1999 |

#### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|
| | Series 63 | |
| Uniform Investment Adviser Law Examination | Series 65 | 12/01/1999 |

Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by NASD to brokers and other securities professionals can be found at www.nasd.com.

©2007 NASD. All rights reserved.    Report# 13539-88172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

3

www.nasdbrokercheck.com



User Guidance

# Registration and Employment History

## Previously Registered with the Following NASD Firms

NASD records show this broker was previously registered with the following NASD firms. This section lists securities industry employments where the broker was registered with NASD.

| Registration Dates | Firm Name | CRD# | Firm Location |
|---|---|---|---|
| 1/2005 - 02/2007 | OPTIONSHOUSE, INC. | 135625 | CHICAGO, IL |
| | | 29997 | SANTA MONICA, CA |
| 10/2001 - 01/2005 | ANALYSIS SECURITIES CORPORATION | 10446 | CHICAGO, IL |
| | INVESTOR | 3018 | CHICAGO, IL |
| 04/1994 - 02/1999 | | 4225 | OAKBROOK, IL |
| 05/1996 - 07/1998 | TALES & ASSOCIATES, INC. | 3949 | BOCA RATON, FL |
| 11/1996 - 02/1998 | FINANCIAL SERVICES, INC. | 10537 | LAKE BLUFF, IL |
| 09/1994 - 05/1995 | SON SECURITIES INC. | 32176 | CHICAGO, IL |
| 11/1990 - 02/1994 | SECURITIES INVESTMENT CORPORATION | 5606 | OAKBROOK, IL |
| 03/1991 - 08/1993 | SECURITIES, INC. | 19616 | RICHMOND, VA |

©2007 NASD. All rights reserved.    Report# 13539-68172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

www.nasdbrokercheck.com

**NASD**
User Guidance

## Registration and Employment History

## Employment History

This section provides 10 years of the broker's employment history as reported by the individual broker, and includes all securities and non-securities related employment, full and part-time work, self-employment, military service, unemployment, and full-time education.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 05/2005 - 10/2005 | DIRECT CAPITOL SECURITIES | SANTA MONICA, CA |
| 10/2004 - 04/2005 | FIRST MONTAUK SECURITIES CORPORATION | CHICAGO, IL |
| 01/2003 - 10/2004 | THE PROVIDENT CORP | CHICAGO, IL |
| 10/1996 - 10/1999 | JENNY INVESTOR ADVISORY SERVICES, INC. | CHICAGO, IL |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information reported.

©2007 NASD. All rights reserved.    Report# 13539-68172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

5

www.nasdbrokercheck.com

User Guidance



# NASD

# Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

**What you should know and/or consider regarding any reported disclosure events:**

- Before reaching a conclusion regarding any of the reported disclosure information contained in your BrokerCheck report, you should ask the broker to clarify the specific event(s) listed, or to provide a response to any questions you may have.
- "Pending" actions involve unproven and/or unsubstantiated allegations.

**Disclosures in BrokerCheck reports come from different sources:**

- **Self-disclosure:** Brokers are required to answer a series of questions on their application requesting securities industry registration (commonly referred to as "Form U4"). For example, brokers are asked whether they have been involved in certain regulatory, civil, criminal and financial matters (e.g., bankruptcy), or been the subject of a customer dispute.
- **Regulator/Employer postings:** In addition, regulators and firms that have employed a broker also may contribute relevant information about such matters. All of this information is maintained in the CRD system.

**Certain thresholds must be met before an event is reported to the CRD; for example:**

- **A law enforcement agency** must file formal charges before a broker is required to report a particular criminal event.
- Likewise, **a regulatory agency** must meet established standards before initiating a regulatory action and/or issuing sanctions. These standards typically include a reasonable basis for initiating the action after engaging in a fact-finding process.

**In order for a customer dispute to be reported to the CRD, a customer must:**

- Allege that their broker engaged in activity that violates certain rules or conduct governing the industry; and
- Claim damages of $5,000 or more as a result of that activity.

(Note: customer disputes may be more subjective in nature than a criminal or regulatory action)

**Certain customer disputes contained in your BrokerCheck report may no longer be required to be reported by the broker on Form U4.**

- Generally, these will be written complaints that were initiated more than two years ago. Once an event is not required to be reported, a broker has no obligation to update the matter.

