**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT J. LARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  07-CV-7283 |
| | ) | |
| PEAK6 INVESTMENTS, LP, ARTHUR | ) | Judge Marvin E. Aspen |
| JOHN HASS, III, NANCY MCKINNEY AND | ) | |
| DANIEL MAX ROSENTHAL, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT PEAK6 INVESTMENTS LP'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

Defendant PEAK6 Investments LP,[1] by its counsel Franczek Sullivan P.C., for its Answer

and Affirmative Defenses to Plaintiff Robert J. Larson's Complaint states:

1.     This is an action for employment discrimination.

**ANSWER**:     Defendant admits that Plaintiff alleges that he was subjected to

employment discrimination, but denies that it discriminated against him in any way.

2.     The plaintiff is Robert J. Larson of the county of Cook in the state of Illinois.

**ANSWER**:     Defendant admits the allegations contained in Paragraph 2.

3.     The defendants are:

PEAK6 Investments LP, whose street address is:
141 West Jackson Blvd, Suite 500, Chicago, Cook County, IL 60604
Telephone Number: 312-362-2401

Nancy McKinney, Director of Human Resources, whose street address is:
PEAK6 Investments LLC 141 West Jackson Blvd, Suite 500, Chicago, IL 60604
Telephone Number: 312-362-2401

---

[1]  This Answer and Affirmative Defenses are filed on behalf of Defendant PEAK6 Investments LP only.
Defendants Hass, McKinney and Rosenthal are separately and simultaneously filing a Motion to Dismiss
the Complaint against them.

Daniel Max Rosenthal, President & CEO, who street address is:
OptionsHouse/PEAK6 Investments LLC
303 East Wacker Drive, Suite 700, Chicago, IL 60601
Telephone Number: 312-676-8801

Arthur John Hass III, Co-CEO, who street address is:
OptionsHouse/PEAK6 Investments LLC
303 East Wacker Drive, Suite 700, Chicago, IL 60601
Telephone Number: 312-676-8801

**ANSWER**:    Defendant admits the allegations contained in Paragraph 3 only as to

Defendant PEAK6.

4.    The plaintiff employed by (sic) the defendant at 141 West Jackson Blvd., Chicago, Cook
County, IL 60604

**ANSWER**:    Defendant admits that Plaintiff was formerly employed by OptionsHouse,

a subsidiary of PEAK6.

5.    The plaintiff [*check one box*]

(c) **X** was employed but is no longer employed by the defendant.

**ANSWER**:    Defendant admits that Plaintiff was formerly employed by OptionsHouse,

a subsidiary of PEAK6.

6.    The defendant discriminated against the plaintiff on or about, or beginning on or about,
2:45 PM Central Standard Time, in Friday, January 26, 2007.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 6.

7.1 (*Choose paragraph 7.1 or 7.2, do not complete both.*)
(a)    The defendant is not a federal governmental agency, and the plaintiff [check one box] has
**X** filed a charge or charges against the defendants asserting the acts of discrimination indicated
in this complaint with any of the following government agencies:

(i) **X** the United States Equal Employment Opportunity Commission, on or about Tuesday,
    February 20,2007.

(ii) **X** the Illinois Department of Human Rights, on or about Thursday, July 12, 2007.

(b) If charges *were* filed with an agency indicated above, a copy of the charge is attached.
    **X** YES.   NO.

2

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

**ANSWER**:    Defendant admits that Plaintiff filed charges against it with the EEOC and

the IDHR.

8.    (*Complete paragraph 8 only if defendant is not a federal governmental agency*.)

(b) **X** the United States Equal Employment Opportunity Commission has issued a *Notice of Right to Sue*, which was received by the plaintiff on October 18,2007, a copy of which *Notice* is attached to this complaint.

**ANSWER**:    Defendant admits that the EEOC issued Plaintiff a Notice of Right to Sue

and that a copy of that Notice was attached to his Complaint. Defendant lacks knowledge or

information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations regarding

the timing of his receipt of the Notice.

9.    The defendant discriminated against the plaintiff because of the plaintiff's [*check only those that apply*]:  (a) **X** Age (Age Discrimination Employment Act).

**ANSWER**:    Defendant denies the allegations contained in Paragraph 9.

11.    Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

**ANSWER**:    Defendant denies the conduct alleged in the Complaint, but admits that

this Court has jurisdiction over claims alleging violations of the statues listed in Paragraph 11.

12.    The defendant [*check only those that apply*]

(b) **X** terminated the plaintiffs employment.

\*      \*      \*

(g) **X** retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

3

**ANSWER**:    Defendant admits that Plaintiff's employment was terminated on January

26, 2007.  Defendant denies the remaining allegations contained in Paragraph 12.

13.    The facts supporting the plaintiff's claim of discrimination are as follows:  Please see attached document.

**ANSWER**:    Defendant admits that Plaintiff attached a document to his Complaint

containing 155 numbered paragraphs of allegations against Defendant, but denies that those

allegations support his claim of discrimination in any way.   (See Defendant's Answers to

Plaintiff's supplemental allegations below.)

14.    [*AGE DISCRIMINATION ONLY*] Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 14.

15.    The plaintiff demands that the case be tried by a jury.  **X** YES  NO.

**ANSWER**:    Defendant admits the allegations contained in Paragraph 15.

16.    THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

\*        \*        \*

(f)  **X** Direct the defendant to amend the plaintiff's Form U-5 (Uniform Securities Industry Termination Notice) from "Discharged" to "Voluntary Termination."

(g)  **X** If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)  **X** Grant such other relief as the Court may find appropriate.

**ANSWER**:    Defendant denies that Plaintiff is entitled to any of the relief sought in

Paragraph 16.

4

**DEFENDANT'S ANSWERS TO PLAINTIFF'S SUPPLEMENTAL ALLEGATIONS
(ATTACHED TO HIS COMPLAINT IN SUPPORT OF PARAGRAPH 13)**

1.      *Introductory Statement*

I am providing this written document to answer paragraph #13 of my claim against the plaintiffs alleging Age Discrimination claim (sic) against my former employer, PEAK6 Investments LP (i.e. "PEAK6"), located at 141 West Jackson Blvd. Suite 500, Chicago, IL 60604, telephone 312-362-2401 my immediate co-supervisors, Mr. Daniel Max Rosenthal, and Mr. Arthur John Hass III.  Messrs. Rosenthal and Hass are both Co-CEO's of OptionsHouse/PEAK6, Inc. a wholly-owned subsidiary of PEAK6 and is registered as a broker-dealer with the U.S. Securities & Exchange Commission (SEC File # 8-066936) and a registered member broker-dealer of the Financial Industry Regulatory Authority ("FINRA"), formerly known until July, 2007 as the National Association of Securities Dealers ("NASD"), Central Registration Depository Firm #135625. (see Exhibit #) PEAK6 was founded in 1997.

         **ANSWER**:      Defendant denies that Plaintiff was subjected to age discrimination and

denies that the allegations contained in Plaintiff's supplemental statement support his claim of

age discrimination.  Defendant admits the remaining allegations contained in Paragraph 1.

2.      *Personal Background of Robert J. Larson, Plaintiff*

As an introduction, I am 50 years old and a United States citizen.  I was born on June 9, 1957, in Chicago, Illinois.  My mother and father were never married (my father who I have never met was a married man with a wife and family).  I was raised by my grandmother who was a widow throughout the time that I lived with her.  My mother, Mary Elizabeth Mischler, was never married and spent almost fifty years of her life in and out of mental institutions and half-way houses from the time that I was born until she died at the age seventy four on April 15th of this year at St. Elizabeth's Hospital, located at 1431 N. Western Avenue, in Chicago, IL.  I have spent time during my life living in homeless shelters in both Chicago and New York City.  I have never been handed anything in my life.  I have always had to work for anything that I have.

         **ANSWER**:      Defendant admits Plaintiff's date of birth is June 9, 1957.  Defendant lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 2.

3.      I am currently married, with a daughter who is fifteen years of age.  My wife is currently unemployed but is actively searching for work.

         **ANSWER**:      Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 3.

368892.1

4.      Since being discharged by OptionsHouse/PEAK6 Investments LP on January 26, 2007, I have applied for work to almost three thousand brokerage firms, banks, savings & loans and other financial entities.  I  have used up all of my unemployment insurance and financial assets. I was unemployed for nine months until Monday, October 29, 2007, when I obtained a temporary position that pays me on an hourly basis with no other benefits for either myself or my wife and/or daughter   I am earning less than I was making at OptionsHouse/PEAK6.

**ANSWER**:     Defendant admits that Plaintiff's employment with OptionsHouse was

terminated on January 26, 2007.  Defendant lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the remaining allegations contained in Paragraph 4.

5.      During the time that I was unemployed, I used up all of my savings and was forced to the State of Illinois for welfare assistance for me and my family.  We qualified for $408 in monthly food stamps (i.e. via the Link Card) from August through the end of October.  We were also dependant upon the local food depositories and panties [sic] for other assistance (see Exhibit #58).

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 5.

6.      In February 1980, I was honorably discharged from the United States Navy.  I have an undergraduate BS in Business Administration in Finance and Economics with a Minor in Accounting from Rockhurst University located in Kansas City, MO.  I also have an MBA in Finance with a Minor in Economics from DePaul University located in Chicago, IL and I have also attended the John Marshall School of Law, which is also located in Chicago, IL, (see Exhibit #1).

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 6.

7.      I have twenty five years of securities industry experience.  I originally was an NASD Senior Compliance Examiner from April 1982 until August 1986.  I became a registered representative in September 1986 and a registered principal in November 1986.  I have been a Director of Compliance for the last thirteen years for various NASD and Exchange member firms.  I have also been an NASD Arbitrator since November 1990.  Finally, I have been a Vice President and Senior Vice President for various NASD Broker-Dealer member firms.

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 7.

368892.1

8.    I was the President & CEO of First Analysis Investment Corporation, a State of Illinois Registered Investment Advisor from May 2003 until January 2005.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8.

9.    I originally interviewed for the Director of Compliance position which was available at OptionsHouse/PEAK6 (f/k/a ezOptions, Inc.), which is a division of PEAK6 on Tuesday, March 29, 2005.  I had been referred to OptionsHouse/PEAK6 by Mr. Marc B. Horin, the President & CEO of National Compliance Consultants, Inc., (see Exhibits #1 and 2).

**ANSWER**:    Defendant admits that Plaintiff initially interviewed for the OptionsHouse Director of Compliance position on March 29, 2005 and that OptionsHouse is a subsidiary of PEAK6.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 9.

10.    The two individuals who interviewed me were:  Mr. Daniel Rosenthal, President & CEO of OptionsHouse/PEAK6 and Mr. Robert Baldwin, who was at the time the Director of Operations for OptionsHouse/PEAK6.  (Please note that Mr. Baldwin plays a very important role in this case.  I shall refer to him more in detail later in my narrative).

**ANSWER**:    Defendant admits that Plaintiff was interviewed by Messrs. Rosenthal and Baldwin, but denies the remaining allegations contained in Paragraph 10.

11.    At that time, Messrs. Rosenthal and Baldwin told me that the company was not at the stage whereby they would need to hire me as the Director of Compliance but that they would contact me in the future should they need me (see Exhibit #2).