**What you should consider when evaluating the status or disposition of a reported disclosure event:**

- Disclosure events may be **pending, on appeal, or final.** Pending and 'on appeal' matters reflect allegations that (1) have not been proven or formally adjudicated, or (2) have been adjudicated but are currently being appealed. Final matters generally may be adjudicated, settled or otherwise resolved.
  - An **adjudicated matter** includes a disposition by (1) a court of law in a criminal or civil matter or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.



Possible multiple reporting sources -- please note:

Disclosure event details may be reported by more than one source (i.e., regulator, firm, or broker). When this occurs, all versions of the reported event will appear in the individual's BrokerCheck report. The different versions of the same reported disclosure event are separated by a solid line with the reporting source clearly labeled.

©2007 NASD. All rights reserved.    Report# 13539-68172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON

6

· www.nasdbrokercheck.com

User Guidance

NASD

- A **settled matter** generally represents a disposition wherein parties involved in a dispute reach an agreement that resolves the matter.

(Note: brokers may choose to settle customer disputes or regulatory matters for business or other reasons)

- Customer disputes also may be **resolved** without any payment to the customer or any finding of wrongdoing on the part of the broker.

| Pending | Final | On Appeal |
|---------|-------|-----------|

©2007 NASD. All rights reserved.    Report# 13539-88172 generated on Wednesday, April 18, 2007 about ROBERT J. LARSON



FINra



COPY

**BrokerCheck Report**
**DANIEL MAX ROSENTHAL**
CRD# 4971856
Report #31335-72857 generated on Monday, November 19, 2007.

**Section Title**                          **Page(s)**

Report Summary                             1

Broker Qualifications                      2 - 3

Registration and Employment History        4

About this BrokerCheck Report              5



(46)

#E: ÷ cx | -A-A||



FINLA

Dear Investor:

FINRA has generated the following BrokerCheck report for DANIEL M. ROSENTHAL. The information contained within this report has been provided by a FINRA brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides include: regulatory actions, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, relatives, consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.

1 Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org

2 For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.




User Guidance

**FINГА**

# Report Summary for this Broker

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by either the broker, a previous employing brokerage firm, or a securities regulator on 11/27/2006.

## Broker Qualifications

This broker is registered with:

- 1 Self-Regulatory Organization
- 1 U.S. state or territory



This broker has passed:

- 1 Principal/Supervisory Exam
- 1 General Industry/Product Exam
- 1 State Securities Law Exam

## Registration and Employment History

This broker was previously registered with the following FINRA firms:

No information reported.

For additional registration and employment history details as reported by the broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this broker? NO



Currently employed by and registered with the following FINRA Firms:

OPTIONSHOUSE, INC.
303 E. WACKER DRIVE
SUITE 700
CHICAGO, IL 60601
CRD# 135625
Registered with this firm since: 11/2005

©
www.finra.org/brokercheck



User Guidance

**FINRA**

2

● ● ●
www.finra.org/brokercheck

## Broker Qualifications

## Registrations

This section provides the SROs, states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective. This section also provides information on the physical location of each branch that the broker is associated with, for each listed employment.

This individual is currently registered with 1 SRO and is licensed in 1 U.S. state or territory through his or her employer.

**Employment 1 of 1**

| | |
|---|---|
| Firm Name: | OPTIONSHOUSE, INC. |
| Main Office Address: | 303 E. WACKER DRIVE |
| | SUITE 700 |
| | CHICAGO, IL 60601 |
| Firm CRD#: | 135625 |

| SRO | Category | Status | Date |
|---|---|---|---|
| NASD | General Securities Representative | APPROVED | 11/03/2005 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| | | | |

## Branch Office Locations

OPTIONSHOUSE, INC.
303 E. WACKER DRIVE
SUITE 700
CHICAGO, IL 60601

©2007 FINRA. All rights reserved.    Report# 31335-72857 generated on Monday, November 19, 2007 about DANIEL M. ROSENTHAL.

User Guidance



FINTA

## Broker Qualifications

www.finra.org/brokercheck

### Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

This individual has passed 1 principal/supervisory exam, 1 general industry/product exam, and 1 state securities law exam.

#### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
|  |  | 09/01/2005 |

#### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
|  | Series | 01/02/2005 |

#### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
|  |  | 01/28/2005 |

Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by FINRA to brokers and other securities professionals can be found at http://www.finra.org/brokerqualifications/.

©2007 FINRA. All rights reserved.　Report# 31335-72857 generated on Monday, November 19, 2007 about DANIEL M. ROSENTHAL.

www.finra.org/brokercheck

User Guidance



# Registration and Employment History

## Previously Registered with the Following FINRA Firms

FINRA records show this broker previously held FINRA registrations with the following firms:

**Registration Dates    Firm Name                CRD#    Branch Location**

No information reported.

## Employment History

This section provides up to 10 years of a broker's employment history as reported by the individual broker, and includes all securities and non-securities related employment, full and part-time work, self-employment, military service, unemployment, and full-time education. Please note that this information is not updated after an individual ceases to be registered with a FINRA firm.

**Employment Dates    Employer Name                        Employer Location**

| 06/1999 - Present | PEAK 6 | CHICAGO, IL |
| 06/1988 - 10/1998 | LOGICAT, INC. | NEW YORK, NY |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

CHIEF TECHNOLOGY OFFICER FOR PEAK 6 INVESTMENTS LP. IT IS INVESTMENT RELATED.

©2007 FINRA. All rights reserved.    Report# 31135-72857 generated on Monday, November 19, 2007 about DANIEL M. ROSENTHAL

User Guidance

FINra

## About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

### Who provides the information in BrokerCheck?

Information made available through FINRA BrokerCheck is derived from the Central Registration Depository (CRD®) as reported on the industry registration and licensing forms brokerage firms and brokers are required to complete.

The forms used by brokerage firms, Forms BD and BDW, are established by the Securities and Exchange Commission (SEC) and adopted by all state securities regulators and self-regulatory organizations (SROs). FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that collect broker information. Regulators provide information via Form U6, which is used primarily to report certain history about brokerage firms and brokers. These forms are approved by the SEC.

### How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (updates typically are required not later than 30 days after the broker/brokerage firm learns of an event). The report data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

### What information is NOT disclosed through BrokerCheck?

Information that has not been reported to the CRD system, or that is not required to be reported, is not disclosed through FINRA BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely, certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. NASD Interpretive Material 8310-2 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from the CRD system. Further information about expungement from the CRD system is available in NASD Notices to Members 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web Site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. The hotline is open Monday through Friday from 8 a.m. to 8 p.m., Eastern Time (ET).

For more information about the following, select the associated link:

• About BrokerCheck Reports:  http://www.finra.org/brokercheck_reports
• Glossary:  http://www.finra.org/brokercheck_glossary
• Questions Frequently Asked about BrokerCheck Reports:  http://www.finra.org/brokercheck_faq
• Terms and Conditions:  http://brokercheck.finra.org/terms.aspx

©2007 FINRA. All rights reserved.    Report# 31335-72857 generated on Monday, November 19, 2007 about DANIEL M. ROSENTHAL

User Guidance

www.finra.org/brokercheck

Report# 31335-72857 generated on Monday, November 19, 2007 about DANIEL M. ROSENTHAL

© 2007 FINRA. All rights reserved.





# BrokerCheck Report

## ARTHUR JOHN HASS III

CRD# 2172376

Report #80682-48838 generated on Monday, November 19, 2007.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| About this BrokerCheck Report | 5 |

(47)

**FINRA**

## Dear Investor:

FINRA has generated the following BrokerCheck report for ARTHUR J. HASS III. The information contained within this report has been provided by a FINRA brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides include:

- Regulatory actions, investment-related civil suits;
- Customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, regulations and FINRA rules approved by the SEC. Securities and Exchange Commission (SEC) State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck

User Guidance



# FINʳa

## Report Summary for this Broker

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by either the broker, a previous employing brokerage firm, or a securities regulator on 06/01/2007.