**ANSWER**:    Defendant denies the allegations contained in Paragraph 11.

12.    On or about October 24 2005, I was contacted by Mr. Rosenthal and Richard Bojanowski, who had replaced Bob Baldwin in April 2005 as the Director of Business Development and who told me that the NASD was prepared to approve OptionsHouse/PEAK6 (then known as "ezOptions") as an NASD Membership firm but that the NASD District No. 8 staff felt that a more seasoned person was needed as Director of Compliance.  My name was mentioned to the NASD staff members and they stated that if OptionsHouse/PEAK6 was to hire me that they would accept my registrations and experience and approve the firm for membership. I accepted a position with the firm on Tuesday, October 25, 2005 and met with the NASD District 8 staff for the Pre-Membership Interview (PMI) that afternoon, (see Exhibit #3).

368892.1

**ANSWER**:    Defendant admits that NASD staff indicated to Rosenthal that OptionsHouse's application would more likely be approved with an experienced Compliance Officer, that Rosenthal contacted Plaintiff on or about October 24, 2005 and that Plaintiff was employed effective October 28, 2005.  Defendant denies the remaining allegations contained in Paragraph 12.

13.     My first full workday at OptionsHouse/PEAK6 was Friday, October 28, 2005.  I was told that my direct supervisor was Daniel Rosenthal, the President, but that I would also report to Richard Bojanowski, whenever Mr. Rosenthal was not available.  I was told that my Firm Employee Number is 260, (see Exhibits # 4, #5, #6, #9, #10, and #13).

**ANSWER**:    Defendant admits the allegations contained in Paragraph 13.

14.     At that time, Mr. Rosenthal and I agreed that I would be a probationary full-time employee for the first four months, and that at the end of that period, it would be determined by Mr. Rosenthal if I would become a permanent employee.  I offered to sign an employment contract with OptionsHouse/PEAK6 by [sic] Mr. Rosenthal said that he felt that it would not be needed.  Subsequently, after my four month probationary employment period, I was notified by the firm that I was a permanent full-time employee, annual salary was $120,000 per year, with a bonus determined by PEAK6 management.  During the entire fifteen months I worked for PEAK6 I never received a raise from my $120,000 base salary, (see Exhibits #4, 5, and 6).

**ANSWER**:    Defendant admits that when Plaintiff was hired, he was told that his position would be evaluated on February 28, 2006 to determine whether he would continue to be offered full-time employment, and that his annual salary was $120,000 per year.  Defendant denies the remaining allegations contained in Paragraph 14.

15.     The firm, with me registered as Director of Compliance and Executive Representative with the NASD, was registered as a NASD Broker-Dealer firm on November 3, 2005, (see OptionsHouse Form BD).

**ANSWER**:    Defendant admits only that Plaintiff was listed as the contact person and authorized signatory on OptionsHouse Form BD from November 9, 2005 to December 1, 2006 and that he used the title Director of Compliance.  Defendant denies the remaining allegations contained in Paragraph 15.

368892.1

16.     During the entire time that I was employed by PEAK6, I was a Designated Control Person with the SEC, NASD and all states.   One can verify this by reviewing the OptionsHouse/PEAK6 Form BD filed with the Central Registration Depository during this time, (see OptionsHouse Form BD).

**ANSWER**:     Defendant denies the allegations contained in Paragraph 16.

17.     At the time that I was hired as the Director of Compliance, I had more securities registrations and experience than any other employee of both the parent company PEAK6 and OptionsHouse/PEAK6.   At the time of my termination, I still have more registrations than all of the other 180 PEAK6 employees either individually or combined, (see Exhibits #1, #17, and #45).   These registrations are:

Series 3 - Registered Commodities Representative
Series 4 - Registered Options Principal
Series 7 - General Securities Registered Representative
Series 8 - NYSE Branch Manager/Sales Supervisor Examination
Series 14 - NYSE Compliance Officer Examination
Series 24 - General Securities Registered Principal Examination
Series 27 - Financial & Operations Principal Examination
Series 53 - Municipal Securities Principal Examination
Series 55 - Equity Trader Examination
Series 63 - Uniform Securities Agent State Law Examination
Series 65 - Registered Investment Advisor Examination

**ANSWER**:     Defendant admits that Plaintiff had the registrations listed in Paragraph 17,

but denies the remaining allegations contained in Paragraph 17.

18.     These registrations require that one sit and pass a federal securities examination sponsored by the NASD/NYSE.   Along with registering the firm with the SEC and NASD, I also registered the firm in all fifty states and the District of Columbia and Puerto Rico.   In almost all of these states, I was required to be the Designated Principal, because I had retail industry experience, whereas the other OptionsHouse/PEAK6 employees did not, (see Exhibit #1).

**ANSWER**:     Defendant admits that the NASD/NYSE administers registration

examinations, and admits that Plaintiff registered OptionsHouse with the SEC, NASD and in all

50 states, the District of Columbia and Puerto Rico.   Defendant denies the remaining allegations

contained in Paragraph 18.

368892.1

19.    In many of the states, because the firm had only me as the person with any true retail securities industry experience, OptionsHouse/PEAK6 was only approved as a broker-dealer in those states with the specific requirement that I be the Designated Principal (i.e. Supervisor) of securities transactions within that given state.  Once I was removed, then technically, the registration for OptionsHouse/PEAK6 was to have been revoked also.  You can verify this by contacting each of the fifty states that OptionsHouse/PEAK6 is registered in, (see Exhibit #16).

    **ANSWER**:    Defendant denies the allegations contained in Paragraph 19.

20.    I am also a State-of-Illinois Registered Insurance Producer.  I have had all of the major Illinois insurance producer licenses since 1998.  No other of the 180 PEAK6 employees has any insurance licenses, (see Exhibit #1).  My insurance Licenses are:

Illinois Accident & Health Insurance Producer
Illinois Casualty Insurance Producer
Illinois Fire Insurance Producer
Illinois Variable Contracts Producer
Illinois Long-Term Care Producer

    **ANSWER**:    Defendant admits that Plaintiff had the insurance licenses listed in

Paragraph 20, but denies the remaining allegations contained in Paragraph 20.

21.    When I first started my employment with OptionsHouse/PEAK6, I was included in all of the staff meetings.  I was encouraged to participate.  Then after about three months, I was dropped from the attendance list.  The reason for this I believe is that Daniel Max Rosenthal, President & CEO did not want to hear my input.  There were many times when I would try to tell Mr. Rosenthal that a certain process was not legal or would not be acceptable to the various securities regulators, and he would become angry, like a small child being told that he could not do something.  In one meeting, Mr. Rosenthal told me to "shut up" when I was trying to explain something in front of the entire staff.  At no time during or after the meeting did he even apologize for his rude remark.  It was only after the meeting, that Bob Baldwin apologized to me for Mr. Rosenthal's poor treatment of me, (see Exhibit #25).

    **ANSWER**:    Defendant denies the allegations contained in Paragraph 21.

22.    Shortly after that meeting, Mr. Edward "Whiz" Buckley, PEAK6 Director of Business Development, commenced meeting with all of the departments of PEAK6 in order to develop a better business plan for each department.  OptionsHouse/PEAK6 was also included in this I was invited to the first few initial sessions, at which time I provided my input, - of which I was encouraged to provide.  Unfortunately, Mr. Rosenthal stopped including me in any staff meetings, because, I assume, he did not like my input.  There must have been at least twenty of these meetings, of which matters which pertained to matters of Compliance were discussed.  And I was not invited.  I asked Mr. Rosenthal why I was not invited to these meetings and he told me that they had nothing to do with Compliance, But [sic] in discussing the content of the meetings with other OptionsHouse/PEAK6 employees many aspects of Compliance were discussed.  I feel

that Mr. Rosenthal deliberately discriminated against me because of my age and experience by excluding me from these meetings. Mr. Rosenthal, from my vantage point, was telling me to leave, that he did not want me with the firm any longer, (see Exhibit #25).

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 22.

23.     There was a section dealing with the Single Point Accountability (called an "SPA") for the Compliance Department which I was responsible for, but Mr. Rosenthal entirely eliminated that section. I was never given an opportunity to discuss my role or that Compliance Department within the OptionsHouse/PEAK6 framework.

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 23.

24.     During August 2006, Steve Claussen, one of the PEAK6 traders wanted to open UTMA accounts for his children and trade "naked-options." I refused to approve the accounts and Claussen complained to Rosenthal. Rosenthal then told me to let him trade "whatever he wants to," (see Exhibit #24). Claussen was also approved to trade "naked options" in his 82 year-old mother's trust account, (see the Dorcas Claussen Trust account).

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 24.

25.     In the early fall of 2006, I was asked by Jenny Just to participate in a questionnaire for the 2007, "50 Best Small & Medium Companies to Work for in America" list. I answered the question. I was very honest and gave the firm poor marks in the majority of its employment categories. At the end I wrote this answer to the following question: *If you could change one thing about this company to make it a better place to work, would it be? My answer was, "Bring in Professional Managers."* (see Exhibit #26).

      **ANSWER**:    Defendant denies that Plaintiff was "very honest" in completing the

questionnaire, but admits the remaining allegations contained in Paragraph 25.

26.     Mr. Arthur John Hass III, was hired as the Co-CEO with Mr. Rosenthal of OptionsHouse/PEAK6 in late September 2006, I was told that he would be handling the administrative functions, whereas Mr. Rosenthal would handle the technology of the firm. From that point onward, I dealt with both Messrs. Hass and Rosenthal on Compliance matters, (see Exhibit # 27).

      **ANSWER**:    Defendant admits that Mr. Hass was hired as Co-CEO and that Mr. Larson

dealt with both Messrs. Hass and Rosenthal on Compliance matters, but denies the remaining

allegations contained in Paragraph 26.

368892.1

27.     Even though I am listed as a control person and the Executive Representative for Options House with the NASD, Messrs. Hass and Rosenthal treated me as a clerk.  They ignored my suggestions and comments and did not include me in discussions about firm Compliance.  They had Mr. Richard Bojanowski, the Director of Business Development, (who also oversaw Securities Operations), consult with our outside legal counsel and regulators without including me.  As a standard operating procedure within the securities industry, the Director of Compliance is always designated as the person who acts as the gatekeeper with outside legal counsel.  How could I do my job when I was not allowed to do it, (see Form BD).

      **ANSWER**:     Defendant denies the allegations contained in Paragraph 27.

28.     As the Director of Compliance, I should be the liaison between OptionsHouse/PEAK6 and James D. Van De Graaff, who is our outside counsel and is a Partner at Katten Muchin Rosenman LLP, located at 525 West Monroe Street, Chicago, IL 60661, telephone 312-902-5200, e-mail at james.vandergraaff@kattenlaw.com, during the time that I was employed by PEAK6.  But I was left out of numerous meetings with Mr. Van De Graaff and the staff dealing with legal and compliance matters.  Messrs. Hass and Rosenthal would have Mr. Bojanowski discuss all legal matters with Mr. Van De Graaff.  It was only after a compliance matter has been discussed and decided between Messrs. Bojanowski and Van De Graaff that I would then be notified of what had happened and I feel that my input was neither wanted nor asked for, even though these decisions affected me and the Compliance Department.

      **ANSWER**:     Defendant admits that James D. Van De Graaff of Katten Muchin

Rosenmann LLP is one of PEAK6's outside counsel, but denies the remaining allegations

contained in Paragraph 28.

29.     This was even more frustrating for me because Mr. Van De Graaff and I had worked with each other during my employment with previous employers and Mr. Van De Graaff and I knew one another well prior to my employment with PEAK6.