## Broker Qualifications

### This broker is registered with:

- 1 Self-Regulatory Organization
- 3 U.S. states and territories



### This broker has passed:

- 1 Principal/Supervisory Exam
- 1 General Industry/Product Exam
- 1 State Securities Law Exam

## Registration and Employment History

This broker was previously registered with the following FINRA firms:

**GOLDMAN, SACHS & CO.**
CRD# 361
09/1991 - 10/2006

For additional registration and employment history details as reported by the broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this broker? — **No**





ARTHUR J. HASS III

**Currently employed by and registered with the following FINRA Firms:**

**OPTIONSHOUSE, INC.**
303 E. WACKER DRIVE
SUITE 700
CHICAGO, IL 60601
CRD# 135625
Registered with this firm since: 10/2006

©2007 FINRA. All rights reserved.     Report# 80682-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III



User Guidance

# Broker Qualifications

## Registrations

This section provides the SROs, states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective. This section also provides information on the physical location of each branch that the broker is associated with, for each listed employment.

**This individual is currently registered with 1 SRO and is licensed in 3 U.S. states and territories through his or her employer.**

## Employment 1 of 1

Firm Name:            OPTIONSHOUSE, INC.
Main Office Address:  303 E. WACKER DRIVE
                      SUITE 700
                      CHICAGO, IL  60601

Firm CRD#:            135625

| SRO | Category | Status | Date |
|-----|----------|--------|------|
| NASD | General Securities Representative | APPROVED | 10/02/2006 |

| U.S. State/ Territory | Category | Status | Date |
|-----------------------|----------|--------|------|
| Illinois | Agent | APPROVED | 12/15/2006 |

## Branch Office Locations

This individual does not have any registered Branch Office where the individual is located.

©2007 FINRA. All rights reserved.    Report# 80682-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III



**FINRA**

3

## Broker Qualifications

### Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

This individual has passed 1 principal/supervisory exam, 1 general industry/product exam, and 1 state securities law exam.

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
|      |          | 02/28/2005 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
|      | Series 7 | 09/09/1991 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
|      | Series 63 | 12/14/2005 |

::: Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by FINRA to brokers and other securities professionals can be found at http://www.finra.org/brokerqualifications/.

©2007 FINRA. All rights reserved.     Report# 80682-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III

www.finra.org/brokercheck



# Registration and Employment History

## Previously Registered with the Following FINRA Firms

FINRA records show this broker previously held FINRA registrations with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|

## Employment History

This section provides up to 10 years of a broker's employment history as reported by the individual broker, and includes all securities and non-securities related employment, full and part-time work, self-employment, military service, unemployment, and full-time education. Please note that this information is not updated after an individual ceases to be registered with a FINRA firm.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 08/1988 - 09/2005 | GOLDMAN SACHS & CO. | NEW YORK, NY |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, director, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

PLATINUM UNDERWRITERS HOLDINGS, LTD. // NON-INVESTMENT RELATED // ADDRESS: 69 PITT'S BUY ROAD, PEMBROKE HM 08 BERMUDA // BUSINESS: REINSURANCE // POSITION: DIRECTOR OF HOLDING CO; // START DATE: 4-25-07 // APPROX HRS PER MONTH: 2 HRS (DURING TRADING HOURS) // DUTIES: SERVE ON AUDIT AND COMPENSATION COMMITTEES

©2007 FINRA. All rights reserved.    Report# 80682-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III

www.finra.org/brokercheck



# About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

## Who provides the information in BrokerCheck?

Information made available through FINRA BrokerCheck is derived from the Central Registration Depository (CRD®) as reported on the industry registration and licensing forms brokerage firms and brokers are required to complete.

The forms used by brokerage firms, Forms BD and BDW, are established by the Securities and Exchange Commission (SEC) and adopted by all state securities regulators and self-regulatory organizations (SROs). FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that collect broker information. Regulators provide information via Form U6, which is used primarily to report certain history about brokerage firms and brokers. These forms are approved by the SEC.

## How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (updates typically are required not later than 30 days after the broker/brokerage firm learns of an event). The report data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

## What Information is NOT disclosed through BrokerCheck?

Information that has not been reported to the CRD system, or that is not required to be reported, is not disclosed through FINRA BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely, certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. NASD Interpretive Material 8310-2 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from the CRD system. Further information about expungement from the CRD system is available in NASD Notices to Members 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web Site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. The hotline is open Monday through Friday from 8 a.m. to 8 p.m., Eastern Time (ET).