      **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 29.

30.     I was treated with constant disrespect by Messrs. Hass and Rosenthal on a daily basis.  Numerous meetings were held daily which pertain to my work wherein I am not included in.  I am not in the loop on almost all major decisions, even though, according to the documents filed with the SEC, FINRA and all states I am an active manager involved in the compliance aspect of the firm.  This means that decisions are made that I am regulatorily [sic] responsible for but that I am not involved in or are aware of, (See Form BD and FINRA Quarterly Supervisor List).

      **ANSWER**:     Defendant denies the allegations contained in Paragraph 30.

368892.1

31.    Mr. Rich Bojanowski (Firm Employee #30) and Joel Blumenau (Firm Employee #100), who had both worked with Mr. Rosenthal at PEAK6 for many years were treated like equals by Mr. Rosenthal (Firm Employee #12), even though neither had retail securities industry experience prior to the exposure while OptionsHouse/PEAK6, their input was always valued, whereas my input, honed by twenty five years of real securities industry experience was never taken seriously or with the value that it should have been accorded.  This in my mind is discriminatory.  I was the oldest employee at OptionsHouse/PEAK6 until December 8, 2006, when a Mr. James Halm, at age 51, was hired as the OptionsHouse/PEAK6 Operations Manager. Including Mr. Halm, I was second oldest employees at PEAK6 at the time of my termination.

    **ANSWER**:    Defendant denies the allegations contained in Paragraph 31.

32.    I had my initial PEAK6 Employee Review with Mr. Rosenthal in January of 2006.  I received a positive review, (see Exhibit #14).  I received my 2006 PEAK6 Bonus on or about January 31, 2006, (see Exhibit #15).  At that time I was told that I was a permanent employee.  I was also told in writing that I would have another review on May 16, 2006.  About a week before I was to have my review, Mr. Rosenthal's father passed away.  A trying time for anyone, and I fully understood when I was told that Mr. Rosenthal had postponed my review until later in May, 2006.  Unfortunately for me, Mr. Rosenthal never gave me the review that I was owed.  I am aware that certain other employees did receive their review, Joel Blumenau and Stefani Sandow, two other OptionsHouse/PEAK6 employees that I know of personally.  I asked about my review and was told by Mr. Rich Bojanowski that Mr. Rosenthal had decided not to proceed with my review.  No reason why was ever provided to me, (see Exhibits #18, #19, and #20)

    **ANSWER**:    Defendant admits that Plaintiff received a performance review and a bonus

in January 2006.  Defendant denies the remaining allegations contained in Paragraph 32.

33.    Finally, according to the PEAK6 Policy on Performance Trackers, I was to have also had an Employee Review on or about September 10, 2006.  This means that prior to my termination on January 26, 2007, I was to have had two reviews, one in May 2006 and September 2006, these meetings never occurred.  No reason for this was ever provided to me, (see Exhibit #12)

    **ANSWER**:    Defendant denies the allegations contained in Paragraph 33.

34.    I had spoken about my problem situation with Mr. Rosenthal with Bob Baldwin, Rich Bojanowski and Kelly Lively (all managers at PEAK6) and I had been warned about not angering Mr. Rosenthal because he has a history of getting rid of people he does not like or want to have around.  I assume that his poor treatment of me during my time of employment at PEAK6 was an indication of his dislike of having me around also.

    **ANSWER**:    Defendant denies the allegations contained in Paragraph 34.

368892.1

35.     Another example of my poor treatment by Mr. Rosenthal is that I was the Financial & Operations Principal (i.e. FINOP) for OptionsHouse/PEAK6.  As such I was responsible for reviewing and approving all Financial & Operational Combined Uniform Single (i.e. FOCUS) Reports submitted the NASD.  As such I should have sole discretion of approval, but Mr. Rosenthal insists that Mr. Bojanowski review and approve these reports also, even though Mr. Bojanowski is not a FINOP.  Mr. Bojanowski is twenty years younger than I am.  There are many meetings which pertained to financial and operations matters which I should have participated in but was excluded from, (see Form BD).

        **ANSWER**:     Defendant admits that Plaintiff's employment duties included serving as

OptionsHouse's Financial and Operations Principal, but denies the remaining allegations

contained in Paragraph 35.

36.     During the afternoon of August 2, 2006, there was a "Brain-Storming Session" which included all members of OptionsHouse/PEAK6 and Edward "Whiz" Buckley, PEAK6 Director of Business Development, wherein Mr. Rosenthal requested ideas for improving the number of new account openings from all of the staff.  I contributed at least five suggestions to Mr. Rosenthal (you may verify this with Mr. Edward Buckley).  Mr. Rosenthal complimented me on my suggestions and asked me in front of all meeting members to provide additional work-ups on each idea in writing.  After the meeting I did just that.  Of course he ignored all of my ideas.  As a matter of fact, he had another employee follow-up on my original ideas, even though Mr. Rosenthal told me that we should each follow-up on our ideas.

        **ANSWER**:     Defendant admits that a meeting was held with OptionsHouse employees

on or about August 2, 2006, that Edward Buckley was present and that Plaintiff spoke during the

meeting.  Defendant denies the remaining allegations contained in Paragraph 36.

37.     I sent Mr. Rosenthal various e-mails asking for time to meet with him concerning my ideas and he never responded to any of these e-mails, (see Exhibit #23).

        **ANSWER**:     Defendant admits that Plaintiff sent Rosenthal an email on August 11,

2006.  Defendant denies the remaining allegations contained in Paragraph 37.

38.     On July 21, 2006, I received a second bonus for calendar year 2006, (see Exhibit #21).

        **ANSWER**:     Defendant admits that Plaintiff received $723 in celebration of PEAK6's

ninth anniversary in July 2006.

39.     In April, 2006, Ms. Donna MacDonald was hired as the Director of Compliance for PEAK6, our parent company.  Prior to Ms. MacDonald's hiring I had spoken with Mr. JP Just, one of the PEAK6 senior managers and the brother of Jenny Just, one of the owners of PEAK6 about this position.  Mr. Just asked me if I knew of anyone who might want to take the position and I told him that I could not think of anyone.  I did ask him if he felt that I should apply for the position and he said no, that the OptionsHouse/PEAK6 Director of Compliance position was considered equal in stature to the PEAK6 position.  I might note that JP Just always treated me with the utmost of respect.  I have nothing but good things to say about JP Just, (see Exhibits #45 and #48)

    **ANSWER**:     Defendant admits that Donna MacDonald was hired as PEAK6's Director

of Compliance in April 2006.  Defendant lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations regarding a conversation with Just or Plaintiff's

feelings about Just.  Defendant denies the remaining allegations contained in Paragraph 39.

40.     I had not known Ms. MacDonald before she came to PEAK6, but in working with her, I found her to be fair and hard-working.  I have nothing but good things to say about her.  My understanding of her background was that she had worked as a Compliance Officer at various broker-dealers before coming to work at PEAK6.

    **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 40.

41.     I do want to note though, and this will become important later in my discussions, that Ms. MacDonald is:

Younger than I am.
Has less experience in years and types of firms worked.
Did not have an MBA or had attended Law School.
Was not an NASD Arbitrator.
Has fewer securities registrations, I have eleven, and I was registered in all fifty states and the District of Columbia and Puerto Rico.
I have 4½ on experience as an NASD Senior Compliance Examiner, the regulatory body which oversees the activities of OptionsHouse/PEAK6, she has never worked for the NASD.
Had no Insurance Producer Licenses.
Is not a State of Illinois Notary Public as I am.

    **ANSWER**:     Defendant admits Plaintiff's allegations regarding MacDonald's age and

qualifications, but denies that her age or qualifications evidence that he was discriminated

against in any way.

368892.1

42.    (NOTE:  At this time I would also like to point out that at the time of my being hired by PEAK6 in October, 2005 through and including January 2007, I had more securities industry experience and licenses than any of the other OptionsHouse/PEAK6, Inc. managers, including Daniel Rosenthal, Arthur John Hass, Peter Lawler, Richard Bojanowski, Joel Blumenau (see Exhibits # 45, #46, #47 and #48) and the two owners of OptionsHouse/PEAK6, Matt Hulsizer and Jenny Just).

        **ANSWER**:    Defendant denies the allegations contained in Paragraph 42.

43.    After Ms. MacDonald was hired, an announcement to all of the PEAK6 staff was made and Ms. MacDonald was introduced during a PEAK6 staff meeting.  Even though I had been working for the firm for at least six months longer, at no time did management ever introduce me as the Director of Compliance for Options House, even though Messrs. Bojanowski and Blumenau had been also introduced to the staff also.  As a matter of fact, there have been many instances wherein Messrs. Hass and Rosenthal had gone out of their way to keep the fact that I was the Director of Compliance for OptionsHouse/PEAK6 from all other PEAK6 employees.  I feel this is because they did not want people to know who I was so that they could replace me without difficulty when the time came.  During the entire fifteen month employment period at PEAK6, it caused me great concern and stress to feel that I was not wanted by an employer and that at any moment Messrs. Hass or Rosenthal would replace me without any warning.  Which, as you can see from my complaint eventually happened to me?

        **ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegation that Plaintiff experienced "great concern and stress."

Defendant denies the remaining allegations contained in Paragraph 43.

44.    Finally, Ms. MacDonald had daily compliance input concerning PEAK6 with Mr. Matt Hulsizer and Jenny Just, the husband and wife owners of PEAK6 and OptionsHouse/PEAK6. Not once in the fifteen months that I worked for them did either Mr. Hulsizer or Ms. Just asked for any input or ideas from me concerning compliance matters at OptionsHouse/PEAK6 or PEAK6, even though I was listed as the OptionsHouse/PEAK6 Executive Representative with the NASD (now FINRA) and was considered a control person.

        **ANSWER**:    Defendant admits that Matt Hulsizer and Jenny Just are married and are

owners of PEAK6 and that Hulsizer and Just communicated frequently with PEAK6 Compliance

Officer MacDonald.  Defendant denies the remaining allegations contained in Paragraph 44.

45.    Another example that I feel was discriminatory is that on July 31, 2006, Ms. Tory L. Game was hired as the first OptionsHouse/PEAK6 Client Service Representative.  During the interview process, both Messrs. Bojanowski and Blumenau interviewed Ms. Game and eventually hired her.  Even though I worked with Ms. Game every day and I was considered a control person in the eyes of the SEC, NASD (now FINRA) and state regulators, I was never

included in this hiring process, which I consider wrong. Other Client Service Representatives were hired after Ms. Game and I was omitted from the interview and hiring process for those new hires also. Even though by securities law, I was responsible for the due diligence for each of these employees, (which meant that I was responsible for checking their background with former employers), in many instances, I only found out about an employee being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

      **ANSWER**:    Defendant admits that Ms. Game was hired on July 31, 2006 and that

Plaintiff did not interview Ms. Game or other Client Service Representatives. Defendant denies

the remaining allegations contained in Paragraph 45.

46.    When Mr. Arthur John Hass III, was hired sometime in mid to late September 2006 by Mr. Rosenthal to be the Co-CEO of OptionsHouse/PEAK6, Inc., at no time was I ever included in the interview or hiring process. This again is discriminatory and ignores the fact that I was a control person and I worked with Mr. Hass on a daily basis.

      **ANSWER**:    Defendant admits that Hass was hired in October 2006 and that Plaintiff

did not interview Hass, but denies the remaining allegations contained in Paragraph 46.

47.    There are other instances, such as when Peter Lawler, Jamie Just and James Halm were hired as new employees of OptionsHouse/PEAK6 and yet I was omitted from the interview and hiring process, even though again, by securities law, I was responsible for the due diligence for each of the these employees. I only found out about these employees being hired when they came to work on their first day and I had to have them complete their Compliance Department paperwork.