For more information about the following, select the associated link:

- About BrokerCheck Reports:  http://www.finra.org/brokercheck_reports
- Glossary:  http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports:  http://www.finra.org/brokercheck_faq
- Terms and Conditions:  http://brokercheck.finra.org/terms.aspx

©2007 FINRA. All rights reserved.    Report# 80682-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III

User Guidance

www.finra.org/brokercheck

©2007 FINRA. All rights reserved.    Report# 80882-48838 generated on Monday, November 19, 2007 about ARTHUR J. HASS III





COPY

**BrokerCheck Report**
**DONNA JOY MACDONALD**
CRD# 1178698

Report #18307-11995 generated on Monday, November 19, 2007.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 - 5 |
| About this BrokerCheck Report | 6 |

# FINra

## Dear Investor:

FINRA has generated the following BrokerCheck report for DONNA J. MACDONALD. The information contained within this report has been provided by a FINRA-brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides include:

- regulatory actions, investment-related civil suits,
- customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and
- financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck

User Guidance



**FINïa**

# Report Summary for this Broker



**DONNA JEAN MACDONALD**
**CRD# 135625**

**Currently employed by and registered with the following FINRA Firms:**

OPTIONSHOUSE, INC.
303 E. WACKER DRIVE
SUITE 700
CHICAGO, IL 60601
CRD# 135625
Registered with this firm since: 09/2007

The report summary provides an overview of the broker's professional background and conduct. The individual broker, a FINRA-registered firm(s), and/or securities regulator(s) have provided the information contained in this report as part of the securities industry's registration and licensing process. The information contained in this report was last updated by either the broker, a previous employing brokerage firm, or a securities regulator on 09/04/2007.

## Broker Qualifications

**This broker is registered with:**

- 1 Self-Regulatory Organization
- 0 U.S. states and territories



**This broker has passed:**

- 2 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 0 State Securities Law Exams

## Registration and Employment History

This broker was previously registered with the following FINRA firms:

**GOLDMAN SACHS EXECUTION & CLEARING, L.P.**
CRD# 3466
JERSEY CITY, NJ
03/2005 - 04/2006

**GOLDMAN, SACHS & CO.**
CRD# 361
NEW YORK, NY
05/2003 - 06/2005

**HULL TRANSACTION SERVICES, L.L.C.**
CRD# 36070
CHICAGO, IL
12/1997 - 01/2002

For additional registration and employment history details as reported by the broker, refer to the Registration and Employment History section of this report.

## Disclosure of Customer Disputes, Disciplinary, and Regulatory Events

This section includes details regarding disclosure events reported by or about this broker to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events include formal investigations and disciplinary actions initiated by regulators, customer disputes, certain criminal charges and/or convictions, as well as financial disclosures, such as bankruptcies and unpaid judgments or liens.

**Are there events disclosed about this broker? No**

©2007 FINRA. All rights reserved.     Report# 18307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD

www.finra.org/brokercheck

FIN`ra`

User Guidance

# Broker Qualifications

## Registrations

This section provides the SROs, states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective. This section also provides information on the physical location of each branch that the broker is associated with, for each listed employment.

This individual is currently registered with 1 SRO and is licensed in 0 U.S. states and territories through his or her employer.

## Employment 1 of 1

Firm Name:          OPTIONSHOUSE, INC.
Main Office Address: 303 E. WACKER DRIVE
                     SUITE 700
                     CHICAGO, IL  60601

Firm CRD#:          135825

| SRO | Category | Status | Date |
|-----|----------|--------|------|
| NASD | General Securities Principal | APPROVED | 09/04/2007 |
| NASD | General Securities Sales Supervisor | APPROVED | 09/04/2007 |

## Branch Office Locations

This individual does not have any registered Branch Office where the individual is located.

©2007 FINRA. All rights reserved.    Report# 18307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD

User Guidance



FINra

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all current principal/supervisory, general product/industry, and/or state securities law exams that the broker has passed. Under certain, limited circumstances, a broker may receive a waiver of an exam requirement based on a combination of previous exams passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on a broker's specific qualifying work experience. Information regarding instances of exam waivers or the grandfathering of an exam requirement are not included as part of the BrokerCheck report.

**This individual has passed 2 principal/supervisory exams, 2 general industry/product exams, and 0 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| General Securities Principal Examination | Series 24 | 05/13/1998 |

### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| | | 06/03/1994 |
| Limited Representative Equity Trader Exam | Series 55 | 08/14/1998 |

### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|

Additional information about the securities industry's qualifications and continuing education requirements, as well as the examinations administered by FINRA to brokers and other securities professionals can be found at http://www.finra.org/brokerqualifications/.