      **ANSWER**:    Defendant admits that Plaintiff did not interview Lawler, Just or Halm, but

denies the remaining allegations contained in Paragraph 47.

48.    As a side matter, I might point out that I was more qualified to be chosen as sole or Co-CEO than Mr. Hass because I have more financial services experience, registrations and hands-on retail brokerage experience. I have approved over 35,000 customer new account forms, Messrs, Rosenthal and Hass have approved none. I have twenty five years on securities industry experience, Hass had eighteen in investment banking, not retail brokerage and Rosenthal had none at all, (see Exhibits #27 and #47).

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 48.

49.    *Employment Discrimination*

On Friday, September 29, 2006, at approximately 2:00 PM CST, filed with Ms. Nancy McKinney, PEAK6 Director of Human Resources a Letter of Complaint (see Exhibit #25) because I felt that I had had my federal, state and local employee rights violated under at least the Age Discrimination in Employment Act of 1967 and also internal PEAK6 Policy #HR-012(see Exhibit #11), "PEAK6 prohibits discrimination in employment based on any characteristic protected by law, including race, color, national origin, sex, age, religion, disability, or sexual orientation (each of which shall be referred to throughout the rest of this Policy as a "protected characteristic"). Employment discrimination occurs when an employee is adversely affected because of a protected characteristic with respect to any term or condition of employment (including hiring, compensation, advancement, discipline or termination). PEAK6 will take appropriate measures to prevent and/or stop any such discrimination."

        **ANSWER**:    Defendant admits that the language quoted in Paragraph 49 is contained in

PEAK6's Policy Against Discrimination and Harassment. Defendant denies the remaining

allegations contained in Paragraph 49, and further denies that Plaintiff was subjected to

discrimination on the basis of age or any other protected characteristic.

50.    Ms. McKinney told me that she would investigate my allegations but never responded to me. It was not until January 26, 2007, when she was present at my termination meeting that she told me that she had found no violations of my PEAK6 employee rights by Mr. Rosenthal. Not once did I receive any written document from anyone at PEAK6 answering my allegations. As a matter of fact, Ms. Harris of the EEOC told me via the telephone that Ms. McKinney states that she never received my letter, which is not true. At this time also, I told her of an updated letter that I was writing to her called, "history,:" which included other updated complaints which I had, (see Exhibit #27)

        **ANSWER**:    Defendant denies the allegations contained in Paragraph 50.

51.    *PEAKS Internal Complaint Procedure (see Exhibit #11)*

According to PEAK6 Policy #HR-012, "Any employee who believes that he or she has been discriminated against or harassed by a co-worker, manager, executive manager, outside contractor, customer, or other person should promptly report such harassment to the Human Resources Manager (currently Ms. Nancy McKinney)...The Human Resources Manager will promptly and thoroughly investigate all complaints of harassment and, based on the investigation, will take appropriate corrective and preventive action. Every effort will be made to conduct an investigation in as discreetly a manner as possible...If harassment is established, PEAK6 will discipline the offender...The Human Resources Manager will inform the complaining employee of 1) how the investigation was conducted and 2) of any corrective action that was taken."

**ANSWER**:    Defendant admits that the excerpts quoted in Paragraph 51 are contained

in PEAK6's Policy Against Discrimination and Harassment.

52.    *Letter of Information provided to Caria Romano of the Chicago District Office of the NASD (n/k/a FINRA)*
On February 6, 2007, I provided an informational memo to Caria Romano, Senior Vice President and District Director for the Chicago District Office of the NASD (n/k/a FINRA) regarding my concern about the firm's books and records (See Exhibit #37).

**ANSWER**:    Defendant admits that Plaintiff attached a letter to his Complaint dated

February 6, 2007 that was purportedly sent to Ms. Romano.

53.    *Formal Complaints Filed with the U.S. EEOC and the State of Illinois Dept. of Human Rights*
On February 20, 2007, I filed an "in-person" compliant with the United States Equal Employment Opportunity Commission ("EEOC") against PEAK6.  The charge number is 440-2007-03177.  The person who is handling the investigation of my compliant with the EEOC is Ms. Sarronda C. Harris, Federal Investigator with the Chicago District Office of the EEOC located at 500 West Madison Street, Suite 2800, Chicago, IL 60661; telephone 312-886-9320, (see Exhibits #40 and #42).

**ANSWER**:    Defendant admits the allegations contained in Paragraph 53.

54.    Also, on July 20, 2007, I filed with the Illinois Department of Human Rights ("IDHR") a concurrent complaint against  PEAK6.  The charge number is 2007CN3582.  The person who is handling the investigation with the IDHR is Ms. Jacquelyn Turner Hamb, Human Rights Investigator II with the IDHR Office located at 100 West Randolph Street, James R. Thompson Center, Suite 10-100, Chicago, IL 60661, telephone 312-814-6225, (see Exhibits #41, #53, and #54).

**ANSWER**:    Defendant admits the allegations contained in Paragraph 54.

55.    *Letter of Information provided to Merri Jo Gillette of the Chicago Regional office of the US Securities and Exchange Commission*
On July 12, 2007, I provided an informational memo to Merri Jo Gilette [sic], Regional Director of the Chicago Regional Office of the US Securities and Exchange Commission, (see Exhibit #52).

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 55.

54(sic).    One of the requirements of all NASD (n/k/a/ FINRA) member broker-dealers who do a public business is to abide to both Federal SEC and NASD Conduct Rules. OptionsHouse/PEAK6 was approved for NASD membership in November 2005, it was not until August 2006 that the firm had any public customers, (and these were basically PEAK6 family related accounts).

**ANSWER**:    Defendant admits that NASD member broker-dealers are required to comply with federal SEC and NASD Conduct Rules, but denies the remaining allegations contained in Paragraph 54.

55(sic).    The NASD had conducted its New Membership Examination in April and May 2006.  Due to the fact that we had done no business at the time of the initial examination, the NASD Examination staff - and me for that matter - could only assume and estimate how the firm's regulatory reporting would work,

**ANSWER**:    Defendant admits that NASD conducted a New Membership Examination in approximately April or May 2006.  Defendant denies the remaining allegations contained in Paragraph 55.

56.    After our initial NASD Membership Examination, there were two areas that were of a concern for me:
   a.    <u>Daily OATS Reporting</u>

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 56.

57.    The daily reporting of Order Audit Trail System (i.e. "OATS") eligible securities, by OptionsHouse/PEAK6 to the NASD (as required by NASD Rule 6950 and 6951-6958, see the NASD Manual).  During the early part of 2006 I registered the firm with the NASD OATS Reporting System.  The MPID for our firm was:  EZOP and I was designated as the OATS Administrator for OptionsHouse/PEAK6.  (see Ex# ___ (sic) for an example of an OATS Report).

**ANSWER**:    Defendant admits that OptionsHouse is registered with the NASD's OATS Reporting System, that its Firm Identification was "EZOP," and that Plaintiff was designated as its OATS Administrator during his employment.

58.    When the NASD had conducted its initial New Member Examination, we had thought that Merrill Lynch Execution (MLCX), one of our order execution firms, would report our

OATS-eligible trades for us. I registered OptionsHouse/PEAK6 with OATS and I was the designated OATS Administrator. Our firm's Market Participant Identification (i.e. "MPID") was "EZOP". I designated "MLCX" as our OATS Reporting Firm, for which they initially acknowledged that they would do. Since we had done no business, and would not do any business until August 2006, this was all well and good.

**ANSWER**: Defendant admits that OptionsHouse is registered with the NASD's OATS

Reporting System, that its Firm Identification was "EZOP," and that Plaintiff was designated as

its OATS Administrator during his employment. Defendant denies the remaining allegations

contained in Paragraph 58.

59. Apparently though, there were disagreements between the senior management of OptionsHouse/PEAK6 and the senior management of Merrill Lynch Execution concerning execution charges and OATS reporting responsibilities. As such, the execution agreement between OptionsHouse/PEAK6 and Merrill Lynch Execution was cancelled. The senior management of OptionsHouse/PEAK6 then signed an execution agreement sometime in late August 2006 with a firm called Interactive Brokerage, (i.e. "IB"). IB agreed to execute out trades, but that they would not do our OATS reporting for us.

**ANSWER**: Defendant admits that PEAK6 entered into an agreement with Interactive

Brokerage in August 2006, but denies the remaining allegations contained in Paragraph 59.

60. It should be noted at this time that I was never included in any of these agreement meetings with either Merrill Lynch or Interactive Brokerage. I was only provided with a copy of the contracts for filing in the Regulatory Storage Files after all of the agreements had been signed and finalized.

**ANSWER**: Defendant denies the allegations contained in Paragraph 60.

61. During a meeting concerning our order execution held in late August 2006. A discussion arose questioning that since IB was not going to be our OATS Reporting Firm, it was decided by Daniel Rosenthal, OptionsHouse/PEAK6 President & CEO, that OptionsHouse/PEAK6 would report its own OATS Eligible trades directly to OATS. In other words, we would become a Direct OATS Reporting Member. It was at this time that I stressed to all members of the firm, not just management that we would be in OATS violation if we did any OATS eligible trades and did not report them. Mr. Rosenthal told me that we would just have to move forward with reporting the OATS trades and the person who we hire to construct ours OATS Reporting System would have to move quickly. I voiced my concern to Mr. Rosenthal at this time that there was no exemption from OATS Reporting. He told me that we should move forward and not worry about such things. The people present at this meeting were: myself as Director of Compliance; Daniel Rosenthal, President & CEO; Richard Bojanowski, Director of Business Development (CRD# 4040154 and who had replaced Robert Baldwin earlier in the year); Joel

Blumenau, Director of Customer Service (CRD#2592445); Gong Szeto, Director of Marketing; and Dave Budworth, Director of Management Information Services. I was also told by Mr. Rosenthal that Ms. Donna Joy MacDonald (CRD#1178698) the Director of Compliance for PEAK6 Investments, LLC and the owners of the firm, Matt Hulsizer and Jenny Just had also been notified of my concerns.

      **ANSWER**:     Defendant denies the allegations contained in Paragraph 61.

62.    In September 2006, after numerous inquiries about OATS reporting on my part, Mr. Rosenthal hired Mr. Robert Lund as the person who would write the computer programs for connecting OptionsHouse/PEAK6 to the OATS System. Mr. Lund had worked with Mr. Budworth in California for a number of years prior to Mr. Budworth's move to Chicago. Mr. Budworth spoke very highly of Mr. Lund, both as a personal friend and fellow worker. Mr. Lund moved from California to Chicago in early September 2006 to start his new job at OptionsHouse/PEAK6. When I met Mr. Lund, I found him to a laid-back, personable and very knowledgeable computer program designer and writer. Mr. Lund had worked with Mr. Budworth at a firm I believe was called "e-Loan," it specialized in finding mortgage loans for prospective home buyers on the Internet. I had great confidence that Rob Lund would get the job done with all respect to OATS reporting.

      **ANSWER**:     Defendant admits that PEAK6 hired Mr. Lund in August 2006. Defendant denies that Mr. Lund's hire was in any way related to purported "inquiries" by Plaintiff or that Lund's duties included any responsibility for OATs. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 62.

63.    Rob Lund had never worked with the OATS System, so I printed out a copy of the NASD OATS Technical Specifications Manual and a copy of the OATS Administrative Manual. He kept the OATS Technical Manual and I kept the OATS Administrative Manual.