©2007 FINRA. All rights reserved.　Report# 18307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD

User Guidance

www.finra.org/brokercheck



# Registration and Employment History

## Previously Registered with the Following FINRA Firms

FINRA records show this broker previously held FINRA registrations with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 05/2003 - 06/2005 | GOLDMAN SACHS & CO. | 361 | NEW YORK, NY |
| 01/1995 - 11/1997 | RODMAN & RENSHAW INC. | 724 | CHICAGO, IL |
| 08/1994 - 09/1994 | HAMILTON INVESTMENTS, INC. | 821 | |

## Employment History

This section provides up to 10 years of a broker's employment history as reported by the individual broker, and includes all securities and non-securities related employment, full and part-time work, self-employment, military service, unemployment, and full-time education. Please note that this information is not updated after an individual ceases to be registered with a FINRA firm.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 03/2005 - 03/2006 | GOLDMAN SACHS EXECUTION & CLEARING | CHICAGO, IL |
| 04/2003 - 03/2005 | GOLDMAN SACHS & CO. | CHICAGO, IL |
| 01/2000 - 10/2000 | HULL QUANTITATIVE FUND, L.L.C. | CHICAGO, IL |

## Affiliations

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

NAME OF OTHER BUSINESS: PEAK6 PERFORMANCE MANAGEMENT LLC, ADDRESS: 141 W. JACKSON BLVD., SUITE 500, CHICAGO, IL 60604

©2007 FINRA. All rights reserved.     Report# I8307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD



User Guidance

FINRA

www.finra.org/brokercheck

## Registration and Employment History

### Affiliations, continued

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

NATURE OF BUSINESS: REGISTERED BROKER-DEALER
POSITION AND TITLE: COMPLIANCE OFFICER
START DATE: MARCH 2006
NUMBER OF HOURS PER MONTH DEVOTED TO OTHER BUSINESS AND DURING TRADING HOURS:
APPROXIMATELY 78 PER MONTH
DUTIES: COMPLIANCE

OPTIONSHOUSE, INC., ADDRESS: 141 W. JACKSON BLVD., SUITE 500, CHICAGO, IL 60604
NATURE OF BUSINESS: REGISTERED BROKER-DEALER
POSITION AND TITLE: COMPLIANCE OFFICER
START DATE: MARCH 2006
NUMBER OF HOURS PER MONTH DEVOTED TO OTHER BUSINESS AND DURING TRADING HOURS:
APPROXIMATELY 2 PER MONTH
DUTIES: COMPLIANCE

©2007 FINRA. All rights reserved.    Report# 18307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD

User Guidance

**FINLA**

## About this BrokerCheck Report

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

### Who provides the information in BrokerCheck?

Information made available through FINRA BrokerCheck is derived from the Central Registration Depository (CRD®) as reported on the industry registration and licensing forms brokerage firms and brokers are required to complete.

The forms used by brokerage firms, Forms BD and BDW, are established by the Securities and Exchange Commission (SEC) and adopted by all state securities regulators and self-regulatory organizations (SROs). FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that collect broker information. Regulators provide information via Form U6, which is used primarily to report certain history about brokerage firms and brokers. These forms are approved by the SEC.

### How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (updates typically are required not later than 30 days after the broker/brokerage firm learns of an event). The report data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

### What Information is NOT disclosed through BrokerCheck?

Information that has not been reported to the CRD system, or that is not required to be reported, is not disclosed through FINRA BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely, certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. NASD Interpretive Material 8310-2 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from the CRD system. Further information about expungement from the CRD system is available in NASD Notices to Members 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web Site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. The hotline is open Monday through Friday from 8 a.m. to 8 p.m., Eastern Time (ET).

For more information about the following, select the associated link:

- About BrokerCheck Reports:  http://www.finra.org/brokercheck_reports
- Glossary:  http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports:   http://www.finra.org/brokercheck_faq
- Terms and Conditions:  http://brokercheck.finra.org/terms.aspx

©2007 FINRA. All rights reserved.    Report# 18307-11995 generated on Monday, November 19, 2007 about DONNA J. MACDONALD