      **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 63.

64.    Rob started working on designing an OATS Reporting System immediately upon his arrival. I know that Rob Lund had numerous meetings over the next five month period with Mr. Rosenthal concerning the status of development of the OATS system. During this time we transacted trades in OATS-eligible securities and no Daily OATS Report was ever filed. I stressed to Mr. Rosenthal that it was a severe violation of NASD OATS Rules and SEC Rules 17a-3 and 17a-4 not to report either: 1) the eligible trades themselves and 2) the fact that we were deficient in our OATS Reporting capabilities. Mr. Rosenthal told me to be silent and in no way was I to notify any regulator about our OATS situation. I told Mr. Rosenthal that if the SEC or

NASD discovered this situation, they would fine and/or possibly close the firm. He told me that that was for him to worry about, not me. Mr. Richard Bojanowski, the Director of Business Development, who was also responsible for the firm's operations also voiced the same concerns to Mr. Rosenthal and he too, was told to remain silent.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 64.

65.    On or about Wednesday, September 13, 2006, I held a Continuing Education Program Meeting attended by ALL employees of OptionsHouse/PEAK6 wherein the only subject covered was the OATS Reporting System. Every OptionsHouse/PEAK6 employee, both registered and non-registered, attended the meeting. A signed attendance sheet should be in the CEP File for review and verification. During this CEP Meeting, I covered all aspects of OATS. I provided each employee with a copy of all of the OATS Rules taken directly from the NASD Manual. I also included copies of all of the NASD Notices-to-Members pertaining to OATS. I provided a pass-around-copy and I then reviewed the OATS Administrative Manual for everyone to read and ask questions of me about OATS. I then introduced Rob Lund, let everyone know that he would be writing our new OATS Reporting Program and I then provided a pass-around-copy of the OATS Technical Specifications Manual. I also again, during this meeting, reiterated that we not reporting our current OATS trades and that we needed to have the OATS Reporting System up and running as soon as possible.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 65.

66.    Mr. Lund worked on our internal OATS Reporting System from September 2006 through and including the first week of January 2007. During that time, not one single OATS Report was filed by OptionsHouse/PEAK6. I continued to tell Mr. Rosenthal that even though Mr. Lund was creating a new OATS Reporting System, our firm was in violation of both the NASD OATS Reporting Rules and the NASD and SEC Books and Records Rules. Mr. Rosenthal told me to remain silent about the matter and that no regulator should be notified of these violations. Mr. Rosenthal threatened to terminate me for reporting these violations to any regulatory entity.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 66.

67.    The next week, on Monday, October 2, 2006, Mr. Arthur John Hass III joined the firm as Co-CEO. On Wednesday, October 4, 2006, at approximately 3:15 PM, I met with Messrs. Rosenthal and Hass to provide them with a copy of the NASD Disciplinary Guidelines pertaining to violations of the NASD OATS System (see Exhibit #22).

**ANSWER**:    Defendant denies the allegations contained in Paragraph 67.

68.    Again, both Messrs. Rosenthal and Hass warned me to keep my mouth shut and not report the matter to any regulator or risk termination. I was also told not to put any of my concerns in written form and never e-mail either of them concerning the matter so that any regulatory agencies investigating the matter could not find a paper trail. At that time, I told them that the firm had violated OATS Reporting Rules for over sixty straight calendar days.

**ANSWER**:     Defendant denies the allegations contained in Paragraph 68.

69.     On or about Wednesday, October 11, 2006, at around 2:00 PM, I contacted Ms. Nichole C. Clark-Ake, who is the Director of Compliance and Chief Compliance Officer of Penson Financial Services, Inc., 1700 Pacific Avenue, Suite 1400, Dallas, Texas, 75201, telephone 214-765-1000.  (Note: Penson is the firm who OptionsHouse/PEAK6 clears all of the firms securities transactions through on a "fully-disclosed" basis).  I notified her of the violations of the OATS Reporting Rules by OptionsHouse/PEAK6.  I also asked her to contact Messrs. Rosenthal and Hass and reiterate to them the severity of the violations of not reporting the transactions on a timely basis.  I contacted her later and she told me that she did discuss the matter with Messrs. Rosenthal and Hass and That they were aware of the potential regulatory problems.  In February 2007, Ms. Cark-Ake and I discussed the possibility of me accepting a job with Penson.  Please review the section entitled "Penson Job."

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations regarding Plaintiff's purported communications with Clark-

Ake.

70.     During this time also, the firm also hired Mr. Peter Traugutt Lawler, (CRD#1131068) as the Director of Institutional Business.  I recall  and employee meeting in early November 2006 wherein Mr. Lawler attended where again I reiterated to all who were present that were violating NASD OATS Reporting Rules by not having an OASTS [sic] reporting System.  So he also was well aware of the firm's OATS violations.

**ANSWER**:     Defendant admits that Lawler was hired on March 3, 2006, but denies the

remaining allegations contained in Paragraph 70.

71.     It was also at this November 2006 meeting that I discussed SEC Release 34-54585 (I.e. [sic] SR-NASD-2005-101) which expanded the OATS reporting requirements to OTC Equity Securities effective in early 2007.

**ANSWER**:     Defendant denies the allegations contained in Paragraph 71.

72.     At that November 2006 meeting, Messrs. Rosenthal and Hass assured all who were present that Mr. Lund was diligently working on the completion of the OATS Reporting System for OptionsHouse/PEAK6.  At that time, the firm was close to failure to file OATS Reports for calendar ninety days.

**ANSWER**:     Defendant denies the allegations contained in Paragraph 72.

73.    On Tuesday, January 2, 2007, without any prior notice, at around 10:30 AM, Mr. Lund came to me to say good-bye.  He said to me, "it just did not work out between OptionsHouse/PEAK6 and him and that he was returning to California."  I wished him well.  He worked for OptionsHouse/PEAK6 approximately four months and never finished our OATS Reporting System.

   **ANSWER**:    Defendant admits that Lund's employment with OptionsHouse terminated

on January 9, 2007.  Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of Plaintiff's allegations regarding his purported communications with Lund.

74.    I immediately went to Messrs. Rosenthal and Hass to let them know that we should report via telegraph the lack of an OATS Reporting System to the SEC and NASD immediately, as required by SEC Rule 17a-11, paragraphs (d) and (e) and the amended NASD Rule 3170.  I told them that we should send immediate telegraphic notice to the SEC and NASD and notify all of the states that we were registered in also.  Both Messrs. Rosenthal and Hass instructed me to remain silent about the matter and not tell anything about our OATS reporting problem to any regulator.

   **ANSWER**:    Defendant denies the allegations contained in Paragraph 74.

75.    At this time, OptionsHouse/PEAK6 had failed to report OATS eligible trades to the NASD from late August 2006 through and including January 2007, some five months.

   **ANSWER**:    Defendant denies the allegations contained in Paragraph 75.

76.    On the day of my termination from OptionsHouse/PEAK6, January 26, 2007, I estimate that the firm had failed to file some 110 business days of required OATS Reports.

   **ANSWER**:    Defendant denies the allegations contained in Paragraph 76.

77.    My other concern dealt with:

   **ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the incomplete allegation contained in Paragraph 77.

78.    2) Daily Review of E-Mails and Instant Messages
The daily review of e-mails and Instant Messages with and to clients, (required by SEC Rules 17a-3 and 17a-4, see pages 1234-1235, NASD Manual and NASD Conduct Rule 3010, Supervision, paragraphs (d)(2) and (d)(3), Review and Retention of Correspondence, see the NASD Manual.

368892.1

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the incomplete allegations contained in Paragraph 78.

79.    One of the SEC and NASD required functions is that a Registered Principal review a representative daily sample of the firm's sales-related e-mails and Instant Messages (IMs).  I was responsible for this function.  When the NASD Examiners had visited the firm in April and May of 2006, we had no customers, so the only e-mails that we had were operational e-mails, which I reviewed on a daily basis.  There were no problems.  After the NASD and left and in August 2006, when we started to do a business, I determined that I was not getting all of the e-mails for proper review.  I was also not receiving any Instant Messages for review.  I have never had an IM account through OptionsHouse/PEAK6, but in other firms which I have worked for, have had IM systems and I was responsible for the review of those sales-related communications also.

**ANSWER**:    Defendant admits that the SEC and NASD require brokerage firms to review sales-related emails and instant messages and that reviewing such messages was part of Plaintiff's duties, but denies the remaining allegations contained in Paragraph 79.

80.    Sometime in September 2006, I approached Mr. Rosenthal and asked him when OptionsHouse/PEAK6 would provide me with a proper review system foe [sic] Instant Messages.  Mr. Rosenthal told me that once Rob Lund had finished the OATS Reporting System that he would then assist me with creating proper review system.  When it became apparent that Rob Lund would not be able to assist me, Mr. Rosenthal told me that Mr. Dave Budworth, the Director of MIS would either help me himself or find someone else to assist me.  I never heard from anyone else.  Whenever I would ask about the IM review system, I would be told that it was on their "list of things to do" but was not considered a high priority item.  Currently, OptionsHouse/PEAK6 has no IM Review System.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 80.

81.    Mr. Lund also worked on our E-Mail and Instant Message Review System from September 2006 through and including the first week of January 2007.  During that time, I was unable to property review all incoming or outgoing e-mail and instant message correspondence.  I continued to tell Mr. Rosenthal that even though Mr. Lund was creating a new E-Mail and Instant Message Review System, our firm was in violation of both the NASD Conduct Rule 3010 and the NASD and SEC Books and Records Rules.  Mr. Rosenthal told me to remain silent about the matter and that no regulator should be notified of these violations.  Mr. Rosenthal threatened to fire me for reporting these violations to anyone.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 81.

82.     Numerous times I warned both Messrs. Rosenthal and Hass about possible violations of NASD and SEC Books and Records Rules.  I told them that according to SEC Rule 17a-11 paragraphs (d) and (e), we were required to notify both the NASD and SEC of these violations. They chose not to listen to me.

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 82.

83.     I had wanted to contact the NASD to report these potential violations but was instructed by Messrs. Rosenthal and Hass not to contact either to the NASD or SEC about these books and records problems.

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 83.

84.     A Mr. Robert Lund was hired in early September, 2006 to work on these books and records problems but he left the Firm on January 2, 2007.

      **ANSWER**:    Defendant admits that Lund was employed by PEAK6 from August 2006

to January 2007, but denies the remaining allegations contained in Paragraph 84.

85.     Finally, on January 26, 2006, some three weeks after Robert Lund left the firm, I was laid-off.  I was told by Messrs. Hass and Rosenthal that OptionsHouse/PEAK6 no longer had any need for my services.

      **ANSWER**:    Defendant admits that Plaintiff was terminated on January 26, <u>2007</u>.

86.     *Holiday Party for 2005*
In early January 2006, the Holiday Party for 2005 was held for all PEAK6 employees.  I attended the party without my wife or daughter.  During the party, both Matt Hulsizer and Jenny Just, the owners of OptionsHouse/PEAK6 said hello to me.  Rather than thanking me for my hard work in registering the firm with the SEC, NASD and all fifty states, they commented to me that they had never been forced to hire an employee before.  They said it to me in such a condescending and insulting manner that I was taken aback.  If they were angry with the NASD for being forced to hire me, then they should have taken their frustrations out on the NASD not me.

      **ANSWER**:    Defendant admits that Plaintiff attended PEAK6's employee holiday party

in January 2006, but denies the remaining allegations contained in Paragraph 86.

87.     *My Medical Condition Discussed*
In April 2003 I had heart surgery performed at Louis A Weiss Memorial Hospital, located at 4640 North Lake Shore Drive, Chicago, Illinois.  I had been born with an enlarged heart and leakage to two of my heart valves.  It was thought by my cardiologist that it would be appropriate to correct the leakage problems and check out the overage condition of the heart.

368892.1

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 87.

88.    The surgery went well and I was proscribed various medication to take for the rest of my life.  These chronic condition medications are:

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 88.

89.    Diovan HCT Tablets 160/12.5 mg - Valsartan and Hydrochlororothiazide - and is an angiotensin II antagonist and thiazide diuretic combination used to treat high blood pressure and congestive heart failure.  I am to take two of these tabs each day.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 89.

90.    Lipitor Tablets 20mg - Atorvastatin - and is an HMG-CoA inhibitor used to lower cholesterol.  I take one of these tabs each day.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 90.

91.    Celebrex Capsules 200 mg - Celecoxib - and is a non stereroidal medicine (NSAID) for anti-inflammation.  I take one of these capsules each day.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 91.

92.    When I went to work at PEAK6 I promptly notified Michael Lazenby and Gael Day of the Human Resources department of my need to continue these medications.  Both Michael and Gael told me that there would be no trouble for the PEAK6 insurance carrier, Destiny Health.  On December 29, 2005, I completed the Destiny Health/PEAK6 Chronic Medication Benefit registration to insure these medications for me.  From that point onward, each quarter, I would be charged $204.00 for these chronic medications and Destiny would be billed $648.41 for the balance.  These charges occurred on 2/23/06; 5/03/06; 7/11/06; and 11 /13/06.  (se Exhibits #7 and #8) [sic].

368892.1

**ANSWER**:      Defendant admits that Plaintiff completed a Medication Benefit Registration Form on December 29, 2005, and that Plaintiff was charged insurance premiums related to his employee health care coverage.  Defendant denies the remaining allegations contained in Paragraph 92.

93.      Finally, on April 12, 2006, I was notified by my orthopedic specialist, Dr. Henry A. Finn, MD, FACS, Director of the University of Chicago Bone & Joint Replacement Center located at Weiss Memorial Hospital, office telephone 773-564-5888, that both of my natural knees were damaged beyond repair as a result of a lifetime of running.  Dr. Finn estimated that to replace both knees with prosthetic joints would cost close to $40,000.

**ANSWER**:      Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 93.

94.      When I told Gael Day of this she wished me well.  She asked when I might have this surgery done and I told her that I wanted to wait until 2007 because I was only 48 years old at the time and this year I turned 50 years-old.

**ANSWER**:      Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 94.

95.      Michael and Gael were both replaced by Nancy McKinney when she became the PEAK6 Director of Human Resources in the spring of 2006.  I feel that part of the reason for PEAK6 terminating me was to save on drug costs and the fact that I had planned on having my orthopedic surgery this year, even though they did not overtly state that.  By terminating me in January, they were assured of saving almost $45,000 in medical expenses

**ANSWER**:      Defendant admits that PEAK6 hired McKinney on June 27, 2006 as Director of Human Resources.  Defendant denies the remaining allegations contained in Paragraph 95.

96.      *My Daughter Meets Matt Hulsizer*
One of the things that Matt Hulsizer and Jenny Just, owners of OptionsHouse/PEAK6 always stressed to the PEAK6 staff was how they wanted every employee to feel that each was part of an extended family.  They made formal announcements that they wanted employees to bring their children to work so that they (Matt and Jenny) could meet them.

368892.1

**ANSWER**:     Defendant admits that PEAK6 and OptionsHouse are congenial workplaces.     Defendant denies that Hulsizer or Just made formal announcements about employees bringing children to work.

97.     One day during the summer of 2006, I brought my daughter Lisa (who was thirteen years old at the time) to work with me.  I had received approval for this so Lisa and I were looking forward to being together for the day.  Overall, we had a pleasant visit until about two o'clock in the afternoon.  Hulsizer/Just enjoy modern art so they have decorated the office located at 141 West Jackson with various works of modern art.

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 97.

98.     One of the new artworks that they had just installed prior to my daughter Lisa's visit was a very large portrait located on the east wall of the trade room showing a "Man Covering His Face" (which is what I will call it).  Lisa asked about it and I told her that it was new and I knew nothing about it.  We went over to check to see if there was a description for it but it was so new that it had none at that time.

**ANSWER**:     Defendant admits that a large portrait is displayed in PEAK6's trade room.

Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 98.

99.     I noticed Hulsizer was on the trade floor.  I thought that it would be a wonderful time to introduce my daughter Lisa to him and he could describe his new artwork to her.  So Lisa and I started to approach Hulsizer as he headed for the stairway leading up to the fifth floor offices.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 99.

100.     I started to open my mouth to introduce Lisa to him when he yelled at me in a very unfriendly voice, "What do you want?  I am in a hurry to make a phone call."  At that moment I realized that he had no interest in meeting my daughter.  I told him that it was not important.  I looked at my poor daughter Lisa and I could tell that she was crushed.  We returned to my desk and she spent the last few minutes of the day in silence.  From that moment onward, Lisa never asked about my workplace again nor did she ever ask to come to work with me again.  This showed me the type of jerk Matt Hulsizer truly was.  There are other examples of this that occurred almost on a daily basis.

**ANSWER**:     Defendant denies that Hulsizer made the statements quoted in Paragraph

100.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations contained in Paragraph 100.

101.    *Christmas Party for 2006*
In early to mid December 2006, OptionsHouse/PEAK6/PEAK6 [sic] had its Christmas Party at a
restaurant called Nine, located at Randolph and Canal Streets in Downtown Chicago.  At that
time there had been discussion about the situation with the ongoing capabilities of
OptionsHouse/PEAK6 and the fact that it was still in the 'Start-Up' mode.

**ANSWER**:     Defendant admits that it hosted a holiday party at the restaurant Nine in

December 2006.  Defendant denies the remaining allegations contained in Paragraph 101.

102.    At this time, both Messrs. Hass and Rosenthal both assured the entire staff that "PEAK6,
and Matt and Jenny (the owners) were committed to the OptionsHouse/PEAK6 concept and that
none of us had to worry about loosing (sic) our jobs."  I took them at their word, as did all of the
other employees.  I fully understand that what they said does not constitute a binding promise or
agreement, but they had no reason to make such statements if they were not true.  It should be
noted that the Parent Company, PEAK6 Investments, LLC earned in excess of $150,000,000
dollars in calendar year 2006, according to Mr. Bob Baldwin, and even though the
OptionsHouse/PEAK6 division lost money, overall the Parent Company and subsidiaries made
more than enough in profits.

**ANSWER**:     Defendant denies the allegations contained in Paragraph 102.

103.    *Annual Bonus Week (see Exhibits #28, and*
The week of January 22-26, 2007 as (sic) the PEAK6 Annual Bonus Week.  It is at this time that
all PEAK6 employees received an Annual Bonus.  Nancy McKinney, the Director of Human
Resources for PEAK6 sent a firm-wide e-mail notifying all PEAK6 employees (including
myself, see Exhibit #28 that the Annual Bonus was to be paid on January 31, 2007, and that on
either Tuesday, January 23rd or Wednesday, January 24th, we would be notified of our bonus
amount.  Since I had been paid an Annual Bonus in January 2006, (see Exhibit #15) I expected to
also receive an Annual Bonus for 2007 also.  I received from the PEAK6 Human Resources
Department an Election Form for tax withholding which I had also received and completed in
January 2006 indicating the amount of federal taxes I wanted withheld from my Annual Bonus
Amount.

**ANSWER**:     Defendant admits that McKinney sent employees an email regarding

bonuses on January 19, 2007 and that Plaintiff attached a copy of that email to his Complaint.

Defendant further admits that it provided Plaintiff a federal tax withholding form in January

2006.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff's bonus expectations.  Defendant denies the remaining allegations contained in Paragraph 103.

104.     Tuesday and Wednesday came and went and I still had not received my bonus amount notification.  Finally, during the morning of Friday, January 26, 2007, I asked Daniel Rosenthal when I might be meeting with him about my Annual Bonus and he told me that there were still some others who had not received their bonus amounts and to not worry, that he would meet with me that afternoon.  At no time did he or Arthur John Hass III tell me that I would not be receiving my Annual Bonus.

     **ANSWER**:     Defendant denies the allegations contained in Paragraph 104.

105.     On Friday, January 26th, the tax withholding election form was to have been filed with the PEAK6 Human Resources Department by no later than 3:00 PM.  At approximately 1:30 PM, I contacted Teresa Grissom of the PEAK6 Human Resources Department via e-mail notifying her of the fact that I had still not received my Annual Bonus amount and could not provide her with my Tax Election Form.  Ms. Grissom replied via e-mail and told me not to worry, that when I received my Annual Bonus Amount, to then file the Tax Election Form with the PEAK6 Human Resources Department, (see Exhibit #29).

     **ANSWER**:     Defendant denies the allegations contained in Paragraph 105.

106.     Of 183 current employees of PEAK6 who were employed on Friday, January 26, 2007, the majority of the employees received a bonus, also the letters from McKinney and Grissom lead me to believe that I would receive one.  Again, I had received a Annual Bonus the year before, (see Exhibit #15).

     **ANSWER**:     Defendant admits that Plaintiff received an annual bonus in 2006.

Defendant denies the remaining allegations contained in Paragraph 106.

107.     *Termination Meeting (see Exhibits #30, #31, #32 and #33)*
On Friday, January 26th, at 2:45 PM, I received a telephone call from Nancy H. McKinney, the PEAK6 Director of Human Resources requesting that I come to see her in her office.  When I arrived in here [sic] office at 2:50 PM, Messrs. Hass and Rosenthal where there in her office.  I was told by Messrs. Hass and Rosenthal that they were, "no in longer in need of my services" and that I was being let go.  They told me that I could claim unemployment and that they would not contest it.  Ms. McKinney then asked me for my Access Key Card which allowed me access to the PEAK6 Office, I immediately gave it to her.

     **ANSWER**:     Defendant admits the allegations contained in Paragraph 107.

108.    At no time did they thank me for my hard and dedicated work that I performed during my fifteen months of employment.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 108.

109.    At no time did they offer to provide to me a "Reference Letter" for prospective employers.

**ANSWER**:    Defendant admits the allegations contained in Paragraph 109.

110.    At no time did they offer me a financial "severance package," in order to help me and my family live during the time that I would be searching for a new job.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 110.

111.    At no time did they provide me with the annual bonus that I was led to believe would be paid to me on that day.

**ANSWER**:    Defendant denies that Plaintiff was entitled to receive a bonus on January

26, 2007, and further denies that he was "led to believe" he would receive a bonus.

112.    At no time did they wish me well or offer words of encouragement that I would find another job.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 112.

113.    McKinney, Rosenthal and Hass treated me as if I was a piece of human garbage. Someone to be used and then replaced, like a computer of [sic] copy machine. They tried to hurry through the exit meeting that I began to feel as if I was taking up their precious time because I was asking questions and not leaving quickly enough.

**ANSWER**:    Defendant denies the allegations contained in Paragraph 113.

114.    Finally, it was at this time also that they provided me with a legal waiver document wherein for a payment of $5,000 less payroll taxes, I would waive all of my federal, state and local employee legal rights and not discuss my employment experience with any other person or entity. I told them that I had no intention of signing such a document and that $5,000 was an insult. Ms. McKinney told me that I had twenty one calendar days (i.e. until Friday, February 16, 2007) to change my mind and sign the document (see Exhibit #30).

**ANSWER**:    Defendant admits that Plaintiff was provided with a copy of a Confidential

Separation Agreement and that he declined to sign that document.

368892.1

115.    I told them that I had no intention of signing the document.  Mr. Hass then told me that already interviewed and hired my replacement.  Also, he told me that Donna MacDonald would take over as the OptionsHouse/PEAK 6 Director of Compliance and that the person that they had just hired would report directly to Donna.  I later discovered that the person they had replaced me with was a Mr. Carl M. Kunz, (see Exhibit #49).  Mr. Kunz and I had both worked at the NASD at different times.  I had known him socially through a series of focus groups that he and I had participated in 2004 sponsored by the Commerce Clearing House (CCH) which is located here in Chicago on Petersen Avenue.  At the time that he was hired to replace me, he was working for David A. Noyes & Company, a NYSE member firm.

   **ANSWER**:    Defendant admits that Plaintiff declined to sign the Confidential

Separation Agreement, and that Kunz was hired by PEAK6 subsequent to Plaintiff's termination.

Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations concerning Plaintiff's relationship with Kunz.  Defendant denies the remaining

allegations contained in Paragraph 115.

116.    In comparing my termination from PEAK6, at other firms, when I have been laid off, I have received financial severance; payment for outsourcing services; paid extended insurance for me, my wife and 14 year old daughter; and $500 for resume creation and copying and miscellaneous fees resting to a job search.  At PEAK6 I received nothing.  I was hustled out of the building like a criminal and I was not allowed to say good-bye to any of my fellow staff members.

   **ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations concerning Plaintiff's separation from employment with his

previous employers.  Defendant denies the remaining allegations contained in Paragraph 116.

117.    In other words, I was thrown away like garbage.  I am a human being, not trash.  I did my job and I was treated like some used piece of equipment being discarded for some new piece of equipment.

   **ANSWER**:    Defendant denies the allegations contained in Paragraph 117.

118.    I also have the following questions regarding these actions regarding Donna Macdonald:
   a.    Why was Donna MacDonald selected over me when am older and I have more experience than she does.  I have twenty five years of securities industry experience, she has ten.
   b.    I had worked that at PEAK6 firm six months longer than Donna has.
   c.    I had been an NASD Senior Compliance Examiner, she has no NASD experience.
   d.    I have more securities registrations than she has.

34

e.    I have been a President & CEO of a Registered Investment Advisor, she has not.
f.    I have six different insurance licenses, she has none.
g.    I have been an NASD Arbitrator for over sixteen years, she has never been an NASD Arbitrator.
h.    I have an MBA from DePaul University, she has no MBA.
i.    I have attended the John Marshall Law School, she has ho law school experience.
j.    Finally, even if she was chosen over me, why did they lay me off when I could have done my job and reported to Ms. MacDonald?  At no time was I provided with a choice as to whether I wanted to stay.  I do not know the credentials of the person who has been hired to replace me, but I should have been provided with an opportunity to retain my current at the time that I was laid-off.

**ANSWER**:    Defendant denies Plaintiff's allegations regarding MacDonald asserted in

his "questions" in Paragraph 118.

119.   I now also have the following questions regarding these actions regarding Carl Kunz:
a.    Why was Carl Kunz hired to replace me?  At no time was I notified by any member of PEAK6 management that I was not performing my job properly.
b.    I am older and I have more experience than he does.  I have twenty five years of securities industry experience, he has twelve.
c.    I have more securities registrations than he has.  When I was discharged, I had over twenty years experience as a Registered Op ions Principal ("ROP").  He did not become a ROP until the day after I was terminated (1/27/2007).  That means that I had twenty years of ROP experience when I was the firm's Director of Compliance.  He had ONE DAY.
d.    I have been a President & CEO of a Registered Investment Advisor, he has not.
e.    I have six different insurance licenses, he has none.
f.    I have been an NASD Arbitrator for over sixteen years, he has never been an NASD Arbitrator.
g.    I have an MBA from DePaul University, he has no MBA.
h.    I have attended the John Marshall Law School, he has ho law school experience.
i.    Mr. Kunz had a full time job at David A. Noyes & Company, Inc. before he was hired by OpitonsHouse/PEAK6.  Why did the management hire him when I could have continued working at PEAK6.

**ANSWER**:    Defendant denies Plaintiff's allegations regarding Kunz asserted in his

"questions" in Paragraph 119.

120.   During the exit interview, Mr. Rosenthal then asked me if I wanted to resign rather than being laid off and for Form U-5 (i.e. the federal securities form which notifies the SEC, NASD and all of the states of the reason for your termination from a securities firm, See Exhibit #32) purposes and I said that I definitely wanted my Form U-5 to state that I was "Laid-Off", I had no intention of resigning from OptionsHouse/PEAK6/PEAK6 [sic].  I had done nothing wrong to resign.

368892.1

**ANSWER**:    Defendant admits that Plaintiff was given the opportunity to resign his

employment rather than having his employment terminated, that Plaintiff rejected the offer and

that the reason for termination is listed on Form U-5.  Defendant denies the remaining allegations

contained in Paragraph 120.

121.    Messrs. Hass and Rosenthal then left Ms. McKinney's Office and I told he [sic] that I felt
that they had violated my federal employee rights.  I also to her where to find my updated letter
to her dated September 29, 2006, (see Exhibit #25).  Ms. McKinney told me that it was too late
to allege a violation of my employee rights and but that she would read my September 29, 2006
letter to her.  I told her to look on my computer for a file named, "History" which was dated
January 12, 2007 and included updated comments by me about both Hass and MacDonald (see
Exhibit # 27).

**ANSWER**:    Defendant admits that at Plaintiff's termination meeting, he informed

McKinney of a letter on his computer and that it was in a file named "History."  Defendant

denies the remaining allegations contained in Paragraph 121.

122.    *Clean Out Desk*
On Friday, January 26th at 3:10 PM I was escorted by Ms. McKinney to my desk and I boxed
my personnel affects and at 3:15 PM was escorted by Ms. McKinney from the firm's office.  I
will note at this time that Nancy McKinney at no time was rude or disrespectful toward me either
on this last day or during the seven months that she had been the PEAK6 Director of Human
Resources.  But again, I was hustled out of the PEAK6 offices without a chance to say good-bye
to any of my fellow employees.

**ANSWER**:    Defendant denies that Plaintiff was "hustled out" of PEAK6's office on

his last day of work, but admits the remaining allegations contained in Paragraph 122.

123.    *Comments Made to Me by Mr. Robert Baldwin, a PEAK6 Manager*
After I was laid-off, I had a telephone conversation with a Mr. Robert "Bob" Baldwin.  Bob
Baldwin had been the other person with Daniel Rosenthal who interviewed me in January 2005.
He then worked with me in the OptionsHouse/PEAK6 Division from October 2005 until he was
transferred to the Technology Division of PEAL6 [sic] during the summer of 2006.

**ANSWER**:    Defendant admits that Baldwin and Rosenthal had interviewed Plaintiff

prior to his hire.  Defendant lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegation concerning a telephone conversation with Baldwin.

124.    As a PEAK6 manager who I had worked for while at OptionsHouse/PEAK6 and other divisions of PEAK6, Bob told me that I had done a very fine job and that there had been no reason for Messrs. Rosenthal and Hass to terminate me.  His final statement to me was that I should find an attorney and sue PEAK6 for violating me [sic] company and employee rights.  He told me that he would be willing to testify on my behalf.

      **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations concerning a telephone conversation with Baldwin.

125.    He continued by saying that it was well known throughout PEAK6 that Mr. Rosenthal did not like me and that was the reason for me being laid-off.

      **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations concerning a telephone conversation with Baldwin.

126.    Mr. Baldwin retired from PEAK6 in April 2007, but you can still contact him at home by calling 1-312-588-1592.

      **ANSWER**:     Defendant admits that Baldwin retired from employment with PEAK6 on

February 28, 2007 and was subsequently retained in the fall of 2007 as a consultant to

OptionsHouse.

127.    A week later, I met with Mr. Richard Bojanowski, he told me that on the Monday following my termination, (i.e. January 29, 2007), Mr. Rosenthal announced during a morning staff meeting with the rest of the staff that I had received a financial package to quite (sic).  That was a lie, I did not quite [sic] and I never received any financial package to leave the firm.

      **ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations regarding Plaintiff's purported communications with Mr.

Bojanowski.  Defendant denies the remaining allegations contained in Paragraph 127.

128.    *Book and Records Violations Disclosed to the NASD*
On Tuesday, February 6, 2007, at 10:30 AM CST I hand delivered a written report to Ms. Carla Romano, Senior Vice President and District 8 Director of the violations that were occurring at OptionsHouse/PEAK6/PEAK6, (see Exhibit #37).  I would like to note that Ms. Romano and I worked as examiners together in the District 8 NASD (n/k/a FINRA) Offices in the early to mid 1980s.

368892.1

**ANSWER**:    Defendant admits that Plaintiff attached a letter to his Complaint dated

February 6, 2007 that was purportedly sent to Ms. Romano.

129.    *Compliance Positions Advertised by Penson Financial*
As I had mentioned previously, Nichole Clark-Ake was the Director of Compliance for Penson, the firm which provided OptionsHouse/PEAK6 with back-office support. This is quite common in the securities brokerage industry. It is commonly called being "fully-disclosed" through Penson Financial.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 129.

130.    After my discharge from PEAK6, sometime in early February 2007, I came across an advertisement in the *National Society of Compliance Professionals* ("NSCP") *Jobline* (see www. nscp.com/jobline) which stated that they were looking for a Senior Compliance Officer, the firm looking for this person was Penson Financial, the firm who PEAK6 cleared through. I submitted my resume via the internet and on or about February 15, 2007. (See Exhibits #38 and #39). I received a call from Ms. Pam Silveus, who was the Director of Human Resources. Penson as you may recall is headquartered in Dallas, Texas. Ms. Silveus asked me if I would be interested in working for Penson in Dallas. I told her that I might be, that I had worked in Dalles [sic] for the NASD as a Senior Compliance Examiner during 1985. Ms. Silveus asked me if I knew Nichole Clark-Ake, the Director of Compliance and Legal Counsel and I said yes, that I had worked with her during my time at OptionsHouse/PEAK6. Ms. Silveus told me that Ms. Clark-Ake would call me and discuss the position. A few days later Ms. Clark-Ake called me. We spoke for about an hour. She seemed quite interested in hiring me. She then told me that she would contact Daniel Max Rosenthal, my immediate supervisor at OptionsHouse/PEAK6 and get back to me. After speaking to Mr. Rosenthal, Ms. Clark-Ake and Ms. Silveus showed no interest in all with either hiring or interviewing me.

**ANSWER**:    Defendant denies Rosenthal spoke with Clark-Ake. Defendant lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 130.

130 (sic).        I feel that Penson was quite interested in me but that Rosenthal and PEAK6 bad-mouthed me and lost all interest in me. I applied for a Second job as Trade Surveillance Officer with Pension but again they showed no interest (see Exhibits /#43 and #44).

**ANSWER**:    Defendant denies that Rosenthal or PEAK6 "bad-mouthed" Plaintiff.

Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the remaining allegations contained in Paragraph 130.

368892.1

131.    *Compliance Position Advertised by PEAK6*
On or about March 16, 2007, while reviewing the *National Society of Compliance Professionals ("NSCP") Jobline* (see www.nscp.com/jobline) I came across a PEAK6 advertisement looking for a Director of Compliance for OptionsHouse/PEAK6 and PEAK6 Advisors, a related company of PEAK6 which also happens to be a Registered Investor Advisor pursuant to the Investment Advisers Act of 1940, (see Exhibit #50).  This is a position in which I am perfectly suitable for, since I had been the Director of Compliance and CCO for OptionsHouse/PEAK6 and a former President of First Analysis Investment Corporation, a State of Illinois RIA.  I applied for the position via the internet (see Exhibit #51) with my current resume which I sent to Nancy H. McKinney.  Ms. McKinney has never had the courtesy to respond to my application.  My question is, why was I discharged when I was the most suitable person for this job even before I was discharged?

        **ANSWER**:    Defendant admits that Plaintiff sent McKinney an email regarding a

Director of Compliance position.   Defendant denies the remaining allegations contained in

Paragraph 131.

132.    *Books and Records Violations Disclosed to the SEC*
On June 12, 2007, I mailed via Certified US Mail a letter to Ms. Merri Jo Gillete, Regional Director of the Midwest Regional Office of the United States Securities and Exchange Commission notifying her of the books and records violations that I felt had or were still occurring at OptionsHouse/PEAK6, (see Ex #52 ).

        **ANSWER**:    Defendant admits only that Plaintiff attached a copy of a document to his

Complaint that was purportedly sent to Ms. Gillette.

133.    *False Allegations Made by PEAK6*
On Monday June 25,2007, Ms. Sarronda Harris of the US EEOC called me to let me know that she had received a response from PEAK6 concerning my allegations.

        **ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of Plaintiff's allegations concerning his purported communications with Ms.

Harris.

134.    Ms. Harris stated that I had refused to work with Ms. Donna Macdonald the other Compliance Officer at PEAK6.  This is a lie.  My response to Ms Harris is provided below.

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Harris.

135.    *Good Afternoon Ms. Harris:*

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Plaintiff's purported communications with Harris.

136.    *I wanted to write to you concerning something that you said that the management of PEAK6 stated to you in their response letter.*

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Harris.

137.    *According to them, Donna Macdonald, the PEAK6 Director and I were equals. That is what I was told when Ms. Macdonald started, some six months after I started working at PEAK6. But this was not the case, (as my letter to Nancy McKinney of September 29, 2006 also addressed).*

   a.    *Ms. Macdonald met on at least a weekly or bi-weekly basis with Matt Hulsizer/Jemmy Just [sic], the owners of OptionsHouse/PEAK6/PEAK6. In the fifteen months that I worked at PEAK6, I never once was invited to meet with Hulsizer. [sic] Just to discuss compliance matters.*

   b.    *Ms. Macdonald was invited to the weekly senior management meetings, I was not.*

**ANSWER**:     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Harris.

368892.1

138.    *Ms. MacDonald was invited to the Fall 2006 Senior Manager Workshop held off site away from the firm's corporate offices. I was not invited, even though they say that Ms. Macdonald and I were equals. If you look at my experience vs. Ms. MacDonald's, you will see that I had more experience than she does and I should also have been included in these meetings.*

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Ms. Harris.

139.    *Finally, concerning my interaction with my fellow employees. One reason for me being so emphatic is that I was attempting to convince senior management that the firm was violating federal "Books and Records Rules" from early September 2006 until the day that I was terminated from PEAK6 (i.e. January 26, 2007) and that the firm should have filed SEC Rule 17a-11 Telegraphic Notice to both the SEC and NASD for violating these books and records rules, But senior management refused to file these required notices and continually ignored my warnings.*

*Thank you.*

*Robert J. Larson*

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Harris.

140.    *Alleged Incorrect Use of the Choice Point AML System*
Ms. Harris also stated to me that PEAK6 alleged that I had incorrectly used the Choice Point Anti-Money Laundering System, which is an outside vendor-provided product to verify whether a potential client was on one of numerous Anti-Money Laundering lists. Apparently, management of PEAK6 - after I had been terminated - has come up with statement that I incorrectly used the Choice Point System. I would like to point out that during the time that I used the Choice Point System, Mr. Rich Bojanowski, the Director of Business used the same system during the same period and no comments were made that the results were incorrect. If I was not following the system correctly, the Mr. Bojanowski was not either.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff's allegations concerning his purported communications with Ms. Harris.   Defendant admits that Plaintiff had incorrectly used the Choice Point Anti-Money Laundering System while employed with PEAK6.   Defendant denies the remaining allegations contained in Paragraph 140.

141.    *Brokerage Supervisor Position Advertised by PEAK6 after Termination*

**ANSWER**:    Defendant admits that PEAK6 advertised an opening for a Brokerage Supervisor Position following Plaintiff's termination.

142.    0n August 25, 2007, PEAK6 advertised that they were looking to hire a Brokerage Supervisor (see Exhibit #56).   Again, I was more than qualified for the position.   I again submitted my resume to Ms. Nancy H. McKinney, *(see Exhibit #57) and as with the Compliance Officer position, I have yet to receive a response from either Ms. McKinney and/or PEAK6 concerning this position.

**ANSWER**:    Defendant admits that PEAK6 advertised an opening for a Brokerage Supervisor Position and that Plaintiff submitted his resume to McKinney.   Defendant denies the remaining allegations contained in Paragraph 142.

143.    Why I was not retained and reassigned to one of these positions rather than summarily terminated.

**ANSWER**:    Defendant states that this is a question posed by Plaintiff for which no response is required.

148(sic). *OptionsHouse Moves from PEAK^ [sic] Offices to their Own Offices*
Sometime in October 2007, the OptionsHouse subsidiary moved its physical location from the Trading Floor of PEAK6 at 141 West Jackson Blvd. to 303 East Wacker Drive, Chicago, Illinois, 60601, telephone: 312-676-8801.   Rosenthal, Hass and the other members of OptionsHouse moved to this address.   They also rehired Bob Baldwin, who had retired from PEAK6 earlier in the year.   Nancy H. McKinney remained at the PEAK6 office located on Jackson Blvd.

**ANSWER**:    Defendant denies that Mr. Baldwin was rehired in October 2007.   Defendant admits the remaining allegations contained in Paragraph 148.

368892.1

149.    *Illinois Department of Human Rights Fact Finding Conference held on November 20, 2007 (see Exhibits #55, #63 and #64)*
On November 20, 2007, Ms. Melonie Morgan-Tyler (tel 312-814-6212) conducted a Fact Finding Conference starting at 9:00 AM CST. Present were Robert Larson, Pro Se, Daniel Max Rosenthal, Nancy McKinney and Ms. Sally Scott, Esq. of Franczek Sullivan PC, Attorneys at Law. Mr. Arthur John Hass III failed to attend the meeting even though he was required to provide attend. No reason was given for him not attending. Shortly before the conference and after the conference, Ms. Morgan-Tyler tried to help settle the case between Larson and PEAK6 but the members of PEAK6 refused to settle.

**ANSWER**:    Defendant admits that a fact-finding conference was held at the

Department of Human Rights on November 20, 2007 and that Plaintiff, Rosenthal, McKinney

and Scott were present. Defendant denies the remaining allegations contained in Paragraph 149.

150.    *Closing Comments*
I feel that the actions taken by certain managers of OptionsHouse/PEAK6 evidence violation of my employee rights under the Age Discrimination in Employment Act of 1967. I received my Right to Sue Letter dated October 18, 2007 from the US Equal Employment Opportunity Commission, (see Exhibit #61).

As it is now, I am unemployed, have no insurance for either myself or my wife (see Exhibits #34, #35 and #36). During the time that I was unemployed, my daughter Lisa, was [sic] been approved for the State of Illinois Department of Human Services "AIIKIds" [sic] Program, (Public Aid Insurance).

**ANSWER**:    Defendant admits that Plaintiff was issued a Right to Sue letter by the

EEOC. Defendant denies that it discriminated against Plaintiff in any way. Defendant lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 150.

151.    In April of this year my family and I were forced to move from a nice two bedroom apartment located in Evanston, IL to a small one bedroom apartment in a much less nice neighborhood located in Chicago, IL as a result of my being discharged by PEAK6.

**ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in Paragraph 151.

152.    If I was still working for PEAK6, I would have earned from February 1 until October 29, 2007 a gross salary of $90,000, (i.e. nine months at $10,000 per month) which would have been more than sufficient to pay all of my bills and provide for my family. I have had three credit

368892.1

cards terminated because I could not make the minimum monthly payments, there [sic] cards are: American Express, Discover Card, and the Optima Card, I have over $70,000 in credit card bills, (see Exhibits 59, #60 and #62).

      **ANSWER**:    Defendant denies Plaintiff "would have earned" $90,000 from February 1, 2007 through October 29, 2007.  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 152.

153.    During the late summer until October 29, 2007, the State of Illinois Department of Human Services provided my family with $408 in monthly Food Stamps (via the Link Card).

      **ANSWER**:    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 153.

154.    None of these terrible events would have happened to me or my family.if [sic] I had not been illegally terminated by PEAK6 as I was.

      **ANSWER**:    Defendant denies that Plaintiff was "illegally terminated by PEAK6." Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning "events" that purportedly "happened to" Plaintiff and/or his family.

155.    By the way, last year PEAK6 earned over $150,000,000 in income with just 180-190 employees, I was not terminated for economic reasons.

      **ANSWER**:    Defendant denies the allegations contained in Paragraph 155.

## AFFIRMATIVE DEFENSES

1.    To the extent Plaintiff alleges any claims that are beyond the scope of a timely charge of discrimination filed with the EEOC or IDHR, those claims are barred.

2.    Upon information and belief, Plaintiff has failed to mitigate his damages and therefore, any relief is barred.  In the alternative, to the extent Plaintiff has mitigated his damages, any relief must be reduced by his earnings, compensation and benefits during the relevant time period.

3.     Plaintiff's Complaint is barred because Defendant exercised reasonable care to prevent and promptly correct any harassing or discriminatory behavior and Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by Defendant.

4.     Plaintiff cannot recover punitive damages because Defendant undertook good faith efforts to comply with federal and state anti-discrimination laws and to prevent discrimination and retaliation.

5.     All decisions made by Defendant with respect to Plaintiff were made in good faith and for legitimate, non-discriminatory reasons.

Respectfully submitted,

PEAK 6 INVESTMENTS, LP

s/Thomas J. Posey
One of Its Attorneys

Sally J. Scott (A.R.D.C. #06204350)
Thomas J. Posey (A.R.D.C. #06280886)
Franczek Sullivan P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300
sjs@franczek.com
tjp@franczek.com
Dated:  March 6, 2008

368892.1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 6, 2008, I electronically filed the foregoing **DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT** with the Clerk of the Court using the CM/ECF system and sent notification of such filing to the party listed below by depositing a true and correct copy of same, postage prepaid, in the U.S. Mail chute at 300 South Wacker Drive, Chicago, Illinois, prior to 5:00 p.m. on this 6th day of March, 2008:

> Mr. Robert J. Larson
> 5334 North Kenmore
> Apartment No. 1N
> Chicago, Illinois 60640

> s/Thomas J. Posey
> One of Defendant's Attorneys

Sally J. Scott (A.R.D.C. #06204350)
Thomas J. Posey (A.R.D.C. #06280886)
Franczek Sullivan P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300
sjs@franczek.com
tjp@franczek.com
Dated:  March 6, 2008

368892.1